EXHIBIT A

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>WILLIAM A. LOGAN, JR. (BAR NO 115042)<br>LOGAN MOONEY LLP<br>100 Pine Street, Suite 1250<br>San Francisco, CA 94111<br>TELEPHONE NO.: (415) 738-0758   FAX NO.: (415) 376-0956<br>ATTORNEY FOR *(Name)*: 300 Prospect Properties, Inc., a California Corporation | FOR COURT USE ONLY<br><br>**FILED**<br>San Francisco County Superior Court<br><br>SEP 24 2019<br><br>CLERK OF THE COURT<br>BY: _____<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco 94102
BRANCH NAME: Civic Center Courthouse

CASE NAME:
300 Prospect Properties, Inc. v. 180 Sansome Street Tenant LLC, et al.

| CIVIL CASE COVER SHEET<br>[X] Unlimited  [ ] Limited<br>(Amount  (Amount<br>demanded  demanded is<br>exceeds $25,000)  $25,000 or less) | Complex Case Designation<br>[ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER:<br>CGC-19-579504<br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[X] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [X] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a.[X] monetary  b.[X] nonmonetary; declaratory or injunctive relief  c.[X] punitive
4. Number of causes of action *(specify)*: Two
5. This case [ ] is  [X] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 9/23/19

William A. Logan, Jr.
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET**<br>CEB<br>www.ceb.com | Cal. Rules of Court, rules 2.30, 3.220, 3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
Uninsured Motorist (46) *(if the
    case involves an uninsured
    motorist claim subject to
    arbitration, check this item
    instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
        Wrongful Death
Product Liability *(not asbestos or
    toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice–
        Physicians & Surgeons
    Other Professional Health Care
        Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip
        and fall)
    Intentional Bodily Injury/PD/WD
        (e.g., assault, vandalism)
    Intentional Infliction of
        Emotional Distress
    Negligent Infliction of
        Emotional Distress
    Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
    Practice (07)
Civil Rights (e.g., discrimination,
    false arrest) *(not civil
    harassment)* (08)
Defamation (e.g., slander, libel)
    (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
        *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease
        Contract *(not unlawful detainer
        or wrongful eviction)*
    Contract/Warranty Breach–Seller
        Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
        Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
        Case
Insurance Coverage *(not provisionally
    complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
    Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
    drugs, check this item; otherwise,
    report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
        Case Matter
    Writ–Other Limited Court Case
        Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
        Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
    *(arising from provisionally complex
    case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of
        County)
    Confession of Judgment *(non-
        domestic relations)*
    Sister State Judgment
    Administrative Agency Award
        *(not unpaid taxes)*
    Petition/Certification of Entry of
        Judgment on Unpaid Taxes
    Other Enforcement of Judgment
        Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
    above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-
        harassment)*
    Mechanics Lien
    Other Commercial Complaint
        Case *(non-tort/non-complex)*
    Other Civil Complaint
        *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
    Governance (21)
Other Petition *(not specified
    above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
        Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
        Claim
    Other Civil Petition

**CIVIL CASE COVER SHEET**

CEB
www.ceb.com

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

180 SANSOME STREET TENANT LLC, a New York limited liability company;
WEWORK COMPANIES, INC., a Delaware corporation, and DOES 1-50, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

300 PROSPECT PROPERTIES, INC., a California Corporation

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: San Francisco County Superior Court <br> *(El nombre y dirección de la corte es):* <br> 400 McAllister Street <br> San Francisco, CA 94102 | CASE NUMBER: <br> *(Número del Caso):* <br> CGC-19-570504 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
William A. Logan, Jr.
100 Pine Street, Suite 1250, San Francisco, CA 94111
(415) 738-0758

| DATE: <br> *(Fecha)* | SEP 24 2019 | CLERK OF THE COURT, by <br> *(Secretario)* | MALENA POLONIO <br> SUMMONS | , Deputy <br> *(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
           ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

CEB
www.ceb.com

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

1   WILLIAM A. LOGAN, JR. (BAR NO. 115042)
2   LAURA M. MOONEY (BAR NO. 203692)
    **LOGAN MOONEY LLP**
3   100 Pine St., Suite 1250
    San Francisco, CA 94111

4   Tel: (415) 738-0758
    Fax: (415) 376-0956
5   E-mail: wlogan@loganmooneyllp.com

6   Attorneys for Plaintiff
7   300 Prospect Properties, Inc.,
    a California Corporation

**FILED**

San Francisco County Superior Court

SEP 24 2019

CLERK OF THE COURT
BY: _____
                    Deputy Clerk

8                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                        **COUNTY OF SAN FRANCISCO**

10                          **UNLIMITED JURISDICTION**

11

12   300 PROSPECT PROPERTIES, INC., a          Case No: CGC-19-579504
     California Corporation;
13                                             **COMPLAINT FOR BREACH OF**
                                               **CONTRACT AND**
14                 Plaintiff,                  **INTERFERENCE WITH**
                                               **CONTRACT**
15        v.

16   180 SANSOME STREET TENANT LLC, a New
     York limited liability company; WEWORK
17   COMPANIES, INC., a Delaware corporation, and
     DOES 1-50, inclusive,

18                 Defendants.

19

20        Plaintiff 300 Prospect Properties, Inc. complains of defendants and alleges as follows.

21        1.     Plaintiff 300 Prospect Properties, Inc. ("Plaintiff") is, and at all times alleged herein

22   was, a corporation duly formed and existing under the laws of the State of California, doing business

23   in the County of San Francisco, California.

24        2.     Defendant 180 Sansome Street Tenant LLC is a New York limited liability company

25   and authorized to do business, and doing business, in San Francisco County, California, with a

26   principal office in San Francisco County, California ("Defendant WeWork").

27

28

3.      Defendant WeWork Companies, Inc. is a Delaware corporation and authorized to do business in California, and is a guarantor of Defendant WeWork's performance under the lease entered into between Plaintiff and Defendant WeWork that is at issue in this action.

4.      The true names and capacities of each of the remaining Defendants sued herein as Does 1 through 50 are presently unknown to Plaintiff, who therefore sues each such Defendant by a fictitious Doe name pursuant to CCP § 474. Plaintiff is informed and believes and thereon alleges that each Defendant named herein as a Doe was in some manner responsible for the occurrences and injuries to Plaintiff as alleged in this complaint. Plaintiff is further informed and believes and thereupon alleges that each of the Defendants named herein as a Doe was acting as an agent and representative of each of the other Defendants named herein and within the scope of his, her or its authority. Plaintiff will amend this complaint to substitute the true names and capacities of these Defendants as their true names and the facts upon which their liability depend are fully ascertained.

5.      On or about November 29, 2018, Plaintiff, as landlord, and Defendant WeWork, as tenant, entered into a written lease whereby Defendant WeWork leased from Plaintiff Floors 2-4, 6-7, 9, 11-12 and 14-18 in Plaintiff's building located at 180 Sansome Street, San Francisco ("the Premises"). Hereinafter, the term "the Building" shall mean Plaintiff's building located 180 Sansome Street, San Francisco. A true copy of the Lease is attached hereto as Exhibit A and is incorporated by this reference ("the Lease").

6.      Defendant WeWork's use of the Premises is to operate a business that provides office suites and shared office workplaces to its subscribing members. Lease, ¶¶ 1H-1I. Upon execution of the Lease, Defendant WeWork undertook to perform leasehold improvement work in the Premises. *See* Lease, Exhibit B.

7.      At the time the Lease was entered into and continuously thereafter, Defendant WeWork knew and has known that Plaintiff has contracts with other tenants in the Building to lease space, and Defendant WeWork knew the identity and type of business for each of those tenants, specifically: (1) that the tenant on the Building's Tenth Floor is the Climate Policy Initiative ("CPI"), a climate think tank; (2) that the tenant on the Building's Eight Floor is INSEEC, a private French

1    school; and (3) that the tenant on the Building's ground floor is Rumble, a group fitness gym with

2    locker facilities on a lower floor served by the Building's elevator.

3        8.      In recognition of Plaintiff's contracts with its other tenants, the Lease contains specific

4    provisions governing Defendant WeWork's tenant improvement work and grants Plaintiff the right to

5    restrict the times during which Defendant WeWork could perform specific types of construction

6    activity.  Specifically, Defendant WeWork agreed as follows:

7        "All such [tenant improvement] work [by Defendant WeWork] will be performed in a
         first class manner causing no interference with the operation of the Building and no
8        unreasonable noise, odors or inconvenience to Landlord or the other tenants of the
         Building; provided, however, Landlord acknowledges and agrees that *Tenant may*
9        *perform all work at all times (i.e. 24 hours a day, 7 days a week) except the*
         *following types of work: (i) shooting of studs for mechanical fastenings*; (ii)
10       installations of any vertical support; (ii) testing of fire alarms (except in the event of
         an emergency) *(iv) core drilling; (v) penetration or floors or ceilings; and (vi) any*
11       *work that can be heard outside of the Premises which Landlord reasonably believes*
         *will interfere with the quiet enjoyment of other tenants or as to which Landlord*
12       *receives [sic] or more reasonable complaints from other tenants in the Building.*  If,
         in connection with any alterations to the Premises (including in connection with any
13       plumbing work), Tenant reasonably needs access to the ceiling of the area on any non-
         Premises floor immediately beneath any floor of the Premises Landlord shall arrange a
14       time (which may be after Business Hours, including on the weekend) to allow Tenant
         access to such other tenant's space (subject to any rights of such tenant regarding
15       access by outside parties) to perform the applicable portion of the alterations, provided
         that Tenant shall pay for after-hours supervision by Landlord's engineer or other
16       Landlord-designated supervisor.  Tenant shall pay the cost of all after-hours and
17       weekend security, engineering and other staff reasonably required by Landlord on
         account of such work."
18

19

20   Lease, ¶ 8.C (emphasis added) and *see* Ex. B, ¶ 3 (all WeWork architects, contractors and

21   subcontractors shall comply with all rules, regulations and requirements in the Lease).

22       9.      In accordance with the Lease, Plaintiff directed defendant WeWork that the contract

23   activities specified in Paragraph 8.C. of the Lease could not be performed during normal business

24   hours, *i.e.*, Monday through Friday, 8:00 a.m. to 6:00 p.m.  *See* Lease, ¶ 1.M (definition of business

25   hours).

26       10.     Defendant WeWork further agreed in the Lease that it "will not do or permit anything

27   to be done in or about the Premises which will in any way unreasonably obstruct or interfere with the

28

rights of other tenants or occupants of the Building or injure or unreasonably annoy them, nor shall

Tenant . . . make or permit any unreasonable or unnecessary noises or odors in or upon the Premises.

Tenant will not commit, or suffer to be committed, any waste upon the Premises or any nuisance

(public or private) or other act or thing of any kind or nature whatsoever that may disturb the quiet

enjoyment or cause unreasonable annoyance of any other tenant in the Building." Lease, ¶ 10.B.

11.    Beginning on or about May 16, 2019, and continuing through the filing date of this

Complaint, Plaintiff received complaints from CPI, the tenant on the Building's 10th Floor, regarding

Defendant WeWork's construction activities during normal business hours, Monday through Friday,

8:00 a.m. to 6:00 p.m.  Those tenant complaints included multiple instances of Defendant WeWork

performing construction work that is specifically barred by Paragraph 8.C. of the Lease, *i.e.*, core

drilling and the penetration of the floor in CPI's leased premises on at least two occasions, and

generating excessive noise that CPI contended was interfering with the quiet enjoyment of the

premises.

12.    In response to CPI's complaints regarding Defendant WeWork's construction

activities, Plaintiff's representatives investigated Defendant WeWork's construction activities in the

Building and confirmed that on multiple occasions, Defendant WeWork was performing construction

activity during normal business hours that are specifically barred by Paragraph 8.C. of the Lease, *i.e.*,

core drilling and the penetration of the floor in CPI's leased premises.  Plaintiff's representatives also

confirmed that Defendant WeWork was performing construction work that could be heard outside of

the Premises which Plaintiff reasonably believed interfered with CPI's quiet enjoyment of its

premises while the noise was on-going, which conclusions Plaintiff communicated to Defendant

WeWork.

13.    Plaintiff immediately communicated each complaint it received from tenant CPI to

Defendant WeWork and demanded that the offending construction work cease.  In addition, Plaintiff

delivered a letter to WeWork dated July 26, 2019, detailing Defendant WeWork's construction

activities in violation of the Lease.  A copy of Plaintiff's July 26, 2019, letter is attached hereto as

Exhibit B.  Defendant WeWork responded by letter dated August 2, 2019, in which it, *inter alia*,

agreed to "reschedule its current work on Floor 11 from normal business hours to after hours and the

1    weekends in response to your request and to minimize any impact on the 10th floor tenant." Despite

2    Defendant WeWork's representation in its letter dated August 2, 2019, Defendant WeWork

3    continued to perform work on Floor 11 during normal business hours that generated noise complaints

4    from tenant CPI after August 2, 2019, including as soon as August 5, 2019, which complaint by CPI

5    consisted of "the usual drilling/hammering" by defendant WeWork.

6        14.    By letter dated August 22, 2019, Plaintiff's counsel informed Defendant WeWork of

7    its continued violations of the Lease. A copy of Plaintiff's counsel's letter to Defendant WeWork is

8    attached hereto as Exhibit C.  To date, Defendant WeWork has not responded to Plaintiff's August

9    22, 2019, letter.

10       15.    Plaintiff thereafter continued to receive noise complaints regarding Defendant

11   WeWork's construction activities from tenant CPI, including multiple instances of Defendant

12   WeWork performing drilling work during normal business hours.

13       16.    In August, 2019, the tenant on the 8th Floor, INSEEC, returned from its summer

14   recess and expressed concerns to Plaintiff regarding the noise generated by Defendant WeWork's

15   construction activity in the Building, especially in light of INSEEC's intent to resume classes with

16   paying students in September, 2019.

17       17.    In early September, 2019, tenant INSEEC resumed classes on the 8th Floor and

18   immediately complained to Plaintiff regarding excessive construction noise from Defendant

19   WeWork's work in the Building that interfered with INSEEC's ability to conduct classes on the 8th

20   Floor.  That noise complaint was immediately communicated to defendant WeWork, with the

21   demand that Defendant WeWork cease all such work.  Thereafter, tenant INSEEC complained again

22   about excessive construction noise generated by Defendant WeWork that interfered with its use of its

23   premises, which Plaintiff immediately communicated to WeWork.  At the same time, Plaintiff

24   continued to receive noise complaints from tenant CPI.

25       18.    In addition to Defendant WeWork's repeated and numerous violations of the Lease in

26   performing construction activities specifically barred by the Lease, Defendant WeWork further

27   disrupted Plaintiff's relationships with its tenants by damaging the Building's elevators.  On or about

28   August 14, 2019, a subcontractor engaged by Defendant WeWork struck a sprinkler head on Floor 4

1  that caused flooding, including water damage to the elevators that service the Building.  As a result,

2  there is now only one functioning elevator in the Building.  It has been reported to Plaintiff that

3  permanent repair of all three elevators may take months.  This has caused an already tenuous

4  relationship between Plaintiff and its tenants to become even more unstable and uncertain, all of

5  which has been caused by the actions of defendant WeWork.

6      19.    In performing the tenant improvements in the Building, Defendant WeWork has acted

7  in complete disregard of its obligations under the Lease regarding prohibited construction activities

8  and in disregard of the disruption that its conduct is and would cause to Plaintiff's relationship with

9  the other tenants in the Building.

10     20.    Pursuant to the Lease, defendant WeWork Companies, Inc. "absolutely,

11 unconditionally and irrevocably guarantee[d]" to Plaintiff "the full and prompt performance and

12 observance of all of the obligations of [Defendant WeWork] under the Lease", which guaranty "is an

13 absolute, unconditional and irrevocable guaranty of payment and performance."  Lease, Ex. D, ¶¶ 1-

14 2.

### FIRST CAUSE OF ACTION: BREACH OF CONTRACT

### (All Defendants)

17     21.    Plaintiff incorporates herein the allegations of paragraphs 1 through 20, above, as

18 though fully set forth.

19     22.    Defendants have willfully breached and continue to be in such willful breach of the

20 Lease by performing tenant improvements in violation of Paragraph 8 and Exhibit B of the Lease,

21 and by, *inter alia*, unreasonably obstructing and interfering with the rights of the other tenants in the

22 Building in violation of Paragraph 10.B of the Lease.

23     23.    Plaintiff has performed all of the terms, conditions and covenants of the Lease that are

24 required to be performed by Plaintiff.

25     24.    The consideration set forth in the Lease was fair and reasonable at the time the

26 agreement was entered into, and the Lease is a just and reasonable contract.

27     25.    As a proximate cause of Defendant WeWork's actions as alleged herein, Plaintiff has

28 suffered damages in an amount to be proven at trial.

26.     Plaintiff has no adequate remedy at law for the injuries currently being suffered and that are threatened to be suffered as a result Defendant WeWork's construction activities in violation of Paragraphs 8 and 10, and Exhibit B, of the Lease.  Only defendants can control the work performed by their contractors, subcontractors and other agents in the Building and ensure that they abide by the prohibited activities provision in Paragraph 8 of the Lease.  Defendants' conduct exposes Plaintiff to legal and other possible adverse actions from other tenants in the Building.  It would be impossible for Plaintiff to determine the precise amount of damages it will suffer if defendants' conduct is not restrained, given that some of the damage inflicted is being suffered by other tenants in the Building (for which said tenants may seek recovery from Plaintiff).  Moreover, unless defendants' are restrained and ordered to comply with their obligations under the Lease, Plaintiff would be forced to institute a multiplicity of actions against them to redress their persistent and continuing violations of the Lease.

WHEREFORE, Plaintiff prays for judgment against defendants, and each of them, as set forth for below.

## SECOND CAUSE OF ACTION: INTERFERENCE WITH CONTRACT

### (Against Defendant WeWork and Does 1 through 50, inclusive)

27.     Plaintiff incorporates herein the allegations of paragraphs 1 through 26, above, as though fully set forth.

28.     Given Defendant WeWork's conduct, as alleged herein, defendants knew or were substantially certain that Defendant WeWork's conduct would interfere with Plaintiff's contracts with the other tenants in the Building, and specifically, the contractual relationship between Plaintiff and CPI, INSEEC, and Rumble, and each of them.  Plaintiff's relationship with these tenants has been disrupted and has required Plaintiff to devote staff time and resources to manage these relationships that would not have been necessary but for Defendant WeWork's conduct alleged herein.

29.     As a proximate cause of Defendant WeWork's actions as alleged herein, Plaintiff has suffered damages in an amount to be proven at trial.

30.     The aforementioned acts of Defendant WeWork were willful, oppressive, fraudulent and/or malicious in that Plaintiff repeatedly and immediately relayed each of the tenants' complaints about Defendant WeWork's barred construction activities, and the interference caused thereby, and Defendant WeWork nonetheless continued in its prohibited construction activities, including persistently performing drilling work during normal business hours and continually generating noise at a level that interfered with the other tenants' quiet enjoyment of their leased premises.  Defendant WeWork's repeated disregard of its obligations under the Lease required Plaintiff to devote large amounts of staff time and resources to continually address complaints due to Defendant WeWork's barred construction activities, forced Plaintiff to retain litigation counsel to address Defendant WeWork's contract violations, and disrupted Plaintiff's normal business operations.  Plaintiff is therefore entitled to punitive damages.

31.     Defendant WeWork threatens to and unless restrained, will continue to be a continuing threat of interference to Plaintiff's contractual relationships with tenants CPI, INSEEC and Rumble, to Plaintiff's great and irreparable injury, for which damages would not afford adequate relief, in that Plaintiff's business reputation and goodwill will continue to be injured, for which damages could not afford an adequate remedy.

WHEREFORE, Plaintiff prays for judgment against defendants, and each of them, as set forth below.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.  For an order requiring Defendants to show cause, if any they have, why they should not be enjoined. as set forth herein, during the pendency of this action;

2.  For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining defendants, and each of them, and their agents, servants, and employees, and all persons acting under, in concert with, or for them:

    a.  From performing the following construction activity in the leased Premises between the hours 8:00 a.m. to 6:00 p.m., Monday through Friday: shooting of studs for mechanical

1    fastenings; installations of any vertical support; testing of fire alarms ( except in the event

2    of an emergency), core drilling; penetration or floors or ceilings; and any work that can be

3    heard outside of the Premises which Plaintiff reasonably believes will interfere with the

4    quiet enjoyment of other tenants or as to which Prospect Properties receives one or more

5    reasonable complaints from other tenants in the Building;

6    b.   Permitting anything to be done in or about the leased Premises that will in any way

7         unreasonably obstruct or interfere with the rights of other tenants or occupants of the

8         Building or injure or unreasonably annoy them;

9    c.   Making or permitting any unreasonable or unnecessary noises in or upon the Premises or

10        other act or thing of any kind or nature whatsoever that may disturb the quiet enjoyment

11        or cause unreasonable annoyance of any other tenant in the Building.

12   3.   For an order that Defendants, and each of them, specifically perform the obligations under

13        Paragraphs 8 and 10 of the Lease, to wit, that Defendants:

14        a.   Will not perform the following construction activity in the leased Premises between

15             the hours 8:00 a.m. to 6:00 p.m., Monday through Friday: shooting of studs for

16             mechanical fastenings; installations of any vertical support; testing of fire alarms

17             (except in the event of an emergency), core drilling; penetration or floors or ceilings;

18             and any work that can be heard outside of the Premises which Plaintiff reasonably

19             believes will interfere with the quiet enjoyment of other tenants or as to which

20             Prospect Properties receives one or more reasonable complaints from other tenants in

21             the Building;

22        b.   Will not do or permit anything to be done in or about the leased Premises that will in

23             any way unreasonably obstruct or interfere with the rights of other tenants or

24             occupants of the Building or injure or unreasonably annoy them, nor shall Defendants

25             use or allow the Premises to be used for any unlawful purposes, nor will Defendants

26             make or permit any unreasonable or unnecessary noises or odors in or upon the

27             Premises, nor will Defendants commit, or suffer to be committed, any waste upon the

28             leased Premises or any nuisance (public or private) or other act or thing of any kind or

1        nature whatsoever that may disturb the quiet enjoyment or cause unreasonable

2        annoyance of any other tenant in the Building.

3    4.   For damages in an amount to be proven at trial, with interest;

4    5.   For an award of punitive damages;

5    6.   For an award of attorneys' fees and expenses;

6    7.   For costs of suit incurred in this action; and

7    5.   For such other and further relief as the court may deem just and proper.

8    Dated: September 24, 2019                    LOGAN MOONEY LLP

9

10                                         By: _____

11                                              William A. Logan, Jr.

12                                              Attorneys for Plaintiff
                                                300 Prospect Properties, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# 180 Sansome Street Office Lease

LANDLORD:  300 Prospect Properties, Inc., a California corporation
TENANT: 180 Sansome Street Tenant LLC, a New York limited liability company

DATE: November 29, 2018

49302/0801
ELL/536444.3

# 180 SANSOME STREET OFFICE LEASE

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | Definitions. | 1 |
| 2. | Lease. | 3 |
| 3. | Possession. | 3 |
| 4. | Base Monthly Rental. | 4 |
| 5. | Additional Rental. | 4 |
| 6. | Security Deposit; Late Charge. | 8 |
| 7. | Use of Premises. | 8 |
| 8. | Alterations; Mechanics' Liens. | 9 |
| 9. | Work to be Performed by Landlord. | 11 |
| 10. | Restrictions on Use. | 11 |
| 11. | Compliance with Law, Environmental. | 11 |
| 12. | Indemnity and Exculpation. | 13 |
| 13. | Insurance. | 14 |
| 14. | Rules and Regulations. | 15 |
| 15. | Utilities and Services. | 15 |
| 16. | Personal Property Taxes. | 17 |
| 17. | Maintenance. | 17 |
| 18. | Restoration of Premises. | 18 |
| 19. | Entry by Landlord. | 18 |
| 20. | Estoppel Certificates. | 18 |
| 21. | Intentionally Omitted. | 19 |
| 22. | Removal of Trade Fixtures by Tenant at End of Term. | 19 |
| 23. | Surrender of Lease. | 19 |
| 24. | Holding Over. | 19 |
| 25. | Default. | 19 |
| 26. | Landlord's Remedies Upon an Event of Default. | 20 |
| 27. | Attorneys' Fees on Event of Default. | 22 |
| 28. | Intentionally Deleted. | 22 |
| 29. | Assignment or Subletting. | 22 |
| 30. | Transfer by Landlord - Release from Liability. | 24 |
| 31. | Damage. | 24 |
| 32. | Condemnation. | 25 |
| 33. | Subordination to Encumbrances. | 25 |
| 34. | Intentionally Deleted. | 26 |
| 35. | Communications and Computer Lines. | 26 |
| 36. | Effect of Exercise of or Failure to Exercise Privilege. | 27 |
| 37. | Waiver. | 27 |
| 38. | Labor Relations; | 27 |
| 39. | Notices. | 28 |
| 40. | Entire Agreement; Amendments. | 28 |
| 41. | Light and Air. | 28 |
| 42. | Auctions and Signs. | 28 |
| 43. | Execution, Recordation. | 28 |
| 44. | Tenant's Authority. | 28 |
| 45. | Limitation of Tenant's Remedies. | 29 |
| 46. | Time and Applicable Law. | 29 |
| 47. | Name. | 29 |
| 48. | Provisions are Covenants and Conditions. | 29 |
| 49. | Severability. | 29 |
| 50. | Captions. | 29 |
| 51. | Successors. | 29 |
| 52. | Relationship of Parties. | 29 |
| 53. | Exculpation of Non-Tenant Parties. | 29 |
| 54. | Brokers. | 30 |
| 55. | Interpretation. | 30 |
| 56. | Force Majeure. | 30 |
| 57. | Asbestos. | 30 |
| 58. | Accuracy of Tenant Information. | 30 |
| 59. | USA Patriot Act and Anti-Terrorism Laws. | 30 |
| 60. | Required Accessibility Disclosures. | 31 |
| 61. | Right of First Offer for Expansion. | 31 |
| 62. | Signage. | 31 |
| 63. | Leasing Restriction. | 32 |
| 64. | Counterparts. | 33 |
| 65. | Arbitration. | 33 |
| 66. | Confidentiality. | 33 |
| 67. | Dogs. | 34 |

EXHIBIT A
   Floor Plan
EXHIBIT B
   Work Letter Agreement
EXHIBIT C
   Rules and Regulations of the Building
EXHIBIT D
   Guarantee
EXHIBIT E
   Term Commencement Agreement
EXHIBIT F
   Proposition 65 Notice and Material Safety Data Sheet
EXHIBIT G
   Space Plan
EXHIBIT H
   Renewal Option
EXHIBIT I
   LOC FORM
EXHIBIT J
   WeWork Membership Agreement
EXHIBIT K
   INTENTIONALLY DELETED
EXHIBIT L
   Tenant's Operational Rider
EXHIBIT M
   SNDA FORM
EXHIBIT N
   Table of Base Monthly Rental
EXHIBIT O
   Tenant's Competitors
EXHIBIT P
   Janitorial Services

49302/0801
ELL/536444.3

## 180 SANSOME STREET OFFICE LEASE

This lease ("Lease") is made in San Francisco, California, on November _21_, 2018, between 300 PROSPECT PROPERTIES, INC., a California corporation ("Landlord") and 180 SANSOME STREET TENANT LLC, a New York limited liability company ("Tenant"). If Tenant consists of more than one person or entity, the obligations under this Lease imposed on Tenant will be joint and several.

1.    **Definitions.** As used throughout this Lease, the following words have the stated meanings:

A.    *Premises.*

Suites 200, 300, 400, 600, 700, 900, 1100, 1200, 1400, 1500, 1600, 1700 and 1800, each consisting of the rentable square feet indicated on Exhibit N to this Lease, and consisting of approximately 78,290 rentable square feet in total, as shown on Exhibit A attached, being floors 2, 3, 4, 6, 7, 9, 11, 12, 14, 15, 16, 17 and 18 of the Building. Suites 700, 1100, 1200, 1600 and 1700 are sometimes referred to herein as the "Initial Premises". Suites 200, 300, 400, 600, 900, 1400, 1500 and 1800 are sometimes referred to herein as the "Secondary Premises". The rentable square feet have been stipulated to between Landlord and Tenant *and will not be subject to change at any time except (a) as necessary to reflect a change in the physical dimensions of the Premises and (b) as a result of the planned renovation of the Building lobby (which will likely increase the rentable square footage of the Building upon completion).* The rentable square feet includes the usable area, without deduction for columns or projections, multiplied by a load factor to reflect a share of certain areas, which may include lobbies, corridors, mechanical, utility, janitorial, boiler and service rooms and closets, restrooms and other public, common and service areas of the Building. Notwithstanding anything contained herein to the contrary, including, without limitation, this Section 1.A., in no event shall Tenant have exclusive possession and use of any common areas, which include, but are not limited to, the second floor patio and main lobby of the building. Further, in no event shall Tenant have any meetings or events or sell or serve alcohol in the common areas.

B.    *Building.*

180 Sansome Street, San Francisco, California 94104.

C.    *Term.*

The Lease shall commence upon delivery of the Initial Premises ("Commencement Date"). Base Monthly Rent will commence on each floor when Tenant completes the tenant improvement work on that floor ("Rent Commencement Date" as to each floor), but not later than one hundred eighty (180) days following Landlord's delivery of the applicable floor to Tenant, which one hundred eighty (180) day period will be extended, on a floor-by-floor basis, due to Landlord Delays (as such term is hereinafter defined) (but, for the avoidance of doubt, excluding delays attributable to Tenant, its Members, and their respective contractors, agents, and employees). The expiration date of the Lease will be ten (10) years from Tenant's completion of tenant improvement on all floors (the "Termination Date"), which in no event shall be later than ten (10) years and six (6) months from Landlord's delivery of the Secondary Premises to Tenant. Landlord anticipates that the Commencement Date will occur on or before the date that is one (1) Business Day following the full execution of this Lease (the "Anticipated Commencement Date"). Landlord anticipates that delivery of the Secondary Premises shall occur within ninety (90) days following the Commencement Date (the "Anticipated Secondary Premises Delivery Date"). For the avoidance of doubt, Tenant shall deliver the Security Deposit and Guaranty to Landlord simultaneously with delivery of the executed Lease, and Landlord will not countersign this Lease until it has received the Security Deposit and Guaranty.

D.    *Base Monthly Rental.*

Commencing on the applicable Rent Commencement Date, Tenant shall pay the amount of fixed base rent (the "Base Rental") for each floor of the Premises as set forth in Exhibit N. As used in Exhibit N, a "Lease Year" shall mean, for each floor of the Premises, (a) with respect to the first Lease Year, the period commencing on the Rent Commencement Date for such floor and ending on the day prior to the first anniversary of the Rent Commencement Date for such floor; and (b) each twelve (12) month period thereafter, ending the day prior to each succeeding anniversary of the Rent Commencement Date for such floor.

E.    *Additional Rental.*

75.07% of the increase in "Direct Expenses" and 70.95% of the increase in "Direct Tax Expenses" (as Paragraphs 5D, 5E and 5F define those terms) of the Building over said expenses in the calendar year 2019 (the "Base Year"). The percentage for Direct Expenses is the rentable square feet of the Premises divided by the Building rentable square footage of 104,288 and for Direct Tax Expenses is the rentable square feet of the Premises divided by the Building Total Rentable Square Footage of 110,352. Landlord may recalculate this percentage from time to time to reflect reconfigurations, additions or modifications to the Building.

F.    *Rent.*

Base Monthly Rental, Additional Rental, and all other charges payable by Tenant to Landlord.

49302/0801
ELL/536444.3

G.    *Security Deposit or Letter of Credit.*

An amount equal to fifteen months' Base Monthly Rental, being the sum of $7,143,962.55, to be provided upon execution of the Lease. Such sum shall be reduced as follows: (i) reduced to $5,715,170.04 on the fourth (4th) anniversary of the Commencement Date; and (ii) reduced to $4,286,377.53 on the eighth (8th) anniversary of the Commencement Date; provided that if an Event of Default is continuing as of the date that either such reduction would occur, such reduction will not occur until such Event of Default is cured. If the rentable square footage of the Premises is increased through addition of floors to the Premises, Tenant shall deposit an additional amount equal to the number of months' rent then held by Landlord with respect to the Premises immediately prior to such addition (meaning, by way of example, fifteen (15) months' rent, prior to the reduction).

H.    Purpose.

General office, administrative, executive administration, Flexible Workplace Center (as hereinafter defined) and for the operation of a business pursuant to which portions of the Premises are licensed in accordance with the WeWork Membership Agreement attached as Exhibit J to this Lease. Purpose shall also include other ancillary office related and Flexible Workplace Center related uses to Tenant's operations and services as the same may develop or expand over time and which are in use, generally, in all or most other WeWork (or an affiliated product line [i.e. HQ by WeWork]) locations, including, but not limited to, training centers, conference rooms, non-commercial kitchens, office storage, office pantries, recreational areas, wellness areas or services or other amenities, or community facilities intended to serve its Members (as hereinafter defined). Notwithstanding anything to the contrary contained herein, Tenant may not use the Premises for the operation of a bar or restaurant, or operate an off-the street retail store.

I.    *Flexible Workplace Center.*

The operation of a business whose primary purposes shall be providing office suites and shared office workplaces to Members and those third-parties servicing such Members for terms determined by Tenant and which offers certain office services incidental to the primary office uses (including, without limitation, conference and meeting facilities and services, administrative support, word processing, secretarial support, reception areas, teleconferencing capabilities, high-speed broadband connectivity, furniture and office equipment usage, lounge areas, break-out rooms, recreational areas for use by Members and Tenant's employees, and traveling and concierge services); cafe or pantry facilities (which may be operated by Tenant and which may sell and/or serve, solely for consumption by Members, Tenant, members "at large" (i.e., licensees of Tenant's services but not affiliated with one particular location), and the employees, invitees and guests of each of the foregoing, limited food items, coffee, beverages, on premises beer, wine and liquor (subject to receipt of governmental permits and approvals;; child care facilities (subject to applicable licensing requirements and further subject to limitation for use solely by Members and employees of Tenant); and any other services which Tenant (or any of its Affiliates) may then be providing to users of its other flexible workplace centers, co-working facilities or other shared working environments (including executive/shared office suites, an incubator-type office/facility, a flexible workplace center or virtual office space).

Landlord agrees that Tenant can seek to obtain, as Tenant's sole expense, a liquor license for a portion of the Premises; provided, however, this is not a condition or will not delay the term or excuse any requirement of the Lease; provided further, however, (i) the liquor license and use is restricted to use only by Tenant's employees and Members and not the public, and (ii) notwithstanding anything to the contrary in this Lease, service of alcohol in the Premises may only be conducted during Business Hours. Tenant's insurance policy to contain a rider or endorsement for liability in connection with this use.

J.    Members.

Companies, entities, individuals and other persons that enter into WeWork Membership Agreements with Tenant or one of its Affiliates or that otherwise occupy space in a facility operated by Tenant or one of its Affiliates including, without limitation, as We Membership, Hot Desk Membership, WeWork Labs Membership, or any successor programs of the foregoing membership, and prospects to enter into such membership agreements. Tenant acknowledges and agrees to monitor its Members' use of the Premises to ensure that its Members are occupying the Premises for the Purpose and abiding by the each Members' Membership Agreement and the Rules and Regulations of the Building, and shall enforce such compliance. Within five (5) business days of Landlord's written request, Tenant shall provide a list of the Members who are then currently occupying the Premises; provided, however, Tenant shall be under no obligation to provide names of individuals employed by such Members.

K.    *Tenant's Address for Notices.*

c/o WeWork Companies Inc.
115 West 18th Street, 2nd Floor
New York, NY 10011
Attn: Legal Department

c/o WeWork Companies Inc.
115 West 18th Street, 2nd Floor
New York, NY 10011

2

49302/0801
ELL/536444.3

Attn: Lease Administration

With Copies to Tenant's registered agent in California:
Corporation Service Company DBA CSC-Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95833-3505

L.     *Landlord's Address for Notices.*

The term "Landlord's Address for Notices" shall mean 300 Prospect Properties, Inc., 100 Bush Street, Suite 218, San Francisco, California 94104.

M.     *Business Hours.*

The term Business Hours" shall mean the hours are 8 a.m. to 6 p.m. Monday through Friday, except for New Year's Day, President's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving and Christmas Day.

N.     *Broker.*

The term "Broker" shall mean Kidder Mathews for Landlord.  The parties acknowledge and agree that Tenant has not retained a broker in connection with this Lease.

O.     *Guarantor.*

The Term "Guarantor" shall mean WeWork Companies Inc. Guarantor shall execute and deliver the Guaranty attached as Exhibit D simultaneously with the parties' mutual execution of this Lease, and the effectiveness of this Lease is conditioned on execution and delivery of the Guaranty.

P.     *Affiliate.*

The term "Affiliate" means any person, corporation, partnership, limited liability company or other entity which directly or indirectly controls, is controlled by or is under common control with the party in question (for this purpose, "control" means either the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the entity or the distribution of its profits, whether by the ownership of voting securities, partnership shares, by contract or otherwise, or the ownership, directly or indirectly, of more than twenty-five percent (25%) of the then outstanding stock, if the entity is a corporation, or of fifty percent (25%) of the ownership interests, if the entity is a partnership, a limited liability company or other entity).

Q.     *Addendums and Exhibits to Lease.*

Exhibit A (Floor Plan), Exhibit B (Work Letter Agreement or Tenant Improvement Agreement), Exhibit C (Rules and Regulations of the Building), Exhibit D (Guarantee), Exhibit E (Term Commencement Agreement), Exhibit F (Proposition 65 Notice and Material Safety Data Sheet), Exhibit G (Space Plan), Exhibit H (Renewal Option), Exhibit I (LOC Form), Exhibit J (WeWork Membership Agreement ), Exhibit L (Tenant's Operational Rider), Exhibit M (SNDA Form), Exhibit N (Table of Base Monthly Rental), Exhibit O (Tenant's Competitors), and Exhibit P (Janitorial Services).

**2.     Lease.**

Landlord leases to Tenant and Tenant leases from Landlord the Premises upon and subject to the terms, covenants and conditions herein set forth.  Tenant covenants as a material part of the consideration for this Lease to keep and perform each and all of said terms, covenants and conditions. Tenant agrees that this Lease is made upon the condition of such performance.  Except as set forth in this Lease, Tenant accepts the Premises in their "as is" state of repair and condition, and Landlord has made no representations to Tenant regarding the condition of the Premises or the Building.

**3.     Possession.**

A.     If Landlord fails, for whatever reason whatsoever, to deliver possession of any portion of the Secondary Premises to Tenant on or before date that is thirty (30) days after the Anticipated Secondary Premises Delivery Date, then Tenant shall be entitled to a Base Monthly Rental Credit (the "Late Delivery Rent Credit") equivalent to one (1) day of Base Monthly Rental for every one (1) day of delay in possession of the Secondary Premises, provided that such Late Delivery Rent Credit shall apply on a floor-by-floor basis, only until each floor of the Secondary Premises is delivered to Tenant.  In the event that Landlord has failed to deliver possession of the Initial Premises on or before the date that is three hundred sixty-five (365) days after the Anticipated Commencement Date, Tenant shall have the right to terminate this Lease without liability to Tenant so long as Tenant gives Landlord written notice of such termination, whereupon Landlord shall immediately return any pre-paid Rent and the Security Deposit to Tenant, this Lease shall terminate, and neither party shall have any further rights or obligations hereunder (other than those expressly intended to survive the expiration thereof).  The Late Delivery Rent

3

49302/0801
ELL/536444.3

Credit, if any, shall be applied against Base Monthly Rental as and when same comes due and is payable until fully applied, provided that such Late Delivery Rent Credit shall be applied after complete application of any free rent period or abatement of Base Monthly Rental hereunder. If the failure to deliver possession is due to a prior tenant holding over, Landlord shall promptly take all commercially reasonable actions, including the institution of summary proceedings to obtain possession and remove any holdover tenant, provided Landlord shall be entitled to any awards obtained in connection therewith. If Landlord tenders possession of the Premises to Tenant before the Commencement Date, and Tenant accepts such prior tender, such occupancy will be subject to all of the terms, covenants and conditions of this Lease including, without limitation, the payment of Rent. The parties will execute the Term Commencement Agreement as soon as the Commencement Date has been ascertained, and Tenant appoints Landlord as its attorney-in-fact to execute it on Tenant's behalf if Tenant fails to do so within 10 days of Landlord's request. As used herein the term "Landlord Delay" means any delay which actually delays Tenant's use and occupancy of all or any portion of the Premises, and/or delays with prevent Tenant from timely performing the Tenant Improvements, in each case caused solely by Landlord and/or any Landlord Party with respect to the following: (a) delays by Landlord in giving authorizations or approvals if expressly required hereunder (meaning failure to provide such approvals within the deadlines provided in this Lease, including any second notice periods); (b) delays attributable to Landlord's failure to reasonably cooperate with Tenant in procuring approvals from governmental authorities if expressly required hereunder; (c) any violation of Law that exists at the Building, if and to the extent it is Landlord's obligation under this Lease to remedy such violation of Law, which actually delays or prevents Tenant from obtaining any governmental permits, consents, approvals or other documentation reasonably required for the lawful occupancy of the Premises or the lawful performance of the Tenant Improvements; (d) delays resulting from work performed by Landlord in the Premises following the Commencement Date which prevent Tenant from performing the initial Alterations; and (e) the existence of any Hazardous Materials in the Premises or the Building for which Landlord is responsible pursuant to the terms of this Lease. Tenant acknowledges and agrees that there shall be no Landlord Delay until the date in which Tenant notifies Landlord of such Landlord Delay (which notice may be via e-mail to Landlord's construction representative or building manager), and Landlord has failed to correct the same within three (3) business days.

B.     Tenant shall have thirty (30) days prior to the Commencement Date for relocation and installation of furniture, fixtures and equipment and the performance of any alterations that are cosmetic in nature (i.e. painting, wallpapering and flooring) provided business is not being conducted in the Premises.

4.     **Base Monthly Rental.**

A.     Tenant agrees to pay Base Monthly Rental, without notice, in advance, on the fifth (5th) business day of each calendar month of the Term. One month's Base Monthly Rental for the entire Premises will be paid upon execution of the Lease. That amount will be applied one-half to the first month's Base Monthly Rental for each floor and one-half to the second month's Base Monthly Rental for each floor. Base Monthly Rental will be abated fifty (50%) per month until each floor has received a total of six (6) months of abated rent. In the event the Term commences or ends on a day other than the first day of a calendar month, then the Base Monthly Rental for such fractional month will be prorated based on a 30-day month.

B.     Subject to any deductions, offsets, abatements or other reductions expressly set forth herein, Base Monthly Rental will be paid by Tenant to Landlord, without deduction or offset, in lawful money of the United States of America, by check or wire transfer at the following payment address: (i) if by check at 100 Bush Street, Suite 218, San Francisco, CA 94104; and (ii) if by wire transfer, to the account listed below. The foregoing address and account may be changed by Landlord from time to time by written notice to Tenant.

> Beneficiary Name : 300 Prospect Properties, Inc.
> Bank Name: Bank of the West
> Bank Address: 505 Montgomery Street, San Francisco, CA 94111
> Account Number: 773016555
> Routing Number: 121100782
> Bank Swift Code: BWSTUS66

C.     All other charges payable by Tenant under the Lease shall be due as of the fifth (5th) business day of the following calendar month and paid as part of Additional Rental unless a different payment date is specified in this Lease.

5.     **Additional Rental.**

A.     Tenant further agrees to pay recurring Additional Rental, in monthly installments, on the fifth (5th) business day of each month of the Term commencing on the first day of the calendar year following the Base Year. If the Term ends on a day other than the last day of a calendar month, then, upon the first day of the last calendar month of the Term, Tenant will pay Landlord a portion of Additional Rental for such fractional month prorated based on a 30-day month. Non-recurring Additional Rental shall be due within thirty (30) days following receipt of the statement of charges.

4

B.      Subject to any deductions, offsets, abatements or other reductions expressly set forth herein, Additional Rental will be paid by Tenant to Landlord, without notice and without deduction or offset, in lawful money of the United States of America, in the same manner as Base Monthly Rental.

C.      Landlord will try to give Tenant advance notice of Additional Rental payable by Tenant, but failure by Landlord to give advance notice is not a waiver by Landlord of its right to receive from Tenant any Additional Rental. In addition, Landlord may, but is not required to, at or after the start of the calendar year following the calendar year set forth in Paragraph 1E, notify Tenant of Landlord's estimate of Tenant's liability for Additional Rental for the ensuing year, which amount will be divided into twelve (12) equal portions and added to the monthly payments of rent required to be made by Tenant in such year. If Tenant's actual payment of Additional Rental is finally determined by Landlord to be greater or less than the total amounts actually paid by Tenant pursuant to this paragraph during the applicable year ("Landlord's Statement"), a credit or payment will be made by Landlord or Tenant, whichever the case may be, within the thirty (30) days following the issuance of Landlord's Statement. Upon written request by Tenant within sixty (60) days of issuance of Landlord's Statement, Landlord will make its prior year records pertaining to Direct Expenses available to Tenant to allow Tenant, at its sole cost and expense, to verify their accuracy. Absent such request, Landlord's Statement shall be final as to such year. Notwithstanding anything to the contrary in this Lease, Tenant's share of Controllable Direct Expenses for calendar year 2020 shall not exceed an amount equal to the product of (a) Tenant's share of Controllable Direct Expenses payable for Calendar Year 2019 and (b) one hundred seven percent (107%) (the "Percentage Limitation"). In no event shall Tenant's share of Controllable Direct Expenses for any subsequent calendar year of the Term exceed an amount equal to the product of (a) Tenant's share of Controllable Direct Expenses payable for the previous calendar year pursuant to the foregoing provisions of this paragraph, and (b) the Percentage Limitation. However, if the actual percentage increase in Tenant's share of Controllable Direct Expenses in any calendar year over the amount payable for the previous calendar year is less than the Percentage Limitation ("Shortfall"), the Shortfall may be added to the Percentage Limitation for subsequent calendar years until exhausted. "Controllable Direct Expenses", as used herein, shall mean all Direct Expenses other than (i) premiums for insurance; (ii) wages subject to collective bargaining agreements, other union-related labor costs (or the cost of contracts dependent or partially dependent on union related labor costs), or wages established or regulated by Law; (iii) snow and ice removal and control; (iv) costs incurred due to force majeure events; (v) costs to comply with governmental requirements (to the extent such costs constitute Direct Expenses and are not excluded costs); and (vi) water, sewer, electric, gas, oil, steam and other utility or regulatory charges. For the avoidance of doubt, the foregoing cap on Controllable Direct Expenses does not affect Tenant's obligations with respect to Direct Tax Expenses.

D.      Direct Expenses include all actual out-of-pocket costs of operation and maintenance of the Building (without duplication) as determined by Landlord including, but not limited to, the following costs by way of illustration only: premiums for property, casualty, liability, rent interruption or any other insurance carried by Landlord; local business taxes whether computed on the basis of payroll, gross revenue or otherwise; salaries, wages and other amounts paid or payable for personnel up to and including the Building manager, which shall include superintendent, operation and maintenance staff, and other employees of Landlord directly involved in the maintenance, management and operation of the Building, including contributions and premiums towards fringe benefits, unemployment, disability insurance, worker's compensation insurance, pension plan contributions and similar premiums and contributions and the total charges of any independent contractors or property managers engaged in the operation; repair, care, maintenance and cleaning of any portion of the Building; fair market rental and other reasonable out-of-pocket costs with respect to Building's management office or another management office maintained by Landlord or its affiliates (provided, however, that the rental amount for such management office cannot be based on more than 7,560 rentable square feet); costs of accounting services incurred in the preparation of statements and financial reports, audit fees; cleaning expenses, cleaning expenses of the Building common areas (excluding rentable square feet of the Building), including without limitation janitorial services, window cleaning and garbage and refuse removal; landscaping expenses, including without limitation irrigating, trimming, fertilizing, replacing plants and floral arrangements; heating, plumbing, mechanical, elevator, sprinklers, fire/life safety systems, security and energy management systems and steam/utilities expenses, including fuel, gas, electricity, water, sewer, telephone, advertising, public relations, tenant relations and activities and other services, maintaining, operating and repairing components of any equipment or machinery used in connection with the Building, and the rental of same or any office or other equipment for the management of the Building; any other items of repair and maintenance of the Building; intrabuilding network cabling and riser maintenance and repair; cost of policing, security and supervision of the Building; audit and accounting fees; any capital improvements (or amortization thereof) (i) made primarily to reduce Direct Expenses or to comply with governmental requirements, (ii) for replacements (as opposed to additions or new improvements) of nonstructural items located in the common areas of the Property required to keep such areas in good condition or (iii) expenditures that are consistent with Direct Expenses as defined above, although the benefits of the expenditures survive the current year; payments under any easement, operating agreement, declaration, restrictive covenant or instrument pertaining to sharing of costs in a planned development; fee for administration and management of the building as determined by Landlord. Permitted capital improvements and repairs may be amortized in the Landlord's reasonable discretion over: (i) their useful lives, (ii) the period during which capital improvements reduce Direct Expenses or (iii) three (3) years or more at Landlord's discretion. Landlord shall adequately allocate costs of operation and maintenance between the building where the Premises are located and other properties owned by landlord or its affiliates and under common management, as determined by landlord in the exercise of its reasonable discretion pursuant to accounting principles consistently applied. Similarly, Landlord may make other allocations of Direct Expenses in accordance with sound management and accounting

principles. Direct Expenses shall not include: (i) costs of renovating or otherwise improving, decorating, painting or redecorating space for tenants or other occupants of the Building, (ii) depreciation and amortization except as expressly permitted in the definition of "Direct Expenses" above, (iii) interest and principal payments on loans, (iv) ground rental payments, (v) real estate brokerage and leasing commissions, free rent, lease takeover obligations, and other inducements, costs, disbursements and expenses incurred in connection with leasing space in the Building and advertising and promotional expenses, legal fees, architectural and engineering (and similar consultant) fees, permits, licenses and inspection cost and fees in connection with the cost of tenant improvements, build out allowances, moving expenses and other concessions incurred in connection with leasing space in the Building, (vi) advertising, marketing expenses and association dues, (vii) costs of Landlord that are reimbursed (or would have been reimbursed had Landlord carried the insurance, warranties, service contracts or other items required to be carried by Landlord under this Lease) by warranties, service contracts, insurance proceeds or otherwise (but insurance deductibles may be included in Direct Expenses, but only to the extent the underlying claim is not based upon the negligence or willful misconduct of Landlord or any of Landlord's employees, agents, contractors, workmen, mechanics, suppliers and invitees, or a Landlord default), (viii) expenses incurred in negotiating leases of other tenants in the Building or enforcing lease obligations of other tenants in the Building, (ix) cost of any expense reimbursed or paid by another tenant of the Building, including, but not limited to (A) work or services performed for any tenant (including Tenant) at such tenant's cost, (B) the cost of any item for which Landlord is paid or reimbursed by warranties, service contracts, insurance proceeds or otherwise, (C) increased insurance premiums or taxes assessed specifically to any tenant of the Building, (D) charges (including applicable taxes) for electricity, water and other utilities for which Landlord is reimbursed by any tenant, and (E) costs incurred in connection with the making of repairs which are reimbursed by another tenant of the Building, (x) costs (including legal fees, fines and penalties) in respect of disputes with tenants or other occupants of the Building or incurred in connection with actions against Landlord occasioned by the violations of Laws, breach of contract, negligence, misconduct, fraud or other tortious act or omission of Landlord or any Landlord's employees, agents, contractors, workmen, mechanics, suppliers and invitees, (xi) except as expressly provided in the definition of "Direct Expenses" above covering annual amortization of these costs, any and all costs of a capital nature including capital improvements, repairs and replacements incurred in connection with the Building or Premises as determined pursuant to GAAP, (xii) costs, fines and penalties incurred as a result of a violation of any Law by Landlord or , including the cost of any judgment, settlement, or arbitration award resulting from any liability of Landlord (other than a liability for amounts otherwise includable in Direct Expenses hereunder) and all expenses incurred in connection therewith, (xiii) costs incurred because Landlord or another tenant violated the terms of any lease for space in the Building, (xiv) legal fees, costs and disbursements incurred in negotiation of individual leases or contracts specifically benefiting fewer than all of the tenants in the Building or as a result of Landlord's negligence or willful misconduct, (xv) general reserves or bad debt loss, rent loss or reserve for bad debt loss or rent loss for the Building, (xvi) costs associated with the correction of defects (patent or latent) in the Building or other improvements, (xvii) costs incurred to test, survey, cleanup, contain, abate, remove or otherwise remedy hazardous materials or asbestos containing materials, (xviii) salaries and other compensation and fringe benefits paid to all persons above the level of a Building manager, (xix) costs incurred by Landlord to the extent that Landlord is reimbursed by a governmental authority, (xx) Landlord's general corporate overhead and administrative expenses, including accounting fees, (xxi) any costs or expenses incurred in connection with services or other benefits (A) of a type not provided to Tenant (or provided to Tenant at separate or additional charge) but that are provided to another tenant or occupant of the Building, or (B) provided to other tenants or occupants of the Building at a level greater than that provided to Tenant without separate or additional charge, in which case such expenses shall be excluded from Direct Expenses to the extent such expenses exceed the amount which would have been incurred to provide such services or other benefits to such other tenant or occupant at the same level as such services or other benefits are provided to Tenant, (xxii) costs incurred with respect to a sale or transfer of all or any portion of the Building or the Premises or any direct or indirect interest therein, (xxiii) management fees for the Premises, which exceed, with respect to any particular period of one (1) year, five percent (5%) per annum of Landlord's gross rental revenues with respect to the Building, (xxiv) costs and expenditures payable to (A) any Affiliate of Landlord, or (B) any person who is a relative by blood or marriage of Landlord or any Affiliate of Landlord, in each case, in excess of the amount which would be paid in the absence of such relationship, (xxv) the cost of acquiring, leasing, restoring, removing or replacing (A) sculptures, (B) paintings, and (C) other objects of art located within or outside of the Building, (xxvi) expenses to the extent allocable directly and solely to the retail spaces of the Building (including, without limitation, plate glass insurance), (xxvii) special, non-Building standard cleaning or janitorial costs or expenses with respect to the Premises or any other rentable portion of the Building, (xxviii) cost of repairs or replacements incurred by reason of fire or other casualty or caused by the exercise of the right of eminent domain or condemnation, except for deductibles on insurance policies covering such repairs or replacements and except to the extent such capital repairs or replacements are expressly permitted to be included in Direct Expenses pursuant to this Lease, (xxix) Direct Tax Expenses, and any other taxes or similar charges that are expressly excluded from the definition of Direct Tax Expenses under this Lease, (xxx) cost of acquiring, installing or replacing any separate electrical meter, water meter or other utility meters for other tenants in the Building, (xxxi) costs relating to withdrawal liability or unfunded pension liability under the Multi-Employer Pension Plan Act or similar Law, (xxxii) cost of installing, operating and maintaining any an observatory, lodging, broadcasting facilities, luncheon club, athletic or recreational club, child care facility, auditorium, cafeteria or dining facility, conference center or similar facilities, including any commercial concessions operated by Landlord, its subsidiaries or Affiliates, including taxes and compensation paid to attendants for such facilities, (xxxiii) any interest or penalty incurred with respect to the late payment of any Direct Expenses, Direct Tax Expenses or other costs or expenses related to the ownership and operation of the Building for any reason, (xxxiv) any costs in connection with an expansion of the rentable area of the Building or the

acquisition by Landlord of easements, or additional land, air or development rights (except as required by Law), (xxxv) cost of providing overtime heat, ventilation and air-conditioning furnished to the Premises or any other leasable space in the Building (whether or not leased to tenants), (xxxvi) to the extent any costs includable in Direct Expenses are incurred with respect to both the Building and other properties (including salaries, fringe benefits and other compensation of Landlord's personnel who provide services to both the Building and other properties), there shall be excluded from Direct Expenses a fair and reasonable percentage thereof which is properly allocable to such other properties, (xxxvii) costs incurred in connection with making any additions to, or building additional stories on, the Building or its plazas, or adding buildings or other structures adjoining the Building, or connecting the Building to other structures adjoining the Building, (xxxviii) any increased insurance costs reimbursed directly to Landlord by a tenant, including Tenant, pursuant to their respective leases, (xxxix) any profits Landlord earns or receives on so-called sundry charges to individual tenants, (xl) new categories of Direct Expenses not included in the Landlord Statement for the Base Year; provided that any such new category of Direct Expenses may be included in Direct Expenses, if, from and after the calendar year in which such new category is first included in Direct Expenses, the Direct Expenses for the Base Year are grossed up to include the amount included in Direct Expenses for such new category of Direct Expenses in such first calendar year (it being understood that Landlord shall not be required to refund any amounts to Tenant for prior calendar years solely by reason of any such gross up of Direct Expenses for the Base Year), (xli) omitted, (xlii) all costs associated with Landlord's voluntary political contributions, voluntary civic contributions or voluntary charitable contributions, and (xliii) the cost of temporary exhibitions located at or within the Building.

E.    Direct Tax Expenses include all real property taxes and annual installments of real estate assessments on the Building; personal property taxes on personal property of Landlord used in the operation or maintenance of the Building; supplemental assessments that may result from changes in ownership, or from the completion of new construction and improvements completed at the Building; escape assessments; impositions created to pay for or supplement the cost of governmental services that the Building or its tenants may use; transit or transportation charges; housing subsidies and/or housing fund assessments; possessory interest taxes; business or license taxes or fees; job training subsidies and/or assessments; open space charges; excises; business or other license or use fees; and the reasonable costs of contesting by appropriate proceedings the amount or validity of any of the foregoing. If, during the Lease Term, the present real property tax is wholly or partly replaced or supplemented by another form of tax, there will be included within the definition of Direct Tax Expenses any such tax, levy, or assessment (other than federal, state, or city and county net income taxes or estate, gift, or other similar taxes) that, whether or not now customary or within the contemplation of the parties to this Lease, may be charged to Landlord and is by way of example and not limitation (i) levied upon, allocable to, or measured by the Rent payable hereunder; (ii) levied upon the business of owning and operating rental properties to the extent such tax is applicable to the Premises; (iii) levied upon or with respect to the possession, leasing, operation, management, or occupancy by Tenant of the Premises or any portion thereof, or (iv) levied upon or measured by the value of Tenant's personal property or leasehold improvements.    Direct Tax Expenses also include all expenses incurred, including attorneys' and consultants' fees, in seeking a reassessment, reduction of, or limit on the increase in any Direct Tax Expenses, whether or not successful.  Property taxes for any calendar year shall include property taxes which are due for payment as well as those paid in such year. Notwithstanding anything to the contrary contained herein, Direct Tax Expenses shall not include (a) any franchise, income, estate, succession, inheritance, recording, capital stock, excise, excess profits, gift, gross receipts, mortgage, occupancy, payroll, rental or stamp tax of Landlord; (b) any stadium, sports complex or arena tax; (c) any penalties or interest that derive from Landlord's failure to pay any tax;  and (d) any services or utility charges or related charges; (f) any charges for which Landlord receives reimbursement.  Landlord shall consult with a reputable and qualified tax specialist chosen by Landlord in its reasonable discretion on an annual basis regarding the likely success and benefits of bringing or causing to be brought an application or proceeding for reduction of the assessed valuation of the Building for each calendar year and will do so if, in Landlord's reasonable business judgment bringing such an application or proceeding is appropriate. Landlord shall proceed to take all commercially reasonable action in pursuit of such reduction if Landlord determines bringing such an application or proceeding is appropriate. In no event shall Landlord seek to adjust the taxes in any calendar year by consenting to higher taxes in one calendar year for the benefit of lower taxes in any other calendar year or for the benefit of lower taxes on another property owned by Landlord or an Affiliate of Landlord. Landlord shall not artificially reduce Taxes for the Base Year.  As of the Effective Date Landlord hereby represents and warrants that there are no tax exemptions, abatements, or incentive packages and programs with governmental authorities specially benefiting the Building.  Notwithstanding the foregoing, Tenant acknowledges the assessed value of the Building and related real property are established and adjusted and re-assessment from time to time in accordance with California 'Proposition 13' and related statutes and regulations. If Tenant has paid Direct Tax Expenses for a particular calendar year and Landlord receives a refund of such taxes for such calendar year or becomes entitled to a credit against a future payment of taxes in which Tenant owes Direct Tax Expenses for, Landlord shall (i) in the case of a refund, pay Tenant within thirty (30) days after Landlord's receipt thereof, or (ii) in the case of a credit, permit Tenant to credit against the applicable Direct Tax Expense payment owed by Tenant to Landlord against which Landlord will take such credit (unless such payment of taxes is due and payable after the end of the Lease Term, in which event Landlord shall pay to Tenant at the time Landlord pays taxes).

F.    If the Building rentable square footage is not one hundred percent (100%) occupied during an entire calendar year, including the Base Year, then the variable component of Direct Expenses and Direct Tax Expenses will be equitably adjusted so that the total amount of Direct Tax Expenses and Direct Expenses equals the amount which would have been paid or incurred by Landlord had the Building been ninety-five percent (95%) occupied for the entire calendar year.  In no event will Landlord be entitled

49302/0801
ELL/536444.3

7

to receive from Tenant and the other tenants in the Building an aggregate amount in excess of actual Direct Expenses and Direct Tax Expenses as a result of the foregoing provision.

**6.     Security Deposit; Late Charge.**

A.      Simultaneously with Tenant's execution of this Lease, Tenant will pay Landlord the Security Deposit in the form of a Letter of Credit ("LOC") to secure the faithful performance by Tenant of all of the terms, covenants, and conditions of this Lease to be kept and performed by Tenant. The LOC shall be in the form attached hereto as Exhibit I (or another form which is substantially similar reasonably approved by Landlord).   The LOC shall name Landlord as beneficiary, be issued (or confirmed) by a financial institution reasonably acceptable to Landlord (the "Issuing Bank"), permitting multiple and partial draws thereon from a location in San Francisco, California (or, alternatively, permitting draws via overnight courier or facsimile).  Tenant shall cause the LOC to be continuously maintained (whether through replacement, amendment, renewal, amendment or extension in the then applicable amount of the Security Deposit.  Landlord shall execute and deliver in connection therewith such acknowledgments and instruments as may be reasonably required to effectuate such reduction, including the delivery to Tenant or the Issuer thereof of the LOC then held by Landlord. Upon delivery to Landlord of any new or replacement LOC, Landlord shall return to Tenant for cancellation, together with any reasonable evidence required by the issuer authorizing cancellation, any LOC then held by Landlord and shall promptly return to Tenant any previously retained proceeds. Any LOC shall be returned by Landlord to Tenant on or before the thirtieth (30th) day after the date when the Term has expired or otherwise been terminated, except for amount required to cure Tenant defaults or pay other outstanding obligations of Tenant at the end of the Term.  Upon the occurrence of an Event of Default, Landlord may present the LOC to the Issuing Bank for full or partial payment (to the extent partial draw-downs are permitted by the terms of the LOC) to the extent necessary to cure the Event of Default, with a statement to the Issuer thereof (with a copy thereof given to Tenant promptly thereafter) executed by Landlord, that an Event of Default has occurred and is continuing under this Lease and apply or retain the whole or any part of the proceeds thereof, as the case may be, to the extent required for the payment of Rent as to which Tenant is in default, for any sum which Landlord may expend or be required to expend by reason of Tenant's Event of Default and for all damages resulting from an Event of Default, including from Landlord's exercise of all remedies provided by law and Paragraph 26. If Landlord applies or retains any part of the proceeds of the LOC, then Tenant shall replenish the LOC in the amount so applied or retained and Landlord shall promptly return to Tenant any previously retained proceeds following Landlord's receipt of the fully replenished LOC. If the Building is sold or leased, Landlord shall transfer the LOC to the buyer or lessee. Landlord shall require such buyer or lessee to unconditionally assume in writing Landlord's obligations hereunder from and after the date of such sale or lease, subject to the terms and conditions hereof. Provided that Landlord delivers to Tenant written acknowledgment by such buyer or lessee acknowledging receipt of the LOC, as the case may be, Tenant shall cause the bank that issued the LOC to issue an amendment to the LOC or issue a new LOC naming the buyer or lessee as the beneficiary thereunder. Provided that Landlord transfers the LOC, as the case may be, to such buyer or lessee and such buyer or lessee shall actually receive from Landlord the security then being held by Landlord and shall have assumed Landlord's obligations hereunder (with a duplicate original copy of such assumption having been delivered to Tenant) in writing, Tenant shall look solely to the new landlord for the return of the LOC. The provisions hereof shall apply to every transfer or assignment of the LOC made to a new landlord.

B.      Landlord and Tenant acknowledge and agree that in no event or circumstance shall the LOC or any renewal thereof or any proceeds thereof be (i) deemed to be or treated as a "security deposit" within the meaning of California Civil Code Section 1950.7, (ii) subject to the terms of such Section 1950.7, or (iii) intended to serve as a "security deposit" within the meaning of such Section 1950.7. The parties hereto (A) recite that the LOC is not intended to serve as a security deposit and such Section 1950.7 and any and all other laws, rules and regulations applicable to security deposits in the commercial context ("Security Deposit Laws") shall have no applicability or relevancy thereto and (B) waive any and all rights, duties and obligations either party may now or, in the future, will have relating to or arising from the Security Deposit Laws.

C.      In the event Landlord draws down on the LOC, the proceeds of the LOC may be held by Landlord and applied by Landlord against any Rent payable by Tenant under this Lease that is not paid when due and/or to pay for all losses and damages that Landlord has suffered or that Landlord reasonably estimates that it will suffer as a result of any breach or default by Tenant under this Lease. Any unused proceeds shall constitute the property of Landlord and need not be segregated from Landlord's other assets.  Tenant hereby (i) agrees that (A) Tenant has no property interest whatsoever in the proceeds from any such draw, and (B) such proceeds shall not be deemed to be or treated as a "security deposit" under the Security Deposit Laws, and (ii) waives all rights, duties and obligations either party may now or, in the future, will have relating to or arising from the Security Deposit Laws.  Landlord agrees that the amount of any proceeds of the LOC received by Landlord, and not (a) applied against any Rent payable by Tenant under this Lease that was not paid when due or (b) used to pay for any losses and/or damages suffered by Landlord (or reasonably estimated by Landlord that it will suffer) as a result of any breach or default by Tenant under this Lease (the "Unused LOC Proceeds"), shall be paid by Landlord to Tenant (x) upon receipt by Landlord of a replacement LOC in the full L-C Amount, which replacement LOC shall comply in all respects with the requirements of this Lease, or (y) within thirty (30) days after the LOC Expiration Date; provided, however, that if prior to the LOC Expiration Date a voluntary petition is filed by Tenant, or an involuntary petition is filed against Tenant by any of Tenant's creditors, under the Bankruptcy Code, then Landlord shall not be obligated to make such payment in the amount of the Unused LOC Proceeds until either all preference issues relating to payments under this

49302/0801
ELL/536444.3

Lease have been resolved in such bankruptcy or reorganization case or such bankruptcy or reorganization case has been dismissed.

D.       Tenant acknowledges that late payment by Tenant to Landlord of Rent or other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which would be extremely difficult to ascertain.   Such costs include, but are not limited to, processing and accounting charges, and late charges that may be imposed upon Landlord. Accordingly, if Landlord does not receive any installment of Rent or any other sum due from Tenant within ten (10) days after due, Tenant will pay to Landlord, in addition to any other sums payable hereunder, a late charge of seven percent (7%) of the amount due, plus any attorneys' fees incurred by Landlord because of Tenant's failure to pay Rent and/or other charges when due hereunder; provided, however, no such late charge shall be due for the first (1ˢᵗ) late payment of Rent. The parties agree that such late charge represents a fair and reasonable estimate of the costs that Landlord will incur because of the late payment by Tenant. Acceptance of such late charges by the Landlord will in no event be a waiver of Tenant's default with respect to any such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder.

**7.     Use of Premises.**

A.       The Premises will be used for the Purpose and for no other purposes without the prior written consent of Landlord, which consent Landlord may withhold in its absolute discretion.

B.       Landlord shall not modify any Building certificate of occupancy in any manner that would result in the prohibition of the Purpose, or which would adversely affect the permissible occupancy or density of the Premises. Tenant shall have the right, subject to all limitations on Alterations set forth in this Lease and compliance with all applicable laws, to amend any Building certificate of occupancy with respect to the floors it is leasing, including to increase the density permitted within the Premises and for purposes of adding an accessory eating and drinking use if required in connection with Tenant's sale and/or service of alcohol; provided, however, that (i) sale and service of alcohol is limited to Tenant's employees and Members and their respective invitees, and (ii) if Tenant's or its Members' and their respective employees' and invitees' activities result in disturbances of a material nature, damages, noise, or other unreasonable conduct, Tenant shall promptly take all necessary actions to eliminate such conduct and repair all damage caused, and if Tenant fails to cause such unreasonable conduct to stop Landlord may elect take all necessary actions, including, but not limited to, curtailing or halting the sale or service of alcohol. Tenant shall appoint one or more "management person(s)" employed by Tenant to supervise the use and occupancy of the Premises by its Members and other occupants and invitees and to promptly enforce the Rules and Regulations of the Building and Tenant's own Member rules and regulations. Tenant shall provide Landlord a list of these management persons and their contact information. As of the effective date of this Lease, the management official signed to the Premises is Greg Rosso who can be contacted at gregory.rosso@wework.com. Landlord shall cooperate with Tenant, at no additional cost or expense to Landlord, by executing any documentation that is customary and reasonably necessary in connection with an application by Tenant to any applicable organization, agency and/or authority to obtain the certificate of occupancy (or any amendments thereto) and the governmental approvals, licenses and permits required of Tenant for: (i) the sale and/or service of liquor, beer and wine at the Premises, and (ii) the Purposes. Notwithstanding the foregoing, Tenant shall not seek any amendment to the certificate of occupancy which overloads or unreasonably burdens any Building system, any part of the Building structure, or impairs the rights of other tenants, as determined by Landlord in its sole but good faith discretion.

C.       Landlord warrants and represents that (i) as of the Effective Date, there are no exclusive provisions or contractual provisions, or other agreements, restrictions, covenants, encumbrances or easements granted to, or benefiting any other party which increase Tenant's obligations under this Lease or limit or restrict in any way Tenant's use of the Premises for the Purpose, Tenant's performance of Tenant Improvements or any of Tenant's rights under this Lease (collectively the "Restrictions"). Landlord agrees that it shall not enter into any such Restrictions during the Lease Term and Landlord agrees to indemnify, defend and hold Tenant harmless from and against all Claims incurred or suffered by Tenant by reason of the enforcement by any part of a Restriction or the Landlord's default under this Subparagraph C of Section 7 or breach of any warranty or representation contained in this Subparagraph C of Section 7.

**8.     Alterations; Mechanics' Liens.**

A.       Tenant will not make or suffer to be made, directly or indirectly, any addition or change to or modification of the Premises, including, without limitation, the installation of fixtures, trade fixtures, and leasehold improvements (hereinafter, "alteration") without first obtaining the written consent of Landlord, which consent will not be unreasonably withheld and which consent may be conditioned upon such matters as Landlord's prior written approval of the reasonable time or times when the alterations are to be performed, employment only of contractors and subcontractors who will not cause labor disharmony, and other reasonable conditions prior to Landlord's approval. Notwithstanding the prior sentence, Landlord's consent shall not be required for any alteration unless such alteration (i) may, in Landlord's sole but good faith judgment, cause a material adverse effect to the structural components of the Building or to the Building's HVAC, electrical or plumbing systems; (ii) causes a change to the exterior of the Building; (iii) will cause the Building to be in violation of any applicable Law; and/or (iv) is a Required Removable (as hereinafter defined). With respect to any alterations where Landlord's consent is required, Landlord shall have the right to review plans and specifications for such alterations, and shall advise Tenant, in writing,

9

of its approval or disapproval of such alterations within five (5) business days after receipt of the plans and specifications and/or Tenant's request of approval, as applicable, or if Landlord has engaged a third-party professional (e.g. a structural engineer) to review the plans and specifications, within ten (10) business days after receipt of the plans and specifications. If Landlord shall fail to respond to Tenant within such applicable time period (either five (5) business days or ten (10) business days as the case may be), then Tenant shall send Landlord a second (2nd) notice wherein Tenant requests approval of a proposed alteration, and if Landlord shall fail to either approve or disapprove such proposed alteration(s) within five (5) business days of Landlord's receipt of such second (2nd) notice, Landlord shall be deemed to have approved the proposed alterations for which Tenant had requested Landlord's approval. If Landlord denies Tenant's request to approve a proposed alterations, Landlord shall provide a detailed explanation as to the reason for such denial and shall thereafter cooperate with Tenant to address any issues related thereto. If Landlord has reviewed a set of plans and specifications and has provided comments/issues to Tenant, then on iterative rounds of plans and specifications, including further developments thereof, Landlord shall not have the right to raise comments/issues that were not previously raised, except in connection with material modifications or revisions by Tenant to the plans and specifications previously proposed by Tenant and reviewed by Landlord. Any alteration (excluding trade fixtures, "WeWork" identifiable improvements and movable furniture installed by Tenant that belongs to Tenant) becomes at once a part of the realty and belongs to Landlord subject to Landlord's rights under Paragraph 17. With respect to any alterations where Landlord's consent is not required, Tenant will notify Landlord at least ten (10) business days prior to commencing such alterations, together with the plans and specifications for such alterations for Landlord's records if reasonably applicable to such alterations. Any alterations will be done in accordance with plans and specifications approved by Landlord, or if Landlord does not have a right to consent to such alterations, in accordance with the plans and specifications delivered to Landlord. In connection with Landlord's review of plans and specifications for which Landlord has a consent right, and at Tenant's request in connection with alterations for which Landlord does not have a consent right, Landlord will inform Tenant whether any portion of the alterations actually depicted on the plans and specifications will be a Required Removable if installed. Tenant shall reimburse Landlord for Landlord's actual, reasonable out-of-pocket costs incurred in hiring a third-party professional to review Tenant's plans and specifications for alterations requiring Landlord's prior approval; provided, however, such reimbursement shall not exceed $5,000.00 per alteration.

B.    All alterations will be made by fully licensed, insured and bonded contractors approved in writing by Landlord in advance.  Landlord pre-approves the following contractors: Team Commercial Construction, Peacock Construction, Inc., and Build by We LLC.

C.    If Tenant makes alterations, it will obtain all permits required and perform the work in accordance with all applicable laws, rules, regulations and ordinances (collectively "Laws"). All such work will be performed in a first class manner causing no interference with the operation of the Building and no unreasonable noise, odors or inconvenience to Landlord or the other tenants of the Building; provided, however, Landlord acknowledges and agrees that Tenant may perform all work at all times (i.e. 24 hours a day, 7 days a week) except the following types of work: (i) shooting of studs for mechanical fastenings; (ii) installations of any vertical support; (iii) testing of fire alarms (except in the event of an emergency); (iv) core drilling; (v) penetration of floors or ceilings; and (vi) any work that can be heard outside of the Premises which Landlord reasonably believes will interfere with the quiet enjoyment of other tenants or as to which Landlord receives or more reasonable complaints from other tenants in the Building.   If, in connection with any alterations to the Premises (including in connection with any plumbing work), Tenant reasonably needs access to the ceiling of the area on any non-Premises floor immediately beneath any floor of the Premises Landlord shall arrange a time (which may be after Business Hours, including on the weekend) to allow Tenant access to such other tenant's space (subject to any rights of such tenant regarding access by outside parties) to perform the applicable portion of the alterations, provided that Tenant shall pay for after-hours supervision by Landlord's engineer or other Landlord-designated supervisor. Tenant shall pay the cost of all after-hours and weekend security, engineering and other staff reasonably required by Landlord on account of such work.

D.    In making any alterations, Tenant will keep the Premises and the Building free from any liens arising out of any work performed, materials furnished, or obligations incurred by Tenant. With respect to alterations that would give rise to any mechanic's or materialmen's lien or similar lien, Tenant may not make such alterations until ten (10) days after written notice to Landlord in order to permit Landlord to post or request Tenant to post any appropriate notices to avoid any possible liability with respect to liens. Tenant will, at Landlord's request, prepare, record and post such notices and at all times permit such notices to be posted and to remain posted until the completion and acceptance of such work. Tenant further agrees that there will be no construction, partitions, or other obstructions which might interfere with Landlord's free access to or from the enclosures containing said installations or facilities. Tenant must notify Landlord if the Alterations include the handling of any Hazardous Materials (defined below) and whether these materials are of a customary and typical nature for industry practices. Neither the approval by Landlord of plans and specifications relating to any Alterations nor Landlord's supervision or monitoring of any Alterations constitute any warranty by Landlord to Tenant of the adequacy of the design for Tenant's intended use or the proper performance of the Alterations.

E.    If, as a result of any alterations made by Tenant it is necessary for Landlord to make any repairs or modifications to the Building, whether within or without the Premises, Tenant shall reimburse Landlord for the reasonable, out-of-pocket costs Landlord incurs in performing such repairs or modifications. The parties acknowledge and agree that if there is a dispute over whether or not it is necessary for Landlord to many repairs to the Building as a result of Tenant's alterations, then such

49302/0801
ELL/536444.3

dispute will be resolved by an Expedited Arbitration Proceeding pursuant to the terms set forth in Section 65.

### 9. Work to be Performed by Landlord.

Landlord is not required to perform any work upon the Premises of any type or nature, unless there is attached to this Lease upon execution a Work Letter Agreement or Tenant Improvement Agreement initiated by the Landlord which specifies such work (the "Tenant Improvements"), or except as otherwise set forth herein, including, without limitation Landlord's repair and maintenance obligations or restoration obligations in connection with casualty or condemnation. The cost of any Tenant Improvements is borne by the Tenant unless the Work Letter Agreement specifies otherwise. Any allowance for Tenant Improvement paid for by Landlord shall be used solely for leasehold and building improvements (not personal property purchases). Upon substantial completion of the Tenant Improvements, Landlord will so notify Tenant. Such notice will constitute delivery of possession by the Landlord. The cost of Tenant Improvements shall be deemed amortized over the Lease Term; in the event of early termination of this Lease, Tenant shall pay to Landlord the unamortized value of the Tenant Improvements no later than the date of termination. Notwithstanding the foregoing, Landlord at its sole cost and expense will provide initial Tenant Building Standard signage in the Building lobby directory and at the entrance to the Premises.

### 10. Restrictions on Use.

A. No use will be made or permitted to be made of the Premises, nor acts done, that will increase the existing rate of insurance upon the Building or cause a cancellation of any insurance policy covering the Building or any part thereof, nor may Tenant sell, or permit to be kept, used, or sold in, on or about the Premises, any article that may be prohibited by the standard form of fire insurance policy. Tenant will, at its sole cost and expense, comply with all commercially reasonable requirements pertaining to the Premises of any insurance organization or company necessary for the maintenance of reasonable fire and public liability insurance covering the Building and its appurtenances.

B. Tenant will not do or permit anything to be done in or about the Premises which will in any way unreasonably obstruct or interfere with the rights of other tenants or occupants of the Building or injure or unreasonably annoy them, nor shall Tenant use or allow the Premises to be used for any unlawful purposes, without limiting the generality of the foregoing, Tenant will not make or permit any unreasonable or unnecessary noises or odors in or upon the Premises. Tenant will not commit, or suffer to be committed, any waste upon the Premises or any nuisance (public or private) or other act or thing of any kind or nature whatsoever that may disturb the quiet enjoyment or cause unreasonable annoyance of any other tenant in the Building. The provisions of this paragraph are for the benefit of Landlord only and are not, and will not be construed to be, for the benefit of any tenant or occupant of the Building or any third party. Notwithstanding anything contained herein, Landlord acknowledges that the mere use of the Premises as a Flexible Workplace Center as typically operated as of the Effective Date under the trade name "WeWork" and as disclosed in writing by Tenant to Landlord prior to execution of the Lease (without taking into account the nature and identity of any Member or the business conducted by any Member), does not, in and of itself, lower the character of the Building, injure the reputation of the Building, impair the value of the Building, constitute a public nuisance, impair the appearance of the Building, interfere with or disturb the operation or use of the Building's lobby or elevators by the other tenants or occupants of the Building, unreasonably overburden the infrastructure of the Building, increase Landlord's insurance cost, invalidate any insurance of Landlord or result in increased premiums under same, or unreasonably disturb or annoy other tenants in the Building.

### 11. Compliance with Law, Environmental.

A. Tenant will, at its sole cost and expense, comply with all Laws pertaining to Tenant's use of the Premises, including as a Flexible Workplace Center, and faithfully observe all Laws and the provisions of all recorded documents in the use of the Premises and all requirements of any board of fire underwriters or other similar body now or hereafter constituted related to or affecting the condition, use, or occupancy of the Premises; provided, however, that Landlord shall be responsible for compliance with Laws which are applicable on a Building-wide basis (including alterations or improvements within the Premises) if such Laws do not become applicable to the Building due to Tenant's specific use of the Premises (as opposed to use for general office purposes), subject to Landlord's right to include its reasonable, out-of-pocket costs of such compliance as in Direct Expenses pursuant to this Lease. The judgment of any court of competent jurisdiction, or the admission of Tenant in any action or proceeding against Tenant, whether or not Landlord is a party thereto, that Tenant has violated any Laws pertaining to the Purpose of this Lease or Tenant's use of the Premises will be conclusive of that fact as between Landlord and Tenant. Without limiting the generality of the foregoing, the duties of Tenant under this provision will include the making of all such alterations of the Premises as may be required by any Law by reason of Tenant's use of the Premises, or occasioned by reason of the failure of Tenant to effect repairs, maintenance, replacement or cleaning of the Premises as required under this Lease; provided, however, Tenant shall have no obligation to comply with any Laws (i) to the extent the same require structural alterations or structural repairs to the Premises ("Structural Work"), all of which Structural Work shall be the obligation of the Landlord, unless such Structural Work is necessitated due to Tenant's negligence or willful misconduct, or as a result of Tenant's use of the Premises, or (ii) applicable on a Building-wide basis (including alterations or improvements within the Premises) if such Laws do not become applicable to the Building due to Tenant's specific use of the Premises (as opposed to use for general office purposes), subject to Landlord's right to include its reasonable, out-of-pocket costs of such compliance as

in Direct Expenses pursuant to this Lease. In addition to the foregoing, Tenant shall be responsible for compliance with Laws in the Common Areas if 'triggered' by Tenant's alterations (including initial Tenant Improvements) during the Term (meaning, for example, if Tenant's request for a building permit in connection with its Tenant Improvements would require path of travel modifications in the Building common areas). Landlord covenants and agrees that Landlord shall, at its sole cost and expense, at all times during the Lease Term comply with all applicable Laws, except to the extent such compliance is expressly assumed by Tenant as provided herein.

B.    As used herein, the following items have the following meanings:

(i)    **Environmental Activity** is any actual, proposed or threatened use, storage, treatment, existence, release, emission, discharge, generation, manufacture, disposal or transportation of any Hazardous Materials from, into, on, under or about the Premises, or any other activity or occurrence that causes or would cause any such event to exist.

(ii)    **Environmental Requirements** means all present and future federal, state, regional or local laws relating to the use, storage, treatment, existence, release, emission, discharge, generation, manufacture, disposal or transportation of any Hazardous Materials.

(iii)    **Hazardous Material** is any chemical, substance or material which is classified or considered to be hazardous or toxic under any present of future federal, state, regional or local laws, regulations or guidelines.

C.    Tenant will not engage in nor permit the occurrence of any Environmental Activity except in the ordinary course of Tenant's business and only in compliance with all Environmental Requirements and prudent industry practices. Tenant will, at its own expense, procure, maintain in effect and comply with all conditions of any and all permits, licenses, and other governmental and regulatory approvals required under any Environmental Requirements for any Environmental Activity by Tenant, including, without limitation, the discharge of (appropriately treated) materials or wastes into or through any sanitary sewer serving the Premises, and upon termination of this Lease will cause all of its Hazardous Materials to be removed from the Premises in accordance with and in compliance with all applicable Environmental Requirements.

D.    Upon having knowledge thereof, Tenant will immediately notify Landlord in writing of (i)any regulatory action that has been instituted, or threatened by any governmental agency or court with respect to Tenant that relates to any Environmental Activity; (ii) any claim relating to any Environmental Activity by Tenant in, on or about the Premises, or that arises out of or in connection with any Hazardous Materials in, on, under or about the Premises or removed from the Premises; or (iii) any actual or threatened material release on, under or about the Premises or any adjacent property of any Hazardous Material, except any Hazardous Material whose discharge or emission is expressly authorized by and in compliance with a permit issued by a federal, state, regional or local governmental agency pursuant to Environmental Requirements.

E.    Tenant will provide Landlord with copies of any communications with federal, state, regional or local governments, agencies or courts with respect to any Environmental Activity or Environmental Requirement relating to the Premises and any communications with any third party relating to any claim made or threatened with respect to any Environmental Activity by Tenant in, on or about the Premises.

F.    Tenant will indemnify, defend (by counsel reasonably acceptable to Landlord), protect, and hold Landlord and each of Landlord's partners, employees, agents, attorneys, successors and assigns, free and harmless from and against any and all claims, liabilities, penalties, forfeitures, losses or expenses (including attorneys' fees) arising from or caused in whole or in part, directly or indirectly, by (i) an Environmental Activity by Tenant or Tenant's agents, contractors, invitees, employees or partners; or (ii) Tenant's failure to comply with any Environmental Requirement. Tenant's obligations under this Section 11 includes, without limitation, and whether foreseeable or unforeseeable, all costs of any repair or cleanup, removal or remediation action, or detoxification or decontamination of the Premises, or the preparation and implementation of any closure, remedial action or other plans in connection therewith that are required as a result of any Environmental Activity by Tenant, and survives the expiration or earlier termination of the Term.

G.    Tenant acknowledges that Landlord has advised Tenant that certain fire-proofing, insulating and other building materials used in the construction of the Building contain asbestos or asbestos-containing materials (collectively, "Asbestos"), including in the outside structural walls of the Building and in the floors of the elevator lobbies. Tenant shall not disturb such outside structural walls or elevator lobby floors at any time. Prior to undertaking any alteration or modification in or around the Premises, Tenant shall notify Landlord, in writing, of the exact nature and location of the proposed alterations and shall promptly supply such additional information regarding the proposed alterations as Landlord shall request. After receipt of Tenant's notice, and subject to Landlord's approval of the proposed alterations, Landlord shall, to the extent appropriate and available, supply Tenant with the Building regulations and procedures for working in areas where there is a risk of coming into contact with Asbestos. Tenant shall strictly comply with all Building regulations and procedures established by Landlord from time to time and with all applicable codes, laws, ordinances, rules and regulations relating to construction of improvements and removal and disposal of Hazardous Materials. Landlord shall have the right at all times to monitor the work for compliance with the Building regulations and procedures and

12

49302/0801
ELL/536444.3

applicable laws. If Landlord determines that any of the Building regulations and/or procedures, or any applicable law relating to the removal and disposal of Asbestos are not being strictly complied with, Landlord may immediately require the cessation of all work being performed in or around the Premises until such time as Landlord is satisfied that the applicable laws, regulations and procedures will be observed. Landlord's monitoring of any work in or around the Premises shall not be deemed a certification by Landlord of compliance with any such laws, regulations or procedures or a waiver by Landlord of its right to require strict compliance with same, nor shall such monitoring relieve Tenant from any liabilities relating to such work.

H.      Tenant, at its sole cost and in compliance with all applicable laws, shall remove and dispose of all Asbestos that is encapsulated within structural walls or elevator lobbies of the Building when the Premises is delivered to Tenant but subsequently disturbed as a result of any action by Tenant or any of Tenant's employees, agents, contractors, members, clients, customers, or invitees. Tenant's indemnity of Landlord under this Section 11 will apply to any claims, liabilities, penalties, forfeitures, losses or expenses (including attorneys' fees) arising from Tenant's disturbance of any Asbestos encapsulated within structural walls or the elevator lobbies of the Building.

I.      Landlord shall remove and dispose of Asbestos or other Hazardous Materials in the Premises upon notification from Tenant of the discovery thereof, except as otherwise expressly provided in this Section 11. If any governmental authority promulgates or revises any Environmental Requirements, or if Landlord otherwise so elects, Landlord may, in its sole discretion, comply with such Environmental Requirements, or elect to make such alterations or remove such Asbestos or other Hazardous Materials. Such compliance or the making of alterations, or the removal of all or a portion of such Asbestos or any other Hazardous Material, or a release of any Hazardous Material caused by another tenant, occupant or other third party in the Building or elsewhere on the Property, no matter where occurring, shall not in any event constitute a breach by Landlord of any provision of this Lease, relieve Tenant of the obligation to pay any Rent due under this Lease, constitute or be construed as a constructive or other eviction of Tenant, or constitute or be construed as a breach of Tenant's quiet enjoyment. From and after the date Landlord tenders the Premises to Tenant, Landlord shall defend, indemnify and hold Tenant harmless from and against any and all losses, damages, liabilities (and any claims relating to the foregoing), costs and expenses (including reasonable attorneys' and consultants' fees) resulting from any release of Hazardous Materials within the Premises or the Building to the extent caused by Landlord or its employees, agents or contractors.

## 12.    Indemnity and Exculpation.

A.      As a material part of the consideration for this Lease, Tenant hereby agrees that Landlord and any lender holding a mortgage or deed of trust covering the Premises will not be liable to Tenant for any damage to Tenant's property, and Tenant waives all claims against such persons for damage to property from any cause whatsoever except as otherwise set forth herein. Tenant further agrees that, except to the extent arising from the negligence or willful misconduct of Landlord or the agents, employees, invitees or independent contractors of Landlord (or any Landlord Affiliate) (collectively, "Landlord Parties"), Tenant will indemnify, defend, and hold Landlord harmless from and against any and all claims, demands, liabilities, damages, judgments, orders, decrees, actions, proceedings, fines, penalties, costs and expenses, including without limitation, reasonable court costs and attorney's fees arising from or relating to any loss of life, damage or injury to person, property or business occurring in or about the Premises, or caused by any act, omission, violation of this Lease or use of the Premises or the Building (including telephone or utility closets or control panels) by Tenant, any other occupant of the Premises, or any of their respective agents, employees, contractors or guests. Without limiting the generality of the foregoing, Tenant specifically acknowledges that this indemnity will apply to claims in connection with or arising out of any alterations or improvements to the Premises and the transportation, use, storage, maintenance, generation, manufacturing, handling, disposal, release or discharge of any Hazardous Materials, except to the extent that any of the same arises from the intentional or negligent acts of Landlord or Landlord's agents or employees.

B.      Except to the extent arising from the willful misconduct of Tenant or any Permitted Tenant Party, Landlord will indemnify, defend, and hold the Tenant and the Permitted Tenant Parties harmless from and against any and all claims, demands, liabilities, damages, judgments, orders, decrees, actions, proceedings, fines, penalties, costs and expenses, including without limitation, reasonable court costs and attorney's fees arising from or relating to any loss of life, damage or injury to person, property or business occurring in or about the Building, or caused by any act, omission, violation of this Lease or use of the Premises or the Building (including telephone or utility closets or control panels) by Landlord or any Landlord Party (but for the avoidance of doubt, not any other tenant or occupant of the Building or other third parties).

C.      If any claim, demand, liability, damage, judgment, order, decree, action, proceeding, fine, penalty, cost and expense (including, without limitation, reasonable court costs and attorney's fees) (collectively, "Claims"), is made or brought against any of the parties, with respect to which one of the parties shall be obligated to indemnify the other party pursuant to the terms of this Lease, then the party seeking indemnification shall promptly notify the other party of such Claim and, upon demand of the party seeking indemnification, the other party, at its sole cost and expense, shall resist or defend such Claim in their name, if necessary, by such attorney selected by such party and reasonably approved in writing by the party seeking indemnification (each party hereby acknowledging that any attorney engaged by the indemnifying party's insurance company shall be deemed to be acceptable). Further, the indemnifying party shall not settle any Claim without the prior written consent of the party seeking indemnification

13

(which consent shall not be unreasonably withheld, delayed or conditioned; provided that, it shall be reasonable for the party seeking indemnification to withhold consent if such settlement involves an admission of liability or other wrongdoing by the party seeking indemnification). Each party shall reasonably cooperate with the other, at the sole cost and expense of the indemnifying party, in defending any Claim. If there exists a conflict of interest which would make it inadvisable for any of the parties to be represented by counsel for the indemnifying party, or if there are legal defenses available to any of the parties which are different from or inconsistent with those available to the indemnifying party, then such other party shall be entitled to retain separate counsel and the indemnifying party shall pay, upon demand, the reasonable fees and expenses of such separate counsel.

13.     Insurance.

A.     *Commercial General Liability Insurance.*

(i)     Tenant at its sole cost and expense will maintain during the entire Term (including any additional period that Tenant will have possession of or otherwise occupy or conduct activities in or about the Premises whether before or after the Term) commercial general liability insurance with primary policy liability limits of not less than $1,000,000 per occurrence, combined single limit bodily injury and/or property damage liability and umbrella policy liability limits not less than $10,000,000.00. Landlord will be included as an additional insured under such policy or policies, and the policy or policies will be primary insurance insofar as Landlord is concerned.

(ii)     If Tenant fails, at any time during the Term, to keep such insurance in full force and effect, Landlord may pay the necessary premiums therefor and the repayment thereof will be deemed to be a part of the Rent due hereunder, payable as such on the next date upon which Base Rental becomes due.

(iii)     All commercial general liability insurance will insure contractual liability coverage for insured contracts (as defined in the policy), including, in any event, this Lease.

(iv)     Not more frequently than once every three years, if, in the opinion of Landlord's lender or of the insurance broker retained by Landlord, the amount of commercial general liability insurance coverage at that time is not adequate, Tenant will increase the insurance coverage to the amount of insurance that in Landlord's reasonable judgment is then being customarily required by prudent landlords of similar buildings in the vicinity of the Premises from tenants leasing space similar in size, nature and location of the Premises.

B.     *Business Interruption Insurance.*

At all times during the Lease Term, Tenant shall procure and maintain business interruption insurance in such amount as will reimburse Tenant for direct or indirect loss of earnings and operating expenses for at least one year, from all perils insured against under a Causes of Loss – Special Form property insurance policy.

C.     *Workers' Compensation Insurance.*

Tenant will also carry and maintain in full force and effect during the entire Term hereof (and during any additional period that Tenant will have possession of or otherwise occupy or conduct activities in or about the Premises whether before or after the Term) employer's liability and workers' compensation insurance as required by law. Tenant shall cause its worker's compensation insurance to include a waiver of subrogation endorsement.

D.     *"Causes of Loss - Special Form" Property Insurance.*

Tenant will also carry and maintain in full force and effect during the entire Term hereof (and during any additional period that Tenant will have possession of or otherwise occupy or conduct activities in, on or about the Premises whether before or after the Term), at Tenant's sole cost and expense, a policy or policies of insurance for damage caused by the perils insured against under a Causes of Loss Special Form policy covering Tenant's furniture, fixtures, equipment, improvements, alterations, trade fixtures, and other personal property including building plate glass. Landlord will be named as loss payee on such policy or policies, to the extent of its interest in such property, and the limits of coverage will be equal to the full replacement value of such property.

E.     *Builder's Risk Insurance.*

If Tenant makes any alterations of the Premises, Tenant will, at Tenant's sole cost and expense, carry "Causes of Loss - Special Form" builder's risk insurance, on a completed value form.

F.     *Waiver of Subrogation.*

With respect to any loss or damage to property, the parties each hereby waive all rights of subrogation of their respective insurers, provided such waiver of subrogation will not affect the right of the insured to recover thereunder. The parties agree that their respective insurance policies are now, or will

14

49302/0801
ELL/536444.3

be, endorsed such that said waiver of subrogation will not affect the right of the insured to recover thereunder, so long as no material additional premium is charged therefor.

G.   Other Insurance Matters.

All the insurance required under this Lease will:

(i)   Be issued by insurance companies authorized to do business in California, with a financial rating of at least an A-VII status as rated in the most recent edition of Best's Insurance Reports.

(ii)   With respect to the commercial general liability insurance, be subject to the requirements that Tenant provide Landlord thirty (30) days advance written notice before cancellation or reduction in coverage that would adversely affect Tenants ability to satisfy its insurance-related obligations under this Lease.

(iii)   Be renewed before expiration of the term of the policy.

A certificate of insurance evidencing such coverage required under this Lease will be deposited with Landlord at the commencement of the Term and on each renewal of the policy.

Tenant will require each of its Members and other permitted sublessees to maintain insurance consistent with the requirements above.

H.   Landlord's Insurance.

Landlord shall (1) insure the Building during the entire Term under "Causes of Loss - Special Form" property insurance policy which, to the extent consistent with the practices of landlords of the comparable buildings, shall be for the replacement cost of the Building and otherwise contain coverages selected by Landlord in its discretion; (2) maintain a Commercial General Liability and Umbrella Liability coverage in amounts not less than $5,000,000.00 per occurrence; and (3) maintain other insurance policies as required by applicable law.

I.   Construction.

Nothing in this Paragraph 13 will be construed as creating or implying the existence of (i) any ownership by Tenant of any alterations in, on or about the Premises or (ii) any right of Tenant to make any alterations in, on or about the Premises.

14.   Rules and Regulations.

The Rules and Regulations attached hereto as Exhibit C are hereby incorporated by reference herein and made a part hereof. Tenant shall abide by, and faithfully observe and comply with the Rules and Regulations and any reasonable and non-discriminatory amendments, modifications and/or additions thereto as may hereafter be adopted and published by written notice to tenants by Landlord for the safety, care, security, good order and/or cleanliness of the Premises and/or the Building. All changes to the Rules and Regulations shall be sent to Tenant in writing at least ten (10) days prior to any change taking effect. Notwithstanding anything to the contrary contained herein, (a) Tenant shall not be required to comply with any rule or regulation which either materially increases Tenant's obligations or decreases Tenant's rights under this Lease, (b) changes to the Rules and Regulations may not result in a material decrease in Landlord's obligation under this Lease, and (c) the Rules and Regulations may not be adopted or enforced in a manner that is unreasonable or discriminatory against Tenant, Permitted Tenant Parties or any other of its agents, employees, contractors or invitees. In the event of any conflict between the Lease and the Rules and Regulations (or any portion thereof), the terms of this Lease shall control. Except as otherwise set forth herein, Landlord shall not be liable to Tenant for any violations of such rules and regulations by any other tenant or occupant of the Building.

15.   Utilities and Services.

A.   During the Lease Term Landlord agrees to furnish or cause to be furnished to the Premises, during Business Hours (and during non-Business Hours as explicitly set forth in this Section 15) subject to applicable law and the Rules and Regulations, the following utilities and services, subject to the conditions and standards set forth herein and in compliance with the provisions of Exhibit L: (i) non-attended automatic elevator service (if the Building has such equipment serving the Premises), in common with Landlord and other tenants and occupants and their agents and invitees, (ii) water for drinking, pantry, cleaning and rest room purposes, (iii) reasonable janitorial and cleaning services (weekdays excluding holidays, provided that the Premises are used exclusively for office purposes and are kept reasonably in order by Tenant (if the Premises are not used exclusively as offices, Landlord, at Landlord's sole discretion, may require that the Premises be kept clean and in order by Tenant, at Tenant's expense, to the satisfaction of Landlord and by persons approved by Landlord; and, in all events, Tenant will pay Landlord for the cost of removing Tenant's refuse and rubbish, to the extent the same exceeds the refuse and rubbish attendant to normal office usage), (iv) radiant heat and air conditioning (weekdays 8 a.m. to 6 p.m., holidays excluded), for the Building's common areas, (v) at all reasonable times, electric current sufficient for general office use (the "Base Electrical Capacity"), and (vi) a security program for ingress and egress, that allows Tenant (and Permitted Tenant Parties) access to the Building 24 hours a day, 7 days a week through Tenant's integration of its key card access system in

15

a manner reasonably acceptable to Landlord, and which does not unfairly discriminate against Tenant or any Permitted Tenant Parties; provided, however, Tenant shall provide Landlord with the names of all persons granted access to the Building through Tenant's integrated security system in a manner reasonably acceptable to Landlord (which may be accomplished via a website or other software provided by Tenant to Landlord at no cost to Landlord). However: (a) without Landlord's consent (which shall not be unreasonably withheld, conditioned or delayed), Tenant may not install, or permit the installation, in the Premises of any space heaters, air conditioning equipment, electronic equipment or other type of equipment or machines which will increase Tenant's use of electric current in excess of the Base Electrical Capacity (provided, however, that the foregoing will not preclude the normal use of personal computers or similar office equipment); (b) if Tenant requires an increase of the electric current above the Base Electrical Capacity which may disrupt the provision of electrical services to other tenants or which exceeds normal usage for tenants in the Building, Landlord may refuse to grant its consent or may condition its consent upon Tenant's paying the cost of installing and providing any additional facilities required to furnish such excess power to the Premises and upon the installation in the Premises of electric current meters to measure the amount of electric current consumed, Tenant will pay for the cost of such meter(s) and the cost of installation, maintenance and repair thereof, as well as for all excess electric current consumed at the rates charged by the applicable local public utility, plus a reasonable amount to cover the additional expenses incurred by Landlord in keeping account of the electric current so consumed; and (c) if Tenant's increased electrical requirements will materially affect the temperature level in the Premises or the Building, Landlord's consent may be conditioned upon Tenant's requirement to pay such amounts as will be incurred by Landlord to install and operate any machinery or equipment necessary to restore the temperature level to that otherwise required to be provided by Landlord, including but not limited to the cost of modifications to any air conditioning system. Landlord will not, in any way, be liable or responsible to Tenant for any loss or damage or expense which Tenant may incur or sustain if, for any reasons beyond Landlord's reasonable control, either the quantity or character of electric service is changed or is no longer available or suitable for Tenant's requirements. Tenant covenants that at all times its use of electric current will never exceed the capacity of the feeders, risers or electrical installations of the Building. If Tenant needs to access electrical risers, Tenant shall provide Landlord at least 24 hours' advance notice and Landlord will assign a Building engineer to unlock the riser closet(s) for Tenant, and at Landlord's option will be present at all times while Tenant is accessing the electrical risers. If submetering of electricity in the Building will not be permitted under future laws or regulations, the Rent will be equitably and periodically adjusted to include an additional payment to Landlord reflecting the cost to Landlord for furnishing electricity to Tenant in the Premises. Any amounts which Tenant is required to pay to Landlord pursuant to this section are due within thirty (30) business days after demand by Landlord and are Additional Rental. Current charge for after-hours HVAC is $250.00 per hour for the entire Building for a minimum of three (3) hours. The parties agree that notwithstanding anything to the contrary contained in this Lease, the provisions of Exhibit L attached hereto shall govern with respect to the matters set forth therein.

B.      Landlord is not liable for any failure to furnish, stoppage of, or interruption in furnishing any of services or utilities, when such failure is caused by accident, breakage, repairs, strikes, lockouts, labor disputes, labor disturbances, governmental regulation, civil disturbances, acts of war, moratorium or other governmental action, or any other cause beyond Landlord's reasonable control, and, in such event, Tenant is not entitled to any damages nor will any failure or interruption abate or suspend Tenant's obligation to pay Base Monthly Rental and Additional Rental or be construed as a constructive or other eviction of Tenant. Further, in the event any governmental authority or public utility promulgates or revises any law, ordinance, rule or regulation, or issues mandatory controls, or voluntary controls relating to the use or conservation of energy, water, gas, light or electricity, the reduction of automobile or other emissions, or the provision of any other utility or service, Landlord may take any reasonably appropriate action to comply with such law, ordinance, rule, regulation, mandatory control or voluntary guideline and Tenant's obligations hereunder will not be affected by any such action of Landlord. Landlord shall not do anything which shall cause a decrease in the services and utilities that Landlord is obligated to provide pursuant to Section 15.A above. The parties acknowledge that safety and security devices, services and programs provided by Landlord, if any, while intended to deter crime and ensure safety, may not in given instances prevent theft or other criminal acts, or ensure safety of persons or property. The risk that any safety or security device, service or program may not be effective, or may malfunction, or be circumvented by a criminal, is assumed by Tenant with respect to Tenant's property and interests, and Tenant must obtain insurance coverage to the extent Tenant desires protection against such criminal acts and other losses, as further described in this Lease. Tenant agrees to cooperate in any reasonable safety or security program developed by Landlord or required by Law. Landlord shall provide Tenant with no less than two (2) Business Days prior written notice of any planned service or utility interruptions or shutdowns and, except in an emergency, Tenant shall have the right to cause Landlord to postpone such interruption or shut down for a reasonable period of time (not to exceed two (2) Business Days) to accommodate Tenant's schedule (or any Member's schedules). Except in an emergency or otherwise required by applicable Law or any utility company or governmental authority, any such interruption or shutdown may only be performed after normal Business Hours. Except as otherwise set forth in this Lease, Tenant shall look to its business interruption insurance coverage (required under Paragraph 13.B above) in connection with interruptions which prevent Tenant from conducting its business in all or any part of the Premises.

C.      Notwithstanding anything in this Lease to the contrary, if Tenant is not reasonably able to use, and does not use, any entire floor of the Premises to conduct its business operations for a period of five (5) consecutive business days as a result of (a) any repair or maintenance activities or Building modifications conducted by Landlord that were not necessitated by the negligence, willful misconduct, or breach of applicable law or this Lease by Tenant or any of Tenant's employees, agents, contractors,

members, clients, customers, or invitees, or (b) the interruption of any HVAC, electricity, water or elevator service to the Premises, provided that such interruption was caused solely by Landlord or its employees, contractors or agents and specifically excluding any period of interruption caused by Force Majeure (as described in Section 56 below) (any of the foregoing, a "Service Interruption"). Tenant shall promptly notify Landlord in writing of any such Service Interruption, and Landlord shall use diligent commercially reasonable efforts to restore such service and Tenant's ability to use all floors of the Premises for its normal business operations. If the Service Interruption continues for five (5) consecutive business days, Tenant's sole remedy for such Service Interruption shall be proportional abatement of Base Rent for each floor of the Premises Tenant is unable to use as a result of the Service Interruption commencing on the sixth (6ᵗʰ) day of the Service Interruption with respect to such floor and continuing until the service is restored such that Tenant is able to use, or actually does use, such floor of the Premises. Tenant acknowledges that it has the right to contract with any telephone and/or telecommunications provider that offers service to the Building to provide telephone, internet and data services to the Premises. Interruption of any such telephone, internet or data services shall be deemed a Service Interruption only if such interruption is solely caused by Landlord. Notwithstanding the foregoing, if the Service Interruption is caused by a casualty, the provisions of Section 31 of this Lease shall apply in lieu of this Section.

D.    Tenant shall have the right but no obligation to reserve one (1) parking space per floor leased. Tenant shall provide a $100 deposit for each of the garage remote controls. The current monthly parking rate for the Building is $500 per parking space, which rate may be increased by Landlord at any time in its sole discretion.

## 16.    Personal Property Taxes.

Tenant is responsible for and will pay before delinquency all taxes and other governmental charges and impositions levied against Tenant, Tenant's improvements, fixtures, trade fixtures, alterations, furniture, fixtures, equipment, or other personal property, Tenant's leasehold interest, the Rent or other charges payable by Tenant, any business carried on at the Premises, or in connection with the use or occupancy thereof, including, without limitation, City of San Francisco Gross Receipts Taxes, payroll taxes, any general or special assessments, levies, fees or charges, transit or transportation charges, housing subsidies and/or housing fund assessments, possessory interest taxes, business or license taxes or fees, job training subsidies and/or assessments, or open space charges, irrespective of whether any of the foregoing is assessed or designated as a real or personal property tax, and irrespective of whether any of the foregoing is assessed to or against Landlord or Tenant. Should any of the foregoing be applied in any manner to the real property taxes levied on the Building or appurtenances thereto, Tenant, upon demand, will pay such personal property taxes to Landlord who in turn will pay the same to the property tax collector. Notwithstanding anything to the contrary contained herein, Tenant shall not be responsible with paying taxes and other governmental charges and impositions if Tenant has already paid (or will pay) such as Direct Tax Expenses and such payment will result in Tenant paying for any such tax or other charge or imposition twice.

## 17.    Maintenance.

A.    Once the Commencement Date has occurred and Landlord has delivered possession of the Premises in accordance with the terms of this Lease, Tenant accepts the Premises as being in good and sanitary order, condition and repair except as otherwise set forth herein. Except as to damage caused by Landlord's (or any Landlord Party's) negligence or willful misconduct or if due to condemnation or casualty (including fire, earthquake, act of God, or the elements), Tenant, at its sole cost and expense, will keep the interior of the Premises and every part thereof in good and sanitary condition and repair. Tenant agrees to carry out promptly all maintenance that at any time may become necessary to put and keep the Premises in as good and sanitary a condition as when received by Tenant from Landlord, reasonable wear and tear excepted, and, the preceding sentence notwithstanding, to replace immediately all interior glass now or hereafter installed in the Premises, however broken. Maintenance or repair required because of burglary or vandalism will be the sole responsibility of Tenant, unless required as a result of Landlord's (or any Landlord Party's) grossly negligent acts or intentional misconduct. Landlord, however, shall keep the Building (including the common areas of the Building) and all Building Systems (including the Building's elevators) in good and sanitary order, condition and repair, and is responsible for the compliance of the common areas in the Building (which may be a part of Direct Expenses as defined in Section 5D of this Lease) with ADA and building codes, such as sprinkler requirements, path of travel and exiting. Notwithstanding any provision set forth in this Lease to the contrary, if (i) Tenant provides prior written notice to Landlord of an event or circumstance which requires the action of Landlord with respect to repair and/or maintenance, (ii) Landlord is, in fact, required to perform repairs and/or maintenance under the terms of this Lease, (iii) Landlord fails to commence such action within a reasonable period of time (given the circumstances) after the receipt of such notice, but in any event not later than thirty (30) days after receipt of such notice (or within two (2) Business Days in the case of an emergency); provided, however, for purposes of this paragraph to "commence" such action shall include any steps taken by Landlord to design, consult, bid, contract for, or seek permit or other governmental approval in connection with the necessary work, and (iv) Landlord's failure to take or perform the required repairs and/or maintenance materially and adversely affects Tenant's use and/or occupancy of the Premises, then Tenant may deliver an additional notice (the "Self-Help Notice") to Landlord specifying that the thirty (30) day period (or two (2) Business Day period, in the case of an emergency) has expired, which notice shall describe the specific action required and that Tenant intends to take or commence such required action, and such notice shall be written in 14-point font, using all capital letters. If such action is required under the terms of this Lease to be taken by Landlord and is not taken by Landlord within three (3) Business Days following Landlord's receipt of the Self-Help Notice, then Tenant may

49302/0801
ELL/536444.3

proceed to take the required action and shall be entitled to reimbursement from Landlord for the reasonable out-of-pocket costs and expenses in taking such action (and only such action as specified in the Self-Help Notice)within thirty (30) days after Tenant delivers a detailed invoice setting forth a particularized breakdown of the costs and expenses incurred in connection with the action taken by Tenant pursuant to the Self-Help Notice. Notwithstanding the foregoing, in no event shall Tenant perform any work (whether pursuant to a Self-Help Notice or otherwise) that materially affects the Building's structure, exterior, roof, or foundations.

B.    If, during the Term, because of the Tenant's use (including as a Flexible Workplace Center) of the Premises, any alterations or improvements to the Premises are required by Law, whether or not such Law was within the contemplation of the parties upon execution of this Lease, Tenant will be obligated to make such alterations or improvements at its sole cost and expense (subject to Section 11 above).

C.·   Tenant hereby waives all rights under, and the benefits of, Subsection 1 of Section 1932 and Sections 1941 and 1942 of the California Civil Code, and under any similar law, permitting Tenant to make repairs at the expense of Landlord or to terminate a lease by reason of the condition of the leased premises.

#### 18.    Restoration of Premises.

Tenant agrees that upon the expiration of the Term, the earlier termination of the Lease for whatever reason, or Tenant's abandonment of the Premises, whichever occurs first, Tenant will surrender or leave the Premises in the good condition and repair, reasonable wear and tear and damage by fire, earthquake, acts of God, or the elements excepted unless such damages was caused by Tenant's (or any of Tenant's employees', agents', contractors', members', clients', customers', or invitees') negligent or willful act or omission. Tenant shall have no restoration obligations (i) with respect to alterations depicted in plans and specifications reviewed by Landlord in accordance with Section 8 above unless Landlord has notified Tenant that any alterations actually depicted on such plans and specifications must be removed, or (ii) unless any aspect of such alterations are identified by Landlord in a walkthrough of the applicable portion of the Premises upon completion of the applicable alterations as requiring removal (provided that if Tenant fails to schedule such a walk-through with Landlord upon completion of such alterations, all such items under this clause (ii) will be subject to removal at Landlord's discretion) (each such alteration that Tenant must remove, a "Required Removable"). At Tenant's request, prior to commencement of alterations, Landlord will advise Tenant whether any particular alteration will be a Required Removable. Without limiting the foregoing, as to the initial Tenant Improvements (Rider 1 to Exhibit B), Landlord shall inform Tenant in connection with Landlord's review of the plans and specifications therefor whether any portion of the alterations actually depicted on the plans and specifications for the initial Tenant Improvements will be a Required Removable if installed, and the parties will conduct a joint walkthrough following completion of the initial Tenant Improvements, after which Landlord will provide Tenant with a list of the initial Tenant Improvements that will be considered Required Removables (subject to Landlord's obligation to identify items actually depicted on the plans and specifications and Tenant's right to request advise before making any alterations in accordance with this Section). The removal and restoration requirement shall also apply to any "storage unit" which Tenant may contract with Landlord to use during the Lease. As used throughout this paragraph, "restoration" means the reconstruction, rebuilding, rehabilitation, and repairs necessary to return altered, improved, or damaged portions of the Premises and other damaged property in, on or about the Premises to substantially the same physical condition in which they were immediately before the alteration, improvement, or damage.

#### 19.    Entry by Landlord.

Landlord reserves the right and Tenant will permit Landlord and its authorized representatives to enter the Premises at all reasonable times (provided that Landlord provides at least forty-eight (48) hours' prior notice, which may be provided by email or telephone, except in connection with entering the Premises to provide janitorial and other routine services or in the case of emergency, in which event no notice shall be required) for purposes of (i) inspecting, performing maintenance or making alterations of the Premises or any other portion of the Building, including the erection and maintenance of such scaffolding, canopies, fences, and props as Landlord may reasonably require; (ii) posting notices of nonresponsibility or nonliability for alterations or repairs; (iii) placing upon the Premises any usual or ordinary "for rent" signs; or (iv) showing or submitting the Premises to prospective purchasers or tenants, all of which actions Landlord may take without any abatement of Rent. Except as otherwise set forth herein, Tenant hereby waives any claim for damages for any injury or inconvenience to or interferences with Tenant's business, any loss of occupancy or quiet enjoyment of the Premises, and any other loss occasioned by such entry. Landlord will use reasonable efforts in order that the entrance to the Premises will not be blocked by the making of such alterations or the performing of such maintenance and that the business of Tenant will not thereby be interfered with unreasonably. For each of the aforesaid purposes, Landlord will at all times have and retain a key with which to unlock all of the Premises, excluding Tenant's vaults, safes, file cabinets and desks, and Landlord may use any means which Landlord deems proper to open said doors in an emergency in order to obtain entry to the Premises. Any entry to the Premises obtained by Landlord by any of said means, or otherwise, will not under any circumstances be construed or deemed to be a forcible or unlawful entry into or a detainer of the Premises, or an eviction of Tenant from the Premises or any portion thereof. Landlord has the right to make alterations to the Building or erect other buildings on the real property adjacent thereto. Except as otherwise set forth herein, Tenant will not in such event be entitled to any direct or consequential damages for any damage or inconvenience occasioned thereby, but Landlord will use its best efforts to

accomplish such work in such a manner as to inconvenience Tenant as little as possible. In the event Tenant is deprived of the use of the Premises by reason of the demolition of the Building, this Lease will terminate without any liability of Landlord to Tenant. Landlord acknowledges and agrees that in exercising the rights reserved to Landlord pursuant to this Section 19 that Landlord will be subject to the provisions of Section 15.B related to Service Interruptions. Further, in exercising the rights reserved to Landlord pursuant to this Section 19, Landlord shall use commercially reasonable efforts to exercise such rights during non-Business Hours at no additional out-of-pocket cost to Landlord. If in exercising such rights during non-Business Hours Landlord reasonably anticipates that it will incur additional out-of-pocket costs (such as overtime costs and expenses) Landlord shall promptly notify Tenant (via writing or e-mail) of such additional costs, and Tenant shall respond within 24 hours (via writing or e-mail) that Tenant chooses to either (i) reimburse Landlord for its reasonable out-of-pocket costs incurred attributable to exercising such reserved rights during non-Business Hours as Additional Rental within thirty (30) days of receipt of an invoice thereof, or (ii) elect to allow Landlord to exercise such rights during Business Hours.

## 20. Estoppel Certificates.

At any time not more than twenty (20) business days after a request is received from Landlord, Tenant will execute, acknowledge and deliver to Landlord, or to such party as Landlord may designate a written statement certifying the date of commencement of this Lease, that this Lease is unmodified and in full force and effect (or, if there have been any modifications of this Lease, that the Lease is in full force and effect as modified and stating the date and nature of the modification or modifications), that Landlord is not in default under this Lease (or, if there is any claimed default, stating the nature and extent thereof), that no Event of Default on the part of Tenant exists under this Lease (or, if an Event of Default exists, specifying the nature and extent thereof), the current amounts of and the dates up to which Rent has been paid, the period for which Rent and other charges have been paid in advance, and any additional matters or information that may reasonably be requested by Landlord. It is expressly understood and agreed that any such statement delivered pursuant to this paragraph may be relied upon by any prospective purchaser of the Building or any lender, prospective lender, or any assignee or prospective assignee of any lender, and by any third person. If Tenant fails to deliver the requested estoppel within such twenty (20) business day period and further fails to deliver the same within five (5) days after Landlord notifies Tenant of such failure, such failure to deliver the requested estoppel will constitute an Event of Default.

## 21. Intentionally Omitted.

## 22. Removal of Trade Fixtures by Tenant at End of Term.

If Tenant fully and faithfully performs all of Tenant's obligations under this Lease, then Tenant may remove, and upon the request of Landlord will remove, at Tenant's sole cost and expense, all trade fixtures, movable furniture and decorations installed in, on or about the Premises by Tenant, provided that such removal may be effected without damage to the Premises.

## 23. Surrender of Lease.

The voluntary or other surrender of this Lease by Tenant, accepted by Landlord, or the mutual cancellation hereof, will not work a merger and, at the option of Landlord, will either terminate any or all existing subleases or subtenancies or operate as an assignment to Landlord of any or all of such subleases or subtenancies.

## 24. Holding Over.

Any holding over after the expiration of the Term without the written consent of Landlord will be construed to be a tenancy from month to month at a rent equal to 150% of the Rent payable under this Lease during the last full month before the date of such expiration, provided that Landlord may specify a higher rent upon thirty (30) days' notice. In addition, Tenant will indemnify Landlord and hold it harmless from and against all actual and reasonable damages, costs, claims, causes of action, liabilities, and expenses (including, without limitation attorneys' fees and expenses and claims for damages by any other person to whom Landlord may have leased all or any part of the Premises effective upon such expiration) sustained by Landlord by reason of such retention.

## 25. Default.

A. *Tenant Default.* Each of the following events shall be an "Event of Default" hereunder:

(i) If Tenant fails to pay when due any installment of Base Rental, Direct Expenses, Direct Tax Expenses, or other items identified in the monthly billing statement provided by Landlord to Tenant and such default shall continue for five (5) business days after Tenant's receipt of notice thereof from Landlord referring to this Subparagraph A(i) of this Section 25, specifying such failure;

(ii) If Tenant fails to pay when due any other monetary obligations of Tenant not set forth in clause (i) above and such default shall continue for thirty (30) days after Tenant's receipt of notice thereof from Landlord referring to this Subparagraph A(ii) of this Section 25, specifying such failure;

(iii) If Tenant fails to perform any other term, covenant or condition of this Lease and such failure continues for thirty (30) calendar days after Tenant's receipt of notice thereof from Landlord,

19

49302/0801
ELL/536444.3

specifying such failure and requiring it to be remedied, provided that if such failure cannot with due diligence be remedied by Tenant within such thirty (30)-day period, if Tenant commences to remedy such failure within such thirty (30)-day period and thereafter prosecutes the remedying of such failure with reasonable diligence, then the period of time after the receipt of such notice by Tenant within which such failure may be remedied shall be extended so long as Tenant prosecutes the remedying of such failure with reasonable diligence; and

(iv)    The filing of a petition by or against Tenant or Guarantor: (1) in any bankruptcy or other insolvency proceeding; (2) seeking any relief under any state or federal debtor relief law; (3) for the appointment of a liquidator or receiver for all or substantially all of Tenant's property or for Tenant's interest in this Lease; or (4) for the reorganization or modification of Tenant's capital structure; however, if such a petition is filed against Tenant, then such filing shall not be an Event of Default unless Tenant fails to have the proceedings initiated by such petition dismissed within sixty (60) calendar days after the filing thereof.

(v)    The occurrence of any of the following:  (a) a general assignment by Tenant or Guarantor for the benefit of creditors; (b) the admission by Tenant or Guarantor in writing of its inability to pay its debts as they become due; or (c) the levying of execution upon any interest of Tenant in or under this Lease or upon the property of Tenant within the Premises, unless the same will be bonded against or discharged within thirty (30) days following the levy or within five (5) days prior to the proposed sale thereunder, whichever is earlier.

B.    Landlord Default.  No default or breach of any of the terms, covenants or conditions of this Lease will exist on the part of Landlord until (i) Tenant serves Landlord with a notice specifying with particularity the default or breach alleged to exist and (ii) Landlord fails to perform or observe said term, covenant or condition, as the case may be, within a reasonable time not to exceed thirty (30) days after receiving the notice.

C.    If the Landlord or Tenant is delayed or prevented from performing the act required by reason of acts of God, strikes, lockouts, labor troubles, inability to procure materials, restrictive laws, or any other cause beyond Landlord's or Tenant's reasonable control, as the case may be, the performance of the act will be excused for the period of the delay, and the period for the performance of the act will be extended for a period equivalent to the period of such delay.

D.    Notwithstanding anything to the contrary contained herein, in no event shall either party be liable for consequential or punitive damages under this Lease, including in connection with an Event of Default or Landlord default.

26.    **Landlord's Remedies Upon an Event of Default.**

A.    Upon an Event of Default Landlord has the following remedies set forth below in this Section 26, which are not exclusive but are in addition to any rights and remedies now or later allowed by law or in equity.

B.    Landlord may either terminate Tenant's right of possession to the Premises, thereby terminating this Lease, or have this Lease continue in full force and effect with Tenant having the right of possession to the Premises.  If Landlord elects to terminate Tenant's right of possession to the Premises, then Landlord will have the immediate right of entry to and may remove all persons and property from the Premises.  Such property so removed may be stored in a public warehouse or elsewhere at the cost and for the account of Tenant.  Upon such termination Landlord, in addition to any other rights and remedies, including rights and remedies under Subparagraphs (1), (2) and (4) of Subdivision (a) of Section 1951.2 of the California Civil Code, or any amendment to or any successor law of that section, will be entitled to recover from Tenant the worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of the award exceeds the rent received by Landlord in mitigating its damages together with the amount of such rental loss that the Tenant proves could be reasonably avoided.  The amount Landlord may recover under Subparagraph (4) of Subdivision (a) of Section 1951.2 of the California Civil Code will include, without limitation, the cost of recovering possession of the Premises, expenses of reletting (including advertising), brokerage commissions and fees, costs of placing the Premises in good order, condition and repair, including necessary maintenance and restoration of the Premises, attorneys' fees, court costs and costs incurred in the appointment of and performance by a receiver to protect the Premises or Landlord's interest under this Lease.  The worth at the time of the award of the amount referred to in Subparagraph (3) of Subdivision (a) of Section 1951.2 of the California Civil Code will be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award plus one percent (1%).  The worth at the time of the award, referred to in Subparagraphs (1) and (2) of Subdivision (a) of Section 1951.2 of the California Civil Code will be computed by allowing interest at the maximum rate permitted by law.  Anything herein to the contrary notwithstanding, Landlord will use commercially reasonable efforts to mitigate Tenant's damages following the termination of this Lease by Landlord as permitted pursuant to this Lease. Any reletting of the Premises by Landlord shall be on such terms and subject to such conditions as Landlord deems commercially reasonable.  Without limiting the generality of the foregoing, (i) Landlord shall not be obligated to relet the Premises (a) in place of other vacant space owned by Landlord in the Building or elsewhere, or (b) to any person or entity or for any use to whom or for which Landlord would not under other circumstances lease the Premises; (ii) Landlord shall not be obligated to observe any instructions given by Tenant about such reletting; (iii) the Premises may be relet for a greater or lesser term than that remaining under this Lease, may be relet as part of a larger area, or may be made smaller if necessary to

20

accommodate a particular tenant's needs and desires; and (iv) Landlord may, but shall not be obligated to, change the character and use made of the Premises..

C.      Any proof by Tenant under Subparagraphs (2) or (3) of Subdivision (a) of Section 1951.2 of the California Civil Code of the amount of rental loss that could be reasonably avoided will be made in the following manner: Landlord and Tenant will each select an independent licensed real estate broker in the business of renting property of the same type and Purpose as the Premises and in the same geographic vicinity; these two brokers will select a third independent licensed real estate broker of similar qualifications; the two brokers selected by the parties will determine the amount of rental loss that could be reasonably avoided for the balance of the Term after the time of the award. The third broker will then decide which of the two brokers has made the better determination of the worth at the time of the award, and his decision will be final and binding on the parties.

D.      If Landlord elects to keep this Lease in full force and effect with Tenant retaining the right of possession to the Premises (notwithstanding the fact that Tenant may have vacated or abandoned the Premises), Landlord may enforce all of its rights and remedies under this Lease or allowed by law or in equity including, but not limited to, the right to recover the installments of Rent as they become due under this Lease; additionally, the Landlord has the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has right to sublet or assign, subject only to reasonable limitations). Notwithstanding any such election to have this Lease remain in full force and effect, Landlord may at any time thereafter elect to terminate Tenant's right of possession to the Premises, thereby terminating this Lease, for any previous Event of Default which remains uncured, or for any existing or subsequent Event of Default. For purposes of Landlord's right to continue this Lease in effect upon Tenant's breach or default, acts of maintenance or preservation or efforts by Landlord to relet the Premises or the appointment of a receiver on initiative of Landlord to protect its interest under this Lease do not constitute a termination of Tenant's right of possession.

E.      If Landlord elects to keep this Lease in full force and effect, Landlord may, as attorney-in-fact of Tenant, sublet the Premises, or any part thereof, from time to time and for such tenant, at such rent, and upon such other terms, covenants and conditions as Landlord in its sole discretion may deem advisable with the unqualified right to make alterations, effect restoration, and perform maintenance to the Premises. Upon each such subletting (i) Tenant will be responsible for, in addition to Tenant's indebtedness to Landlord other than Rent due hereunder, the reasonable out-of-pocket costs of such subletting and of such alterations, restoration and maintenance incurred by Landlord, and the amount by which the Rent hereunder for the period of such subletting (to the extent such period does not exceed the Term hereof) exceeds the amount agreed to be paid as Rent for the Premises for the period of such subletting, or (ii) at the option of Landlord, rents received from such subletting will be applied: first, to the payment of Tenant's indebtedness to Landlord other than Rent due hereunder; second, to the payment of costs of such subletting and of such alterations, restoration and maintenance; third, to the payment of Rent due and unpaid hereunder; and fourth, the residue, if any, to be held by Landlord and applied in payment of future Rent as the same becomes due hereunder. If Tenant has been credited with any rent to be received by such subletting and such rent is not promptly paid to Landlord by the subtenant(s), or if such rent received from such subletting during any month is less than the Rent to be paid during that month by Tenant hereunder, Tenant will pay any such deficiency to Landlord. Such deficiency will be calculated and paid monthly on the date Rent is due and payable hereunder. No taking possession of the Premises by Landlord, as attorney-in-fact for Tenant, will be construed as an election on Landlord's part to terminate this Lease unless a notice of such election is given to Tenant. Notwithstanding any such subletting without termination of this Lease, Landlord may at any time thereafter elect to terminate this Lease for any previous, existing or subsequent Event of Default. At Landlord's option and application, a receiver for Tenant will be appointed to take possession of the Premises, to exercise Landlord's right to sublet the Premises as attorney-in-fact for Tenant, and to apply any rent collected from the Premises as provided herein.

F.      Nothing in this paragraph affects Landlord's right to indemnification for liability arising prior to the termination of the Lease for damage to person or property.

G.      If an Event of Default occurs, then, after notice and without waiving or releasing Tenant from the performance of such term, covenant or condition, Landlord may, but will not be obligated to, perform the same, and, in exercising any such right, may pay necessary and incidental costs and expenses in connection therewith. All sums so paid by Landlord, together with interest thereon at the maximum rate of interest allowed by law, will be deemed Additional Rental hereunder and will be payable to Landlord by Tenant on the next rent-paying day.

H.      Rent not paid when due bears interest, in addition to any late charge provided hereunder, at the maximum rate of interest allowed by law from the date due until paid.

I.      No security or guaranty which may now or hereafter be furnished Landlord for the payment of the Base Rental or for performance by Tenant of the other terms, covenants or conditions of this Lease will in any way be a bar or defense to any action in unlawful detainer, for the recovery of the Premises, or to any action which Landlord may at any time commence for a breach of any of the terms, covenants or conditions of this Lease.

49302/0801
ELL/536444.3

### 27. Attorneys' Fees on Event of Default.

If either Landlord or Tenant obtain legal counsel or bring an action against the other for any reason relating to or arising out of this Lease, the unsuccessful party will pay to the prevailing party its reasonable attorneys' fees and expenses in addition to statutory costs, which will be payable whether or not such action is prosecuted to judgment. The term "prevailing party" includes, without limitation, a party who obtains substantially the relief sought whether by compromise, settlement or judgment.

### 28. Intentionally Deleted.

### 29. Assignment or Subletting.

A. Tenant will not, directly or indirectly, voluntarily or involuntarily, assign, pledge, encumber, or otherwise transfer this Lease or any interest therein, and will not sublet the Premises or any part thereof or any right or privilege appurtenant thereto, or permit any other person (the authorized representatives of Tenant excepted) to occupy or use the Premises or any portion thereof (collectively "assign") without first receiving the written consent of Landlord. Landlord agrees not to unreasonably withhold such consent, but may in lieu of granting such consent terminate this Lease or exercise its other rights as hereinafter provided. Any such assignment without Landlord's consent will be void and will, at the option of Landlord, constitute an Event of Default pursuant to Subparagraph A(iii) of Section 25. A consent to one assignment will not be deemed to be a consent to any other or further assignment. This Lease and any interest in it will not be assignable as to the interest of Tenant by operation of law without the prior written consent of Landlord.

B. Landlord acknowledges that, as standard operating procedure within the conduct of its business, Tenant shall enter into WeWork Membership Agreements in the form used by Tenant as of the Effective Date (which is attached hereto as Exhibit J) or other written agreements with its Members and clients for their licensing of space and services provided by Tenant within the Premises; such service license agreements shall not constitute an assignment or sublease under this Lease. Tenant agrees to not create a "leasehold interest" in the Premises with any of its service licensees/Members, and to indemnify and hold Landlord harmless from all claims, damages, expenses and attorney's fees resulting from any claim of a leasehold interest by any such service licensee/Member. Tenant shall provide Landlord with a current list of its service licenses/Members every month, including the name, address, telephone number and email address of the authorized agent for service of process for each service licensee/member; Landlord agrees to maintain any such list in strict confidence. The foregoing shall not prevent Landlord from disclosing such information as needed in litigation, including eviction proceedings.

C. If Tenant contemplates an action under Subparagraph A, Tenant will give Landlord sixty (60) calendar days' notice thereof, designating the terms proposed and, if a sublease, the term thereof and space proposed to be sublet. Tenant will also provide a current financial statement of any proposed assignee and any further information which Landlord may reasonably request. Landlord may, upon notice to Tenant within such thirty (30)-day period after receipt of Tenant's notice of intention to assign, (i) assign from Tenant its leasehold interest or sublease the Premises (or a portion of the Premises proposed by Tenant to be assigned, for the term for which such portion is proposed to be assigned, but at the same Rent as Tenant is required to pay to Landlord under this Lease for the same space, computed on a pro rata share of rentable square footage basis, (ii) terminate this Lease as it pertains to the portion of the Premises so proposed by Tenant to be assigned or subleased and recapture such portion of the Premises, or (iii) approve Tenant's proposal to assign, subject to Landlord's subsequent written approval of the specific agreement between Tenant and the proposed assignee, or (iii) terminate this Lease in its entirety if, after said subleasing or assignment, Tenant will have then subleased or assigned more than 50% of the original square footage of the Premises and recapture the Premises. If Landlord elects to terminate any portion of the Premises pursuant to this Subparagraph B, then Tenant may deliver a rescission notice to Landlord of its intention to void the proposed assignment or subletting within ten (10) business days of Tenant's receipt of Landlord's termination notice and this Lease shall continue in full force and effect. If Tenant fails to timely deliver such recession notice, then this Lease as it pertains to the portion of the Premises Tenant seeks to assign or sublease or upon acceptance of the offer to terminate this Lease in its entirety, then this Lease (in its entirety or as it pertains to said portion, as the case may be) will terminate as of the end of the calendar month in which such notice of termination is given to Tenant. Tenant must then vacate and surrender all or such portion of the Premises and the provisions of this Lease applicable to termination upon expiration of the Term will apply to all or to such portion of the Premises. Such termination will not relieve Tenant from liability for any Event of Default with respect to all or such portion of the Premises occurring prior to termination.

D. Intentionally Deleted

E. A corporate Tenant will have the right in the event of a merger, consolidation, reorganization, or recapitalization, whether or not Tenant survives as the surviving corporation, to assign or transfer this Lease to such surviving corporation; provided, however, such right of assignment or transfer will be limited to an assignee (i) whose net worth is equal to or greater than the net worth of Tenant at the time of such assignment or transfer and (ii) whose historical profitability (in both duration and amount) is equal to or greater than Tenant, as viewed at the time of the proposed assignment or transfer. In the event Tenant contemplates making an assignment or transfer as provided in this subparagraph, Tenant will give thirty (30) days' notice to Landlord of its intention to make such assignment or transfer and will furnish Landlord with all pertinent information as to the net worth of the proposed assignee or transferee.

F.    In all events, if this Lease is assigned or sublet other than to Landlord, Tenant will continue to be primarily liable under this Lease, any guarantor of Tenant's obligations under this Lease will remain fully liable under guarantees provided by such guarantor, and the assignee or subtenant will execute an agreement by which it assumes and agrees to be jointly and severally liable for the complete performance by Tenant of its obligations hereunder. Notwithstanding the foregoing, in the event of an assignment of this Lease, Tenant and any such guarantor may obtain a release of their respective obligations under this Lease and the applicable guaranty arising from and after the date of the assignment if (i) the assignee of this Lease has a tangible net worth of at least $300,000,000 (or $100,000,000 if the then existing amount of the Security Deposit is simultaneously doubled, subject to future rights of proportionate reduction), (ii) with respect to a release of the guarantor only, a new guarantor with a tangible net worth of at least $300,000,000 (or $100,000,000 if the then existing amount of the Security Deposit is simultaneously doubled, subject to future rights of proportionate reduction) executes a replacement guaranty in amount, form, and substance equivalent to the existing guaranty, or (iii) with respect to Tenant only, if the assignee has a tangible net worth equal to or greater than the assignor's tangible net worth as of the date of the assignment (which, for the avoidance of doubt, shall not be deemed to release the existing guarantor from its obligations under the applicable Lease guaranty). For the avoidance of doubt, a release of the prior Tenant and guarantor under this Section 29 will not affect the Tenant's obligation to maintain the Security Deposit in the form and amount required under this Lease (subject to the increases referenced in the preceding sentence, if applicable). The net worth for the proposed assignee or replacement guarantor shall be documented by current unaudited financial statements and audited financial statements for such entity for the preceding three (3) years, or other documentation acceptable to Landlord in its sole discretion.

G.    Tenant irrevocably assigns to Landlord, as security for the performance of Tenant's obligations under this Lease, all rent from any assignment of all or any part of the Premises. A receiver for Tenant, appointed on Landlord's application, may collect such rent and apply it toward Tenant's obligations under this Lease except that, until the occurrence of an Event of Default by Tenant, Tenant will have the right to collect such rent.

H.    In no event may Tenant assign this Lease or sublet the Premises, or any portion thereof, to any then-existing or prospective tenant of the Building.

I.    Tenant will pay to Landlord the amount of Landlord's reasonable cost of processing every proposed assignment (including, without limitation, the cost of attorneys' and other professional fees and the administrative, accounting, and clerical time of Landlord), and the amount of all reasonable direct and indirect expenses as well as a minimum fee to Landlord of $700 arising from any assignee's or subtenant's taking occupancy (including, without limitation, the expenses of freight elevator operation for the moving of furnishings, trade fixtures and other personal property, security service, janitorial and cleaning service, and rubbish removal service). Notwithstanding anything to the contrary contained in this Lease, Landlord will have no obligation to process any request for its consent to assignment or sublease prior to Landlord's receipt of payment by Tenant of the amount of Landlord's estimate of the processing costs and expenses and all other direct and indirect costs and expenses of Landlord and its authorized representatives arising from such matter.

J.    Notwithstanding the provisions of this Section 29 above, Landlord's consent shall not be required (and the provisions of Subparagraphs A through I of this Section 29 shall not be applicable thereto) for any of the following (each a "Permitted Transfer"): (i) an assignment or subletting to an Affiliate or successor of Tenant; (ii) a Complete Sales Transaction; (iii) a Partial Sales Transaction; (iv) an assignment of Tenant's entire leasehold interest or sublease of the entire Premises to a Qualified Transferee; (v) an Operations Agreement; (vi) the mere change of Tenant's name or form of ownership; or (vii) a private or public sale of equity or debt of any member of Tenant's Affiliated Group (including any initial public offering of stock of any member of Tenant's Affiliated Group). Any party to which this Lease is transferred to through a Permitted Transfer shall be referred herein as a "Permitted Transferee". For purposes hereof:

(i)    "Complete Sale Transactions" shall mean the transfer of control, merger, consolidation, reorganization or sale of all or substantially all of the assets or equity interests of any parent company of Tenant (including WeWork Companies Inc.);

(ii)    "Partial Sale Transaction" shall mean the Transfer of the Premises by change of control, merger, consolidation, reorganization or all of all or a portion of the assets or equity interests of one or more entities comprising Tenant's Affiliated Group, resulting in (a) the assignment of five (5) or more locations of the space marketed as "WeWork" and owned or leased by members of Tenant's Affiliated Group as of the date of such assignment, or (b) the assignment of at least two (2) or more locations in New York City of the space marketed as "WeWork" and owned or leased by members of Tenant's Affiliated Group as of the date of such assignment;

(iii)    "Tenant's Affiliated Group" shall mean Tenant and all Affiliates of Tenant and/or the parent company of Tenant;

(iv)    "Qualified Transferee" shall mean any legal entity or individual (or any guarantor thereof) which has a net worth, calculated pursuant to GAAP, in excess of $50,000,000.00 or an EBITDA of at least ten (10) times the annual Base Rental payable under the Lease for at least two (2) consecutive years prior to the date of the proposed Transfer to such entity; and

(v) "Operations Agreement" shall mean any management agreement, operation agreement, license, revenue share agreement, concession or similar agreement between Tenant and any third-party pursuant to which such third-party becomes the tenant under this Lease and Tenant (or an Affiliate of Tenant) continues to use, operate, maintain, oversee or manage all or a part of the Premises, provided that such Operations Agreement shall be expressly subject to the terms of this Lease.

K.     Any assignee or sublessee, including Permitted Transferees, shall assume in writing all of the obligations under this Lease arising from and after the effective date of the assignment (or sublease). Solely in connection with a Permitted Transfer, the assignor will be released from all obligations under the Lease upon the assignee's assumption in writing of all obligations of Tenant under this Lease whether arising before or after such assignment; provided such release shall not release any then existing guarantor from its obligations under a guaranty of this Lease, and shall not affect the Tenant's then-current obligation to maintain the Security Deposit. Following any assignment or sublease, the obligations for which any prior tenant remains liable under this Lease shall include any obligations arising in connection with any amendments to this Lease executed by Landlord and the assignee or sublessee, as the case may be, but only to the extent that such amendments are made with knowledge and written consent of such prior tenant.

L.     Notwithstanding anything in this Lease to the contrary, including this Section 29, Tenant shall have the right (without Landlord's consent) to (i) allow Permitted Tenant Parties to use and occupy the Premises, provided that (a) such parties shall not be deemed to be subtenants or assignees of Tenant at the Premises, and (b) Tenant shall ensure that such parties comply with all terms and conditions of this Lease, and (ii) sublease or license space in the Premises to an Affiliate of Tenant for the purposes of any or all of beer, wine or spirits concessions. For purposes of the prior grammatical sentence, "Affiliate" means any "affiliate" as otherwise defined herein, or any person or entity owned or controlled by an officer of WeWork Companies Inc.

M.     Omitted.

N.     Notwithstanding anything to the contrary contained herein, all rights which may be exercised by the original tenant under this Lease shall transfer to and may be exercised by any transferee.

## 30.     Transfer by Landlord - Release from Liability.

If Landlord  sells or transfers the Building, or assigns its interest as Landlord in this Lease, then, from the effective date of such sale, assignment or transfer, Landlord will be released from all further liability to Tenant, express or implied, under this Lease, and Tenant agrees to look solely to the successor in interest of Landlord in and to the Building or this Lease, except as to any matters of liability based upon Landlord's action prior to transfer or that have accrued and remain unsatisfied as of the date of such sale, assignment or transfer.  It is intended that the covenants and obligations contained in this Lease on the part of Landlord will be binding upon Landlord and its successors and assigns only during their respective periods of ownership of the fee or leasehold estate, as the case may be.  If any security is given by Tenant to secure the faithful performance of all or any part of the terms, covenants and conditions of this Lease on the part of Tenant, Landlord may transfer and deliver the security to the successor in interest of Landlord, and thereupon Landlord will be discharged from any further liability in reference thereto. Landlord may enter into any transaction described in this paragraph without the consent of Tenant.

## 31.     Damage.

If the Premises or the Building is damaged from any cause covered by Landlord's and/or Tenant's insurance, Landlord will forthwith repair such damage provided the cost of repair does not exceed the insurance proceeds available from the insurance carried by both parties, and provided further that such repairs can be made within one hundred eighty (180) days after such damage occurs.  This Lease will remain in full force and effect during the period such repairs are being made; provided, however, if such casualty was not caused by Tenant, its Members, or their respective employees, agents, contractors, or invitees, all or a portion of the Premises is unusable due to a casualty and/or Landlord's subsequent restoration work and not actually used by Tenant or its Members, then all Rent shall proportionately abate from the date of the casualty until that portion of the Premises is usable for the Permitted Use (or such earlier date as Tenant or its Members re-commence use of such portion of the Premises). Except as set forth herein, such damage will not in any way void or render voidable this Lease or any provision hereof. If such damage was caused by any risk not covered by Landlord's or Tenant's insurance, or if the cost of repairs exceeds the insurance proceeds payable from the parties, Landlord may, at its option, make such repairs, provided the repairs can be made within one hundred eighty (180) days after such damage occurs, and, in such event, this Lease will remain in full force and effect and will be neither void nor voidable.  If Landlord elects not to make repairs it is not obligated to make, or if such repairs cannot be made within the 180-day period, this Lease may be terminated by either party upon notice and without liability to the other party.  If either Landlord or Tenant gives notice of termination as provided herein, this Lease and all interests of Tenant in the Premises will terminate on the date specified in the notice. Landlord will under no circumstances be required to repair any damage by fire or any other cause, whether of a similar or dissimilar nature.  Tenant and Landlord hereby each specifically waive the provisions of Section 1932, Subdivision 2 and Section 1933, Subdivision 4, of the California Civil Code. In the event the Building is damaged to the extent of more than twenty-five percent (25%) of the then replacement cost thereof, Landlord may elect to terminate this Lease, whether the Premises are

damaged or not and without liability to Tenant.  A total destruction of the Premises or of the Building will terminate this Lease without liability of Landlord to Tenant.

**32.    Condemnation.**

A.    As used in this Lease, "condemn" is coextensive with the phrase "right of eminent domain", i.e., the right of people or government to take property for government or public use, and will include the intention to condemn expressed in writing as well as the filing of any action or proceeding for condemnation.

B.    If any action or proceeding is commenced for the condemnation of the Building or any part thereof, or if Landlord is advised in writing by any agency, entity or body having the right or power of condemnation of its intention to condemn the same, then Landlord may:

(i)    Without any obligation or liability to Tenant, and without affecting the validity and existence of this Lease other than as hereinafter provided, agree to sell or convey to the condemnor the part or portion of the Premises or Building sought by the condemnor free from this Lease and the rights of Tenant hereunder.  Such agreement may be made without first requiring that any action or proceeding be instituted, or if such action or proceeding will have been instituted, without requiring any trial or hearing thereof, and Landlord is expressly empowered to stipulate to judgment therein.

(ii)    Terminate this Lease and all rights of Tenant hereunder.

(iii)    Continue this Lease in full force and effect, provided that such condemnation does not result in a taking of the Premises.  If this Lease continues in full force and effect and by reason of the condemnation an alteration of the Building is required, and such alteration materially interferes with Tenant's business in the Premises, then Tenant will be entitled to a reasonable abatement in Rent during the period of such modification or alteration to the extent such work interferes with Tenant's business.

C.    If a portion of the Premises is permanently condemned and taken, and such condemnation and taking materially affects Tenant's business in the Premises, then Tenant will have the option of either terminating all of its obligations under this Lease or continuing this Lease in full force and effect with respect to such portion of the Premises not taken.  In such latter event, Rent for the remainder of the Term will be reduced in the proportion which the rentable square footage of the Premises taken bears to the total rentable square footage of the original Premises.

D.    If, as a result of any such condemnation proceedings, a leasehold interest or right of possession only is so condemned or taken for a period of time less than the then unexpired Lease Term, this Lease will continue in full force and effect and any condemnation award will be payable to Landlord and will be credited against the Rent payable by Tenant for said period.  If the amount received by Landlord is in excess of said Rent, Tenant will be entitled to receive such excess, and, if the amount so received by Landlord is less than said Rent, then Tenant will pay the amount of such deficiency to Landlord, if such condemnation is for a period of time extending beyond the expiration of the Lease Term, the foregoing provisions will apply only up to the date of expiration of the Term.  Upon said expiration, Landlord will receive all awards thereafter payable, and no accounting will be made to Tenant for such period extending beyond said expiration.

E.    All compensation and damages awarded for the taking of the Premises, Building, or any portion or portions thereof, will, except as otherwise herein provided, belong to and be the sole property of Landlord, and Tenant will not have any claim or be entitled to any award for diminution in value of its leasehold interest hereunder or for the value of any unexpired Lease Term; provided, however, Tenant will be entitled to any separate award that may be made for the taking of or damage to, or on account of any cost or damage Tenant may sustain in the removal of, Tenant's merchandise, fixtures, trade fixtures, equipment and furnishings.

F.    If this Lease is terminated, in whole or in part, under this paragraph, all Rent and other charges payable by Tenant to Landlord hereunder and attributable to the Premises taken will be paid up to the date upon which actual physical possession will be taken by the condemnor, and the parties will thereupon be released from all further liability in relation thereto.

**33.    Subordination to Encumbrances.**

This Lease, and the leasehold estate created hereby, is at all times subject to and subordinate to any lien, mortgage, deed of trust, deed to secure debt, encumbrance or other security instrument (any of the foregoing, a "Mortgage"), and replacements thereof, in any amount whatsoever now existing or hereafter placed on or against the Building or any part thereof, or against Landlord's interest or estate therein, provided, however, the holder of such Mortgage enters into a subordination and non-disturbance agreement either in (i) the form customarily used by said holder (with commercially reasonable modifications requested by Tenant), or (ii) the form attached hereto as Exhibit M (with any changes thereto, if any, as Tenant shall require for such agreement to be in form for recordation in the applicable real estate records, and together with such documents, if any, as shall be necessary to record such agreement in such records the "Acceptable SNDA").  Landlord represents and warrants to Tenant, that as of the Effective Date, (i) there exists no Mortgage encumbering all or any portion of the Building, and (ii) there are no ground or other underlying leases of or affecting all or any portion of the Building.  However, Landlord or any lender may elect to make this Lease prior and superior to any Mortgage placed or to be

25

placed by Landlord upon or against the Premises or Building, or any part thereof, which election will, of and by itself and without further notice to or act or agreement of Tenant, make this Lease and the estate created hereby prior and superior to any Mortgage, whether presently existing or hereinafter created. Notwithstanding the foregoing, Tenant covenants and agrees to execute and deliver upon demand an Acceptable SNDA evidencing such superiority or subordination of this Lease to such Mortgages as may be required by Landlord or any lender. In the event of foreclosure or exercise of any power of sale under any lien or encumbrance superior to this Lease or to which this Lease is subject or subordinate, Tenant will attorn to the purchaser at any foreclosure sale or pursuant to the exercise of any power of sale in accordance with the Acceptable SNDA received by Tenant from the foreclosing lender, in which event this Lease will not terminate, and Tenant will automatically be and become the Tenant of said purchaser upon the same terms, covenants and conditions as are contained in this Lease. If, in connection with Landlord's obtaining financing for the Building, the lender requests reasonable modifications in this Lease as a condition to such financing, Tenant will not unreasonably withhold, delay or defer its consent thereto, provided that such modifications do not increase the obligations of Tenant hereunder or materially adversely affect the leasehold interest hereby created or Tenant's rights hereunder or decrease Landlord's obligations hereunder. Tenant shall execute such documentation as Landlord may reasonably request from time to time, in order to confirm the matters set forth in this paragraph in recordable form.

## 34.  Intentionally Deleted

## 35.  Communications and Computer Lines.

A.  Tenant shall not alter, modify, add to or disturb any telecommunications wiring or cabling not exclusively located within the Premise or elsewhere in the Building without Landlord's prior written consent (such consent shall not be unreasonably withheld, conditioned or delayed). Landlord shall provide and maintain, at no expense to Tenant (other than as an item of Direct Expenses), telephone riser space in the Building core adequate to accommodate the telecommunications needs of a general office tenant and lines and conduits in Building risers or pathways that provide a continuous connection of intrabuilding telecommunications cabling from a distribution frame located in an access controlled area on the floor of the Premises (the "IDF") to the main telecommunications demarcation point located in the ground or basement level floors of the Building (the "MPOE"); provided, however, Landlord shall have no obligation (and Tenant shall have no right) to increase the capacity of the existing telecommunications riser and distribution facilities and/or cabling in the Building without Landlord's prior consent, which may be withheld in Landlord's sole discretion. Landlord and Tenant acknowledge that AT&T currently services the Building; and Tenant may permit another reputable telecommunications service provider reasonably acceptable to Landlord (but not, in any event, Comcast) to service the Building at no cost to Landlord, and if AT&T or such other reputable telecommunications service provider ceases at any time to service the Building, to bring in an additional reputable telecommunications service provider reasonably acceptable to Landlord at no cost to Landlord, such that at all times two (2) reputable telecommunications service providers are servicing the Building. By its acceptance of possession of the Premises, Tenant shall be deemed to have agreed that the existing number and type of lines serving the Premises is adequate for Tenant's occupancy. The number and type of lines presently allocated to Tenant at the IDF shall not be increased or added to without the prior written consent of Landlord (such consent shall not be unreasonably withheld, conditioned or delayed). Any and all telecommunications equipment and cabling serving Tenant and the Premises and connecting to or from the IDF shall be located solely in the Premises, and Tenant shall only be permitted to access the IDF, with the prior written consent of Landlord, which shall not be unreasonably withheld, conditioned or delayed, and for purposes of confirming interconnection with the Building's riser facilities. Only Landlord and/or Landlord's approved installers are authorized to install and/or connect additional telecom lines (including, voice, data, video, cable and other) from the MPOE and/or the IDF to the Premises, and such work shall be at Tenant's expense. Tenant shall maintain and repair all telecommunications cabling and wiring within or exclusively serving the Premises. Tenant shall be liable to Landlord for any damage to the telecommunications cabling and wiring in the Building due to the act (negligent or otherwise) of Tenant or any employee, agent or contractor of Tenant. Except as set forth in Section 15.B in connection with a Service Interruption, Tenant hereby waives any claim against Landlord for any damages if Tenant's telecommunications services and/or equipment are in any way interrupted, damaged or otherwise interfered with, except to the extent caused by the negligence or wilful or criminal misconduct of Landlord, its agents or employees; provided that in no event shall any such interruption, damage or interference entitle Tenant to any consequential damages (including damages for loss of business) or relieve Tenant of any of its obligations under this Lease. Landlord reserves the right to limit the number of local exchange carriers and competitive alternative telecommunications providers (collectively "TSPs") having access to the Building's riser system and infrastructure, and Landlord reserves the right to charge TSPs for the use of Landlord's telecommunications riser system and infrastructure; provided, however, in all cases, Landlord will provide Building and riser access to at least one TSP for dial tone telecommunications service to tenants of the Building. As of the Effective Date, the following TSPs are providing telecommunications services to the Building: AT&T.

B.  Tenant may, in a manner consistent with the provisions and requirements of this Lease, including subparagraph A above, install, maintain, replace, remove or use any communications or computer wires, cable and related devices (collectively the "Lines") in or serving the Premises, provided: (a) Tenant obtains Landlord's prior written consent, which consent may be conditioned or withheld in Landlord's sole and absolute discretion, (b) if Tenant at any time uses any equipment that may create an electromagnetic field exceeding the normal insulation ratings of ordinary twisted pair riser cable or cause radiation higher than normal background radiation, the Lines therefor (including riser cables) must be appropriately insulated to prevent such excessive electromagnetic fields or radiation, (c) Tenant may not

26

install "mini" satellite dishes (e.g., Direct TV) in the Premises, and (d) Tenant will pay all costs in connection therewith. Landlord reserves the right to require that Tenant remove any Lines which are installed in violation of these provisions.

C.    Provided that Landlord's actions do not materially interfere with Tenant's use of the Premises for the Purpose, including interfering with Tenant's Lines installed in the Premises, Landlord may, but is not obligated to: (i) install new Lines in the Building, and (ii) create additional space for Lines in the Building, and adopt reasonable and uniform rules and regulations with respect to the Lines.

D.    Tenant may not, without the prior written consent of Landlord in each instance, grant to any third party a security interest or lien in or on the Lines, and any such security interest or lien granted without Landlord's written consent is null and void. Except to the extent arising from the intentional or negligent acts of Landlord or any Landlord Party or except as set forth in Section 15.B in connection with a Service Interruption, Landlord has no liability for damages arising from, and Landlord does not warrant that Tenant's use of any Lines will be free from the following (collectively called "Line Problems"): (x) any eavesdropping or wire-tapping by unauthorized parties, (y) any failure of any Lines to satisfy Tenant's requirements, or (z) any shortages, failures, variations, interruptions, disconnections, loss or damage caused by the installation, maintenance, replacement, use or removal of Lines by or for other tenants or occupants at the Property. Under no circumstances will any Line Problems be deemed an actual or constructive eviction of Tenant, render Landlord liable to Tenant for abatement of Rent, or relieve Tenant from performance of Tenant's obligations under this Lease. Landlord will in no event be liable for damages by reason of loss of profits, business interruption or other consequential damage arising from any Line Problems.

E.    Upon the expiration or earlier termination of this Lease, Tenant shall remove, at its sole cost and expense (and by installers approved by Landlord), all telecommunications lines and cabling within the Premises and/or exclusively serving the Premises, and all Lines installed by Tenant (or on behalf of Tenant) inside and outside the Premises and tie/tag all Lines installed by Tenant (or on behalf of Tenant) within the Premises.

F.    Except as set forth in Section 15.B in connection with a Service Interruption, Tenant releases Landlord and waives any and all claims for damages, losses and expenses against Landlord arising from or relating to any interruption or failure to furnish or maintain telecommunications services; no interruption of telecommunication service shall constitute a constructive eviction or entitle Tenant to an abatement of Rent.

## 36.    Effect of Exercise of or Failure to Exercise Privilege.

Neither the exercise of nor failure to exercise any right, option, or privilege hereunder by Landlord or Tenant will exclude such party from exercising any and all other rights, options, or privileges hereunder at any other time, nor will such exercise or nonexercise relieve Landlord or Tenant from their obligation to perform each and every term, covenant and condition to be performed hereunder, or from damages or other remedy for failure to perform or meet their obligations under this Lease.

## 37.    Waiver.

The waiver by Landlord or Tenant of any performance or breach of any term, covenant or condition contained herein will not be deemed to be a waiver of such term, covenant or condition, or of any subsequent or continuing breach of the same, or of any other term, covenant or condition contained herein. Nor will any custom or practice that may arise between the parties in the administration of the provisions of this Lease be deemed a waiver of, or in any way affect, the right of Landlord or Tenant to insist upon the performance by the other party hereto in strict accordance with the provisions of this Lease. The subsequent acceptance of Rent hereunder by Landlord will not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease other than Tenant's breach in failing to pay the particular Rent so accepted regardless of Landlord's knowledge of such additional preceding breach at the time of the acceptance of such Rent.

## 38.    Labor Relations;

Tenant will conduct its labor relations and its relations with its Members and their respective employees so as to avoid all strikes, picketing, and boycotts of, on, or about the Premises or the Building. Tenant must use, and require its Members to use, union contractors and subcontractors in connection with Alterations to the Premises. Tenant shall not in any event be permitted to obtain separate janitorial services, which will be provided by a union contractor selected by Landlord throughout the Term. If Tenant's or its Members' conduct results in picketing, strikes, work stoppages, or other union labor activities or disputes (each a "Union Dispute"), whether or not such Union Dispute adversely impacts the access or other rights of occupants of the Building or day-to-day harmonious operations of the Building (a "Disruption"), Tenant shall, upon notice from Landlord (which may be provided telephonically), take all necessary actions to resolve such Union Dispute within twenty-four (24) hours of such notice, including, without limitation, termination of any contractor or subcontractor engaged by or on behalf of Tenant or its members. Tenant shall defend, hold harmless, and indemnify Landlord and Landlord Parties from all claims, damages, losses, costs, liabilities, and expenses, including reasonable attorneys' fees, arising out of any a Union Dispute or a Disruption.

27

49302/0801
ELL/536444.3

**39. Notices.**

All notices and demands under this Lease will be in writing and may be given (a) by personal delivery, with verification of delivery requested, (b) sent by United States certified or registered mail, postage prepaid, return receipt requested, or (c) by a nationally recognized (i.e. FedEx, UPS, etc.) overnight courier and addressed: if to Tenant, at Tenant's Notice Addresses set forth in Section 1.K of the Lease, or at such other address as Tenant may from time to time designate by giving notice thereof to Landlord under this paragraph; and if to Landlord, at the Building office, or at such other address as Landlord may from time to time designate by giving notice thereof to Tenant under this paragraph. Mailed notice will be deemed given two (2) business days after the date of postmark unless mailed to a location outside of New York City, in which case it shall be deemed given three (3) business days after the date of postmark, or if sent by a nationally recognized overnight courier, on the first (1st) business day following the day sent, or if set by personal delivery, when delivered and receipted by the part to whom addressed (or on the date that such receipt is refused, if applicable). For the purpose of serving notices under California Code of Civil Procedure Section 1161, et seq., Tenant reaffirms the representations made in Section 1.I. above.

**40. Entire Agreement; Amendments.**

This Lease represents the entire agreement of the parties with respect to the parties' rights and duties under this Lease, and no promises or representations, express or implied, whether written or oral, not set forth herein will be binding upon or inure to the benefit of Landlord or Tenant. Tenant acknowledges that neither Landlord nor any authorized representative of Landlord, or any other person purporting to act on Landlord's behalf, has made any representation, warranty, or statement with respect to the amount of taxes that may or will be assessed against the Premises, the cost of any insurance required to be maintained by Tenant hereunder, or any other matter relating to this Lease that is not expressly covered in this Lease. With respect to such matters, Tenant is relying upon its own independent investigation and sources of information, and Tenant expressly waives any right Tenant might otherwise have to rescind this Lease or to claim damages by reason of Tenant's misunderstanding or mistake. This Lease will not be amended or modified by any oral agreement, either express or implied; all amendments and modifications hereof will be in writing and signed by both Landlord and Tenant.

**41. Light and Air.**

Tenant covenants and agrees that no diminution of light, air or view by any structure which may hereafter be erected (whether or not by Landlord) will entitle Tenant to any reduction of Rent hereunder, result in any liability of Landlord to Tenant, or in any other way affect this Lease.

**42. Auctions and Signs.**

A. Tenant will not conduct any auctions in, upon, or from the Premises, affix any signs, awnings, notices, or other advertising matter to the Premises, or issue or circulate any advertising matter in the Building without the prior written consent of Landlord. Subject to Section 62 below, the design and character of any such signs, awnings, notices, or other advertising matter will also be subject to Landlord's prior written approval (such approval to be granted or withheld in Landlord's sole but good faith determination).

B. Landlord acknowledges that Tenant may install one "WeWork" signs on the exterior of the Building and refer to the "WeWork Building" in advertising, publicity and other communications, provided that Tenant's may only refer to the Building as the "WeWork Building" when and so long as Tenant leases one hundred percent (100%) of the rentable square footage of office space in the Building. All signage shall be at Tenant's expense and subject to Landlord's prior review (including, but not limited to, graphics, color, size and location). All signage shall be removed upon expiration or earlier termination of this Lease and the surfaces and other work on the Building restored to its original condition. Tenant's right to use "WeWork" the WeWork name, tradename, trademark, etc. is conditioned on Tenant receiving the right to use the same from Guarantor. Tenant represents and warrants to Landlord that in connection with any signs or other use of the "WeWork" name, that Tenant has the right to use such tradename, trademark, etc., and shall provide Landlord with documentation reasonably acceptable to Landlord confirming such rights. Tenant shall indemnify, defend, and hold Landlord harmless from and against any claims, demands, liabilities, damages, judgments, orders, decrees, actions, proceedings, fines, penalties, costs and expenses, including without limitation, reasonable court costs and attorney's fees, arising from or relating to Tenant's use thereof.

**43. Execution, Recordation.**

Submission of this instrument for examination or signature by Tenant does not constitute a reservation of an option for a lease, and this instrument will not be effective as a lease or otherwise until execution and delivery by both Landlord and Tenant. Tenant will not record this Lease or any memorandum of this Lease.

**44. Tenant's Authority.**

If Tenant is a corporation, partnership, trust, association, or other entity, Tenant and each person executing this Lease on behalf of Tenant hereby covenant and warrant that (i) Tenant is duly incorporated or otherwise established or formed and validly existing under the laws of its state of incorporation,

28

establishment, or formation; (ii) Tenant has and is duly qualified to do business in California; (iii) Tenant has full corporate, partnership, trust, association, or other appropriate power and authority to enter into this Lease and to perform all of Tenant's obligations hereunder; (iv) each person (and all persons if more than one signs) signing this Lease on behalf of Tenant is duly and validly authorized to do so; and (v) when executed by both parties, this Lease and all of the terms and conditions contained herein will be binding and enforceable against Tenant.

## 45.    Limitation of Tenant's Remedies.

If Tenant obtains a judgment against Landlord, Tenant agrees to look solely to Landlord's interest in the Building for recovery, including any proceeds of sale of the Building, any rents received at the Building, and any insurance proceeds related to the Building.

## 46.    Time and Applicable Law.

Time is of the essence of this Lease and each and all of its provisions. This Lease will be construed and interpreted in accordance with the laws of the State of California. Tenant, Landlord and any Guarantor, consent to the exclusive jurisdiction of any federal or state court located within the City and County of San Francisco, California and any other court in which Landlord may initiate equitable or legal proceedings which has subject matter jurisdiction over the matter in controversy. Tenant waives any right to remove a state court action to federal court on grounds of diversity of citizenship and consents to remand any action filed in federal court to the California state superior court. Tenant waives any objection of forum non conveniens and venue. Tenant, and any guarantor, waives personal service of process and consents to service of process being made in the same manner as notices are given.

## 47.    Name.

Tenant will not use the name of the Building for any purpose other than as the address of the business conducted by Tenant in the Premises.

## 48.    Provisions are Covenants and Conditions.

All provisions, whether set forth herein as covenants or conditions on the part of Tenant, are deemed both covenants and conditions.

## 49.    Severability.

The unenforceability, invalidity, or illegality of any provision of this Lease, for any reason, will not render its other provisions unenforceable, invalid, or illegal. In such an event, this Lease will be equitably construed as if it did not contain the invalid, illegal, or unenforceable provision to the extent permitted by applicable law, it being the intent of the parties that this Lease will be enforced to the greatest extent possible.

## 50.    Captions.

The table of contents and the headings to the paragraphs of this Lease are for convenience only, are not part of this Lease, and will have no effect on the construction or interpretation hereof.

## 51.    Successors.

This Lease, subject to the provisions as to assignment and sublease, apply to, inure to the benefit of, and bind the heirs, successors, administrators, executors, and assigns of the parties hereto.

## 52.    Relationship of Parties.

Neither anything contained in this Lease nor any acts of the parties will be construed to create any relationship between the parties other than that of Landlord and Tenant.

## 53.    Exculpation of Non-Tenant Parties.

Landlord agrees that Landlord is entering into this Lease with Tenant and except for any claim arising from fraud, Landlord shall have no recourse, and shall not have the right to make any claim against, any entity (including any officers, directors, trustees, beneficiaries, shareholders, members, employees, partners, principals or Affiliates of Tenant, each an "Exculpated Party", and collectively, the "Exculpated Parties") other than Tenant, with respect to any obligations hereunder or arising in connection herewith and that Tenant's assets shall specifically exclude the assets of the Exculpated Parties. Landlord acknowledges and agrees that (a) the foregoing agreement with respect to each Exculpated Party (the "Exculpated Party Agreement") is an essential and material term of this Lease, (b) each Exculpated Party shall be a third party beneficiary of the Exculpated Party Agreement and of Landlord's acknowledgement and agreement in the immediately preceding clause (a), and the foregoing agreement shall inure to the benefit of Tenant's and the Exculpated Parties present and future officers, directors, trustees, beneficiaries, shareholders, members, employees, present and future partners, principals or Affiliates of Tenant, and their respective heirs, successors and assigns, (c) Tenant would not have entered this Lease without the Exculpated Party Agreement or the acknowledgments and

agreements contained in the immediately preceding clauses (a) and (b), and (d) the Exculpated Parties shall not have any liability for any duties, responsibilities, liabilities or obligations of Tenant under, or in any way related to, this Lease, and Landlord hereby expressly waives and releases such liability on behalf of itself and all persons claiming by, through or under Landlord. No past, present or future Exculpated Parties shall be named as a party in any suit or other judicial proceeding of any kind or nature whatsoever brought against Tenant with respect to the duties, responsibilities, liabilities or obligations of Tenant under this Lease, except any claim arising from fraud. Notwithstanding the foregoing and for the avoidance of doubt, nothing in this Lease shall constitute a waiver by Landlord of its right to bring claims against Exculpated Parties for their individual negligent acts and omissions, willful misconduct, fraud, and unlawful conduct.

## 54.    Brokers.

Tenant warrants and represents to Landlord that it has had no dealings with any real estate broker or agent or any other party who could be entitled to a commission or finder's fee in connection with the negotiation of this lease, except as set forth in paragraph 1.L. above. Landlord warrants and represents to Tenant that Landlord has not there is no real estate brokerage commission other than what Landlord is paying Kidder Mathews ("Broker") by separate agreement. Landlord hereby agrees to indemnify, defend, and hold Tenant harmless from claims for any commission or finder's fee charges by Broker with respect to this Lease.

## 55.    Interpretation.

The parties acknowledge that each party has reviewed and revised, and has been provided the opportunity of its respective counsel to review and revise, this Lease, and no rule of construction to the effect that any ambiguities are to be resolved against the drafting party may be employed in the interpretation or construction of this Lease, or any amendments or exhibits hereto, or any other document executed and delivered by either party in connection herewith.

## 56.    Force Majeure.

Except as may be otherwise specifically provided herein, time periods for performance under this Lease not involving the payment of money will be extended for periods of time during which the nonperforming party's performance is prevented due to circumstances beyond the party's control, including, without limitation, strikes, embargoes, governmental regulations, inability to obtain permits, acts of God, war or other strife. Tenant waives its right to terminate this Lease under Section 1932(I) of the California Civil Code or under any similar law, statute or ordinance now or hereafter in effect.

## 57.    Asbestos.

Tenant acknowledges that it has been expressly disclosed to Tenant by Landlord's Managing Agent that the Building and the Premises contain asbestos-containing materials ("ACM"). The acknowledgment by Tenant of the ACM does not in any manner impose any liability or responsibility on Tenant for removal, treatment or abatement of such ACM or any responsibility whatsoever regarding such ACM provided, however, that Tenant shall comply with all applicable laws and regulations in connection with any work in the Premises including, but not limited to, work which requires entry into the ceiling and Exhibit F.

## 58.    Accuracy of Tenant Information.

Tenant represents and warrants that all information which Tenant has provided to Landlord prior to execution of this Lease is true and complete in all material respects; tenant further represents and warrants that all information provided to Landlord by Tenant during the Lease Term shall be true and correct in all material respects.

## 59.    USA Patriot Act and Anti-Terrorism Laws.

Tenant represents and warrants to, and covenants with, Landlord that neither Tenant nor any of its respective constituent owners, affiliates or employees currently are, or shall be at any time during the Term hereof, in violation of any laws relating to terrorism or money laundering (collectively, the "Anti-Terrorism Laws"), including without limitation Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order") and/or the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (the "USA Patriot Act"). Likewise, Landlord represents and warrants to, and covenants with, Tenant that neither Landlord nor any of its respective constituent owners, affiliates or employees currently are, or shall be at any time during the Term hereof, in violation of any Anti-Terrorism Laws, including without limitation the Executive Order and the USA Patriot Act.

Tenant covenants with Landlord that neither Tenant nor any of its respective constituent owners, affiliates or employees is or shall be during the Term hereof a "Prohibited Person," which is defined as follows: (i) a person or entity that is listed in the Annex to, or is otherwise subject to, the provisions of the Executive Order; (ii) a person or entity owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (iii) a person or entity with whom Landlord is prohibited from dealing with or otherwise engaging in any

30

transaction by any Anti-Terrorism Law, including without limitation the Executive Order and the USA Patriot Act; (iv) a person or entity who commits, threatens or conspires to commit or support "terrorism" as defined in Section 3(d) of the Executive Order; (v) a person or entity that is named as a "specially designated national and blocked person" on the then-most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov/offices/eotffc/ofac/sdn/t11sdn.pdf, or at any replacement website or other replacement official publication of such list; and (vi) a person or entity who is affiliated with a person or entity listed in items (i) through (v) above. Likewise, Landlord covenants with Tenant that neither Landlord nor any of its respective constituent owners, affiliates or employees is or shall be during the Term hereof a Prohibited Person.

At any time and from time to time during the Lease Term, but not more than once per calendar year, Tenant shall deliver to Landlord, within thirty (30) days after receipt of a written request therefor, a written certification or such other evidence reasonably acceptable to Landlord evidencing and confirming Tenant's compliance with this Section. Likewise, at any time and from time to time during the Lease Term, but not more than once per calendar year, Landlord shall deliver to Tenant, within thirty (30) days after receipt of a written request therefor, a written certification or such other evidence reasonably acceptable to Tenant evidencing and confirming Landlord's compliance with this Section.

## 60. Required Accessibility Disclosures

A. In accordance with California Civil Code Section 1938, Landlord hereby states that the Building has not undergone an inspection by a Certified Access Specialist. Section 1938 provides in part:

"A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises."

Unless this Lease requires the Landlord to correct violations of construction-related accessibility standards within the Premises at the time the Premises are delivered to Tenant or thereafter, the costs thereof shall be borne by Tenant.

## 61. Right of First Offer for Expansion.

A. Landlord grants Tenant a Right of First Offer to lease space in the balance of the Building. Landlord shall provide Tenant with written notice when the availability of available space ("Offer Space") becomes known to Landlord, and Tenant shall have five (5) business days to deliver written notice to Landlord of Tenant's exercise of its Right of First Offer with respect to the space described in Landlord's notice. The First Offer Space shall be leased at 100% of the then prevailing market rent for such space at the time Tenant exercises its Right of First Offer, but in no event less than $73.00 per square foot per year increased by three percent (3%) each year from the commencement date with respect to such expansion space. The term for the expansion space will be (x) ten (10) years from the commencement date with respect to such expansion space, if such commencement occurs prior to the fifth (5th) anniversary of the Commencement Date, or (y) a period from seven (7) to ten (10) years from the commencement date with respect to such expansion space, at Tenant's option, if such commencement occurs on or after the fifth (5th) anniversary of the Commencement Date, and it will be subject to all the other terms and conditions of the Lease.

B. As used herein, the term "available" shall mean space that is then ready, or, within five (5) business days shall be ready, to be offered in the marketplace to the public at large for rent, free and clear of all claims and rights of other parties. The Offer Space shall be deemed not to be or not have become "available" if, as to such space, there is in effect a lease, lease option or other right of extension, renewal, expansion, refusal, negotiation or similar or other right which was entered into before the execution date of this Lease.

## 62. Signage

A. Tenant is hereby granted the right, for the Lease Term, to brand and install one (1) sign panel on the exterior of the Building facing Sansome Street in a location to be designated by Landlord, at Tenant's cost ("Permanent Signage"). Such Permanent Signage shall be subject to (a) all San Francisco codes, regulations and required approvals, (b) signage rights already granted to other tenants in the Building and (c) Landlord's approval, not to be unreasonably withheld. No signage (including audio/visual equipment) will be allowed in the elevator cabs.

B. In addition to the above signage, Tenant, at Tenant's cost, will have the right to install temporary signage on the exterior of the Building, subject to agreement between the parties as to its design, size, appearance and location and further subject to all San Francisco codes, regulations and required approvals. Subject to the foregoing conditions, such temporary signage may be installed by

Tenant following Lease execution and must be removed by Tenant after the later of opening or installation of Permanent Signage, all at Tenant's cost. If Tenant needs governmental approvals (including a variance) for its Permanent Signage, the temporary signage may remain until Tenant obtains all required approvals and installs it Permanent Signage, but in no event longer than six months. Tenant would be responsible for the removal of the Temporary Signage and any necessary restoration of the Building caused by the Temporary Signage.

C.       Tenant shall remove all signage when required (no later than Lease expiration as to Permanent Signage), repair all damage caused by the signage and restore the Building to its pre-signage condition.

D.       Landlord acknowledges and agrees that Tenant may, upon Landlord's prior approval (such approval not to be unreasonably withheld, conditioned or delayed) assign its right to the Sansome Street signage provided hereunder to any Member taking at least five (5) or more floors in the Premises. This means, for the avoidance of doubt, that such Member's sign will remove and replace the existing WeWork sign (or the sign of a Member previously assigned such right). Such signage will be subject to satisfaction of all signage requirements in this Lease.

## 63.    Leasing Restriction

A.       From and after the Effective Date, Landlord agrees that during the Term it shall not, and shall not permit any of its Affiliates to do any of the following: (i) lease, sell, license or otherwise contract (including management agreements, operating agreements or similar agreements) with a Competitor (as hereinafter defined) for space within the Building; (ii) permit any Competitor to install signage, branding, advertising or other identifying material related to such Competitor on the exterior or within the interior of the Building, or (iii) permit any tenant or other occupant of the Building to assign is lease or sublet its premises to a Competitor or consent to an assignment by any tenant or other occupant to a Competitor to the extent Landlord has the right to prevent such tenant or other occupant or assignee to do so (it being understood that Landlord will place restrictions on assignment or subleasing to Competitors on the then-existing Competitor list in future Building leases but may have no reasonable basis to withhold consent to an existing tenant's assignment or sublease to a Competitor, or to future tenant's assignment or sublease to a Competitor added to the list of Competitors after the date Landlord entered into the lease with such future tenant). Landlord acknowledges that foregoing covenants and restrictions contained in this Section 63 are reasonable and necessary to protect Tenant's legitimate interest and constitute a material inducement to Tenant to enter into this Lease. This right is subject and subordinate to all pre-existing rights of current tenants and occupants of the Building and their successors and assigns.

B.       Further, Landlord acknowledges that a breach or threatened breach of this Section 63 would give rise to irreparable harm to Tenant, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by Landlord of any such obligations, Tenant shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond). Notwithstanding anything to the contrary in this Lease, as Tenant's sole monetary remedy with respect to a breach by Landlord of this Section 63 during the pendency of any default by Landlord under this Section 63, all Rent shall abate as follows: (i) there shall be a twenty-five percent (25%) abatement from the date in which Tenant provides Landlord notice of violation of this Section 63 until either Landlord cures such violation or the date that is sixty (60) days following Landlord's receipt of such notice; and (ii) there shall be fifty percent (50%) abatement of Rent thereafter until the date that Landlord cures such violation of this Section 63; provided, however, that if such violation continues for more than twelve (12) months, Tenant may elect by written notice delivered to Landlord within thirty (30) days after the end of such twelve (12) month period, to terminate this Lease, and if Tenant fails to terminate within that period all further rental abatement shall cease and Tenant shall be deemed to have waived any further right to object to the particular breach of this Section 63 at issue.

C.       As used herein the term "Competitor" shall mean any business, entity, person or other individual that engages directly or indirectly in the Restricted Business. As used herein, the term "Restricted Business" shall mean the design, development, marketing, managing and/or operating of a flexible workplace center as such party's primary business. The foregoing restriction shall not apply to professional services firms and other service providers providing services to a Competitor (e.g. an architect providing design services for a Competitor, a law firm providing legal services to a Competitor, or a marketing firm providing marketing services on behalf of a Competitor) or businesses for which subleases of office space are incidental to its primary business. Notwithstanding anything to the contrary in this Lease, Tenant's Competitors shall be only the parties listed on Exhibit O to this Lease as of the date any applicable Landlord action is taken. Tenant may update the list of Competitors from time to time subject to Landlord's reasonable approval (but not more often than once in any twelve (12) month period). The Competitors on such list shall be consistent with the definition of Competitor above, and such replacement list shall thereafter be deemed to contain the entire list of Tenant's Competitors.

D.       Landlord shall notify all future tenants and occupants of the Building of Tenant's exclusive use rights set forth in this Section 63 by including reference to Tenant's rights under this Section 63 in such tenant's lease or occupant's occupancy agreement (meaning, for the avoidance of doubt, that future leases will prohibit tenants thereunder from assigning or subleasing to Competitors named on the list then effective pursuant to this Section 63). Tenant acknowledges that there shall be no violation of this Section 63 for (i) any tenant or occupant (or their successors and assigns) operating under pre-existing

rights under their leases or occupancy agreements or where Landlord has no right to prevent such a violation (e.g. because a Competitor has been permitted to take an assignment of a lease in bankruptcy and to operate as a Competitor), or (ii) any tenant (or occupant) (each a "Rogue Tenant") who assigns or subleases its premises to a Competitor in violation of the terms of its lease or occupancy agreement despite knowing of Tenant's rights hereunder. Notwithstanding the foregoing, Landlord agrees to exercise its rights and remedies under its lease with any Rogue Tenant in good faith (including, without limitation, bringing an eviction action) to remedy such a violation by such Rogue Tenant (without any representation or warranty as to the result of such exercise of its rights and remedies).

**64.     Counterparts.**

This Lease may be executed in counterparts.

**65.     Arbitration.**

If pursuant to any provision of this Lease (other than a provision with respect to the determination of FMV, with respect to which the provisions of Exhibit H shall apply or in connection with Landlord's institution of eviction proceedings), Landlord and/or Tenant is entitled to submit a particularly dispute to arbitration, and such party (the "Initiating Party") desires to do such, such dispute shall be submitted to binding arbitration conducted in San Francisco pursuant to the expedited arbitration proceeding provisions of the Commercial Arbitration Rules of the American Arbitration Association then prevailing in San Francisco (an "Expedited Arbitration Proceeding"). The Initiating Party shall submit the dispute to arbitration by delivering notice (each such notice being herein called an "Arbitration Notice") of its desire to the other party (the "Responding Party"), which notice shall describe the dispute in question, indicate the provision(s) of this Lease under which such dispute arose and appoint, and set forth, the name and address of, the person who will act as arbitrator on the Initiating Party's behalf in connection with the dispute in question The Responding Party, within ten (10) business days after its receipt of the Arbitration Notice, shall give notice to the Initiating Party, which notice shall appoint, and set forth the name and address of, a second arbitrator with respect to the dispute in question (it being agreed that if (x) the Responding Party fails to appoint a second arbitrator within such ten (10)-business day period and (y) such failure continues for two (2) business days after the Responding Party receives a notice of such failure from the Initiating Party, then the first arbitrator may appoint such second arbitrator). If, within ten (10) business days (the "Discussion Period") following the appointment of the second arbitrator (however such second arbitrator is appointed), the two (2) appointed Arbitrators are unable to agree with respect to the issue to be determined, then the two (2) arbitrators shall, within five (5) business days following the end of the Discussion Period, appoint, by written instrument delivered to both the Initiating Party and the Responding Party, a third arbitrator with respect to the dispute in question (it being agreed that if the two (2) arbitrators fail to appoint a third arbitrator within the aforesaid five (5)-business day period, then either the Initiating Party or the Responding Party may apply to the American Arbitration Association, or if the American Arbitration Association refuses or fails to act, then to a court of competent jurisdiction in the State of California, for the appointment of such third arbitrator) and the third Arbitrator alone shall be instructed to render a decision within ten (10) business days of such appointment. Landlord and Tenant shall each have the right to appear and be represented by counsel before the arbitrators and to submit such data and memoranda in support of their respective positions in the matter in dispute as may be reasonably necessary or appropriate in the circumstances. Each arbitrator appointed under this Section 65 (whether by Landlord, Tenant or any other person(s), organization or court) shall not then be employed by Landlord, Tenant or any Affiliate of Landlord or Tenant, and, in all other respects, shall be impartial. In addition, each arbitrator (i) shall meet the qualifications set forth in this Lease requiring or permitting arbitration of such issue, or (ii) if no such qualifications are so set forth, shall have at least ten (10) years' experience in the business of leasing, operating and managing commercial office buildings in San Francisco. The arbitration shall be conducted as an Expedited Arbitration Proceeding. Any determination or award in such arbitration shall (i) be in writing, (ii) be final and conclusive on the parties (and counterpart copies thereof shall be delivered to each of the parties), and (iii) not add to, subtract from or otherwise modify the provisions of this Lease. Judgment upon any such determination or award may be entered in any court having jurisdiction thereof. In connection with any Expedited Arbitration Proceeding, the arbitrators shall determine the extent to which each party is successful in such Expedited Arbitration Proceeding in addition to rendering a decision on the dispute submitted. If the arbitrators determine that one party is entirely unsuccessful, then such party shall pay all of the fees of the arbitrators and reasonable attorneys' fees. If the arbitrators determine that both parties are partially successful, then each party shall be responsible for the arbitrators' and reasonable attorney's fees only to the extent such party is unsuccessful (e.g., if Landlord is eighty percent (80%) successful and Tenant is twenty (20%) successful, then Landlord shall be responsible for twenty percent (20%) of the arbitrators' fees and reasonable attorneys' fees and Tenant shall be responsible for eighty percent (80%) of the arbitrators' reasonable and attorneys' fees). If the parties reach a settlement prior to the final arbitration decision, each party shall pay its own expenses and the parties shall each pay one-half of the fees and costs of the third arbitrator (if any). The parties acknowledge and agree that this Section's provisions shall not apply for eviction summary proceedings filed by Landlord against Tenant.

**66.     Confidentiality.**

Landlord shall not use or disclose and Landlord shall instruct Landlord's employees, agents and service providers with knowledge of this transaction not to so use or disclose (i) the existence, and any material term or condition, of this Lease (including, without limitation, the names of the parties involved or any other identifying details with respect to the provisions of this Lease); (ii) any information (whether or not in writing, whether or not patentable and whether or not copyrightable) of a private, secret

33

or confidential nature relating to Tenant's technology, operations, members, customers, business plans, promotional and marketing activities, finances and other business affairs that is learned by or disclosed to Landlord, and (iii) any and all design plans, schematic drawings or similar items created by or for Tenant or Landlord in connection with Tenant's Alterations. The above notwithstanding, nothing contained herein shall restrict Landlord's ability to disclose any term or condition of this Lease (i) to Landlord's lenders (or potential lenders), attorneys, accountants and other professionals with a need to know such information to perform its duties that Landlord retains such professionals for, provided that such recipients shall agree in writing to keep such information confidential, (ii) in connection with any arbitration or potential litigation between the parties under this Lease, or (iii) that are or become a matter of public record or known to the general public under circumstances involving no breach by Landlord or others of the terms of this Section 66. Further, Landlord may disclose any confidential matters under this Section 66 as required by any laws, ordinances, rules or regulations or by a court of competent jurisdiction or any other governmental authority issuing a subpoena to Landlord or as relevant in any arbitration or litigation between the parties to this Lease. Landlord shall not make a public statement or issue a press release regarding this Lease (including the identity of Tenant) without Tenant's prior written consent. Landlord agrees that Tenant's and its Affiliates' trademarks and other intellectual property (including, without limitation, name/logo, and pictures of the interior of the Premises) and the goodwill associated therewith are the sole and exclusive property of Tenant and may not be used by Landlord for any purpose except with the express prior written consent of Tenant.

### 67.    Dogs

Notwithstanding any provision to the contrary contained in this Lease, Landlord hereby permits Tenant and Tenant's Members, subject to the terms of this Section, to bring to the Building fully domesticated, fully vaccinated, trained dogs, none of which weigh more than thirty (30) pounds (hereinafter referred to individually as a "Permitted Dog", and collectively as the "Permitted Dogs"), which are owned by Tenant's employees and Members as pets (as opposed to guide, signal or service dogs as defined by applicable law), and to keep such Permitted Dogs in the Premises during those times in which such employees or Members are present in the Premises. Tenant's Members or individual owners of Permitted Dogs shall be required to maintain documentation that each Permitted Dog is properly trained and fully vaccinated on a current basis, and shall provide such documentation to Landlord's representatives (including Landlord's security guards) on request. In no event shall Tenant permit more than three (3) Permitted Dogs on any floor of the Premises at any time, or permit any dangerous breeds to enter the Premises or the Building. Dangerous breeds include, but are not limited to the following: Pit Bull, German Shepherd, Boxer, Rottweiler, Chow, Doberman Pincher, Siberian Husky, Akita, Wolf Hybrid or any mix of the foregoing breeds. Permitted Dogs shall not be left unattended in the Premises or any part of the Building at any time. In all portions of the Building other than the Premises (specifically including, without limitation, all common areas), Permitted Dogs shall, at all times, remain on a leash and controlled by Tenant's employees or Members, and shall not be permitted to walk or otherwise roam through the Building except for entry and egress to the Premises. All dogs must be carried in on a leash. Further, Tenant agrees not to, and to cause its employees and Members not to, bring any Permitted Dog to the Building in the event such Permitted Dog becomes ill or contracts a disease that could potentially threaten the health or wellbeing of any tenant or occupant of the Building (which diseases shall include, without limitation, rabies, leptospirosis, flea infestation and Lyme disease). Landlord shall have the right to prohibit any Permitted Dog upon reasonable notice to Tenant if such Permitted Dogs is, in Landlord's reasonable judgment, found to be a nuisance to the Building (for purposes hereof, the causes for which Permitted Dogs may be found to be a "nuisance" include but are not limited to (i) repeated or loud barking by such Permitted Dog, (ii) such Permitted Dog biting any occupant or invitee of the Building, (iii) such Permitted Dog defecating or urinating in the Building or common areas, (iv) failure to clean up any defecation or urination by such Permitted Dog immediately upon verbal or other notice from Landlord or defecates or urinates regularly on or about the Premises or the Building, (v) such Permitted Dog otherwise damaging or destroying the Building, the Premises or common areas or any property in the Building, the Premises or common areas or causing injury to any person or other animal in or around the Building). If Landlord makes the determination that any Permitted Dog regularly defecates or urinates on or about the Premises or the Building or is a nuisance, Landlord may issue Tenant a warning notice with respect to such Permitted Dog. If Landlord subsequently determines that such Permitted Dog continues to regularly defecate or urinate or remains a nuisance, Landlord may by second notice to Tenant permanently prohibit such Permitted Dog. Tenant shall be responsible for any damage and/or costs incurred by Landlord as a result of Permitted Dogs' presence in any portion of the Building, including increased wear and tear caused by the presence of Permitted Dogs in any portion of the Building. Tenant shall appoint one or more Tenant employees to supervise the presence of Permitted Dogs in the Premises and to promptly enforce dog-related rules and regulations. Tenant shall provide Landlord a list of these employees and their contact information. Tenant shall promptly notify Landlord of any incident related to any Permitted Dogs, including damage caused by any such Permitted Dogs to the Premises or any other part of the Building, or any biting or other personal injury caused by such Permitted Dogs. Without limiting the generality of the foregoing, Tenant shall promptly repair any damage caused by Permitted Dogs to the Building, the Premises or the common areas, and Tenant shall indemnify, protect, defend and hold Landlord harmless from and against all losses, damages, claims, actions, causes of action, liabilities, costs and expenses (including reasonable attorneys' fees) incurred by Landlord in connection with the rights granted to Tenant under this Section. If Tenant fails to promptly clean up any mess caused by any dog on or about the Premises and the Building, or to promptly repair any damage caused by such dogs, without limiting Landlord's other rights and remedies, Landlord may clean up such mess or undertake such repair and Tenant shall promptly reimburse Landlord for the costs thereof, together with a fifteen percent (15%) administrative fee. In the event Landlord receives any verbal or written complaints from any other tenant or occupant of the Building in connection with health-related

49302/0801
ELL/536444.3

issues (e.g., allergies) related to the presence of Permitted Dogs in and around the Premises or the Building, Landlord and Tenant shall promptly meet and mutually confer, in good faith, to determine appropriate mitigation measures to eliminate the causes of such complaints (which mitigation measures may include, without limitation, additional and/or different air filters to be installed in the Premises HVAC system, or elsewhere in the Building), and Tenant shall cause such measures to be taken promptly at its sole cost or expense. Tenant shall require each individual bringing a Permitted Dog into any part of the Building to sign a pet contract in Tenant's commercially reasonable form, and shall enforce such agreement against each such individual pet owner. Tenant's rights under this Section 67 are subject to, and Tenant shall comply with, all Applicable Laws associated with or governing the presence of dogs at or within the Building.   The rights granted herein with respect to Tenant's Dogs shall not apply or be transferable to any other animal, and in the event Tenant wishes to bring an animal or dog other than Tenant's Dogs into the Building, Tenant shall submit a written request to Landlord for its approval, which approval may be withheld in Landlord's sole and absolute discretion. The right to bring Permitted Dogs into the Premises pursuant to this Section is personal to the original Tenant. If Tenant assigns the Lease or sublets all or any portion of the Premises, then, as to the entire Premises, upon such assignment, or, as to the portion of the Premises sublet, upon such subletting and until the expiration of such sublease, the right to bring Permitted Dogs into such portion the Premises shall simultaneously terminate and be of no further force or effect.

[Signatures appear on the following page.]

By: _____

Its: _____

TENANT:

180 SANSOME STREET TENANT LLC,
a New York limited liability company

By: _____   Peter Greenspan

Its: _____   Assistant Secretary

In witness whereof, Landlord and Tenant execute this 180 Sansome Street Office Lease as of the date first above written.

LANDLORD:

300 PROSPECT PROPERTIES, INC.,
a California corporation

By: _____

Its: ___Joshua Kwan, Chief Operating Officer___

TENANT:

180 SANSOME STREET TENANT LLC,
a New York limited liability company

By: _____

Its: _____

## EXHIBIT A
### Floor Plan

CADs of the Premises were provided to Tenant on September 11, 2018

49302/0801
ELL/536444.3

## EXHIBIT B
### Work Letter Agreement
(Tenant Performs Work)

This Work Letter Agreement ("Work Letter") is executed in connection with the office lease (the "Lease") between 180 Sansome Street Tenant LLC as "Tenant", and 300 Prospect Properties, Inc., a California corporation as "Landlord", relating to demised premises ("Premises") at the building located at 180 Sansome Street, San Francisco (the "Building"), which Premises are more fully identified in the Lease. Capitalized terms used herein, unless otherwise defined in the Work Letter, shall have the respective meanings ascribed to them in the Lease.

For and in consideration of the agreement to lease the Premises and the mutual covenants contained herein and in the Lease, Landlord and Tenant hereby agree as follows:

1.        Tenant's Initial Plans and the Work.   Tenant desires to perform certain leasehold improvement work in the Premises in substantial accordance with this Exhibit B ( Rider 1 to Exhibit B) and Exhibit G, the Space Plan (collectively, the "Initial Plan"), a copy or copies of which is/are attached hereto as Rider 1 and Exhibit G.  Such work as described in the Initial Plan and as more fully detailed in the Working Drawings (as defined and described in Paragraph 2 below), shall be hereinafter referred to as the "Work".  Within thirty (30) days after the Tenant signs this Lease, Tenant shall furnish to Landlord such additional plans, drawings, specifications and finish details as Landlord may reasonably request referred to as "Specifications".  Tenant shall lose one (1) day of Base Rental abatement pursuant to this Lease for each day Tenant is late in delivering the same.  Upon Landlord approval of Specifications, said Specifications shall then become incorporated into the Initial Plan.  All plans, drawings, specifications and other details describing the Work which have been or are hereafter furnished by or on behalf of Tenant shall be subject to Landlord's approval, which Landlord agrees shall not be unreasonably withheld, conditioned or delayed.  Subject to Paragraph 8  in connection with Landlord approval of alternations, Landlord shall not be deemed to have acted unreasonably if it withholds its approval of any plans, specifications, drawings or other details or of any Additional Work (as defined in Paragraph 7 below) because, in Landlord's reasonable opinion, the work, as described in any such item, to the Additional work, as the case may be: (a) is likely to adversely affect Building systems, the structure of the Building or the safety of the Building and/or its occupants; (b) might impair Landlord's ability to furnish services to Tenant or other tenants in the Building; (c) would increase the cost of operating the Building; (d) would violate and government laws, rules or ordinances (or interpretations thereof); (e) contains or uses hazardous or toxic materials or substances; (f) would adversely affect the appearance of the Building; (g) might adversely affect another tenant's premises; (h) is prohibited by a ground lease affecting the Building; or (i) is likely to be substantially delayed because of unavailability or shortage of labor or materials necessary to perform such work or the difficulties or unusual nature of such work.  The foregoing reasons, however, shall not be the only reasons for which Landlord may withhold its approval, whether or not such other reasons are similar or dissimilar to the foregoing.  Neither the approval by Landlord of the Work or the Initial Plan or any other plans, drawings, specifications or other item associated with the Work nor Landlord's supervision or monitoring of the Work shall constitute any warranty by Landlord to Tenant of the adequacy of the design for Tenant's intended use of the Premises.

2.        Work Drawings.  If necessary for the performance of the Work and not included as part of the Initial Plan attached hereto, Tenant shall prepare or cause to be prepared final working drawings and specifications for the Work (the "Work Drawings") based on and consistent with the Initial Plan and other plans, drawings, specifications, finish details and other information furnished by Tenant to Landlord and approved by Landlord pursuant to Paragraph 1 above.  So long as the Working Drawings are consistent with the Initial Plan, Landlord shall either (1) approve the Working Drawings within seven (7) business days, if Tenant submits Working Drawings for a single floor, or within ten (10) business days if Tenant submits Working Drawings for multiple floors at the same time (including, without limitation, if Tenant is submitting Working Drawings for individual floors within seven (7) business days of one another) after receipt of same from Tenant  by initialing and returning to Tenant  each sheet of the Working Drawings or by executing Landlord's approval in the form then in use, whatever method of approval Landlord may designate, or (2) disapprove and resubmit the Working Drawings subject to "Tenant Delays" (as defined and described under Paragraph 6 of the Work Letter).  If Landlord fails to respond to the Working Drawings within such seven (7) or ten (10) business day period, as applicable, then Tenant shall provide Landlord with a second notice requesting Landlord's approval of the Working Drawings. If Landlord shall fail to either approve or disapprove the Working Drawings within three (3) business days after such second notice (with respect to the expiration of the seven (7) business day period) or five (5) business days after such second notice (with respect to the expiration of the ten (10) business day period), Landlord shall be deemed to have approved of the Working Drawings.

3.        Performance of the Work.  Tenant, at its expense, shall cause the Work to be performed using building standard materials, quantities and procedures then in use by Landlord ("Building Standards"), except as may be stated or shown otherwise in the Working Drawings.  Landlord shall have the right to approve Tenant's architects, contractors and subcontractors, who shall comply with all rules, regulations and requirements for the Lease in connection with the Work.  All contractors and subcontractors shall use union labor exclusively. For fire and life safety work, Tenant shall use Building-approved contractors.  If Tenant requests approval of any contractor, architect or subcontractor and Landlord fails to respond to such request within seven (7) days after (which response may include a request for additional information regarding such contractor, architect, or subcontractor) then Tenant shall provide Landlord with a second notice requesting Landlord's approval.  If Landlord shall fail to either

B-1

49302/0801
ELL/536444.3

respond to such request within three (3) business days after such second notice, Landlord shall be deemed to have approved of the contractor, architect and/or subcontractor, as the case may be.

    4.    **Tenant Delays.** There shall be no extension of the scheduled commencement or expiration date of the Lease Term if the Work has not been substantially completed on said scheduled date by reason of any delay directly attributable to Tenant, Tenant's contractor or other agents, or due to the nature of Tenant's Work or selection of materials therein ("Tenant Delays"). Examples of Tenant Delays include, but are not limited to:

    (i)    The failure of Tenant to furnish all or any plans, drawings, specifications, finish details or other information required under Paragraph 1 above on or before the date stated in Paragraph 1;

    (ii)    The failure of Tenant to produce the Working Drawings satisfactory for Landlord approval within a reasonable time required to accomplish the completed Work;

    (iii)    The failure of Tenant to comply with the requirements of Landlord's Construction Rules & Regulations.

    (iv)    Tenant's requirements for special work or materials, finishes, or installations other than a standard vanilla shell build-out or Tenant's requirement for special construction staging or phasing.

    (v)    The performance of any work not specified in the Initial Plan or incorporated in subsequent approved Working Drawings ("Additional Work") by Tenant or the performance of any Additional Work in the Premises by any person, firm or corporation employed by or on behalf of Tenant, or any failure to complete or delay in completion of such work; or

    (vi)    Any other act or omission of Tenant that causes a delay.

    5.    **Access.** Tenant shall give Landlord, and Landlord's employees, agents, contractors, workmen, mechanics, suppliers and invitees, access to the Premises in order to perform any additional Work without impediment. Tenant's employees, agents, contractors, workmen, mechanics, suppliers and invitees, if any, shall work in harmony and not interfere with Landlord or Landlord's agents in performing any Landlord Work in the Premises, Landlord's work in other premises and common areas of the Building, or the general operation of the Building. If at any time any such person representing Tenant shall cause or threaten to cause such disharmony or interference, including labor disharmony, and Tenant fails to immediately institute and maintain such corrective actions as directed by Landlord, then Landlord may suspend construction activities upon twenty-four (24) hours' prior written notice to Tenant. Any such entry into and occupancy of the Premises by Tenant or any person or entity working or on behalf of Tenant shall be deemed to be subject to all of the terms, covenants, conditions and provisions of the Lease, specifically including the provisions of Section 8 thereof regarding Tenant's improvements and alterations to the Premises).

    6.    **Lease Provisions.** The terms and provisions of the Lease, insofar as they are applicable to this Work letter, are hereby incorporated herein by reference. All amounts payable by Tenant to Landlord hereunder shall be deemed to be Additional Rental under the Lease and, upon any Event of Default in the payment of same, Landlord shall have all of the rights and remedies provided for in the Lease.

    7.    **Miscellaneous.**

    (a)    This Work letter shall be governed by the laws of the state in which the Premises are located.

    (b)    This work letter may not be amended except by a written instrument signed by the party or parties to be bound thereby.

    (c)    Any person signing this Work letter on behalf of Tenant warrants and represents he/she has authority to sign and deliver this Work Letter and bind Tenant.

    (d)    Notices under this Work Letter shall be given in the same manner as under the Lease.

    (e)    The headings set forth herein are for convenience only.

    (f)    This Work Letter sets forth the entire agreement of Tenant and Landlord regarding the Work except as otherwise set forth herein.

    (g)    In the event that the final Working Drawings and specifications are included as part of the Initial Plan attached hereto, or in the event Landlord performs the Work without the necessity of preparing Working Drawings specifications, then whenever the term Working Drawings is used in this Agreement, such term shall be deemed to refer to the Initial Plan and all supplemental plans and specifications approved by Landlord.

B-2

8.      Exculpation of Landlord. Notwithstanding anything to the contrary contained in the Work Letter, it is expressly understood and agreed by and between the parties hereto that:

(a)      The recourse of Tenant or its successors or assigns against Landlord with respect to the alleged breach by or on the part of Landlord of any representation, warranty, covenant, undertaking or agreement contained in this Work Letter or the Lease shall extend only to Landlord's interest in the real estate, of which the Premises demised under the Lease Documents are a part (hereinafter, "Landlord's Real Estate") and not to any other assets of Landlord or its beneficiaries; and

(b)      Except to the extent of Landlord's interest in the Building, no personal liability or personal responsibility of any sort with respect to any of Landlord's Work Letter undertakings or any alleged breach thereof is assumed by, or shall any time be asserted or enforceable against Landlord, its beneficiaries, or against any of their respective directors, officers, employees, agents, constituent partners, beneficiaries, trustees or representatives.

Any addendum attached hereto is incorporated by this reference.

[Signatures appear on the following page.]

**180 SANSOME STREET TE      IT LLC,**
a New York limited liability company

**300 Prospect Prope     , Inc.**
a California corporation

By: _____ Peter Greenspan _____

By: _____

Title: _____ Assistant Secretary

Title: _____

IN WITNESS WHEREOF, this Work Letter Agreement is executed as   of the_____ 29 _____day of ____November____ 2018.


TENANT:                                          LANDLORD:
180 SANSOME STREET TENANT LLC,                   300 Prospect Properties, Inc.
a New York limited liability company             a California corporation


By: _____             By: _____

Title:_____             Title: _____ Joshua Kwan, Chief Operating Officer.

49302/0801
ELL/536444.2

## Rider 1
### to Exhibit B

The Premises are leased "AS IS". All work shall be done by Tenant at its sole expense.
Nevertheless, Landlord shall provide the "Tenant Improvement Allowance" to Tenant in the amount of $60.00 per rentable square foot toward the cost of permitted Tenant Improvements.

1. Tenant shall use the Tenant Improvement Allowance for hard construction costs only, consisting of construction labor and materials and the utilities, taxes and insurance related thereto. The Tenant Improvement Allowance shall not be used for soft costs such as design, architectural, engineering, consulting, permitting, legal, accounting or overhead.

2. Prior to execution of the Lease, Tenant has designated <u>Tenant as the party</u> responsible for managing the Tenant Improvement construction. If Landlord has been selected as the responsible manager, Tenant shall pay Landlord a construction management fee of ten (10%) percent of the Tenant Improvement Allowance utilized by Tenant. If Tenant has been selected as the responsible manager, Tenant shall pay Landlord a construction supervision fee of $250.00 per hour, capped at twenty thousand dollars ($20,000.00) for the entirety of the initial Tenant Improvements for Landlord's time and expense in connection with reviewing initial plans/drawings, progress walkthroughs, construction related meetings etc. Tenant shall be pay Landlord additional fees at $250.00 per hour for any additional work required of Landlord due to changes in Tenant's plans/drawing and Landlord's involvement with activities beyond Landlord's review of the initial plans/drawings, progress walkthroughs and related meetings.

3. Landlord shall reimburse tenant for the Tenant Improvement Allowance within thirty (30) days of Tenant's submission of (a) evidence of payment reasonably acceptable to Landlord, including by invoices marked paid and cancelled checks, (b) partial or final lien waivers relating to the payments and (c) certificates from Tenant's architect stating the percentage of work completed (the documentation set forth in the foregoing (a), (b) and (c) shall be referred to herein as the "Required Documentation"). Landlord may retain ten percent (10%) from each payment until Tenant delivers a completion certificate from the general contractor or architect and unconditional lien waivers from the general contractor and subcontracts.

4. If (i) Tenant requests the Tenant Improvement Allowance (or a portion thereof) and (ii) Tenant has delivered the Required Documentation to Landlord, and Landlord fails to pay the requested amount of the Tenant Improvement Allowance within such 30-day period (unless and except to the extent Landlord is disputing in good faith Tenant's entitlement to all or any portion of the requested amount of the Tenant Improvement Allowance), Tenant shall have the right to send Landlord notice of such failure ("Allowance Notice"). The Allowance Notice shall include a reminder in bold uppercase lettering of the consequences of Landlord's failure to pay the requested amount of the Tenant Improvement Allowance within five (5) business days, then Tenant shall be allowed to apply such unpaid amount as a credit against Rent next due and payable under the Lease. Any disputes under this paragraph may be submitted by either party to arbitration pursuant to Section 65 of the Lease, provided that in all events Landlord shall be required to disburse to Tenant any requested and undisputed amounts of the Tenant Improvement Allowance.

5. Tenant shall have the right to use architects, contractors and subcontractors of Tenant's selection, subject to Landlord's approval, for the construction of any and all Tenant Improvements, except fire/life/safety, for which Tenant shall use the building approved contractor.

6. Tenant must use union labor, including general contractor and all subs, for the Tenant Improvements.

   7. Tenant may install its own security system in the Premises and/or integrate its own security system into the existing Building security system, subject to such reasonable conditions as Landlord may require.

49302/0801
ELL/536444.3

## EXHIBIT C

### Rules and Regulations of the Building

A.      Signs.  No sign, placard, picture, advertisement, name or notice will be inscribed, displayed, printed, or affixed on or to any part of the outside or inside of the Building without the prior written consent of Landlord, and Landlord will have the right to remove any such sign, placard, picture, advertisement, name, or notice without notice to and at the expense of Tenant.  All approved signs or approved lettering on doors will be printed, painted, affixed or inscribed at the expense of Tenant by a person approved by Landlord.  All signs located in the interior of the Premises shall be in good taste so as not to detract from the general appearance of the Premises or the Building.  Tenant shall not solicit business in the lobby or other common areas nor distribute any advertising matter to, in or upon the common areas or other tenants' premises nor use handbills, balloons or other giveaways or promotional items for advertising at or around the Building.  In the event of the violation of the foregoing by any tenant, Landlord may notify Tenant of such violation and if Tenant fails to remove the violating item within ten (10) Business Days following such notification Landlord may remove the same without any liability, and may charge the expense incurred in such removal to the tenant violating this rule.

B.      Window Coverings.  Only the standard Building window coverings as established by Landlord will be hung in the windows in the Premises and the use of any other curtains, blinds, shades, or screens attached to or hung in or used in connection with any window or door of the Premises will be discontinued immediately by the Tenant.  All window coverings which Tenant wishes to install shall be subject to the prior review and written approval of Landlord, including, but not limited to, style, size, color, method of installation, etc.; this includes any "standard 'WeWork' blinds and window coverings.  No items or coverings may be hung on the windows.  No awning will be permitted on any part of the Premises.  Except as otherwise specifically approved by Landlord, all electrical ceiling fixtures along the perimeter of the Building must be fluorescent and of a quality, type, design and bulb color approved by Landlord.  Tenant shall not place anything or allow anything to be placed near the glass of any window, door, partition or wall which may appear unsightly from outside the Premises.

C.      Building Directory.  The bulletin board or directory of the Building will be provided exclusively for the display of the name and location of tenants, and Landlord reserves the right to exclude any other names therefrom, including subtenants.  Additional names, if approved by Landlord, and name changes are to be paid by Tenant.

D.      Hallways and Passages.  The sidewalks, halls, passages, exits, entrances, elevators, and stairways in the Building will not be obstructed by Tenant or used for any purpose other than for ingress to and egress from the Premises.  The halls, passages, exits, entrances, elevators, stairways, balconies and roof are not for the use of the general public, and the Landlord will in all cases retain the right to control and prevent access thereto by all persons whose presence in the judgment of the Landlord will be prejudicial to the safety, character, reputation, and interest of the Building and its tenants, provided that nothing herein contained will be construed to prevent such access to persons with whom the Tenant normally deals in the ordinary course of Tenant's business unless such persons are engaged in illegal or improper activities.  The doors, windows, glass lights, and any lights or skylights that reflect or admit light into the halls or other places of the Building will not be covered or obstructed.  Neither Tenant nor any employees or invitees of Tenant will go upon the roof of the Building.  No furniture is permitted in the elevator lobbies, unless expressly permitted by the San Francisco Fire Department.

E.      Locks.  Excluding installation of Tenant's Key Card System, Tenant will not alter any lock nor install any new or additional locks or any bolts on  entrance door of the Premises.  Tenant will make sure that Landlord, at all times, has a key to each lock for each entrance of the Premises, Landlord will not keep copies of keys to Tenant's interior offices.  Tenant, upon the termination of the tenancy, will deliver to the Landlord the keys to all offices, rooms, and toilet rooms which will have been furnished to the Tenant or which the Tenant will have made.  Tenant shall pay to Landlord the cost of replacing lost keys or of changing the lock or locks opened by such lost key if Landlord shall deem it necessary to make such change.

F.      Restrooms.  The toilet rooms, toilets, urinals, wash bowls, and other restroom apparatus within the Building will not be used for any purpose other than that for which they were constructed, and no foreign substance of any kind whatsoever will be thrown therein, and the expense of any breakage, stoppage, or damage resulting from the violation of this rule by Tenant or his employees or invitees will be borne by Tenant.

G.      Moving In and Out of Premises; Heavy Equipment.  No furniture, freight, or equipment of any kind will be brought into the Building without the consent of Landlord, and all moving of the same into or out of the Building will be done at such time and in such manner as Landlord will designate.  In any event, any major moving-in or out (i.e. a move-in or out that requires use of more than one (1) elevator load) must be scheduled after Business Hours.  All persons employed to move furniture, freight or equipment of any kind must be approved by Landlord in writing in advance.  No hand trucks except those equipped with rubber tires and side guards or such other material handling equipment as Landlord may approve will be used in any space, including the common areas, of the Building, either by Tenant or by others.  No other vehicles of any kind will be brought by Tenant into the Building or kept in, on or about the Premises.  Tenant will not overload the floor of the Premises and Landlord will have the right to prescribe the weight, size, and position of all safes and other heavy equipment brought into the Building and also the times and manner of moving the same in and out of the Building.  Safes or other heavy objects will, if considered necessary by Landlord, stand on wood strips of such thickness as is necessary to properly distribute the

C-1

weight. Landlord reserves the right to inspect all safes, freight or other bulky articles to be brought into the Building and to exclude from the Building all safes, freight or other bulky articles which violate any of these Rules and Regulations or the Lease of which these Rules and Regulations are a part. Landlord reserves the right to prohibit or impose conditions upon the installation in the Premises of heavy objects which might overload the building floors. Landlord will not be responsible for loss of or damage to any such safe or property from any cause except if such loss or damage is due to the gross negligence or willful misconduct of Landlord or any Landlord Party. All damage done to the Building by moving or maintaining any such safe or other property will be repaired at the expense of Tenant.

H.    Janitorial Services and Cleaning. Tenant will not employ any person or persons other than the janitor of Landlord for the purpose of cleaning the Premises unless otherwise agreed by Landlord.; If Tenant wishes to provide "day porter" operations (i.e. for purposes of restocking kitchen supplies and refrigerators), Landlord shall provide union janitors for the "day porter" service, at Tenant's sole cost. Except with the written consent of Landlord, no person or persons other than those approved by Landlord will be permitted to enter the Building for the purpose of cleaning the same. Tenant will not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness. Landlord will not be responsible to Tenant for any loss of property on the Premises, however occurring, or for any damage done to the effects of Tenant by the janitor or any other employee or any other person. Janitor service will include ordinary dusting and cleaning by the janitor assigned to such work as more particularly described in the janitorial specifications attached as Exhibit P to this Lease (subject to revision from time to time in Landlord's reasonable business judgment), and janitor service will not be furnished on Saturdays, Sundays or holidays. Tenant may request from Landlord union janitorial service and/or "day porter" service for weekends and holidays, at Tenant's sole cost. Window cleaning will be done only by Landlord's vendor, and only between 6:00 a.m. and 5:00 p.m. No article will be hung out of any window of the Building, and Tenant will not sweep or throw or permit to be swept or thrown from the Premises any dirt or other substance into any of the corridors, halls, elevators, or stairways, or out of the doors or windows of the Building.

I.    Use of Premises. Tenant will not mark, drive nails, screw, or drill into the partitions, woodwork, or plaster, (except in connection with the installation of normal office wall art) or in any way deface the Premises or any part thereof. No loudspeaker or other similar device, system, or apparatus which can be heard or experienced outside the Premises will, without the prior written approval of Landlord, be used in or at the Premises. No tenant or its officers, agents, employees or invitees shall drill into or in any way deface any part of the Premises or the Building, except as permitted in its lease. Tenant will not use, keep, or permit to be used or kept any foul or noxious gas or substance in or on the Premises; permit any unreasonable odor, smell, or vapor to escape from the Premises to other portions of the Building; or permit or suffer the Premises to be occupied or used in a manner offensive or objectionable to the Landlord or other occupants of the Building by reason of noise, odors, and/or vibrations, or interfere in any way with other tenants or those having business therein, nor will any animals or birds be brought in or kept in or about the Premises or the Building (except for dogs as expressly permitted by this Lease). No cooking will be done or permitted by Tenant on the Premises, (with the exception of ordinary office coffee brewing and microwave cooking) nor will the Premises be used for the storage of merchandise, for washing clothes, for lodging, or for any improper, objectionable, or immoral purposes. Tenant will not use or keep in or on the Premises or in the Building any kerosene, gasoline, or inflammable or combustible fluid or material, or use any method of heating or air conditioning other than that supplied by the Landlord. Tenant will close and securely lock the windows, transoms, and doors of the Premises before leaving the Building and observe strict care not to leave windows open when it rains. Tenant will exercise care and caution that all water faucets or water apparatus are entirely shut off before Tenant or Tenant's employees leave the Building and that all electricity, gas, or air conditioning will likewise be carefully shut off, so as to prevent waste or damage. For any default or carelessness Tenant will make good all injuries sustained by Landlord or other tenants or occupants of the Building.

J.    Communications and Computer Equipment. If Tenant desires telephone or other communications or computer connections, the Landlord will direct electricians at Tenant's expense as to where and how the wires are to be introduced. No boring, cutting or stringing of wires will be allowed without the consent of Landlord. The location of telephones, call boxes, and other office equipment and computer or communications equipment affixed to or installed in the Premises will be subject to the approval of Landlord. All costs of installation will be paid for by Tenant.

K.    Floor Coverings. Tenant will not lay linoleum, tile, carpet, or other floor covering so that the same will be affixed to the floor of the Premises in any manner except as approved by the Landlord. The expense of repairing any damage resulting from a violation of this rule or removal of any floor covering by Tenant or his contractors, employees, or invitees will be borne by Tenant.

L.    Deliveries. No furniture, packages, supplies, equipment, or merchandise will be received in the Building or carried up or down in the elevators, except between such hours and in such elevators as will be designated by the Landlord.

M.    Access Refused. On Sundays and legal holidays, and on other days between the hours of 6:30 p.m. and 6:00 a.m., access to the Building, or to the halls, corridors, elevators, or stairways in the Building, or to the Premises, may be refused unless the person seeking access complies with the requirements of Landlord's security personnel or accesses the Building through Tenant's Keycard System. Landlord shall furnish and approve passes to persons for whom any tenant requests the same in writing. Each tenant shall be responsible for all persons for whom he requests passes and shall be liable to Landlord for all acts of such persons. In the case of invasion, mob, riot, public excitement or

49302/0801
ELL/536444.3

other commotion, Landlord reserves the right to prevent access to the Building during the continuance of the same, by the closing of the gates and doors or otherwise, for the safety of the tenants and others and the protection of the Building and the property therein. Landlord will in no case be liable for damages for any error with regard to the admission to or exclusion from the Building of any person.

N.      Soliciting on Premises. Canvassing, peddling, soliciting and the distribution of handbills or any other written materials in the Building are prohibited, and Tenant will cooperate to prevent the same.

O.      Landlord's Employees. The requirements of Tenant will be attended to only upon application at the office of the Building. Employees of Landlord will not perform any work or do anything outside of their regular duties unless under special instructions from the Landlord, and no employee will admit any person (Tenant or otherwise) to any office without specific instructions from the Landlord. The costs of Landlord's employees or agents performing services for a particular tenant and not for all tenants in general shall be billed to the particular tenant together with a reasonable administration fee and payable as additional rent.

P.      Vending Machines. Except for WeWork Honesty Market(s), WeMRKT(s), or similar amenities ancillary to Tenant's use of the Premises for the Purpose, no vending machines or similar machines of any description will be installed, maintained, or operated upon the Premises without the written consent of the Landlord.

Q.      Building Name and Address. Landlord will have the right, exercisable without notice and without liability to Tenant, to change the name and the street address of the Building.

R.      Trash. Tenant will store all of its trash and garbage within its Premises. No material will be placed in the trash boxes or receptacles if such material is of such nature that it may not be removed or disposed of in the ordinary and customary manner of removing or disposing of trash and garbage in the City and County of San Francisco. All garbage and refuse removal and disposal will be made only through entrances and elevators provided for such purposes and at such times as Landlord will designate. Landlord will have the right to charge Tenant for the removal of any trash and garbage in excess of that resulting from normal office use.

S.      Doors. All doors opening onto service corridors shall be kept closed, except when in use for ingress and egress, and left locked when not in use.

T.      Equipment. All equipment of any electrical or mechanical nature shall be placed by tenants in the premises in settings approved by Landlord, to absorb or prevent any vibration, noise or annoyance.

U.      Air Conditioning. No air conditioning unit or other similar apparatus shall be installed or used by any tenant without the written consent of Landlord.

V.      Energy Conservation. Tenants shall cooperate with Landlord in the conservation of energy used in or about the Building. Tenant shall not obstruct, alter or in any way impair the efficient operation of Landlord's heating, lighting, ventilating and air conditioning system, if any, and shall not place bottles, machines, parcels or any other articles on the induction unit enclosure so as to interfere with air flow. Tenant shall not tamper with or change the setting of any thermostats or temperature control valves, and shall in general use heat, gas, electricity, air conditioning equipment, if any, and heating equipment in a manner compatible with sound energy conservation practices and standards.

W.      Disorderly Persons. Landlord reserves the right to exclude or expel from the Building any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of the rules and regulations of the Building.

X.      Smoking. Tenant and its employees, agents, subtenants, contractors and invitees shall comply with all applicable "no-smoking" ordinances and, irrespective of such ordinances, shall not smoke or permit smoking of cigarettes, cigars or pipes outside of Tenant's Premises (including plaza areas) in any portions of the building.

Y.      Bicycle Parking. Tenant and its employees are not permitted to bring bicycles into elevators and/or within the Premises. Bicycles can be stored in the bicycle racks located in Building's garage on a first-come, first-serve basis, free of charge. Tenant may lease, at separate expense, a storage room from Landlord to use for purpose of bicycle parking, any alteration done to the storage room(s) shall be Tenant's sole cost and expense to restore to its original condition. Tenant may use garage remote control to access basement bicycle storage (subject to $100.00 deposit for each garage remote) or may gain access through Landlord's Building key-card access system (or Tenant's integrated system, subject to the terms of this Lease.

Z.  Parking. Tenant shall have the right but not obligation for one (1) parking space per floor leased. Tenant shall provide a $100 deposit for each of the garage remote controls. The current monthly rate is $500.00 per space. Parking space is assigned and may not be transferred.

AA.      Water Conservation. Tenants shall cooperate with Landlord in the conservation of water and avoidance of penalties for water used in or about the Building, including without limitation installation of

C-3

49302/0801
ELL/536444.3

low flow toilets, water sub-meters if applicable, and water conservation devices of any kind. The tenant shall have total responsibility for such compliance relating to its Premises.

BB.     Safety and Security Devices.  Tenant acknowledges that safety and security devices, services and programs provided by Landlord, if any, while intended to deter crime and ensure safety, may not in given instances prevent theft or other criminal acts or ensure the safety of persons or property. The risk that any safety or security device may not be effective, or may malfunction or may be circumvented by a criminal, is assumed by Tenant, and Tenant shall obtain insurance coverage to the extent Tenant desires protection against such criminal acts and other losses.  Tenant agrees to cooperate with any reasonable safety program developed by Landlord

CC.     Amendments.  Landlord reserves the right to expand, modify or otherwise change or amend these Rules and Regulations from time to time with upon seventy-two (72) hours' prior notice to Tenant, but provided that any such changes will not unreasonable affect Tenant's ability to conduct its business in the Premises, and such changed rules and regulations will be complied with by all tenants in the Building. Each tenant may obtain a copy of the most current Rules and Regulations at the Building Office.

DD.     Other.  The Tenant Handbook, a copy of which has been given to Tenant (or its broker) prior to Lease execution, and copies of which are available in the Building Office, is incorporated herein as part of the Rules and Regulations.

EE.     Pet Access. Pets are not allowed in the Building, except that service dogs with required licenses are permitted in the Premises and the Building and other dogs as expressly permitted by this Lease.

C-4

**Guarantee**

LEASED PREMISES: The entirety of floors 2, 3, 4, 6, 7, 9, 11, 12, 14, 15, 16, 17 and 18 in the building located at 180 Sansome Street, San Francisco, California, containing collectively approximately 78,290 RSF (as modified from time to time by agreement of Landlord and Tenant).

LANDLORD: 300 Prospect Properties, Inc., a California corporation, or its successors and assigns

TENANT: 180 Sansome Street Tenant LLC, a New York limited liability company

DATE OF LEASE As of November ___, 2018

DATE OF GUARANTY Same as Date of Lease

1. In consideration of, and as an inducement for, the granting, execution and delivery of that certain Lease Agreement dated as of the date hereof between Landlord and Tenant respecting the Premises captioned above (the "Lease") and in further consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned, WEWORK COMPANIES INC. ("Guarantor"), a Delaware corporation, having an address of 115 West 18th Street, 2nd Floor, New York, New York 10011, hereby absolutely, unconditionally and irrevocably guarantees to Landlord the full and prompt performance and observance of all of the obligations of Tenant under the Lease, including the full and prompt payment of all Base Rental and Additional Rental (as defined in the Lease) payable by Tenant under the Lease (collectively, the "Obligations").

2. This Guaranty is an absolute, unconditional and irrevocable guaranty of payment and performance. The liability of Guarantor, as set forth above, is co-extensive with that of Tenant and this Guaranty shall be enforceable against Guarantor without the necessity of any suit or proceedings on Landlord's part of any kind or nature whatsoever against Tenant, whether or not Landlord has exhausted any other security that Landlord holds from Tenant, and without the necessity of any notice of non-payment to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives.

3. Guarantor hereby expressly agrees that this Guaranty shall be a continuing guaranty and that the validity of this Guaranty and the obligations and liability of Guarantor hereunder shall in no way be terminated, affected, diminished or impaired by reason of (a) the assertion of or the failure by Landlord to assert against Tenant any of the rights or remedies reserved to Landlord pursuant to the terms, covenants and conditions of the Lease, or (b) any assignment of the Lease, or (c) any renewal, extension, or expansion of the Lease or any modification thereof, whether pursuant to the Lease or by subsequent agreement of Landlord and Tenant, or (d) any extension of time that may be granted by Landlord to Tenant, or (e) any consent, indulgence or other action, inaction or omission under or in respect of the Lease, or (f) any dealings or transactions or matter or thing occurring between Landlord and Tenant, or (g) any bankruptcy, insolvency, reorganization, arrangement, assignment for the benefit of creditors, receivership or trusteeship affecting Tenant or Tenant's successors or assigns whether or not notice thereof is given to Guarantor, or (h) any matter or thing whatsoever, whether or not specifically mentioned herein, other than full payment and performance of all Tenant's obligations under the Lease or Landlord's failure to perform an obligation expressly required of Landlord under the Lease which expressly excuses Tenant's performance thereunder.

4. No payment by Guarantor pursuant to any provision hereof shall entitle Guarantor, by subrogation or otherwise, to the rights of Landlord to any payment by Tenant or out of the property of Tenant, except after payment in full of all sums owing by Tenant under the Lease.

5. The Guarantor represents and warrants to Landlord as follows:

   a. The execution, delivery and performance by Guarantor of this Guaranty have been duly authorized by all necessary corporate action.

   b. Guarantor has the full power, authority and legal right to execute and deliver, and to perform and observe the provisions of, this Guaranty including the payment of all moneys hereunder. This Guaranty constitutes the legal, valid and binding obligation of Guarantor enforceable in accordance with its terms, except as enforcement thereof may be limited by (a) bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting creditors' rights generally or (b) the non-availability of equitable remedies which are discretionary with the courts.

   c. No authorization, approval, consent or permission (governmental or otherwise) of any court, agency, commission or other authority or entity is required for the due execution, delivery, performance or observance by the Guarantor of this Guaranty or for the payment of any sums hereunder.

d. Neither the execution or delivery of this Guaranty, nor the consummation of the transactions herein contemplated, nor the compliance with the terms and provisions hereof, conflict or will conflict with or result in a breach of any of the terms, conditions or provisions of any law, order, writ, injunction or decree of any court or Governmental Authority, or of any agreement or instrument to which Guarantor is a party of by which it is bound, or constitutes or will constitute a default thereunder.

6. Guarantor acknowledges and agrees that all disputes arising, directly or indirectly, out of or relating to this Guaranty shall be dealt with and adjudicated in the state courts of California sitting in San Francisco, or the Federal courts sitting in San Francisco; and hereby expressly and irrevocably submits the person of Guarantor to the jurisdiction of such courts in any suit, action or proceeding arising, directly or indirectly, out of or relating to this Guaranty. So far as is permitted under the applicable Law, this consent to personal jurisdiction shall be self-operative and no further instrument or action, other than service of process in one of the manners specified in this Guaranty, or as otherwise permitted by law, shall be necessary to confer jurisdiction upon the person of Guarantor in any such court. Guarantor irrevocably consents to the service of any and all process in any such suit, action or proceeding by service of process to Guarantor in accordance with applicable Law at the address of Guarantor as hereinafter provided (or if such address is subsequently changed, at such last known address), whether within or without the jurisdiction of any such courts of California or the Federal courts sitting in San Francisco.

7. Provided that service of process is effected upon Guarantor in one of the manners hereafter specified in this Guaranty or as otherwise permitted by law, Guarantor irrevocably waives, to the fullest extent permitted by law, and agrees not to assert, by way of motion, as a defense or otherwise, (a) any objection which it may have or may hereafter have to the laying of the venue of any such suit, action or proceeding brought in such a court as is mentioned in the previous paragraph, (b) any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum, or (c) any claim that it is not personally subject to the jurisdiction of the above-named courts. Provided that service of process is effected upon Guarantor in one of the manners hereafter specified in this Guaranty or as otherwise permitted by law, Guarantor agrees that final judgment from which Guarantor has not or may not appeal or further appeal in any such suit, action or proceeding brought in such a court of competent jurisdiction shall be conclusive and binding upon Guarantor and, may so far as is permitted under the applicable Law, be enforced in the courts of any state or any Federal court and in any other courts to the jurisdiction of which Guarantor is subject, by a suit upon such judgment and that Guarantor will not assert any defense, counterclaim, or set off in any such suit upon such judgment.

8. Guarantor hereby consents to process being served in any suit, action or proceeding of the nature referred to in this Guaranty by the mailing of a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to Guarantor at the address provided above or to any other address of which Guarantor shall have given written notice to Landlord. Guarantor irrevocably waives, to the fullest extent permitted by law, all claim of error by reason of any such service and agrees that such service (a) shall be deemed in every respect effective service of process upon Guarantor in any such suit, action or proceeding and (b) shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon and personal delivery to Guarantor.

9. Nothing in this Guaranty shall affect the right of Landlord to serve process in any manner permitted by law or limit the right of Landlord or any of its successors or assigns, to bring proceedings against Guarantor in the courts of any jurisdiction or jurisdictions.

10. Should Landlord be obligated by any bankruptcy or other law to repay to Tenant or Guarantor or to any trustee, receiver or other representative of either of them, any amounts previously paid, then this Guaranty shall be reinstated in the amount of such repayment. Landlord shall not be required to litigate or otherwise dispute its obligation to make such repayments if it in good faith and on the advice of counsel believes that such obligation exists.

11. All remedies afforded to Landlord by reason of this Guaranty are separate and cumulative remedies and it is agreed that no one of such remedies, whether exercised by Landlord or not, shall be deemed to be in exclusion of any other remedy available to Landlord and shall not limit or prejudice any other legal or equitable remedy which Landlord may have.

12. All defined terms used in this Guaranty which are defined in the Lease shall have the meanings ascribed to such terms in the Lease.

13. If any provision of this Guaranty or the application thereof to any person or circumstance shall to any extent be held void, unenforceable or invalid, then the remainder of this Guaranty or the application of such provision to persons or circumstances other than those as to which it is held void, unenforceable or invalid shall not be affected thereby and each provision of this Guaranty shall be valid and enforced to the fullest extent permitted by law.

14. As a further inducement to Landlord to make and enter into the Lease and in consideration thereof, Guarantor hereby waives trial by jury and the right thereto in any action or proceeding of

any kind or nature, arising on, under or by reason of or relating to, this Guaranty or any agreement collateral hereto.

15. No waiver of any provision of this Guaranty nor any modification decreasing the obligations of Guarantor or termination of this Guaranty shall be effective unless in writing and signed by Landlord, nor shall any waiver be applicable, except in the specific instance for which it is given.

16. The laws of the State of California applicable to contracts made and to be performed wholly within the State of California shall govern and control the validity, interpretation, performance and enforcement of this Guaranty.

17. This Guaranty shall be binding upon Guarantor and its successors and assigns and inure to the benefit of Landlord and its successors and assigns. Notwithstanding the foregoing, Guarantor shall have no right to assign all or any part of its obligations under this Guaranty to any other party without Landlord's consent, which may be withheld in Landlord's sole discretion (except as expressly provided in the Lease), and any such assignment without Landlord's consent shall be void.

18. Notwithstanding anything to the contrary herein contained, there shall be no personal liability imposed on any shareholder, member or other holder of an equity interest in Guarantor or on any officer, director or employee thereof.

19. Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made in connection with this Guaranty or pursuant to any applicable Law or requirement of public authority shall be in writing (whether or not so stated elsewhere herein this Guaranty) and shall be deemed to have been properly given, rendered or made only if sent by (i) registered or certified mail, return receipt requested, posted in a United States post office station or letter box in the continental United States, (ii) nationally recognized overnight courier (e.g., Federal Express) with verification of delivery requested or (iii) personal delivery with verification of delivery requested, in any of such cases addressed as follows:

If to Landlord:

> 300 Prospect Properties, Inc.
> 100 Bush Street, Suite 218
> San Francisco, California 94104

and if to Guarantor as follows:

> 115 West 18th Street
> New York, New York 10011
> Attention: Legal Department

With a copy to:

> c/o WeWork Companies Inc.
> 115 West 18th Street, 2nd Floor
> New York, NY 10011
> Attn: Lease Administration

and shall be deemed to have been given, rendered or made (x) if mailed, on the second business day following the day so mailed, unless mailed to a location outside of the State of New York, in which case it shall be deemed to have been given, rendered or made on the third business day after the day so mailed, (y) if sent by nationally recognized overnight courier, on the first business day following the day sent or (z) if sent by personal delivery, when delivered and receipted by the party to whom addressed (or on the date that such receipt is refused, if applicable).

20. In the event of any action or proceeding relating to this Guaranty with respect to any of the provisions of this Guaranty, the prevailing party in such action or proceeding shall be entitled to its reasonable attorneys' fees, arbitration fees and disbursements with respect thereto.

21. Notwithstanding anything to the contrary herein, Guarantor's maximum aggregate liability under this Guaranty (including all enforcement costs with respect thereto) for the entire Term shall not exceed the sum of $7,000,000.00 (the "Cap on Liability"). The Cap on Liability shall be reduced as follows (provided that if an Event of Default is continuing as of the date that any such reduction would occur, such reduction will not occur until such Event of Default is cured):

a. On the fourth (4th) anniversary of the Commencement Date, to $6,000,000;

b. On the fifth (5th) anniversary of the Commencement Date, to $5,000,000;

c. On the sixth (6th) anniversary of the Commencement Date, to $4,000,000;

d. On the seventh (7th) anniversary of the Commencement Date, to $3,000,000;

e.  On the eighth (8th) anniversary of the Commencement Date, to $2,000,000;

f.  On the ninth (9th) anniversary of the Commencement Date, to $1,000,000; and

g.  On the tenth (10th) anniversary of the Commencement Date, this Guaranty shall terminate and be of no further force or effect

[Signature Pages to Follow]

WEWORK COMPANIES II

By: _____

Name:
Title:

Peter Greenspan
Assistant Secretary

STATE OF New York )
) ss:
COUNTY OF New York )

On the 7th day of November in the year 208, before me, the undersigned, personally appeared Peter Greenspan, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Rebecca Sciabarasi
Notary Public

REBECCA SCIABARASI
Notary Public, State of New York
Reg. No. 01SC6379256
Qualified in New York County
Commission Expires 08/13/2022

## EXHIBIT E
### Term Commencement Agreement

THIS AGREEMENT, made as of the _____ day of _____, 20___, by and between 300 Prospect Properties, Inc., a California corporation ("Landlord") and _____ ("Tenant").

A.      Landlord and Tenant are parties to that certain lease agreement dated _____, 20___, for premises described as _____ ("Premises") located in the property ("Property") commonly known as 180 Sansome Street, San Francisco, CA.

B.      The Lease contemplated a Term commencing on _____, 20___, and ending on _____, 20___ (subject to any extensions provided for in the Lease).

C.      The parties desire to enter this Agreement confirming an adjustment to the commencement and/or expiration dates of the Term, all on the terms and conditions set forth hereinafter.

NOW, THEREFORE, in consideration of the foregoing recitals, the parties agree as follows.

1.      The parties hereby confirm and agree that the Term commenced on _____ and shall expire on _____, unless sooner terminated, or extended pursuant to the terms of the Lease.

2.      The parties confirm and agree that all work and improvements, if any, required to be performed by Landlord under the Lease or any other agreement or document entered in connection therewith, relating to the Premises, have been completed, except as may be specified in any Schedule 1 attached hereto, which may set forth certain additional "punch list items," which Landlord agrees to complete promptly hereafter.

LANDLORD                              TENANT

300 PROSPECT PROPERTIES, INC.,        _____
a California corporation              _____
                                      _____

By: _____

Its: _____        By: _____

                                     Its: _____

E-1

# EXHIBIT F
### Proposition 65 Notice and Material Safety Data Sheet

Extensive asbestos abatement has occurred in the 180 Sansome Building, albeit, there are areas within the building that still contain the ACM identified below. *It is important to note that all known accessible asbestos is abated when found during a construction project.* All contractors are required to comply with applicable laws and perform work in accordance with the general industry standards. Any work, which would likely disturb asbestos fibers, has been and will continue to be conducted in containment areas. Air monitoring is conducted routinely during the work in areas outside the containment areas to assure that the work was performed as required. All surveys for ACM, including a detailed description of the analytical methods employed and air monitoring results, are available for review at the building office during normal business hours.

In November 2006, 300 Prospect Properties requested ACC Environmental Consultants to perform a National Emissions Standard for Hazardous Air Pollutants (NESHAPS) style asbestos survey of the 180 Sansome Building, to determine the locations of accessible and to the extent feasible, inaccessible friable and non-friable asbestos containing materials (ACBM).

## SURVEY RESULTS

### 1.    ASBESTOS

#### A.  Areas of known and presumed asbestos-containing materials (ACM)

General building materials on each floor such as painted walls, flooring and ceilings observed were intact and in good condition. At the time of the Survey, all floors, with exception of the mentioned below, had been renovated either partially or completely within the last twenty years or so. Asbestos containing materials were abated as each floor was renovated. However, some asbestos containing materials still remain in a few areas of the building.

At the time of the Survey (2006), the seventh floor, fourteenth floor and rooftop mechanical room had the original asbestos containing fireproofing sprayed to the decking and structural members of the floor above. This same fireproofing was found above the loading ramp and first floor mezzanine ceiling space.

*Since November 2006, the following locations have been abated of Asbestos-Containing Materials (ACM's):*
- *Loading dock ramp ceiling (ACM fireproofing material),*
- *\*1st floor, adjacent to main lobby (fireproofing material & floor tile mastic,*
- *\*\*Mezzanine: fireproofing over-spray behind restroom furred-out walls and three column enclosures. Two (2) adjacent to elevator #C3 and one (1) adjacent to the men's room.*
- *7th floor,*
- *14th floor,*
- *3rd, 4th, 7th, 8th, 10th & 14th floors – perimeter wall cut-outs to clean-up residual fireproofing over-spray.*

\*Asbestos fireproofing material on the deck, above the "old bank vault" was left in place as other inaccessible structural steel fireproofing material extending into the main building lobby area.

\*\* There are several column enclosures and furred-out walls with possible ACM fireproofing over-spray in the mezzanine floor as well as other floor areas.

All remaining asbestos containing materials are mostly floor tiles and associated adhesives located in several non abated areas. The wallboard joint compounds in some elevator lobbies were found to contain asbestos. Plaster found throughout the building did not contain asbestos.

All asbestos information, including Survey Reports, bulk sample and air monitoring analyses is available for review during normal business hours at the Building Management Office. If you wish to examine these documents, please make an appointment with the Building Property Manager, at (415) 986-8880.

#### B.  Health Risks Associated with Asbestos:

Inhalation exposure to asbestos is associated with an increased incidence of cancer and respiratory disease. Asbestos is known to the State of California to cause cancer.

#### C.  Asbestos Work Guidelines:

49302/0801
ELL/536444.3

> Any repair, moving, drilling, boring or otherwise disturbing any known or presumed ACM may release asbestos fibers. Any such activity must be undertaken in accordance with all applicable laws and the Asbestos O & M Program, and shall not be attempted by anyone who is not qualified to handle ACM. Any known or presumed ACM shall not be repaired, moved, drilled, bored, or otherwise disturbed except under the supervision of a "competent person" as defined in Cal/OSHA regulations and in accordance with all applicable regulations of Cal/OSHA, DTSC, BAAQMD and the City and County of San Francisco.
>
> To ensure that these procedures are effective, it is important to avoid any activity that could disturb asbestos-containing materials except by those authorized to abate asbestos.

**2.    LEAD**

CAL/OSHA states (in their Lead in Construction Standard, Title 8 CCR Section 1532.1) that all paints contain detectable amounts of lead. Paint samples collected in the Building resulted in concentrations high enough to be classified as lead based paint. Therefore, painted surfaces in the building contain lead but as long as the painted surfaces are intact and not flaking or peeling, no action for removal of the paint is required.

**3.   PROPOSITION 65**

A number of building materials in this building have been identified as chemicals known to the State of California to cause cancer, birth defects or other reproductive harm. In addition, vehicle exhaust from the parking garage contains chemicals known to the State of California to cause cancer, birth defects or other reproductive harm. Proposition 65, the Safe Drinking Water and Toxic Enforcement Act of 1986, requires that you be warned of the presence of these materials.

WARNING: This building contains chemicals known to the State of California to cause cancer, birth defects, or other reproductive harm.

As a matter of policy, any ACM that becomes accessible, during renovations, is abated. The management of 180 Sansome Building is committed to maintaining a safe and pleasant working environment for all employees and contractors. If you have any questions or concerns regarding this Exhibit "F", please feel free to contact the Property Management Office, at 415 986-8880.

49302/0801
ELL/536444.3

**EXHIBIT G**
Space Plan

Attached

49302/0801
ELL/536444.3

# EXHIBIT H

## Renewal Option

1.  **Generally.** Tenant shall have an option (the "Renewal Option") to renew the initial Term with respect to all (but not less than all) of the Premises demised under or pursuant to this Lease as of the expiration date of the Term for two additional terms (each a "Renewal Term") of five (5) years, commencing on the day immediately following the expiration date of the prior Term, under the following terms and conditions as to each option and subject to credit approval by Landlord:

    A.  Tenant gives Landlord written notice of its election to exercise the Renewal Option no earlier than the date which is eighteen (18) months prior to the expiration date of the then-current Term and no later than the date which is twelve (12) months prior to the expiration date of the then-current Term.

    B.  Tenant has not been in Default under the Lease through the date Tenant exercises the Renewal Option and does not breach the Lease or become in default at any time through and including the proposed commencement date of the Renewal Term.

    C.  Tenant's notice of election shall be binding, and Tenant shall thereupon be obligated to renew the Lease for the Rent as determined below.

2.  **Term.** If Tenant timely and properly exercises the Renewal Option in accordance with the provisions of Section 1:

    (a)  The Base Monthly Rental payable for the Renewal Term shall be the fair market value ("FMV") of the Premises (defined below) as of the commencement of the Renewal Term. All other rent (e.g., Additional Rent and Percentage Rent) shall remain as provided in the Lease, except that the Base Year will be the year in which the Renewal Term commences. In no event will the initial Base Monthly Rental for the Renewal Term be less than the rent existing as of the end of the initial Term.

    (b)  The FMV shall be then prevailing rent for comparable deals in the market place. The "prevailing rental rate" shall mean the total rental then being received by landlords and paid by tenants for "comparable deals" in the market place. "Comparable deals" shall mean leases which are approximately as long, and commencing at approximately the same time, as the Renewal Term and are for comparable space in comparable buildings (with occupancy rates similar to the Building) subject to reasonable adjustments for 1) the desirability of the applicable floor or location in the building, and 2) the desirability of the geographic location of the applicable building. "Comparable deals" shall explicitly exclude from consideration any transactions where the landlord of the subject building is in default of its mortgage or other indebtedness on the building, or is currently, or has within the prior six months, been involved in foreclosure proceedings on the applicable building. "Comparable deals" shall also exclude transactions whereby the Tenant has some form of equity participation in the deal. The intent of the parties is that Tenant will obtain the same rent and other economic benefits that landlords would otherwise give in comparable deals and that Landlord will make and receive the same economic payments and concessions that landlords would otherwise make and receive in comparable deals. Landlord's good faith determination of the "prevailing rental rate" shall be conclusive and binding as to Landlord and Tenant, unless Tenant initiates the arbitration procedure set forth in subparagraph (c) below no later than eighty (80) days before the commencement date of the Renewal Term. If Tenant timely and properly exercises the Renewal Option, Landlord agrees to give Tenant written notice setting forth Landlord's good faith determination of the prevailing rental rate, which notice shall be given at least one hundred twenty (120) days prior to the commencement date of the Renewal Term. If Tenant does not agree with Landlord's determination, the parties will negotiate in good faith in an attempt to resolve any differences subject to the provisions of subparagraphs (c) and (d) below.

    (c)  No later than eighty (80) days before the commencement date of the Renewal Term, Tenant may initiate a "three broker" method of arbitration to determine the prevailing rental rate, by delivering written notice to the Landlord, together with the name of a real estate broker who has at least five (5) years of experience as a broker for the leasing of office space in San Francisco, and who has not previously been retained by Tenant. Within ten (10) days after receipt of such notice, the Landlord shall provide the Tenant with the name of a real estate broker who meets the same criteria (i.e., said broker has not previously been retained by Landlord) by written notice. Thereafter, within ten (10) days the two brokers shall together appoint a third broker who meets the same criteria, and

within an additional ten (10) days the three brokers shall jointly determine the prevailing rental rate for general office space.

(d)    Each broker shall consider all components of this Lease and comparable deals. Prevailing rental rate shall be determined with reference to the average or normal values being achieved by leases on landlord forms entered into with private sector tenants for comparable space in comparable buildings in equally desirable locations within the same market assuming operating expense and real estate tax pass throughs and increases corresponding to those contained in this Lease. If the three brokers cannot agree to a rent within the time provided, the determination of the broker who is the mean of the two extremes shall be binding and conclusive. Each party shall pay all costs, fees and expenses of the broker they select and the parties shall share equally the costs, fees and expenses of the third broker.

3.    **No Improvements.** Landlord shall not be obligated to perform any leasehold improvement work in any part of the Premises or give Tenant an allowance or other economic concession for any such work or for any other purposes for the Renewal Term.

4.    **No Further Options.** Tenant shall have no further options to renew the Lease Term beyond the expiration date of the second Renewal Term.

5.    **Remaining Terms of Lease in Force.** Except as otherwise provided herein, all of the terms and provisions of this Lease shall remain the same and in full force and effect during the Renewal Term.

6.    **Amendment.** If Tenant exercises the Renewal Option, Landlord and Tenant shall execute and deliver an amendment to this Lease reflecting the lease of the Premises by Landlord to Tenant for the Renewal Term on the terms provided above, which amendment (or new lease, as the case may be) shall be executed and delivered at least sixty (60) days before the commencement date of the Renewal Term.

7.    **Termination.** The Renewal Option shall automatically terminate and become null and void and of no force or effect upon the earlier to occur of (1) the expiration or termination of this Lease, (2) the termination of the Tenant's right to possession of the Premises, (3) the assignment of this Lease by Tenant (other than pursuant to a Permitted Transfer), (4) the sublease by Tenant of all or part of the Premises under circumstances which result in termination of the Lease as provided in paragraph 29, (5) failure of Tenant to timely or properly exercise the Renewal Option, or (6) the Event of Default by Tenant under the Lease.

8.    **No Assignment.** Tenant may not assign the Renewal Option.

49302/0801
ELL/536444.3

# EXHIBIT I
## LOC FORM

[Attached]

49302/0801
ELL/536444.3

## EXHIBIT J
### WeWork Membership Agreement

[Attached]

49302/0801
ELL/536444.3

WEWORK MEMBERSHIP AGREEMENT

MEMBERSHIP DETAILS FORM

| MEMBER COMPANY | |
|---|---|
| **Member Company (Legal Name):** | |
| **Industry:** | |
| WEWORK | |
| **WeWork Entity (Legal Name):** | |
| CONTRACT TERM DETAILS | |
| **Agreement Date:** | |
| **Start Date:** | |
| **Initial Commitment Term (Start Date and End date):** | |
| **Additional Commitment Term Options (Start Date and End date) (if applicable):** | |
| **Termination Notice Timelines Requirement** | |
| OFFICE SPACE DETAILS AND MEMBERSHIPS | |
| **Address of Main Premises:** | |
| **Dedicated Office Space Description (if applicable) (e.g., entire 4th floor of Main Premises):** | |
| **Office Number(s) (if applicable):** | |
| **Individual Memberships (as of Start Date):** | |
| **Maximum Number of Individual Memberships** | |
| **Capacity (defined below) (based on the WeWork layout):** | |
| PRICING / FINANCIAL TERMS | |
| **Membership Fee (Monthly):** | $ <br><br> See "Membership Fee Schedule" below for detailed breakdown. |
| **Service Retainer:** | $ <br><br> To be paid within seven (7) Business Days of the date of the Agreement Date and, in any event, prior to the Start Date. You shall <u>not</u> be permitted to move into the Office Space until the Service Retainer has been fully paid. |
| **Set-Up Fee:** | $ |

2

|  |  | To be paid within seven (7) Business Days of the Agreement Date and, in any event, prior to the Start Date. You shall not be permitted to move into the Office Space until the Set-Up Fee has been fully paid. |
|---|---|---|
| **BILLING** | | |
| Payment Method: | | |
| Net Payment Term (if applicable): | | |
| Billing Notes: | | |
| **SERVICE CREDIT AND REPLACEMENT FEES (FOR USE OUTSIDE OF MAIN PREMISES)** | | |
| Conference Room (per credit): | | |
| Black & White printing (per sheet printed): | | |
| Color printing (per sheet printed): | | |
| Keycard Replacement Fee: | | |

| **PURCHASED PRINTING AND CONFERENCE ROOM CREDITS FOR USE OUTSIDE OF MAIN PREMISES (IF APPLICABLE)** | | |
|---|---|---|
| Service | Units | Cost |
| Conference Room Credits (per month): | | |
| Black and White Print and Copy Credits (per month): | | |
| Color Print and Copy Credits (per month): | | |

| **ADDITIONAL SERVICES (IF APPLICABLE)** | | |
|---|---|---|
| Service | Units | Cost |
| Beverages: | | |

| **CUSTOM WORK ("WEWORK WORK") DETAILS (IF APPLICABLE)** | |
|---|---|
| WeWork Work Description: | |
| WeWork Work Cost Allocation between the Parties: | |
| WeWork Work Fit Out Letter (if applicable): | As set forth on Exhibit B. |

| **ADDITIONAL ITEMS (IF APPLICABLE)** | |
|---|---|
| Overtime HVAC: | |
| IT Services/Customization: | |
| Security Access: | |
| Parking: | |
| Broker Used in Connection with the Agreement: | |
| Exhibits: | |

3

| **Additional Notes:** | Notwithstanding anything to the contrary herein, we may terminate this Agreement at any time prior to the Start Date if we have not executed a final lease with the landlord for the Main Premises. In the event of such early termination by us, we will not be subject to any liability, including but not limited to any claims, liabilities, and/or expenses including attorneys' fees or other alleged damages related directly or indirectly to such early termination and we will promptly return to you any payments you may have made to us pursuant to this Agreement. |
|---|---|

.4

## Membership Fee Schedule

| Applicable Period (Insert exact Start and End Dates) | Market Rate: (tax excluded) | Discount (if applicable): | Total Discounted Fee Due (tax excluded) (if applicable) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Notes to the Membership Fee Schedule:**

- The Membership Fee is subject to Section 4 of the Agreement, including the automatic annual increase and amendments to the Membership Fee following the Initial Commitment Term and any Additional Commitment Term(s)
- If discounts vary from month to month, discounts should be stated on a monthly basis (and start and end dates stated clearly)
- If discounts apply to optional additional commitment terms, these should be clearly stated

| MEMBER CONTACT DETAILS | |
|---|---|
| **PRIMARY MEMBER** | |
| Primary Member Name: | |
| Phone Number: | |
| Email: | |
| Address: | |
| **AUTHORIZED SIGNATORY** Authorized Signatory | _____ Please check here if Primary member is also |
| Contact Name: | |
| Phone Number: | |
| Email: | |
| Address: | |
| **BILLING CONTACT** Billing Contact | _____ Please check here if Primary member is also |
| Contact Name: | |
| Phone Number: | |
| Email: | |
| Address: | |
| WEWORK CONTACT DETAILS | |
| **MAIN WEWORK CONTACT** | |
| WeWork Employee Name: | |
| Phone Number: | |
| Email: | |

8

**SIGNATURE:** (Signatory must match Authorized Signatory as noted in Contact Details above).

This Agreement, including the Terms and Conditions, Membership Details Form and Exhibits attached hereto, will be effective when signed by both parties. In the event of any conflict between the Terms and Conditions, the Membership Details Form and Exhibits, the Membership Details Form shall prevail.

By signing this Agreement, you represent to us that you have the proper authority to execute this Agreement on behalf of the company listed above and incur the obligations described in this Agreement on behalf of such company.

| COMPANY SIGNATURE | WEWORK SIGNATURE |
|---|---|
| Company Name: | WeWork Building Entity: |
| Signature: | Signature: |
| Name (Print): | Name (Print): |
| Title: | Title: |
| Date: | Date: |

7

## TERMS AND CONDITIONS

### 1. DEFINED TERMS

"**Agreement**" means Membership Detail Form, the Terms and Conditions and the Exhibits attached hereto.

"**Authorized Signatory**" means an individual authorized to legally bind the Member Company.

"**Capacity**" is a pre-established definitive number for a given Office Space which we: (i) determine before any custom work / alterations; (ii) do not change regardless of any custom work / alterations; and (iii) use to calculate the Termination Notice Timelines.

"**Main Premises**" means the Premises in which the Office Space is located, as set forth in the Membership Details Form.

"**Member**" means each individual person you authorize on your list of Members (the "**Member List**") as being allowed to receive the Services (defined below), each being recognized as an "**Individual Membership**", and collectively "**Members**".

"**Member Company**" or "**you**" means the company or entity that enters into a Membership Agreement with WeWork and is listed in the Membership Details Form.

"**Office Space**" means the dedicated office number(s), workspace location(s) and/or other areas specified in the Membership Details Form, provided that, if the symbol "Ø" is included on the Form, we will provide the office number(s) and/or workspace location(s) prior to the Start Date.

"**Premises**" means a building or portion of a building in which WeWork offers or plans to offer offices, workstations, other workspaces, and/or other services to WeWork members.

"**Primary Member**" means the primary Member contact for WeWork located in the Main Premises and set out in the Member Contact Details of the Membership Details Form.

"**Set-Up Fee**" means the fee that is charged per desk each time a member is added as part of your membership, including with respect to the Individual Memberships at the Start Date and any additional Members added to your membership under this Agreement.

"**Start Date**" means the date set forth in the Membership Details Form.

"**WeWork**", "**we**" or "**us**" means the WeWork entity you are contracting with as set forth in the Membership Details Form.

"**WeWork Member Network**" means the WeWork members-only online community accessed through the internet or our mobile app.

### 2. THE BENEFITS OF MEMBERSHIP

a. Services. Subject to the terms and conditions of this Agreement and any other policies we make available to you with prior notice from time to time, during the Term (defined below), WeWork will use commercially reasonable efforts to provide you (and your Members, as applicable) with the services described below. These services are referred to in this Agreement as the "**Services**."

    i.  Office Space at the Main Premises:

a. Dedicated access to the Office Space, subject to our access rights as set forth in this Agreement, and provided that no other WeWork members shall have access to your Office Space unless authorized by you or one of your Members.

b. Regular maintenance of the Office Space, including cleaning.

c. Furnishings for the Office Space of the quality and in the quantity typically provided to other WeWork member companies with similar office space, workstations, and/or other workspace, as applicable.

d. You shall be permitted to install your own printers, copiers and/or scanners in the Office Space.

e. In the event you have conference rooms located within your Office Space, you shall also have unlimited and dedicated complimentary use of the conference rooms within such Office Space to the exclusion of all other WeWork members.

f. Electricity for reasonably acceptable office use in the Office Space.

g. Heat and air-conditioning ("HVAC") in the Office Space during Regular Business Hours.

ii. Upon booking space at Premises other than the Main Premises:

a. Access to and use of the WeWork Member Network in accordance with the terms of services for the WeWork Member Network available on our website or mobile app (the "WeWork Member Network ToS").

b. Access to and use of the shared Internet connection at any other Premises.

c. Use of the printers, copiers and/or scanners available to WeWork members at any other Premises using printing credits.

d. Use of the conference rooms available to WeWork members at any other Premises, in each case subject to availability and your prior reservation of such conference rooms using conference room credits.

e. Use of common areas, kitchens and beverages made available to WeWork members.

f. Opportunity to participate in members-only events, benefits and promotions.

The Services listed in this Section in paragraphs (i)(a), (c) and (g) will be deemed "material" for the purpose of this Agreement (the "Material Services"). All other Services listed in this Section are deemed "non-material" for the purpose of this Agreement (the "Non- Material Services").

b. **Certain Services.** The conference rooms in any WeWork Premises and heat and air-conditioning in the Office Space may only be available during Regular Business Hours on Regular Business Days, as defined below. "Regular Business Hours" are generally from 9:00 a.m. to 6:00 p.m. on Regular Business Days. "Regular Business Days" are all weekdays, except local bank/government holidays. Notwithstanding the foregoing, the Member Company may make a request for HVAC in the Office Space outside of Regular Business Hours ("Overtime HVAC"). The availability and cost of Overtime HVAC is determined on a building-by-building basis. If a Member Company requires Overtime HVAC and such Overtime HVAC is available, the conditions of such services including required notice periods and costs are to be included on the Membership Details Form.

2

c.  **Our Rights.** We are entitled to access your Office Space, with or without notice, in connection with our provision of the Services, for safety and/or emergency purposes or for any other purposes but will do so in a manner to minimize interference with your business operations and if our access to such space is not in connection with an emergency or regular provision of the Services, we will endeavor to provide you with prior notice before entering, but please note that we may still enter your Office Space after giving such notice, even if we have not received a response from you. We may temporarily move furniture contained in your Office Space; in any such event, we will return the furniture to its original location as soon as reasonably practicable. We reserve the right to alter your Office Space, provided that we will not do so in a manner that substantially decreases the square footage of your assigned Office Space or related amenities and we shall endeavor to provide you with advance notice of any such changes. We may also modify or reduce the list of Non-Material Services provided for your Office Space at any time; provided that such modification or reduction will be done in a manner to minimize interference with your business operations. The Services may be provided by us, an affiliate or a third party.

d.  **Office Space Not Timely Available.** If we are unable to make the Office Space available by the Start Date for any reason, including due to changes in construction plans, delays in obtaining permits, or any other obstacles in procuring space in any Premises, we will notify you of any such circumstances and we will not be subject to any liability related to such inability, nor will such failure affect the validity or enforceability of this Agreement.  This Agreement shall remain in full force and effect, provided that, at our sole discretion we will either (x) provide you with alternate office space (which may or may not be within a WeWork building) with reasonably comparable Capacity during such period and charge your Membership Fee or (y) you will not be obligated to make payments of the Membership Fee until the Office Space is made available to you except as set forth below in this Section 4(d). Notwithstanding the foregoing, if we are unable to make the Office Space available by the Start Date due to delays caused by your actions or inactions or due to changes in work or other customizations to the Office Space requested by you, we will not be subject to any liability related to such delay nor will such delay affect the validity of this Agreement and we shall have no obligations to provide you with the benefits described in subsections (x) and (y) of this paragraph and you shall not be entitled to terminate this Agreement and you shall be responsible for the payment of the Membership Fees from the Start Date.

## 3.  YOUR MEMBERS

a.  **Creating and Updating the Member List.**  After the execution of this Agreement, we shall coordinate with you to complete our member registration procedures for your Members.  You are responsible for maintaining the accuracy of the Member List. Your Primary Member may make changes to your Member List via the Primary Member's "Member Management" tool on the WeWork Member Network. Only those individuals set forth on the Member List will be deemed to be "Members" and entitled to the benefits described in this Agreement. Your Members will be able to begin using, accessing, and/or receiving the Services from the Start Date or, if after the Start Date, the date on which they have been added to the Member List and have completed the registration procedure. All Members shall be required to provide valid government issued identification in order to be issued an activated keycard to access the Premises.  In the event you wish to add new Members to your Member List in excess of the number of Individual Memberships (as of the Start Date) on the Membership Details Form, such addition shall be subject to our prior approval and your Primary Member must send an email, from the Primary Member's email account on file with WeWork, to the email address specified at the bottom of the Membership Details Form requesting such addition. The email requesting such addition of such new Member must include the name(s) and email address(es) of the new Member(s) and the effective date on which they are requested to become a new Member. We

3

reserve the right in our discretion to limit at any time the number of memberships permitted under this Agreement to a number equal to the Capacity set forth in the Membership Details Form.

b.  **WeWork Member Network.** A profile on the WeWork Member Network must be created for each individual member added to the Member List. If you elect to retain the "default" settings of your Member Network Account, such profiles will be viewable by us, our employees and agents, and other WeWork members. The created profile will include only the Member's name and the Member Company; any additional information, including a photograph, shall be added solely as determined by you or your Members.

At any time, you may choose, at your sole election, to set your company and Members' accounts to 'private.' If you elect to utilize the 'private' setting, your company and Member accounts will be viewable only by us, our employees and agents in order to facilitate the provision of Services and will not be viewable by any other members who have access to the WeWork Member Network. In the 'private' setting, your Members have the ability to use utility features (such as booking conference rooms and registering guests) on the WeWork Member Network, and the use of such utility features by your Members on the WeWork Member Network will be viewable only by us, our employees and agents, and will be anonymous to any other members who have access to the WeWork Member Network. If you elect to utilize the 'private' setting, all individuals registered as your Members will be set as 'private' and prevented from conducting any social activity on the WeWork Member Network.

c.  **Changes to or Removal of Primary Member or Authorized Signatory.** An Authorized Signatory generally has the sole authority to make changes to or terminate this Agreement. A Primary Member will generally serve as WeWork's primary contact regarding matters that involve your Members, the physical Office Space or the Premises. We will be entitled to rely on communications to or from the Authorized Signatory or Primary Member as notice to or from the applicable Member Company. However, an Executive Officer of the applicable Member Company ("Executive Officer") will have the authority to override the request of an Authorized Signatory or Primary Member, as applicable, provided that we receive such a request to override from the Executive Officer within 24 hours following our receipt of the applicable Authorized Signatory's or Primary Member's request. We will be entitled to request reasonable information to confirm that an individual claiming to be an Executive Officer truly is one and to exercise our discretion in determining whether a particular position constitutes an Executive Officer. An Executive Officer will also have the authority to remove or replace the individual serving as the Authorized Signatory and/or Primary Member. If the individual designated as the Primary Member ceases to provide services to the Member Company or ceases using the Office Space regularly, you shall promptly designate a replacement Primary Member; however, if you fail to do so within three (3) Regular Business Days after we provide notice to you concerning the absentee Primary Member, unless we receive alternate instructions from the Authorized Signatory or Executive Officer, WeWork shall designate an interim Primary Member until we received direction from you. We will use our reasonable judgment in designating an interim Primary Member.

## 4.  MEMBERSHIP FEES; PAYMENTS

a.  **Payments Due Upon Signing.** Upon submitting a signed and completed Agreement, you will be obligated to deliver to us, in the amount(s) set forth on your Membership Details Form, (i) the Service Retainer and (ii) the Set-Up Fee. Where desks are added to your membership after the Start Date, the related Set-Up Fee shall be paid on the invoice after such addition. The current Set-Up Fee for the Main Premises is set forth in the Membership Details Form.

b.   **Membership Fee.** During the Term (defined below) of this Agreement, your monthly Membership Fee will be due monthly and in advance as of the first (1ˢᵗ) day of each month or in accordance with the Net Payment Term period set forth in the Membership Details Form, if applicable. You are obligated to make payment of all Membership Fees owed throughout the Commitment Term and this obligation is absolute notwithstanding any early termination of the Agreement by you ("Membership Fee Obligations"). You agree to pay promptly: (i) all sales, use, excise, value added, and any other taxes which you are required to pay to any other governmental authority (and, at our request, will provide to us evidence of such payment) and (ii) all sales, use, excise, value added and any other taxes attributable to your Membership as shown on your invoice. The Membership Fee set forth on the Membership Details Form covers the Services for only the number of Members indicated in the Membership Details Form.

Unless otherwise provided in the Membership Details Form, on each annual anniversary of the Start Date, the Membership Fee will be subject to an automatic three percent (3%) increase of the previous year's Membership Fee. Following any Commitment Term (which shall include any extensions of the Commitment Term, as defined in section 5(b)), we reserve the right to further increase or decrease the Membership Fee at our sole discretion upon thirty (30) days' prior notice to you in advance of and in accordance with the Termination Notice Timeline below in Section 5(e).

c.   **Invoices; Financial Information.** WeWork will send or otherwise provide invoices and other billing-related documents, information and notices to the Primary Member, unless a different Billing Contact is indicated on the Membership Details Form. Change of the Billing Contact will require notice from the Authorized Signatory in accordance with this Agreement.

d.   **Credits; Overage Fees.** Each month, you will receive the number of credits for conference room use and a certain number of credits for color and black and white copies and printouts, as specified on the Membership Details Form. These allowances may not be rolled over from month to month. If these allocated amounts are exceeded, you will be responsible for paying fees for such overages as listed on the Membership Details Form. WeWork reserves the right to increase the overage fees in a manner that applies to all members at the Premises subject to providing you with thirty (30) days' advanced notice.

e.   **Late Fees.** If payment of the Membership Fee or any other accrued and outstanding fee is not made by the tenth (10ᵗʰ) of the month in which such payment is due or within the amount of days set forth in the Net Payment Terms section of the Membership Details Form after issuance of the invoice relating to such payment, if applicable, you will be responsible for paying a late fee of 10% of the outstanding invoice. Late fees are subject to change from time to time.

f.   **Form of Payment.** We accept payment of all amounts specified in this Agreement solely by the methods we communicate to you during the membership sign up process or from time to time during the Term. You are required to inform us promptly of any changes to your payment information. Changing your payment method may result in a change in the amount required under this Agreement to be held as the Service Retainer. Only a single payment method may be used at any given time to make payments under this Agreement.

g.   **Outstanding Fees.** Any outstanding fees will be charged in arrears on a monthly basis. When we receive funds from you, we will first apply funds to any balances which are in arrears and to the earliest month due first. Once past balances are satisfied, any remaining portion of the funds will be applied to current fees due. If any payments remain outstanding after we provide notice to you, we may, in our sole discretion, withhold Services or terminate this Agreement in accordance with Section 5(e).

h.   **WeWork Work.** In the event that we have agreed to customize office space for you ("**Customized Office Space**"), the details, and if applicable, the amount and terms of payment for the customization, shall be set forth on the Membership Details Form and any corresponding exhibit thereto. If set forth on the Membership Details Form, or otherwise mutually agreed to by the parties in writing, you agree to pay to us the "WeWork Work" fees and any other costs or expenses related to the Customized Office Space incurred by us (collectively, the "**WeWork Work Expenses**"), in accordance with the terms set forth on the Membership Details Form or other applicable written agreement. Unless we otherwise agree in writing, all WeWork Work Expenses are due notwithstanding any termination or expiration of this Agreement and are immediately due and payable from you to us if you fail to move into the Office Space or seek to terminate this Agreement prior to moving into the Office Space. Unless the parties agree otherwise in writing, you shall be fully responsible for all costs and expenses related to restoring the Office Space to its original condition prior to the WeWork Work (the "**WeWork Work Restoration Expenses**"). All WeWork Work Restoration Expenses shall be paid on or before your final day of access to and use of the Office Space.

i.   **No Refunds.** Except for the return of the Service Retainer provided for in Section 5(e) of this Agreement, subject to the requirements described therein, there are no refunds of any fees, including the Set-Up Fees, or other amounts paid by you or your Members in connection with the Services.

## 5.   TERM AND TERMINATION

a.   **Move-in.** This Agreement will be effective when signed by both parties ("**Effective Date**"); provided that we have no obligations to provide you with the Services until the later of (i) the date on which payment of your Service Retainer, Set-Up Fee and first month's Membership Fee has been received by us or (ii) the Start Date. Subject to having satisfied item (i) in the previous sentence, if the Start Date is a Regular Business Day, you will be entitled to begin to access the Office Space no earlier than 11:00 a.m. on the Start Date. If the Start Date is not a Regular Business Day, you will be entitled to move into the Office Space no earlier than 11:00 a.m. on the first Regular Business Day after the Start Date.

b.   **Term.** Unless otherwise set forth on the Membership Details Form, following the Initial Commitment Term and any Additional Commitment Terms set forth in the Membership Detail Form or agreed upon by the parties prior to the termination of the Initial Commitment Term or the applicable Additional Commitment Term (the Initial Commitment Term and each Additional Commitment Term collectively referred to herein as "**Commitment Term**"), this Agreement shall automatically renew for the lesser of: (i) a six (6) month period or (ii) the period remaining on our underlying lease for the Main Premises, (any term after the Commitment Term, an "**Automatic Renewal Term**"), unless prior to such renewal either party provides the other with written notice of its intent to terminate this Agreement in accordance with the applicable requirements provided in this Agreement. The Initial Commitment Term, the Additional Commitment Terms (if any) and all subsequent Automatic Renewal Terms (if any) shall constitute the "**Term.**" This Agreement will continue until terminated in accordance with this Agreement.

c.   **Termination by You; Changes in Office Space.** Except as set forth in this section, you may terminate this Agreement by delivering to us the WeWork Exit Form ("**Exit Form**") in accordance with the notice timelines set forth below (the "**Termination Notice Timelines**") prior to the month in which you intend to terminate this Agreement ("**Termination Effective Month**"). The termination will become effective on the last Regular Business Day of the Termination Effective Month; provided that no termination by you shall be effective prior to the Start Date or during the Commitment Term, and termination by you prior to the Start Date or during the Commitment Term is a breach of this Agreement. If you terminate this Agreement prior to the Start Date or the end of the Commitment

h

Term, your Membership Fee Obligations, your Set Up Fees and any WeWork Work Expenses (if applicable) (in each case, to the extent not paid as of the date of such termination) shall become immediately due. In addition to any rights, claims and remedies we choose to pursue at our discretion, your Service Retainer shall be forfeited immediately as a result of your breach. During the Commitment Term, if you deliver an Exit Form to WeWork pursuant to the Termination Notice Timelines, you may terminate the Agreement as early as the last Regular Business Day of the Commitment Term. Any Exit Form delivered to WeWork during the Commitment Term but with less notice than required by the Termination Notice Timelines to be effective before the end of the Commitment Term shall become effective in accordance with the rest of this Section 5(c). For instance, if you would like to terminate this Agreement on the last Regular Business Day of April, and the Capacity for this Agreement is between zero (0) and forty-nine (49), the last opportunity to deliver the Exit Form to us would be on January 31. The Exit Form needs to be completely filled out and signed by the Authorized Signatory. You will not be entitled to pro ration with respect to the last month's Membership Fee. For instance, if you vacate your Office Space before the last Regular Business Day of April, you will still owe us the full Membership Fee for the month of April. On the last Regular Business Day of the month, you must vacate the Office Space no later than 4:00 p.m.

### Termination Notice Timelines

| Capacity | Notice Required |
|---|---|
| 0 - 49 | Four (4) month |
| 50 - 99 | Six (6) months |
| 100 or greater | Eight (8) months |

d. **Termination or Suspension by Us.** We may withhold Services or immediately terminate this Agreement: (i) upon breach of this Agreement by you or any Member; (ii) upon termination, expiration or material loss of our rights in the Premises; (iii) if any outstanding fees are still due after we provide notice to you; (iv) if you or any of your Members fail to comply with the terms and conditions of the WeWork Member Network ToS, the WeWork Privacy Policy, or any other policies or instructions provided by us or applicable to you; or (v) at any other time, when we, in our sole discretion, see fit to do so. You will remain liable for past due amounts but not for future membership fees which would have been due for the remainder for any Term but for such termination, and we may exercise our rights to collect due payment, despite termination or expiration of this Agreement.

An individual Member will no longer be allowed access to the Services and is no longer authorized to access any Premises upon the earlier of (x) the termination or expiration of this Agreement; (y) your removal of such Member from the Member List and (z) our notice to you that such Member materially or repeatedly violated this Agreement.

e. **Service Retainer.** The Service Retainer will be held as a retainer for performance of all your obligations under this Agreement, including the Membership Fee Obligations, and is not intended to be a reserve from which fees may be paid. In the event you owe us other fees, you may not rely on deducting them from the Service Retainer, but rather must pay them separately. We will return the Service Retainer, or any balance after deducting outstanding fees and other costs due to us, including any unsatisfied Membership Fee Obligations, to you by bank transfer or other method that we communicate to you within thirty (30) days (or earlier if required by applicable law) after the later of (i) the termination or expiration of this Agreement and (ii) the date on which you provide to us all account information necessary for us to make such payment. Return of the Service Retainer is also subject to your complete performance of all your obligations under this Agreement, including full satisfaction of your Membership Fee Obligations and any additional obligations applicable following termination or expiration of this Agreement.

7

f. **Removal of Property Upon Termination.** Prior to the termination or expiration of this Agreement, you will remove all of your, your Members', and your or their guests' property from the Office Space and Premises. After providing you with reasonable notice, we will be entitled to dispose of any property remaining in or on the Office Space or Premises after the termination or expiration of this Agreement and will not have any obligation to store such property, and you waive any claims or demands regarding such property or our handling of such property. You will be responsible for paying any fees reasonably incurred by us regarding such removal. We shall have no implied obligations as a bailee or custodian and your hereby indemnify us and agree to keep us indemnified in respect of any claims of any third parties in respect of such property.

## 6. HOUSE RULES

In addition to any rules, policies and/or procedures that are specific to a Main Premises used by you, you agree to be bound by the House Rules set forth in Exhibit A attached hereto. You are responsible for ensuring your Members comply with all House Rules.

## 7. ADDITIONAL AGREEMENTS

a. **Information Technology.** In order to utilize all the functionalities offered by us, it may be necessary to install software onto a Member's computer, tablet, mobile device or other electronic equipment. In addition, a Member may request that we troubleshoot problems a Member may have with respect to printing, accessing the network connection or other issues. If we provide such services, we will not be responsible for any damage to your equipment.

   WeWork provides Internet access to Members via a wireless network connection. If any additional internet services are proposed to be provided pursuant to this Agreement, prior to any such installation or removal, you shall coordinate with the WeWork IT team to discuss the actual setup, appropriate time, manner and means for such installation or removal and any additional fees that may result from the request, which fees shall be set out in the Membership Details Form. To the extent that we incur any costs in connection with such installation or removal, which are not otherwise paid by you, we shall deduct such costs from the Service Retainer. You shall also be responsible for any monthly fees incurred relating to your private, secured wired network and any additional IT services.

b. **Waiver of Claims.** To the extent permitted by law, you, on your own behalf and on behalf of your Members, employees, agents, guests and invitees, waive any and all claims and rights against us and our landlords at the Premises and our affiliates, parents, and successors and each of our and their employees, assignees, officers, agents and directors (collectively, the "WeWork Parties") resulting from injury or damage to, or destruction, theft, or loss of, any property, person or pet, except to the extent caused by the gross negligence or willful misconduct of the WeWork Parties.

c. **Limitation of Liability.** To the fullest extent permitted by law, the monetary liability (individually or in the aggregate) of any of the WeWork Parties to you or your Members, employees, agents, guests or invitees for any reason and for all causes of action, will not exceed the total Membership Fees paid by you to us under this Agreement in the twelve (12) months prior to the claim arising. None of the WeWork Parties will be liable under any cause of action, for any indirect, special, incidental, consequential, reliance or punitive damages, including loss of profits or damages resulting from business interruption. You acknowledge and agree that you may not commence any action or proceeding against any of the WeWork Parties, whether in contract, tort, or otherwise, unless the action, suit, or proceeding is commenced within one (1) year of the cause of action's accrual. Notwithstanding anything contained in this Agreement to the contrary, you acknowledge and agree that you shall not commence any action or proceeding against any of the WeWork Parties other than

the WeWork Party you are directly contracting with hereunder and the assets of such person for any amounts due or for the performance of any obligations in connection with this Agreement.

d. **Indemnification.** You will indemnify the WeWork Parties from and against any and all third party claims, liabilities, and expenses including reasonable attorneys' fees, resulting from any breach or alleged breach of this Agreement by you or your Members or your or their guests, invitees or pets or any of your or their actions or omissions, except to the extent a claim results from the gross negligence, willful misconduct or fraud of the WeWork Parties. You are responsible for the actions of and all damages caused by all persons and pets that you, your Members or your or their guests invite to enter any of the Premises, including but not limited to any vendors hired by you that enter the Premises. You shall not make any settlement that requires a materially adverse act or admission by us or imposes any obligation upon any of the WeWork Parties unless you have first obtained our or the relevant WeWork Party's written consent. None of the WeWork Parties shall be liable for any obligations arising out of a settlement made without its prior written consent.

e. **Insurance.** You are responsible for maintaining, at your own expense and at all times during the Term personal property insurance and commercial general liability insurance covering you and your Members for property loss and damage, injury to your Members and your Members' guests or pets and prevention of or denial of use of or access to, all or part of the Premises, in form and amount appropriate to your business. In addition, you are responsible for maintaining, at your own expense and at all times during the Term, workers' compensation insurance providing statutory benefits in accordance with the law and employers' liability in an amount appropriate to your business. You will ensure that WeWork and the landlord of the applicable Premises shall each be named as additional insureds on your commercial general liability policy and that all insurance policies shall include a clause stating that the insurer waives all rights of recovery, under subrogation or otherwise, you may have against WeWork and the landlord of the applicable premises. You shall provide proof of insurance upon our request.

f. **Pets.** If the Office Space is in Premises designated by us to be one in which pets are permitted, and if any Member plans on regularly bringing a pet into the Office Space or otherwise into the Premises, we may require this Member to produce proof of vaccination for such pet and evidence of compliance with applicable local regulations. If any of your Members brings a pet into the Premises, you will be responsible for any injury or damage caused by this pet to other members or guests or other occupants of the Premises or to the property of (i) WeWork or any employees, members or guests or (ii) the owner(s) or other occupants of the Premises. None of the WeWork Parties will be responsible for any injury to such pets. We reserve the right to restrict any Member's right to bring a pet into the Premises in our sole discretion.

g. **Other Members.** We do not control and are not responsible for the actions of other member companies, members, or any other third parties. If a dispute arises between member companies, members or their invitees or guests, we shall have no responsibility or obligation to participate, mediate or indemnify any party.

h. **Joint Marketing.** The Parties agree to use commercially reasonable efforts to coordinate a meeting with their respective brand, public relations and/or marketing teams to explore mutual marketing, publicity and promotional content related to your membership.

i. **Privacy and Personal Data.** We collect, process, transfer and secure personal data about you or your Members pursuant to the terms of our Privacy Policy, which can be found on our website, and in accordance with all applicable data protection laws. Note that you are not obligated to provide us with personal information and any information collected by us will be provided by you at your own

5

will and with your explicit consent granted therein by execution of this Agreement. You hereby (i) undertake, where necessary, to obtain consent from such Member to the collection, processing, transferring and securing of data described therein and (ii) confirm that you in fact collect and process such Member's personal data in accordance with applicable law.

## 8. ARBITRATION AND CLASS ACTION WAIVER

a.  **Governing Law.** This Agreement and the transactions contemplated hereby shall be governed by and construed under the law of the State of New York, U.S.A. and the United States without regard to conflicts of laws provisions thereof and without regard to the United Nations Convention on Contracts for the International Sale of Goods or New York's or any other implementation of the Uniform Computer Information Transactions Act.

b.  **Venue; Arbitration.** Except that either party may seek equitable or similar relief from any court of competent jurisdiction, any dispute, controversy or claim arising out of or in relation to this Agreement, or at law, or the breach, termination or invalidity of this Agreement, that cannot be settled amicably by agreement of the parties to this Agreement shall be finally settled in accordance with the arbitration rules of JAMS then in force, by one or more arbitrators appointed in accordance with said rules. The place of arbitration shall be New York, New York, U.S.A.

c.  **Proceedings; Judgment.** The proceedings shall be confidential and in English. The award rendered shall be final and binding on both parties. Judgment on the award may be entered in any court of competent jurisdiction. In any action, suit or proceeding to enforce rights under this Agreement, the prevailing party shall be entitled to recover, in addition to any other relief awarded, the prevailing party's reasonable attorneys' fees and other fees, costs and expenses of every kind in connection with the action, suit or proceeding, any appeal or petition for review, the collection of any award or the enforcement of any order, as determined by the arbitrator(s) or court, as applicable. This Agreement shall be interpreted and construed in the English language, which is the language of the official text of this Agreement.

d.  **Class Action Waiver.** Any proceeding to resolve or litigate any dispute in any forum will be conducted solely on an individual basis. Neither you nor we will seek to have any dispute heard as a class action or in any other proceeding in which either party acts or proposes to act in a representative capacity. No proceeding will be combined with another without the prior written consent of all parties to all affected proceedings. You and we also agree not to participate in claims brought in a private attorney general or representative capacity, or any consolidated claims involving another person's account, if we are a party to the proceeding. YOU ARE GIVING UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIVIDUAL ARBITRATIONS.

## 9. MISCELLANEOUS

a.  **Nature of the Agreement; Relationship of the Parties.** The whole of the Office Space remains our property and in our possession and control. We are giving you access to the Office Space so that we can provide the Services to you. Notwithstanding anything in this Agreement to the contrary, you and we agree that our relationship is not that of landlord-tenant or lessor-lessee and this Agreement in no way shall be construed as to grant you or any Member any title, easement, lien, possession or related rights in our business, the Premises, the Office Space or anything contained in or on the Premises or Office Space. This Agreement creates no tenancy interest, leasehold estate, or other real property interest. The parties hereto shall each be independent contractors in the performance of their

10

obligations under this Agreement, and this Agreement shall not be deemed to create a fiduciary or agency relationship, or partnership or joint venture, for any purpose. Neither party will in any way misrepresent our relationship.

b. **Updates to the Agreement.** Changes to membership and overage fees, will be governed by Section 4(b) and 4(d) of this Agreement, respectively. We may from time to time update this Agreement and will provide notice to you of these updates. You will be deemed to have accepted the new terms of the Agreement following the completion of two (2) full calendar months after the date of notice of the update(s). Continued use of the Office Space or Services beyond this time will constitute acceptance of the new terms. We may otherwise update this Agreement by mutual agreement of the parties (or as required by law).

c. **Waiver.** Neither party shall be deemed by any act or omission to have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by the waiving party.

d. **Subordination.** This Agreement is subject and subordinate to our lease with our landlord of the Premises and to any supplemental documentation and to any other agreements to which our lease with such landlord is subject to or subordinate. However, the foregoing does not imply any sublease or other similar relationship involving an interest in real property.

e. **Extraordinary Events.** WeWork will not be liable for, and will not be considered in default or breach of this Agreement on account of, any delay or failure to perform as required by this Agreement as a result of any causes or conditions that are beyond WeWork's reasonable control, including without limitation (i) any delays or changes in construction of, or WeWork's ability to procure any space in, any Premises, and (ii) any delays or failure to perform caused by conditions under the control of our landlord at the applicable Premises.

f. **Severable Provisions.** Each provision of this Agreement shall be considered separable. To the extent that any provision of this Agreement is prohibited, this Agreement shall be considered amended to the smallest degree possible in order to make the Agreement effective under applicable law.

g. **Survival.** Sections 1, 2(c), 4 (to the extent any payments remain outstanding), 5(e), 5(f), 5(g), 6 (clause (b) of Exhibit A), 7, 8, and 9, and all other provisions of this Agreement reasonably expected to survive the termination or expiration of this Agreement will do so.

h. **Notices.** Any and all notices under this Agreement will be given via email and will be effective on the first business day after being sent. All notices will be sent via email to the email addresses specified on the Membership Details Form, except as otherwise provided in this Agreement. WeWork may send notices to either (or both) the Primary Member or the Authorized Signatory, as WeWork determines in its reasonable discretion. Notices related to the physical Office Space, Premises, Members, other Member Companies or other issues in the Premises should be sent by the Primary Member. Notices related to this Agreement and the business relationship between you and WeWork should be sent by your Authorized Signatory. In the event that we receive multiple notices from different individuals within your company containing inconsistent instructions, the Authorized Signatory's notice will control unless we decide otherwise in our reasonable discretion.

i. **Headings; Interpretation.** The headings in this Agreement are for convenience only and are not to be used to interpret or construe any provision of this Agreement. Any use of "including," "for example" or "such as" in this Agreement shall be read as being followed by "without limitation" where appropriate. References to any times of day in this Agreement refer to the time of day in the Office Space's time zone.

33

j.  **No Assignment.** Except in connection with a merger, acquisition, corporate reorganization, or sale of all or substantially all of the shares or assets of you or your parent corporation, you may not transfer or otherwise assign any of your rights or obligations under this Agreement (including by operation of law) without our prior consent. We may assign this Agreement without your consent.

k.  **Sanctions.** You hereby represent and warrant that:

(i)  During the Term of this Agreement you and your Members will comply with all applicable U.S. and non-U.S. economic sanctions and export control laws and regulations, including but not limited to the economic sanctions regulations implemented under statutory authority and/or Executive Orders and administered by the U.S. Treasury Department's Office of Foreign Assets Control ( "OFAC") (31 C.F.R. Part 500 et seq.), the U.S. Commerce Department's Export Administration Regulations (15 C.F.R. Part 730 et seq.), the economic sanctions rules and regulations of the European Council, United Kingdom, and EU Member States, and EU's Dual-use Regulation 428/2009 (collectively, "Trade Control Laws").

(ii)  Neither you nor any of your Members, subsidiaries or affiliates, nor directors or officers is (a) a citizen or resident of, an entity organized under the laws of, or otherwise located in, a country subject to comprehensive territorial sanctions maintained by OFAC (hereinafter referred to as "Sanctioned Countries"), (b) identified on U.S. Government restricted party lists including the Specially Designated Nationals List and Foreign Sanctions Evaders List administered by OFAC; the Denied Parties List, Unverified List or Entity List maintained by the U.S. Commerce Department Bureau of Industry and Security; or the List of Statutorily Debarred Parties maintained by the U.S. State Department Directorate of Defense Trade Controls, (c) a listed person or entity on the Consolidated List of persons and entities subject to asset-freezing measures or other sanctions maintained by the European Union, and by the Member States of the European Union, (d) or a person or entity subject to asset-freezing measures or other sanctions maintained by the United Kingdom's HM Treasury (collectively referred to herein as "Restricted Parties").

(iii)  Neither you nor any of your Members, subsidiaries and/or affiliates are 50% or more owned, individually or in the aggregate, directly or indirectly by one or more Restricted Parties or otherwise controlled by Restricted Parties.

(iv)  Less than 10% of your total annual revenues are, and will continue to be for the duration of the Agreement, generated from activities involving, directly or indirectly, one or more of the Sanctioned Countries.

(v)  Neither you nor any of your Members will, at any time during the Term, engage in any activity under this Agreement, including the use of Services provided by WeWork in connection with this Agreement, that violates applicable Trade Control Laws or causes WeWork to be in violation of Trade Control Laws.

l.  **Anti-Money Laundering.** You hereby represent and warrant that at all times you and your Members have conducted and will conduct your operations ethically and in accordance with all laws, including but not limited to laws that prohibit commercial bribery and money laundering (the "Anti-Money Laundering Laws"), and that all funds which You will use to comply with your payment obligations under this Agreement will be derived from legal sources, pursuant to the provisions of Anti-Money Laundering Laws. You will provide us with all information and documents that we from time to time may request in order to comply with all Anti-Money Laundering Laws.

m. **Anti-Corruption Laws.** Neither You nor any of your Members, your directors, officers, employees, agents, subcontractors, representatives or anyone acting on your behalf, (i) has, directly or indirectly, offered, paid, given, promised, or authorized the payment of any money, gift or anything of value to: (A) any Government Official or any commercial party, (B) any person while knowing or having reason to know that all or a portion of such money, gift or thing of value will be offered, paid or given, directly or indirectly, to any Government Official or any commercial party, or (C) any employee or representative of WeWork for the purpose of (1) influencing an act or decision of the Government Official or commercial party in his or her official capacity, (2) inducing the Government Official or commercial party to do or omit to do any act in violation of the lawful duty of such official, (3) securing an improper advantage or (4) securing the execution of this Agreement, (ii) will authorize or make any payments or gifts or any offers or promises of payments or gifts of any kind, directly or indirectly, in connection with this Agreement, the Services or the Office Space. For purposes of this section, "Government Official" means any officer, employee or person acting in an official capacity for any government agency or instrumentality, including state-owned or controlled companies, and public international organizations, as well as a political party or official thereof or candidate for political office

n. **Brokers.** You hereby represent and warrant that you have not used a broker or realtor in connection with the membership transaction covered by this Agreement, except as may be provided for in the WeWork broker referral program and as specified in the Membership Details Form. You hereby indemnify and hold us harmless against any claims arising from the breach of any warranty or representation of this paragraph.

o. **Counterparts and Electronic Signature.** This Agreement may be executed in any number of counterparts by either handwritten or electronic signature, each of which when executed shall constitute a duplicate original, but all the counterparts shall together constitute the one agreement, and each of which counterparts may be delivered by emailing the other party to this Agreement signed scanned document or electronically signed portable document format (pdf) version of the contract (as applicable). Each party agree to the execution of this Agreement in this manner, and the parties acknowledge that execution in this manner creates a binding contract between the parties on the Effective Date.

p. **Entire Agreement.** This Agreement, including the Membership Details Form, constitutes the entire agreement between the parties relating to the subject matter hereof and shall not be changed in any manner except by a writing executed by both parties or as otherwise permitted herein. All prior agreements and understandings between the parties regarding the matters described herein have merged                          into                          this                          Agreement.

## EXHIBIT A

## HOUSE RULES

a.  **You acknowledge and agree that:**

    i.    keys, key cards and other such items used to gain physical access to the Premises, or the Office Space remain our property. You will cause your Members to safeguard our property and you will be liable for replacement fees should any such property be lost, stolen or destroyed;

    ii.    you shall promptly notify us of any change to your contact and payment information;

    iii.    we will provide notice to you of any changes to services, fees, or other updates by emailing the email addresses provided by you. It is your responsibility to read such emails and to ensure your Members are aware of any changes, even if we notify such Members directly;

    iv.    carts, dollies and other freight items which may be made available may not be used in the passenger elevator except at our discretion;

    v.    all of your Members are at least 18 years of age;

    vi.    you shall be solely and fully responsible for ensuring that no alcohol is consumed by any of your Members or guests who is younger than the legal age for consuming alcohol in the applicable jurisdiction;

    vii.    common spaces in any Premises are to be enjoyed by all our Member Companies, members and guests unless otherwise instructed by us, and are for temporary use and not as a place for continuous, everyday work;

    viii.    you will provide us with reasonable notice of and complete all required paperwork prior to hosting any event at a Premises;

    ix.    you will be responsible for any damage to your Office Space exceeding normal wear and tear;

    x.    you may not make any structural or nonstructural alterations or installations of wall attachments, furniture or antennae in the Office Space or elsewhere in the Premises without prior approval by us. In the event that any alterations or installations are made, you shall be responsible for the full cost and expense of the alteration or installation and, prior to the termination of this Agreement, the removal of such items and the restoration necessitated by any such alterations. To the extent that we incur any costs in connection with such alteration, installation or removal which are not otherwise paid by you we shall deduct such costs from the Service Retainer. In no event are you permitted to perform any of these actions. Only a member of our facilities staff is entitled to perform an alteration, installation, removal or restoration. Reach out to a member of your community team for more information;

    xi.    you shall not communicate, or attempt to communicate, directly with our landlord under the lease for the Premises for any reason;

    xii.    you will use commercially reasonable efforts to ensure that your and your Members' computers, tablets, mobile devices and other electronic equipment are kept clean of any malware, viruses, spyware, worms, Trojans, or anything that is designed to perform

malicious, hostile and/or intrusive operations. We reserve the right to remove any device from our networks that poses a threat to our networks or users until the threat is remediated; and

xiii.    you consent to our non-exclusive, non-transferable use of your Member Company name and/or logo in connection with identifying you as a Member Company of WeWork, alongside those of other Member Companies, on a public-facing "Membership" display on wework.com, as well as in video and other marketing materials. You warrant that your logo does not infringe upon the rights of any third party and that you have full authority to provide this consent. You may terminate this consent at any time upon thirty (30) days' prior notice.

b.  **No Member will:**

i.    perform any activity or cause or permit anything that is reasonably likely to be disruptive or dangerous to us or any other Member Companies, or our or their employees, guests or property, including without limitation in the Office Space or the Premises;

ii.    use the Services, the Office Space or the Premises to conduct or pursue any illegal or offensive activities or comport themselves to the community in a similar manner;

iii.    misrepresent himself or herself to the WeWork community, either in person or on the WeWork Member Network;

iv.    take, copy or use any information or intellectual property belonging to other Member Companies or their Members or guests, including without limitation any confidential or proprietary information, personal names, likenesses, voices, business names, trademarks, service marks, logos, trade dress, other identifiers or other intellectual property, or modified or altered versions of the same, and this provision will survive termination of this Agreement;

v.    take, copy or use for any purpose the name "WeWork" or any of our other business names, trademarks, service marks, logos, trade dress, other identifiers or other intellectual property or modified or altered versions of the same, or take, copy or use for any purpose any pictures or illustrations of any portion of the Premises, without our prior consent, and this provision will survive termination of this Agreement;

vi.    use the Office Space in a "retail," "medical," or other nature involving frequent visits by members of the public;

vii.    sell, manufacture or distribute any controlled substance, including alcoholic beverages, from the Office Space, or obtain a license for such sale, manufacture, importation, or distribution using the Office Space or the address of the Main Premises;

viii.    make any copies of any keys, keycards or other means of entry to the Office Space or the Premises or lend, share or transfer any keys or keycards to any third party, unless authorized by us in advance;

ix.    install any locks or other security devices to access the Office Space or anywhere within the Premises or install surveillance devices within the Office Space or anywhere within the Premises, unless authorized by us in advance;

x.    allow any guest(s) to enter the building without performing any additional required steps according to our policies; or

xi.   bring any weapons of any kind, or any other offensive, dangerous, inflammable or explosive materials      into        the       Office      Space       or      the        Premises.

## EXHIBIT B

### CUSTOM WORK – DESCRIPTION OF WORK

1. WeWork Work Description:

2. WeWork Work Cost Allocation Between the Parties:

3. Other Provisions to be Agreed Upon:

# EXHIBIT K
## INTENTIONALLY DELETED

## EXHIBIT L
### Tenant's Operational Requirement

1) **BUSINESS HOURS**
   a) Business Hours (which are defined in the Lease) mean the hours are 8 a.m. to 6 p.m. Monday through Friday, except for Holidays (as hereinafter defined) The term Holidays shall mean New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving and Christmas Day.

2) **ELEVATORS**
   a) Passenger Elevators:
      i) There are Three (3) passenger elevators in the Building. One of the three is designated as Freight Elevator.
      ii) Landlord shall provide minimum of passenger elevators as follows:
         (1) No fewer than One (1) elevators during any period of maintenance and repairs of the elevators.
   b) Freight Elevators:
      i) For reserved use of the freight elevator, Tenant to have access to freight at no charge, first come, first serve, with 48 hours prior request to and approval from Management. Tenant to have the right to use the freight elevator for minor loads (i.e. a single load of the freight elevator) during normal Business Hours on a first come, first serve basis. Moving in and out shall be subject to Landlord's reasonable requirements, including that items may not be moved through the Building lobby.

3) **SECURITY/ACCESS**
   a) Tenant and its members and employees shall have access with Landlord approved and issued key card to the Building on a 24/7/365 basis; or via Tenant's integration of its own key card system into Landlord's existing system in a manner reasonably acceptable to Landlord.
   b) Landlord to provide security personnel and procedures for the Building 24/7/365.
   c) Tenant's Security/Access
      i) Tenant has the right to install a security system within the Premises and to integrate that system with Landlord's existing key card system in a manner reasonably acceptable to Landlord.

      ii) Tenant may install reader routers at all points of access control along path of access to premises Tenant may install security cameras at access points to the Premises, and within the Premises.
         (1) Landlord does not have right to install cameras within Premises.

4) **COMMON AREA CLEANING.**
   a) Landlord to provide janitorial and cleaning services for the Building and all Common Areas, including, without limitation:
      i) Provision of commercially reasonable pest control services no less than monthly. In the event a pest issue from the Common Areas affects the Premises, Landlord shall provide appropriate pest control services to the Premises.
      ii) Cleaning of sidewalk and keep it free of trash and debris (swept/mopped no less than once per week)
      iii) Performing dusting of Common Area surfaces and ledges no less than weekly.
      iv) Restocking/maintaining any Common Area bathrooms not less than daily.
      v) All exterior windows washed by Landlord not less than once per year.

5) **FIRE SAFETY**
   a) Landlord to provide fire safety/emergency action plan for the Building.
   b) Landlord to manage fire systems, including preventative maintenance, and provide fire safety director for the Building as required by law.
   c) Landlord to ensure fire alarm testing will be conducted after Business Hours to the extent permitted by any applicable laws.

L-1

**6) TRASH REMOVAL**

Landlord will provide ordinary office cleaning Monday to Friday night (except observed holidays). If interior offices are locked, Janitors will not clean them. If Tenant require extra cleaning, trash disposal, Tenant will need to hire a Day Porter for such work. Tenant is prohibited from bringing trash to Building trash bins.

**7) SERVICES AND UTILITIES**

a) Current charge for after hours (over time) HVAC is $250 per hour, minimum of two hours.

b) In case of overtime HVAC request, Tenant must provide notice of need for overtime HVAC at least 48 hours in advance.

c) Landlord is responsible for and will maintain all HVAC systems servicing the Building.

d) Building engineer be onsite 7:00am to 3:00pm Monday to Friday (except observed holidays).

**8) JANITORIAL WORK**

a) Tenant shall use unioned Janitorial labor provided by Landlord in accordance with the Lease.

**10) REPAIRS AND MAINTENANCE**

a) Tenant shall have the right to perform cosmetic repairs and basic maintenance within the premises as needed, provided that Tenant shall provide Management scope of work, use unioned vendor, and submit vendor certificate of insurance at least 48 hours prior to vendor(s) being on site.

**11) CONSTRUCTION**

a) Landlord Plans to remodel the Building Lobby.

**12) CONFLICTS**

a) Notwithstanding anything to the contrary in the Lease, to the extent that any provisions of this Exhibit conflict with any provisions of the Lease, then the terms and provisions of the Lease shall control. No changes shall be effective to this Exhibit unless agreed to, in writing, by Landlord and Tenant.

**13) Events in Premises**

a) Tenant will use commercially reasonable efforts to provide Landlord with at least forty-eight (48) hours notice of any proposed event with fifty (50) or more attendees, and Tenant shall cooperate with Landlord in reducing security and legal risks associated with such events. At Landlord's request, Tenant will provide additional security for after-hours events at Tenant's cost. In addition, if issues arise with particular Member events (e.g. neighbor complaints, police calls, or disruption of other Building tenants and occupants), Tenant will take action reasonably requested by Landlord to prevent future occurrences of such issues, including, without limitation, enforcing the rules and regulations under this Lease or its membership agreement with the applicable Member, prohibiting such Member from holding future after-hours events, or exercising other appropriate rights and remedies against such Member)

b) Intentionally Omitted.

c) All after-hours events shall end by 11:00 p.m. PST.

d) Tenant will clean up after use, and pay for all janitorial services required to do so.

e) landlord reserves the right to reasonably regulate the time, place and duration of such activities.

f) landlord reserves the right to impose reasonable conditions on such activities, including for the interests of other tenants.

L-2

## EXHIBIT M
### SNDA Form

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

_____

_____

_____

_____

(Space Above For Recorder's Use)

### SUBORDINATION AGREEMENT, ACKNOWLEDGMENT OF LEASE ASSIGNMENT, ESTOPPEL, ATTORNMENT AND NON-DISTURBANCE AGREEMENT

THIS SUBORDINATION AGREEMENT, ACKNOWLEDGMENT OF LEASE ASSIGNMENT, ESTOPPEL, ATTORNMENT AND NON-DISTURBANCE AGREEMENT ("Agreement") is made _____ by and between _____, owner(s) of the real property hereinafter described ("Mortgagor"), _____ ("Tenant") and _____ (collectively with its successors or assigns, "Lender").

### RECITALS

A.   Pursuant to the terms and provisions of a lease dated _____ ("Lease"), Mortgagor granted to Tenant a leasehold estate in and to a portion of the property described on Exhibit A attached hereto and incorporated herein by this reference (which property, together with all improvements now or hereafter located on the property, is defined as the "Property").

B.   Mortgagor has executed, or proposes to execute, that certain Deed of Trust ("Security Instrument") securing, among other things, that certain Promissory Note dated _____ ("Note") in the principal sum of _____ in favor of Lender ("Loan"). The Security Instrument was recorded in the Official Records of _____ County Recorder's Office as Document No. _____ on _____.

C.   As a condition to Lender making the Loan secured by the Security Instrument, Lender requires that the Security Instrument be unconditionally and at all times remain a lien on the Property, prior and superior to all the rights of Tenant under the Lease and that the Tenant specifically and unconditionally subordinate the Lease to the lien of the Security Instrument.

D.   Mortgagor and Tenant have agreed to the subordination, attornment and other agreements herein in favor of Lender.

NOW THEREFORE, for valuable consideration and to induce Lender to make the Loan, Mortgagor and Tenant hereby agree for the benefit of Lender as follows:

1.   SUBORDINATION. Mortgagor and Tenant hereby agree that:

1.1   Prior Lien. The Security Instrument securing the Note in favor of Lender, and any modifications, renewals or extensions thereof (including, without limitation, any modifications, renewals or extensions with respect to any additional advances made subject to the Security Instrument), shall unconditionally be and at all times remain a lien on the Property prior and superior to the Lease;

1.2   Subordination. Lender would not make the Loan without this agreement to subordinate; and

1.3   Whole Agreement. This Agreement shall be the whole agreement and only agreement with regard to the subordination of the Lease to the lien of the Security Instrument and shall supersede and cancel, but only insofar as would affect the priority between the Security Instrument and the Lease, any prior agreements as to such subordination, including, without limitation, those provisions, if any, contained in the Lease which provide for the subordination of the Lease to a deed or deeds of trust or to a mortgage or mortgages.

AND FURTHER, Tenant individually declares, agrees and acknowledges for the benefit of Lender, that:

1.4   Use of Proceeds. Lender, in making disbursements pursuant to the Note, the Security Instrument or any loan agreements with respect to the Property, is under no obligation or duty to, nor has

M-1

Lender represented that it will, see to the application of such proceeds by the person or persons to whom Lender disburses such proceeds, and any application or use of such proceeds for purposes other than those provided for in such agreement or agreements shall not defeat this agreement to subordinate in whole or in part; and

1.5     Waiver, Relinquishment and Subordination. Tenant intentionally and unconditionally waives, relinquishes and subordinates all of Tenant's right, title and interest in and to the Property to the lien of the Security Instrument and understands that in reliance upon, and in consideration of, this waiver, relinquishment and subordination, specific loans and advances are being and will be made by Lender and, as part and parcel thereof, specific monetary and other obligations are being and will be entered into which would not be made or entered into but for said reliance upon this waiver, relinquishment and subordination.

2.     ASSIGNMENT. Tenant acknowledges and consents to the assignment of the Lease by Mortgagor in favor of Lender.

3.     Tenant acknowledges and represents that:

3.1     Entire Agreement. The Lease constitutes the entire agreement between Mortgagor and Tenant with respect to the Property and Tenant claims no rights with respect to the Property other than as set forth in the Lease;

3.2     No Prepaid Rent. No deposits or prepayments of rent have been made in connection with the Lease, except as follows (if none, state "None"):

3.3     No Default. To the best of Tenant's knowledge, as of the date hereof: (i) there exists no breach, default, or event or condition which, with the giving of notice or the passage of time or both, would constitute a breach or default under the Lease; and (ii) there are no existing claims, defenses or offsets against rental due or to become due under the Lease;

3.4     Lease Effective. The Lease has been duly executed and delivered by Tenant and, subject to the terms and conditions thereof, the Lease is in full force and effect, the obligations of Tenant thereunder are valid and binding and there have been no (further) amendments, modifications or additions to the Lease, written or oral; and

3.5     No Broker Liens. Neither Tenant nor Mortgagor has incurred any fee or commission with any real estate broker which would give rise to any lien right under state or local law, except as follows (if none, state "None"):

4.     ADDITIONAL AGREEMENTS. Tenant covenants and agrees that, during all such times as Lender is the [Beneficiary][Grantee][Mortgagee] under the Security Instrument:

4.1     Modification, Termination and Cancellation. Tenant will not consent to any modification, amendment, termination or cancellation of the Lease (in whole or in part) without Lender's prior written consent and will not make any payment to Mortgagor in consideration of any modification, termination or cancellation of the Lease (in whole or in part) without Lender's prior written consent;

4.2     Notice of Default. Tenant will notify Lender in writing concurrently with any notice given to Mortgagor of any default by Mortgagor under the Lease, and Tenant agrees that Lender has the right (but not the obligation) to cure any breach or default specified in such notice within the time periods set forth below and Tenant will not declare a default of the Lease, as to Lender, if Lender cures such default within fifteen (15) days from and after the expiration of the time period provided in the Lease for the cure thereof by Mortgagor; provided, however, that if such default cannot with diligence be cured by Lender within such fifteen (15) day period, the commencement of action by Lender within such fifteen (15) day period to remedy the same shall be deemed sufficient so long as Lender pursues such cure with diligence;

4.3     No Advance Rents. Tenant will make no payments or prepayments of rent more than one (1) month in advance of the time when the same become due under the Lease;

4.4     Assignment of Rents. Upon receipt by Tenant of written notice from Lender that Lender has elected to terminate the license granted to Mortgagor to collect rents, as provided in the Security Instrument, and directing the payment of rents by Tenant to Lender, Tenant shall comply with such direction to pay and shall not be required to determine whether Mortgagor is in default under the Loan and/or the Security Instrument.

4.5     Insurance and Condemnation Proceeds. In the event there is any conflict between the terms in the Security Instrument and the Lease regarding the use of insurance proceeds or condemnation proceeds with respect to the Property, the provisions of the Security Instrument shall control.

5.     ATTORNMENT. In the event of a foreclosure under the Security Instrument, Tenant agrees for the benefit of Lender (including for this purpose any transferee of Lender or any transferee of Mortgagor's

49302/0801
ELL/536444.3

title in and to the Property by Lender's exercise of the remedy of sale by foreclosure under the Security Instrument) as follows:

5.1 Payment of Rent. Tenant shall pay to Lender all rental payments required to be made by Tenant pursuant to the terms of the Lease for the duration of the term of the Lease;

5.2 Continuation of Performance. Tenant shall be bound to Lender in accordance with all of the provisions of the Lease for the balance of the term thereof, and Tenant hereby attorns to Lender as its landlord, such attornment to be effective and self-operative without the execution of any further instrument immediately upon Lender succeeding to Mortgagor's interest in the Lease and giving written notice thereof to Tenant;

5.3 No Offset. Lender shall not be liable for, nor subject to, any offsets or defenses which Tenant may have by reason of any act or omission of Mortgagor under the Lease, nor for the return of any sums which Tenant may have paid to Mortgagor under the Lease as and for security deposits, advance rentals or otherwise, except to the extent that such sums are actually delivered by Mortgagor to Lender; and

5.4 Subsequent Transfer. If Lender, by succeeding to the interest of Mortgagor under the Lease, should become obligated to perform the covenants of Mortgagor thereunder, then, upon any further transfer of Mortgagor's interest by Lender, all of such obligations shall terminate as to Lender.

5.5 Limitation on Lender's Liability. Tenant agrees to look solely to Lender's interest in the Property and the rent, income or proceeds derived therefrom for the recovery of any judgment against Lender, and in no event shall Lender or any of its affiliates, officers, directors, shareholders, partners, agents, representatives or employees ever be personally liable for any such obligation, liability or judgment.

5.6 No Representation, Warranties or Indemnities. Lender shall not be liable with respect to any representations, warranties or indemnities from Mortgagor, whether pursuant to the Lease or otherwise, including, but not limited to, any representation, warranty or indemnity related to the use of the Property, compliance with zoning, landlord's title, landlord's authority, habitability or fitness for purposes or commercial suitability, or hazardous wastes, hazardous substances, toxic materials or similar phraseology relating to the environmental condition of the Property or any portion thereof.

6. NON-DISTURBANCE. In the event of a foreclosure under the Security Instrument, so long as there shall then exist no breach, default, or event of default on the part of Tenant under the Lease, Lender agrees for itself and its successors and assigns that the leasehold interest of Tenant under the Lease shall not be extinguished or terminated by reason of such foreclosure, but rather the Lease shall continue in full force and effect and Lender shall recognize and accept Tenant as tenant under the Lease subject to the terms and provisions of the Lease except as modified by this Agreement; provided, however, that Tenant and Lender agree that the following provisions of the Lease (if any) shall not be binding on Lender nor its successors and assigns: any option to purchase with respect to the Property; any right of first refusal with respect to the Property.

7. MISCELLANEOUS.

7.1 Remedies Cumulative. All rights of Lender herein to collect rents on behalf of Mortgagor under the Lease are cumulative and shall be in addition to any and all other rights and remedies provided by law and by other agreements between Lender and Mortgagor or others.

7.2 NOTICES. All notices, demands, or other communications under this Agreement and the other Loan Documents shall be in writing and shall be delivered to the appropriate party at the address set forth below (subject to change from time to time by written notice to all other parties to this Agreement). All notices, demands or other communications shall be considered as properly given if delivered personally or sent by first class United States Postal Service mail, postage prepaid, or by Overnight Express Mail or by overnight commercial courier service, charges prepaid, except that notice of Default may be sent by certified mail, return receipt requested, charges prepaid. Notices so sent shall be effective three (3) Business Days after mailing, if mailed by first class mail, and otherwise upon delivery or refusal; provided, however, that non-receipt of any communication as the result of any change of address of which the sending party was not notified or as the result of a refusal to accept delivery shall be deemed receipt of such communication. For purposes of notice, the address of the parties shall be:

Mortgagor: _____

Tenant: _____

Lender: _____

M-3

Any party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days' notice to the other party in the manner set forth hereinabove.

     7.3    Heirs, Successors and Assigns. Except as otherwise expressly provided under the terms and conditions herein, the terms of this Agreement shall bind and inure to the benefit of the heirs, executors, administrators, nominees, successors and assigns of the parties hereto.

     7.4    Headings. All article, section or other headings appearing in this Agreement are for convenience of reference only and shall be disregarded in construing this Agreement.

     7.5    Counterparts. To facilitate execution, this document may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single document. It shall not be necessary in making proof of this document to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

     7.6    Exhibits, Schedules and Riders. All exhibits, schedules, riders and other items attached hereto are incorporated into this Agreement by such attachment for all purposes.

     IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

NOTICE: THIS SUBORDINATION AGREEMENT CONTAINS A PROVISION WHICH ALLOWS THE PERSON OBLIGATED ON YOUR REAL PROPERTY SECURITY TO OBTAIN A LOAN A PORTION OF WHICH MAY BE EXPENDED FOR OTHER PURPOSES THAN IMPROVEMENT OF THE LAND.

IT IS RECOMMENDED THAT, PRIOR TO THE EXECUTION OF THIS AGREEMENT, THE PARTIES CONSULT WITH THEIR ATTORNEYS WITH RESPECT HERETO.

MORTGAGOR:

[SIGNATURE BLOCK FOR MORTGAGOR]

TENANT:

[SIGNATURE BLOCK FOR TENANT]

LENDER:

[SIGNATURE BLOCK FOR LENDER]

     IF DOCUMENT TO BE RECORDED, ALL SIGNATURES MUST BE ACKNOWLEDGED – ADD
APPROPRIATE NOTARY ACKNOWLEDGEMENT

     [IF LEASE GUARANTY] LEASE GUARANTOR'S CONSENT

The undersigned ("Lease Guarantor") consents to the foregoing Subordination Agreement; Acknowledgment of Lease Assignment, Estoppel, Attornment and Non-Disturbance Agreement and the transactions contemplated thereby and reaffirms its obligations under the lease guaranty ("Lease Guaranty") dated LEASE GUARANTY DATE. Lease Guarantor further reaffirms that its obligations under the Lease Guaranty are separate and distinct from Tenant's obligations.

AGREED:

Dated as of: _____

LEASE GUARANTOR:

[SIGNATURE BLOCK FOR LEASE GUARANTOR]

     IF DOCUMENT TO BE RECORDED, ALL SIGNATURES MUST BE ACKNOWLEDGED

## EXHIBIT N
### Table of Base Monthly Rental

| Floor 2 | | | |
| 4,936 Rentable Square Feet | | | |
| Period | Annual Base Rental per Rentable Square Foot | Annual Base Rental | Base Monthly Rental |
|---|---|---|---|
| Lease Year 1 | $73.00 | $360,328.00 | $30,027.33 |
| Lease Year 2 | $75.19 | $371,137.84 | $30,928.15 |
| Lease Year 3 | $77.45 | $382,271.98 | $31,856.00 |
| Lease Year 4 | $79.77 | $393,740.13 | $32,811.68 |
| Lease Year 5 | $82.16 | $405,552.34 | $33,796.03 |
| Lease Year 6 | $84.63 | $417,718.91 | $34,809.91 |
| Lease Year 7 | $87.17 | $430,250.48 | $35,854.21 |
| Lease Year 8 | $89.78 | $443,157.99 | $36,929.83 |
| Lease Year 9 | $92.47 | $456,452.73 | $38,037.73 |
| Lease Year 10 | $95.25 | $470,146.31 | $39,178.86 |

| Floor 3 | | | |
| 6,195 Rentable Square Feet | | | |
| Period | Annual Base Rental per Rentable Square Foot | Annual Base Rental | Base Monthly Rental |
|---|---|---|---|
| Lease Year 1 | $73.00 | $452,235.00 | $37,686.25 |
| Lease Year 2 | $75.19 | $465,802.05 | $38,816.84 |
| Lease Year 3 | $77.45 | $479,776.11 | $39,981.34 |
| Lease Year 4 | $79.77 | $494,169.39 | $41,180.78 |
| Lease Year 5 | $82.16 | $508,994.48 | $42,416.21 |
| Lease Year 6 | $84.63 | $524,264.31 | $43,688.69 |
| Lease Year 7 | $87.17 | $539,992.24 | $44,999.35 |
| Lease Year 8 | $89.78 | $556,192.01 | $46,349.33 |
| Lease Year 9 | $92.47 | $572,877.77 | $47,739.81 |
| Lease Year 10 | $95.25 | $590,064.10 | $49,172.01 |

| Floor 4 | | | |
| 6,104 Rentable Square Feet | | | |
| Period | Annual Base Rental per Rentable Square Foot | Annual Base Rental | Base Monthly Rental |
|---|---|---|---|
| Lease Year 1 | $73.00 | $445,592.00 | $37,132.67 |
| Lease Year 2 | $75.19 | $458,959.76 | $38,246.65 |
| Lease Year 3 | $77.45 | $472,728.55 | $39,394.05 |
| Lease Year 4 | $79.77 | $486,910.41 | $40,575.87 |
| Lease Year 5 | $82.16 | $501,517.72 | $41,793.14 |
| Lease Year 6 | $84.63 | $516,563.25 | $43,046.94 |
| Lease Year 7 | $87.17 | $532,060.15 | $44,338.35 |
| Lease Year 8 | $89.78 | $548,021.96 | $45,668.50 |
| Lease Year 9 | $92.47 | $564,462.61 | $47,038.55 |
| Lease Year 10 | $95.25 | $581,396.49 | $48,449.71 |

49302/0801
ELL/536444.3

| Floor 6 | | | |
|---|---|---|---|
| 6,104 Rentable Square Feet | | | |
| Period | Annual Base Rental per Rentable Square Foot | Annual Base Rental | Base Monthly Rental |
| Lease Year 1 | $73.00 | $445,592.00 | $37,132.67 |
| Lease Year 2 | $75.19 | $458,959.76 | $38,246.65 |
| Lease Year 3 | $77.45 | $472,728.55 | $39,394.05 |
| Lease Year 4 | $79.77 | $486,910.41 | $40,575.87 |
| Lease Year 5 | $82.16 | $501,517.72 | $41,793.14 |
| Lease Year 6 | $84.63 | $516,563.25 | $43,046.94 |
| Lease Year 7 | $87.17 | $532,060.15 | $44,338.35 |
| Lease Year 8 | $89.78 | $548,021.96 | $45,668.50 |
| Lease Year 9 | $92.47 | $564,462.61 | $47,038.55 |
| Lease Year 10 | $95.25 | $581,396.49 | $48,449.71 |

| Floor 7 | | | |
|---|---|---|---|
| 6,107 Rentable Square Feet | | | |
| Period | Annual Base Rental per Rentable Square Foot | Annual Base Rental | Base Monthly Rental |
| Lease Year 1 | $73.00 | $445,811.00 | $37,150.92 |
| Lease Year 2 | $75.19 | $459,185.33 | $38,265.44 |
| Lease Year 3 | $77.45 | $472,960.89 | $39,413.41 |
| Lease Year 4 | $79.77 | $487,149.72 | $40,595.81 |
| Lease Year 5 | $82.16 | $501,764.21 | $41,813.68 |
| Lease Year 6 | $84.63 | $516,817.13 | $43,068.09 |
| Lease Year 7 | $87.17 | $532,321.65 | $44,360.14 |
| Lease Year 8 | $89.78 | $548,291.30 | $45,690.94 |
| Lease Year 9 | $92.47 | $564,740.04 | $47,061.67 |
| Lease Year 10 | $95.25 | $581,682.24 | $48,473.52 |

| Floor 9 | | | |
|---|---|---|---|
| 6,107 Rentable Square Feet | | | |
| Period | Annual Base Rental per Rentable Square Foot | Annual Base Rental | Base Monthly Rental |
| Lease Year 1 | $73.00 | $445,811.00 | $37,150.92 |
| Lease Year 2 | $75.19 | $459,185.33 | $38,265.44 |
| Lease Year 3 | $77.45 | $472,960.89 | $39,413.41 |
| Lease Year 4 | $79.77 | $487,149.72 | $40,595.81 |
| Lease Year 5 | $82.16 | $501,764.21 | $41,813.68 |
| Lease Year 6 | $84.63 | $516,817.13 | $43,068.09 |
| Lease Year 7 | $87.17 | $532,321.65 | $44,360.14 |
| Lease Year 8 | $89.78 | $548,291.30 | $45,690.94 |
| Lease Year 9 | $92.47 | $564,740.04 | $47,061.67 |
| Lease Year 10 | $95.25 | $581,682.24 | $48,473.52 |

49302/0801
ELL/536444.3

| Floor 11<br>6,107 Rentable Square Feet | | | |
|---|---|---|---|
| Period | Annual Base Rental per Rentable Square Foot | Annual Base Rental | Base Monthly Rental |
| Lease Year 1 | $73.00 | $445,811.00 | $37,150.92 |
| Lease Year 2 | $75.19 | $459,185.33 | $38,265.44 |
| Lease Year 3 | $77.45 | $472,960.89 | $39,413.41 |
| Lease Year 4 | $79.77 | $487,149.72 | $40,595.81 |
| Lease Year 5 | $82.16 | $501,764.21 | $41,813.68 |
| Lease Year 6 | $84.63 | $516,817.13 | $43,068.09 |
| Lease Year 7 | $87.17 | $532,321.65 | $44,360.14 |
| Lease Year 8 | $89.78 | $548,291.30 | $45,690.94 |
| Lease Year 9 | $92.47 | $564,740.04 | $47,061.67 |
| Lease Year 10 | $95.25 | $581,682.24 | $48,473.52 |

| Floor 12<br>6,107 Rentable Square Feet | | | |
|---|---|---|---|
| Period | Annual Base Rental per Rentable Square Foot | Annual Base Rental | Base Monthly Rental |
| Lease Year 1 | $73.00 | $445,811.00 | $37,150.92 |
| Lease Year 2 | $75.19 | $459,185.33 | $38,265.44 |
| Lease Year 3 | $77.45 | $472,960.89 | $39,413.41 |
| Lease Year 4 | $79.77 | $487,149.72 | $40,595.81 |
| Lease Year 5 | $82.16 | $501,764.21 | $41,813.68 |
| Lease Year 6 | $84.63 | $516,817.13 | $43,068.09 |
| Lease Year 7 | $87.17 | $532,321.65 | $44,360.14 |
| Lease Year 8 | $89.78 | $548,291.30 | $45,690.94 |
| Lease Year 9 | $92.47 | $564,740.04 | $47,061.67 |
| Lease Year 10 | $95.25 | $581,682.24 | $48,473.52 |

| Floor 14<br>6,107 Rentable Square Feet | | | |
|---|---|---|---|
| Period | Annual Base Rental per Rentable Square Foot | Annual Base Rental | Base Monthly Rental |
| Lease Year 1 | $73.00 | $445,811.00 | $37,150.92 |
| Lease Year 2 | $75.19 | $459,185.33 | $38,265.44 |
| Lease Year 3 | $77.45 | $472,960.89 | $39,413.41 |
| Lease Year 4 | $79.77 | $487,149.72 | $40,595.81 |
| Lease Year 5 | $82.16 | $501,764.21 | $41,813.68 |
| Lease Year 6 | $84.63 | $516,817.13 | $43,068.09 |
| Lease Year 7 | $87.17 | $532,321.65 | $44,360.14 |
| Lease Year 8 | $89.78 | $548,291.30 | $45,690.94 |
| Lease Year 9 | $92.47 | $564,740.04 | $47,061.67 |
| Lease Year 10 | $95.25 | $581,682.24 | $48,473.52 |

49302/0801<br>ELL/536444.3

| Floor 15 | | | |
|---|---|---|---|
| 6,107 Rentable Square Feet | | | |
| **Period** | **Annual Base Rental per Rentable Square Foot** | **Annual Base Rental** | **Base Monthly Rental** |
| Lease Year 1 | $73.00 | $445,811.00 | $37,150.92 |
| Lease Year 2 | $75.19 | $459,185.33 | $38,265.44 |
| Lease Year 3 | $77.45 | $472,960.89 | $39,413.41 |
| Lease Year 4 | $79.77 | $487,149.72 | $40,595.81 |
| Lease Year 5 | $82.16 | $501,764.21 | $41,813.68 |
| Lease Year 6 | $84.63 | $516,817.13 | $43,068.09 |
| Lease Year 7 | $87.17 | $532,321.65 | $44,360.14 |
| Lease Year 8 | $89.78 | $548,291.30 | $45,690.94 |
| Lease Year 9 | $92.47 | $564,740.04 | $47,061.67 |
| Lease Year 10 | $95.25 | $581,682.24 | $48,473.52 |

| Floor 16 | | | |
|---|---|---|---|
| 6,107 Rentable Square Feet | | | |
| **Period** | **Annual Base Rental per Rentable Square Foot** | **Annual Base Rental** | **Base Monthly Rental** |
| Lease Year 1 | $73.00 | $445,811.00 | $37,150.92 |
| Lease Year 2 | $75.19 | $459,185.33 | $38,265.44 |
| Lease Year 3 | $77.45 | $472,960.89 | $39,413.41 |
| Lease Year 4 | $79.77 | $487,149.72 | $40,595.81 |
| Lease Year 5 | $82.16 | $501,764.21 | $41,813.68 |
| Lease Year 6 | $84.63 | $516,817.13 | $43,068.09 |
| Lease Year 7 | $87.17 | $532,321.65 | $44,360.14 |
| Lease Year 8 | $89.78 | $548,291.30 | $45,690.94 |
| Lease Year 9 | $92.47 | $564,740.04 | $47,061.67 |
| Lease Year 10 | $95.25 | $581,682.24 | $48,473.52 |

| Floor 17 | | | |
|---|---|---|---|
| 6,107 Rentable Square Feet | | | |
| **Period** | **Annual Base Rental per Rentable Square Foot** | **Annual Base Rental** | **Base Monthly Rental** |
| Lease Year 1 | $73.00 | $445,811.00 | $37,150.92 |
| Lease Year 2 | $75.19 | $459,185.33 | $38,265.44 |
| Lease Year 3 | $77.45 | $472,960.89 | $39,413.41 |
| Lease Year 4 | $79.77 | $487,149.72 | $40,595.81 |
| Lease Year 5 | $82.16 | $501,764.21 | $41,813.68 |
| Lease Year 6 | $84.63 | $516,817.13 | $43,068.09 |
| Lease Year 7 | $87.17 | $532,321.65 | $44,360.14 |
| Lease Year 8 | $89.78 | $548,291.30 | $45,690.94 |
| Lease Year 9 | $92.47 | $564,740.04 | $47,061.67 |
| Lease Year 10 | $95.25 | $581,682.24 | $48,473.52 |

49302/0801
ELL/536444.3

| Floor 18 | | | |
| --- | --- | --- | --- |
| 6,095 Rentable Square Feet | | | |
| Period | Annual Base Rental per Rentable Square Foot | Annual Base Rental | Base Monthly Rental |
| Lease Year 1 | $73.00 | $444,935.00 | $37,077.92 |
| Lease Year 2 | $75.19 | $458,283.05 | $38,190.25 |
| Lease Year 3 | $77.45 | $472,031.54 | $39,335.96 |
| Lease Year 4 | $79.77 | $486,192.49 | $40,516.04 |
| Lease Year 5 | $82.16 | $500,778.26 | $41,731.52 |
| Lease Year 6 | $84.63 | $515,801.61 | $42,983.47 |
| Lease Year 7 | $87.17 | $531,275.66 | $44,272.97 |
| Lease Year 8 | $89.78 | $547,213.93 | $45,601.16 |
| Lease Year 9 | $92.47 | $563,630.35 | $46,969.20 |
| Lease Year 10 | $95.25 | $580,539.26 | $48,378.27 |

49302/0801
ELL/536444.3

## EXHIBIT O
### Tenant's Competitors

1. Regus/Spaces
2. Knotel
3. Industrious
4. Breather
5. Mindspace

49302/0801
ELL/536444.3

# EXHIBIT P

## Janitorial Services

*Scope of Work / Specifications*

### JANITORIAL   SPECIFICATIONS

### Cleaning Specifications for and 180 Sansome Street, San Francisco

A.  **General Office Area, Lobbies, Elevator Lobbies, Corridors and Copy Rooms Specifications:**

   1.  Nightly Services (Monday to Friday):

     a)   Check Janitorial Log for notes from Property Manager

     b)   Empty all waste paper baskets and other trash, recycle and compost containers (replace liners) including, but not limited to, those in cubicles areas, offices, conference rooms, kitchens, coffee areas, copy rooms, bathrooms, etc.

     c)   Remove all recycling as required to designated areas outside of building. Township shall participate in any building recycling programs as they may change over the life of the contract.

     d)   Dust mop all resilient and composition floors with microfiber flat mops. Damp mop to remove spills and stains as required including, but not limited to, those in bathrooms, kitchens, coffee rooms, copy rooms, lobby areas, eating areas, etc.

     e)   Return chairs and waste baskets to the proper positions including, but not limited to, those in cubicles, lobby seating areas, eating areas, informal (non-enclosed) meeting areas, conference rooms and enclosed offices.

     f)  Clean, sanitize and polish drinking fountains.

     g)   Dust all desks and other furniture tops that are free of paper, files, pictures, etc. Do not touch computers, telephones, or other electronic devices. Dusting to arms length is acceptable.

     h)   Spot clean all carpets to remove obvious stains and spills. If spot can not be removed by spray and blotting then it should be reported to building foreman for further corrective action.

     i) 3x per week vacuum occupied tenant suites. Vacuum all carpets and rugs in all areas including, main traffic areas, conference rooms, private offices, and walk off mats.

     j) 5x per week Vacuum all lobbies, elevator cabs, and common area hallways.

     k)   Janitorial supervisor will report any problems noted with the building to the Property Manager.

     l)  Secure all lights and doors, set alarm if applicable.

Note: Janitorial services will not be provided to locked interior offices. Janitors and Management do not keep keys for Tenant's interior offices.

49302/0801
ELL/536444.3

# 300 PROSPECT PROPERTIES, INC.
### 100 BUSH STREET, SUITE 218
### SAN FRANCISCO, CALIFORNIA 94104

TEL: (415) 986-8880     FAX: (415) 986-8846

July 26, 2019

180 Sansome Street Tenant LLC
c/o WeWork Companies Inc.
115 West 18th Street, 2nd Floor
New York, NY 10011
Attn: Lease Administration

180 Sansome Street Tenant LLC
c/o WeWork Companies Inc.
115 West 18th Street, 2nd Floor
New York, NY 10011
Attn: Legal Department

With Copy to:
Corporation Service Company DBA CSC-Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95833-3505

### RE: Construction Noise

Dear Tenant:

Reference is made to that 180 Sansome Street Office Lease dated November 29, 2018 (the "Lease") between 300 Prospect Properties, Inc. ("Landlord"), and 180 Sansome Street Tenant LLC ("Tenant"), pursuant to which Tenant leases certain premises from Landlord (the "Premises") in the building located at 180 Sansome Street, San Francisco, California (the "Building"). Capitalized terms used but not defined in this letter have the meanings given to such terms in the Lease.

Section 8C of the Lease provides that, in making alterations to the Premises, Landlord may restrict the times in which Tenant conducts the following work: "(i) shooting of studs for mechanical fastenings;…(iv) core drilling; (v) penetration of floors or ceilings; and (vi) any work that can be heard outside of the Premises which Landlord reasonably believes will interfere with the quiet enjoyment of other tenants or as to which Landlord receives [sic] or more reasonable complaints from other tenants in the Building".

Tenant is currently constructing its initial alterations in the Premises pursuant to the Lease and the Work Letter Agreement attached as Exhibit B to the Lease. As a result of construction noise caused by Tenant or its contractors in the Premises, Landlord has received numerous complaints from its tenth floor tenant in the Building over a period from May 16, 2019 through the present. The complaints have indicated Tenant or its contractors are engaged in activities including drilling, grinding, moving heavy equipment, and loud banging during the Building's Business Hours (defined in the Lease as 8 a.m. to 6 p.m. Monday through Friday, except specified holidays).

Because the activities of Tenant or its contractors have involved drilling and other work which has been heard outside of the Premises and which Landlord reasonably believes is interfering with other tenants' quiet enjoyment of their premises, and Landlord has in fact received numerous complaints, Landlord has instructed Tenant to conduct those activities outside of the Building's Business Hours. Tenant and its contractors have failed on numerous occasions to comply with these instructions, constituting a pattern of disregard for the requirements of the Lease. On multiple occasions, Tenant's construction superintendent has argued that the noise at

issue is within "commercially reasonable standards". Landlord disputes this assertion given the nature of the noise its tenant has complained about, as witnessed by Landlord's representatives, but that argument is not relevant because the relevant provision of the Lease, cited above, does not turn on whether the applicable construction noise is within commercially reasonable standards. Instead, it turns on whether Tenant or its contractors are generating noise that can be heard outside of the Premises which Landlord reasonably believes will interfere with the quiet enjoyment of other tenants, or as to which Landlord receives reasonable complaints from other tenants in the Building.

Tenant or its contractor is generating noise which can be heard outside the Premises, and Landlord reasonably believes it is interfering with other tenants' quiet enjoyment of their premises, and has exercised its right to cause Tenant to conduct those activities after Business Hours. Tenant has repeatedly failed to conduct those activities after hours in accordance with Landlord's instructions. Therefore, Tenant is in default under the Lease. Landlord's tenth floor tenant has threatened to bring legal action against Landlord as a result of Tenant's construction noise. In the event such legal action occurs, Landlord may seek defense and indemnity from Tenant under Section 12A of the Lease, which requires Tenant to indemnify, defend, and hold Landlord harmless from and against any and all claims, demands, liabilities, damages, and other matters caused by Tenant's and its employees' and contractors' violation of the Lease. In addition, Landlord reserves all other rights and remedies under the Lease or at law or in equity with respect to Tenant's breach of the Lease.

Regards,
*300 Prospect Properties, Inc.*

Helen Liu
*Operations Manager*

c. Thomas Tin
   Brad Van Blois
   Arash Gohari
   Chris Grimaldi
   Brad S. Thomas

2

# LOGAN MOONEY LLP

100 PINE STREET
SUITE 1250
SAN FRANCISCO, CA 94111
Tel: 415/738.0758   Fax: 415/376.0956

WILLIAM A. LOGAN, JR.
wlogan@loganmooneyllp.com

August 22, 2019

**VIA FEDERAL EXPRESS**

Brad S. Thomas
WeWork
Salesforce Tower
415 Mission Street, Floor 37
San Francisco, CA 94105

Re:   180 Sansome Street – WeWork Construction Noise

Dear Mr. Thomas:

We have been retained by 300 Prospect Properties, Inc. ("Prospect Properties") in connection with WeWork's construction of tenant improvements at 180 Sansome Street and WeWork's failure to abide by the construction noise and other requirements set forth in its lease with Prospect Properties dated November 29, 2018 ("the Lease"). We write specifically in response to your letter dated August 2, 2019.

Your position that WeWork has "fully complied with its obligations under its Lease in relation to its construction of tenant improvements and, specifically, with regard to its noise generating activities" is flatly contradicted by the numerous complaints Prospect Properties has received from Climate Policy Initiative ("CPI"), the tenant located on the 10th Floor of 180 Sansome Street, regarding WeWork's construction work in the building. Contrary to the assertion in your letter, the Lease does not grant WeWork the right to perform, during business hours, construction work that "is typical and customary in commercial tenant improvement

# LOGAN MOONEY L.L.P

Brad S. Thomas
August 22, 2019
Page 2

projects performed in multi-tenanted buildings."  Rather, the Lease specifically proscribes the type of construction activity that can take place during normal business hours (8 am to 6 pm, Monday through Friday).  During those hours, WeWork cannot do the following: "(i) shooting of studs for mechanical fastenings; ... (iv) core drilling; (v) penetration of floors or ceilings; and (vi) any work that can be heard outside of the Premises which *Landlord reasonably believes* will interfere with the quiet enjoyment of other tenants *or* as to which Landlord receives [sic] or more reasonable complaints from other tenants in the Building."  Lease, ¶ 8.C (emphasis added).

CPI has reported to Prospect Properties numerous instances of excessive noise interfering with CPI's ability to perform work in their leased space during normal business hours, which complaints Prospect Properties immediately reported to WeWork.  CPI's noise complaints include the following specific construction activities barred by paragraph 8.C of the Lease, which complaints were made on different dates regarding WeWork's construction activities during normal business hours: "drilling through cement or grinding on an adjacent floor", "grinding or drilling above us", "drilling was so loud that our staff had to cancel call with clients", "drilling has now stopped in floors above us, but it would now appear that the trades are moving in heavy equipment which is making as much noise as the drilling was", "[d]rilling has resumed again", "drilling has just started up again", "[t]here are workers in our unit preforming some loud work. We were never given noticed that they would enter our office", "[t]hey are still doing construction in our phone room in our unit. This work is not approved during work hours", "constant noise and drilling all day", "[d]rilling has just started now", "I can confirm drilling is still on right now", "drilling has resumed above us", and "workers broke through the bathroom room floor. Someone could have been severely injured" with attached photograph of ruptured

# LOGAN MOONEY L.L.P.

Brad S. Thomas
August 22, 2019
Page 3

bathroom tile in CPI's premises.[1]  CPI's numerous noise complaints are documented in writings made contemporaneous with the events they describe.  Representatives of Prospect Properties visited the building after receiving CPI's complaints and witnessed the work WeWork contractors were performing and their generation of excessive construction noise that, in Prospect Properties' opinion, constituted an interference with CPI's quiet enjoyment of their leased premises.  Thus, it is beyond any reasonable dispute that WeWork is in breach of paragraph 8 of the Lease.

With respect to your cursory assertion that WeWork has "video recordings of its activities in the space" that it contends shows WeWork's "full compliance with the Lease", those video recordings are obviously of no probative value unless they document WeWork's construction activities at the exact time CPI complained of excessive construction noise.  From what we know of WeWork's video recordings, they were made *after* Prospect Properties notified WeWork of a specific noise complaint by CPI and show no activities during the relevant time periods, *i.e.*, work being performed at the time CPI lodged a noise complaint.  If WeWork has video recordings of its activities in the entire construction space that were made at the same time CPI complained of loud construction noises, please forward them to us for our review.

The only defense offered in your letter regarding WeWork's construction activities in violation of paragraph 8 of the Lease is an attack on CPI and its supposed lack of sophistication, with you characterizing CPI as having "little experience with, and unrealistic expectations about, what is reasonable in this context, which have led to their unreasonable complaints."  No facts are provided to support this conclusion.  More importantly, it ignores the governing legal standard.  The covenant of quiet enjoyment insulates CPI and the other tenants at 180 Sansome

---

[1] There are numerous additional complaints about loud and excessive noise as well as the interference with CPI's ability to work in their premises due to WeWork's construction activity, which additional complaints are not set forth herein.

# LOGAN MOONEY LLP

Brad S. Thomas
August 22, 2019
Page 4

Street from any act that interferes with their right "to use and enjoy the premises *for the purposes contemplated by the tenancy*." *Andrews v. Mobile Aire Estates* (2005) 125 Cal.App.4th 578, 589 (emphasis added). CPI is a climate think tank, performing research and analysis on land use policies around the world (*see* https://en.wikipedia.org/wiki/Climate_Policy_Initiative). Prospect Properties is of the opinion that given the noise and disruption to date generated by WeWork's construction, CPI has a valid argument that it is being deprived of the right to use and enjoy their leased premises for their primary function, *i.e.*, research activities.

Your dismissal of CPI's complaints—both their veracity and their reasonableness—without any factual or legal support demonstrate a troubling pattern. The pattern includes WeWork performing whatever construction work it wants, whenever it wants. It also includes your claim that WeWork's proposed actions to accommodate CPI "will result in project delays and additional project costs, for which WeWork reserves its right to seek recovery from the Landlord under the Lease." WeWork's delays in connection with the tenant improvements are of its own making. For example, WeWork was required to submit its initial plans for the tenant improvements to Prospect Properties within thirty days of November 29, 2018, the date the Lease was signed. WeWork submitted its initial permit sets for the leased premises on February 27, 2019 (after repeated inquiries by Prospect Properties), and submitted its revised plans on April 16, 2019. WeWork did not get its permits approved by the San Francisco Department of Building Inspection until May 23, 2019, nearly six months after delivery of the premises on January 1, 2019. It appears to us that WeWork has been severely behind schedule from the very beginning and is now attempting to make up time by performing prohibited construction work during normal business hours in contravention of its duties under the Lease. Moreover, Prospect Properties is not liable for WeWork's construction delays in any event. *See* Lease, ¶ 12.

# LOGAN MOONEY LLP

Brad S. Thomas
August 22, 2019
Page 5

We further note that your representation that WeWork "has rescheduled its current work on Floor 11 from normal business hours to after hours and the weekend in response to your request and to minimize any impact on" CPI has already been disregarded by WeWork. Its construction activities on the 11th floor continued after August 2nd, including drilling, hammering and other loud noises that generated noise complaints by CPI after August 2nd, which have been communicated to WeWork.

Prospect Properties is concerned about potential legal action by CPI if WeWork continues its tenant improvements in a manner inconsistent with its obligations under the Lease. In addition, since your August 2nd letter, there have been additional complaints by other tenants, which have been communicated by Prospect Properties to WeWork. It is in both parties' interest to ensure that litigation is not commenced and that WeWork's interference with Prospect Properties' relationships with its existing tenants comes to an end. Accordingly, Prospect Properties proposes the following: (1) in recognition of the disturbances to CPI's tenancy to date, no construction work will be performed on the 11th floor during normal business hours (Monday through Friday, 8:00 am to 6:00 pm); (2) to the greatest extent possible, WeWork will commence construction work at 5:00 am on weekdays; (3) WeWork will ensure that all work moving forward complies with the Lease; (4) WeWork will prepare a noise mitigation plan to govern construction activities moving forward, which will include how WeWork will reduce the impact of noise and related vibrations through specific strategies like using muffling equipment, and a process for WeWork to quickly and effectively respond to noise or other construction complaints by the tenants at 180 Sansome Street, such as providing direct text message access to the on-site construction manager who will immediately respond to all noise or other construction complaints received from a tenant; and (5) WeWork will ensure that the following construction work will not be performed in the building between the hours 8:30 a.m. to 6:00 p.m. (Monday – Friday): shooting of studs for mechanical fastenings; installations of any vertical support; testing of fire

# LOGAN MOONEY LLP

Brad S. Thomas
August 22, 2019
Page 6

alarms (except in the event of an emergency), core drilling; penetration or floors or ceilings; and any work that can be heard outside of the Premises which Prospect Properties reasonably believes will interfere with the quiet enjoyment of other tenants or as to which Prospect Properties receives one or more reasonable complaints from other tenants in the Building.  Please let us know as soon as possible WeWork's position on these remedial steps, and further ideas on how the damage done to date can be mitigated and how future breaches of the Lease can be avoided.

Notwithstanding our efforts to reach a mutually acceptable resolution of the issues addressed in this letter, Prospect Properties necessarily reserves all of its rights and remedies under the Lease.

Very truly yours,

William A. Logan, Jr.

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:**    **FEB-26-2020**

**TIME:**    **10:30AM**

**PLACE:**    **Department 610**
              **400 McAllister Street**
              **San Francisco, CA  94102-3680**

All parties must appear and comply with Local Rule 3.

---

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.  However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 610 twenty-five (25) days before the case management conference.

---

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.  **This case is eligible for electronic filing and service per Local Rule 2.11.  For more information, please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

## ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

---

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION,  AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

(SEE LOCAL RULE 4)

---

Plaintiff **must** serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint.  (CRC 3.221.) The ADR package may be accessed at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution or you may request a paper copy from the filing clerk.  All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400  McAllister Street, Room 103-A**
**San Francisco, CA  94102**
**(415) 551-3869**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

WILLIAM A. LOGAN, JR. (BAR NO. 115042)
LAURA M. MOONEY (BAR NO. 203692)
**LOGAN MOONEY LLP**
100 Pine St., Suite 1250
San Francisco, CA 94111

Tel:  (415) 738-0758
Fax: (415) 376-0956
E-mail: wlogan@loganmooneyllp.com

Attorneys for Plaintiff
300 Prospect Properties, Inc.,
a California Corporation

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**09/25/2019**
**Clerk of the Court**
BY: VANESSA WU
Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

## UNLIMITED JURISDICTION

|  |  |
|---|---|
| 300 PROSPECT PROPERTIES, INC., a California Corporation;<br><br>Plaintiff,<br><br>v.<br><br>180 SANSOME STREET TENANT LLC, a New York limited liability company; WEWORK COMPANIES, INC., a Delaware corporation, and DOES 1-50, inclusive,<br><br>Defendants. | Case No: CGC-19-579504<br><br>**EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>**Date**:  September 26, 2019<br>**Time**:  11:00 a.m.<br>**Location**: Dept. 302<br>**Judge**: The Honorable Ethan Schulman<br><br>**Date Action Filed**: September 24, 2019 |

Plaintiff 300 Prospect Properties, Inc. ("Plaintiff") applies, *ex parte*, for a temporary restraining order restraining defendants 180 Sansome Street Tenant, LLC and WeWork Companies, Inc., and their employees, agents and servants from further violations of the parties' lease in performing construction activities during normal business hours that are barred by the lease, to wit, shooting of studs for mechanical fastenings; installations of any vertical support; testing of fire alarms (except in the event of an emergency), core drilling; penetration of floors or ceilings; and any work that can be heard outside of the leased premises which Plaintiff landlord reasonably believes

will interfere with the quiet enjoyment of other tenants or as to which Plaintiff receives one or more reasonable complaints from other tenants in the Building.  Plaintiff also applies for an order to show cause why a preliminary injunction should not be granted enjoining defendants and their agents, servants, and employees, from committing the above described acts during the pendency of this action.  This application is made on the grounds set forth in Code of Civil Procedure §§ 526(a)(1)-(6) and on the further ground that great or irreparable injury will result to Plaintiff before the matter can be heard on notice.  Plaintiff filed this action on September 24, 2019, and has not previously applied to any judicial officer for any of the relief sought herein.

Plaintiff's counsel gave notice of the ex parte application to defendants on September 24, 2019, at 6:40 p.m., in compliance with Rules 3.1230 and 3.1204 of the California Rules of Court. Logan Decl. Re Notice, ¶¶ 2-4, Ex. A.  Plaintiff's counsel has not been advised of any outside counsel for Defendants.  However, the lease at issue provides that Plaintiff is to deliver notices to the WeWork Legal Department at 115 West 18th Street, 2nd Floor, New York, New York.  Accordingly, notice of the instant ex parte application was given via e-mail to the following individuals who are reported as both in-house counsel for WeWork and representatives for the defendants:

| | |
|---|---|
| Jared DeMatteis, Esq.<br>General Counsel<br>WeWork<br>115 W 18th Street<br>New York, New York  10011-4113<br>jared@wework.com<br>(646) 893-3020 | Pamela Swindler, Esq.<br>Head of Real Estate Transactions<br>and Special Counsel<br>WeWork<br>115 W 18th Street<br>New York, New York  10011-4113<br>pam.swidler@wework.com,<br>pamela.swidler@wework.com<br>(203) 536-1815 |
| Peter A. Greenspan, Esq.<br>Assistant Secretary<br>180 Sansome Street Tenant LLC<br>115 W 18th Street<br>New York, New York  10011-4113<br>pgreenspan@wework.com<br>(212) 202-3406 | Brad S. Thomas, Esq.<br>Transaction Manager and Special<br>Counsel<br>WeWork<br>415 Mission Street<br>San Francisco, CA  94105<br>brad.thomas3@wework.com<br>(877) 796-2434 |

| | |
|---|---|
| Jennifer C. Berrent, Esq.<br>Chief Operating Officer, Chief Legal<br>Officer and Secretary<br>WeWork<br>115 W 18th Street<br>New York, New York  10011-4113<br>Jennifer.berrent@wework.com<br>jberrent@wework.com | |

See Logan Decl. Re Notice, ¶ 3.

This Application will be based upon the instant application, the complaint filed in this action, the accompanying memorandum of points and authorities submitted herewith, the declarations of Helen Liu, Doug Davies, Diego Hernandez and William A. Logan, Jr., submitted herewith, and such other and further matters as the court may deem appropriate.

Dated: September 25, 2019

LOGAN MOONEY LLP

By: _____

William A. Logan, Jr.

Attorneys for Plaintiff
300 Prospect Properties, Inc.

1   WILLIAM A. LOGAN, JR. (BAR NO. 115042)
    LAURA M. MOONEY (BAR NO. 203692)
2   **LOGAN MOONEY LLP**
    100 Pine St., Suite 1250
3   San Francisco, CA 94111

4   Tel:  (415) 738-0758
    Fax: (415) 376-0956
5   E-mail: wlogan@loganmooneyllp.com

6   Attorneys for Plaintiff
    300 Prospect Properties, Inc.,
7   a California Corporation

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**09/25/2019**
**Clerk of the Court**
BY: VANESSA WU
Deputy Clerk

8           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                    **COUNTY OF SAN FRANCISCO**

10                      **UNLIMITED JURISDICTION**

11

12   300 PROSPECT PROPERTIES, INC., a
     California Corporation;

13                                   Plaintiff,

14          v.

15   180 SANSOME STREET TENANT LLC, a New
     York limited liability company; WEWORK
16   COMPANIES, INC., a Delaware corporation, and
     DOES 1-50, inclusive,
17
                                     Defendants.
18

19

20

Case No: CGC-19-579504

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
*EX PARTE* APPLICATION FOR
TEMPORARY RESTRAINING
ORDER AND ORDER TO SHOW
CAUSE RE PRELIMINARY
INJUNCTION**

**Date**:  September 26, 2019
**Time**:  11:00 a.m.
**Location**: Dept. 302
**Judge**: The Honorable Ethan Schulman

**Date Action Filed**: September 24, 2019

21   **I.     RELIEF SOUGHT**

22          Plaintiff is the landlord of a commercial building located at 180 Sansome Street, San

23   Francisco ("the Building").  Defendant 180 Sansome Street Tenant, LLC ("Defendant WeWork") is

24   Plaintiff's tenant and is currently performing tenant improvements to its leased premises, which

25   consist of Floors 2-4, 6-7, 9, 11-12 and 14-18 ("the Premises").  To avoid unreasonable disruptions to

26   the other tenants in the Building, the parties' lease provided that Plaintiff could restrict the times in

27   which Defendant WeWork conducts certain types of work; specifically, work that involves core

28

drilling, the penetration of floors or ceilings, and "any work that can be heard outside of the Premises which [Plaintiff] Landlord reasonably believes will interfere with the quiet enjoyment of other tenants or as to which Landlord receives [one] or more reasonable complaints from other tenants in the Building." Declaration of Helen Liu, ¶¶ 5-6. Plaintiff directed Defendant WeWork that this type of construction work was not to be performed during normal business hours, *i.e.*, Monday through Friday, from 8:00 a.m. to 6:00 p.m. *Id.* ¶¶ 7-8.

Since beginning its tenant improvements in May, 2019, Defendant WeWork has repeatedly violated the Lease by performing barred construction activity during normal business hours. As the tenant complaints increased, and Defendant WeWork fell further behind schedule, it has become more intransigent. Defendant WeWork performing barred construction activity during business hours is now becoming the norm in the Building, and the other tenants are threatening legal action. Having no other recourse, Plaintiff seeks a temporary restraining order directing defendants to do what they agreed to do in the Lease—not perform any of the barred construction activities during normal business hours—pending a hearing on whether a preliminary injunction should issue.

## II.    FACTS

Plaintiff and Defendant WeWork executed a lease for the Premises on November 29, 2018 ("the Lease"). Liu Decl., ¶ 3.[1] Major tenant improvements to the many floors leased by Defendant WeWork were contemplated at the time the Lease was executed, and WeWork's obligations in connection with making those improvements were set forth in the Lease. *Id.*, ¶ 5 and Lease, Ex. B. Paragraph 8.C. of the Lease authorizes Plaintiff to restrict the times in which Defendant WeWork can perform the following type of construction activity in connection with the tenant improvements:

> "All such work [by Defendant WeWork] will be performed in a first class manner causing no interference with the operation of the Building and no unreasonable noise, odors or inconvenience to Landlord or the other tenants of the Building; provided, however, Landlord acknowledges and agrees that ***Tenant may perform all work at all times (i.e. 24 hours a day, 7 days a week) except the following types of work: (i) shooting of studs for mechanical fastenings***; (ii) installations of any vertical support; (iii) testing of fire alarms (except in the event of an emergency) ***(iv) core drilling; (v) penetration or floors or ceilings; and (vi) any work that can be heard outside of the***

---

[1] Co-defendant WeWork Companies, Inc. "absolutely, unconditionally and irrevocably guarantee[d]" to Plaintiff "the full and prompt performance and observance of all of the obligations of [Defendant WeWork] under the Lease." *Id.*, and Compl., Ex. A (Lease, Ex. D, ¶¶ 1-2).

*Premises which Landlord reasonably believes will interfere with the quiet enjoyment of other tenants or as to which Landlord receives [sic] or more reasonable complaints from other tenants in the Building.*"

Liu Decl., ¶¶ 5-6 (Lease, ¶ 8.C (emphasis added); and Lease, Ex. B, ¶ 3 (WeWork obligated to ensure that its construction crews comply with all requirements in the Lease).

Despite Plaintiff's direction that Defendant WeWork was not to perform the work specified in Paragraph 8.C. during normal business hours, Defendant WeWork has consistently done so since beginning construction in May, 2019. *Id., ¶¶* 8-10. The first complaint about excessive construction noise was lodged almost immediately by Plaintiff's tenant on the 10th Floor, Climate Policy Initiative ("CPI"). CPI's complaints have continued through the filing date of this action, and they include numerous instances of construction activities specifically barred by Paragraph 8.C. The following are examples, all of which complaints were made on different dates, during normal business hours:

- "drilling through cement or grinding on an adjacent floor",
- "grinding or drilling above us",
- "drilling was so loud that our staff had to cancel call with clients",
- "drilling has now stopped in floors above us, but it would now appear that the trades are moving in heavy equipment which is making as much noise as the drilling was",
- "[d]rilling has resumed again", "drilling has just started up again",
- "[t]here are workers in our unit preforming some loud work. We were never given noticed that they would enter our office", "[t]hey are still doing construction in our phone room in our unit. This work is not approved during work hours",
- "constant noise and drilling all day",
- "[d]rilling has just started now",
- "I can confirm drilling is still on right now",
- "drilling has resumed above us",
- "Drilling is still going on. As I mentioned a few times, we have high level executive meetings this week. The noise is really disruptive",
- "The drilling and hammering has started up again this morning",

3

- "Drilling has commenced once again above us",

- "Drilling above us has started up again",

- "Just 5 minutes ago the drilling above us commenced and caused us to terminate our executive team meeting because of the sound",

- "workers broke through the bathroom room floor", and

- "the construction team broke through our floor again."[2]

Liu Decl., ¶¶ 8-11, Ex. A, pages 2, 8, 11, 13, 14, 15, 17, 19, 22, 24, 28, 29, 31, 32, 33, 34, and 38.

Plaintiff's tenant on the 8th Floor, INSEEC, is a private French school that was in recess during the 2019 summer months.  In August, 2019, INSEEC expressed concerns to Plaintiff regarding the noise generated by Defendant WeWork's construction activities in the Building and potential interference with INSEEC's business once classes resumed in early September, 2019.  *Id.*, ¶ 17.  Despite Plaintiff's best efforts to ensure no disruption would take place, Defendant WeWork continued to engage in prohibited construction activities during normal business hours during the week of September 9, generating complaints from INSEEC, including drilling noise that interfered with INSEEC's classes.  *Id.*, Ex. D.

Plaintiff immediately communicated each tenant complaint of excessive noise to Defendant WeWork.  Plaintiff independently investigated those complaints, and its personnel have verified numerous instances where Defendant WeWork was performing barred construction activity during normal business hours.  On many occasions, Plaintiff has directed Defendant WeWork to cease the offending activity, only to see the offending conduct resume.  Liu Decl., ¶¶ 12-13; Declaration of Doug Davies, ¶¶ 2-4.  It is Plaintiff's conclusion that the noise complaints are reasonable and that the noises heard outside of the WeWork Premises constituted an unreasonable interference with the other tenants' quiet enjoyment of their leased spaces.  Plaintiff has communicated this conclusion to defendant WeWork on numerous occasions.  Liu Decl., ¶¶ 14-15, Exs. A, B, D; Logan Decl., Ex. A.

WeWork's response to the repeated and continuous complaints of excessive noise caused by its barred construction activity during normal business hours has been to merely pay lip service to its

---

[2] Plaintiff received numerous other complaints about loud and excessive noise as well as interference with CPI's ability to work in their premises due to WeWork's construction activity.  Liu Decl., *id.*

1  Lease obligations and continue with its offending construction activities.  Liu Decl., ¶ 12, Exs. A, C,

2  D; Davies Decl., ¶¶ 2-4; Decl. of Diego Hernandez, ¶ 3, 9-11.  To document the level of construction

3  noise generated by Defendant WeWork, Plaintiff recently retained a noise consultant to record sound

4  levels on the 10th Floor in response to a noise complaint by CPI on September 17, 2019.  The

5  consultant documented that Defendant WeWork generated significant, continuous construction noise

6  that could be heard on the 10th Floor and that interfered with the ability to conduct normal office

7  work, including interference with speech communication.  Having heard and recorded the noise

8  generated by Defendant WeWork, the consultant stated that the noise was "likely objectionable to

9  most people[.]"  Hernandez Decl., ¶¶ 1-11.

10  Undoubtedly, a large part of the problem stems from (1) Defendant WeWork being

11  significantly behind schedule on the tenant improvements and (2) refusing to perform noisy

12  construction activities after normal business hours due to its own budgetary reasons.  *See* Liu Decl.,

13  ¶ 18-20; Davies Decl., ¶ 4.  WeWork exacerbated an already tense situation in the Building when, on

14  August 15, 2019, one of its subcontractors broke a sprinkler head and flooded the Buildings' three

15  elevators.  As of the filing date of the Complaint, there is only one operable elevator in the Building,

16  which must service all of the other tenants, their employees and visitors.  Liu Decl., ¶ 19.  Add to this

17  WeWork's intent to make a public offering (Logan Decl., Ex. B), and it can be seen that the pressure

18  on defendants to quickly complete their tenant improvements on a compressed schedule has become

19  extreme.  Defendant WeWork cannot do so, however, by performing barred construction activity

20  during normal business hours.  Because defendants have refused all reasonable efforts to bring them

21  into compliance with the Lease, Plaintiffs seek this Court's intervention.

22  **III.  ARGUMENT**

23  **A.  Plaintiff Is Highly Likely to Succeed on the Merits**

24  The Lease grants Plaintiff the right to restrict specific construction activities during normal

25  business hours, as it has done, and there can be no reasonable dispute that WeWork has breached the

26  Lease in this respect.  The documentation of the pervasive noise complaints caused by WeWork is

27  voluminous and persuasive.  Liu Decl., ¶¶ 8-17, Exs. A, D; Davies Decl., ¶ 2-4; Hernandez Decl.,

28

¶¶ 3-11.  Defendant WeWork's on-site employees have admitted there had been violations of the construction activity ban, even if they also sometimes attempted to minimize those breaches.  Liu Decl., Ex. A ("We have shared the noise restrictions with each subcontractor at our kick off meetings and we will continue to stay on top of it. Sorry for the inconvenience here"; "As discussed we are on it. Looks like the sprinkler installer drilled a bit past 8:30 and we will make sure it does not happen again"; "We continue to ask our trade partners to be cognizant of the tenants and they are but I foresee two more weeks of active construction and additional complaints"; I am investigating [drilling/noise complaint] now and we will mitigate this for the remainder of the day"; "We went and checked this out. By the time we received the complaint, the floor was cleared out").

On countless occasions, Plaintiff has directed Defendant WeWork to comply with its obligations under the Lease and to refrain from engaging in prohibited construction activities during business hours.  But after months of fruitless efforts, Defendant WeWork has shown that it has no intention of ensuring that its construction crews abide by the Lease.  Plaintiff provides this one typical example: on July 26, 2019, Plaintiff delivered a letter to Defendant WeWork detailing its construction activities in violation of the Lease.  Defendant WeWork responded by letter dated August 2, 2019, in which it, *inter alia*, agreed to "reschedule its current work on Floor 11 from normal business hours to after hours and the weekends in response to your request and to minimize any impact on the 10th floor tenant."  Liu Decl., ¶¶15-16, Exs. B-C.  Despite Defendant WeWork's representation in its August 2nd letter, Defendant WeWork continued to perform work on Floor 11 during normal business hours that generated noise complaints from CPI after August 2, 2019, including a complaint of "the usual drilling/hammering" on August 5, 2019.  *Id*., Ex. A, p. 27.

Although Defendant WeWork may have no consideration for the other tenants in the building, Plaintiff does not have the luxury of disregarding their valid and repeated noise complaints.  Plaintiff submits the evidence is overwhelming that Defendant WeWork has repeatedly violated the construction activity ban in the Lease, and that Plaintiff reasonably exercised its discretion under the Lease to: (1) determine the other tenants' noise complaints were legitimate; and (2) that Defendant WeWork was wrongfully interfering with those tenants' use and enjoyment of their premises.  Thus,

Plaintiff has established a likelihood that it will succeed on the merits.  Code Civ. Proc. § 526(a)(1); *Weingand v. Atlantic Sav. & Loan Assn.* (1970) 1 Cal.3d 806, 820.

**B.      Equitable Relief Enjoining Defendants from Performing Barred Construction Activity during Normal Business Hours Is Appropriate and Necessary to Protect Plaintiff's Rights and Avoid Irreparable Injury**

Temporary restraining orders may be granted *ex parte* if it appears that great or irreparable injury would result to the applicant before the matter could be heard on notice.  Code Civ. Proc. § 527(c)(1).  Irreparable injury includes wrongs of a repeated and continuing character or ones that cause damages estimable only by conjecture and not by an accurate measure.  *Wind v. Herbert* (1960) 186 Cal.App.2d 276, 285.  In the context of the landlord-tenant relationship, injunctive relief is appropriate to enjoin a tenant's unauthorized and forbidden act under the lease and to compel the tenant to perform as required under the lease.  The landlord is entitled to performance, not dollars for lack of performance.  *Harmon v. De Turk* (1917) 176 Cal. 758, 761-762; *Associated Oil Co. v. Myers* (1933) 217 Cal. 297, 305; *General Petroleum Corp. of California v. Loughead* (1933) 218 Cal. 554, 555-556.  So, too, injunctive relief is necessary here to compel defendants to perform under the Lease.  Defendants are the only parties with the direct legal right to control the construction activities by their employees, subcontractors and agents so as to ensure compliance with the Lease.

In addition, defendants have further violated Plaintiff's rights by usurping to their own use Plaintiff's contractual right under Paragraph 8.C. of the Lease to determine the specific types of construction work that can be performed by Defendant WeWork during normal business hours.  While some of the damage to Plaintiff might theoretically be measured in a monetary amount—such as the amounts the other tenants might seek from Plaintiff in lawsuits to enforce their leasehold rights—those monetary amounts do not remedy the fundamental wrong of depriving Plaintiff of its rights under Paragraph 8.C of the Lease.  Restoring that right can be accomplished only through the Court's traditional exercise of its equity jurisdiction.  *Kellogg v. King* (1896) 114 Cal. 378, 387 (injunction should issue to restrain defendants from entering plaintiff's land and destroying his game preserve by shooting the wild game thereon; while value of game destroyed could be estimated in dollars, that was not the actual injury to plaintiff, whose injury was the destruction of the privilege to

1    hunt itself).  As explained by the Court in *Wind v. Herbert* (1960) 186 Cal.App.2d 276, 285 (internal

2    quotations, ellipses and citations omitted, emphasis in original):

> 3    "The concept of 'irreparable injury' which authorizes the interposition of a court of
> equity by way of injunction does not concern itself entirely with injury beyond the
> 4    possibility of repair or beyond possible compensation in damages. . . [T]he equitable
> rule as stated by the Supreme Court in Anderson v. Souza, 38 Cal.2d 825, 828 [] is
> 5    that: The term 'irreparable injury' means that species of damages *whether great or
> small, that ought not to be submitted to on the one hand or inflicted on the other*.  The
> 6    argument that there is no 'irreparable damage,' would not be so often used by
> wrongdoers if they would take the trouble to observe that the word 'irreparable' is a
> 7    very unhappily chosen one, used in expressing the rule that an injunction may issue to
> prevent wrongs of a repeated and continuing character, or which occasion damages
> 8    estimable only by conjecture and not by any accurate standard."

9         Defendants' conduct in violation of its Lease has been repeated and continuing, and it has

10   exposed Plaintiff to legal and other possible adverse actions from the other tenants in the Building.  It

11   would not be possible for Plaintiff to determine the precise amount of damages it will suffer if

12   defendants' conduct is not restrained, given that some of the damage inflicted is being suffered by

13   other tenants in the Building (which tenants may seek recovery from Plaintiff).  In addition, Plaintiff

14   has suffered damage to its reputation and goodwill, given Plaintiff's inability to date, despite its best

15   efforts, to compel defendants to comply with their Lease obligations.  Liu Decl., ¶¶ 11, 17, 20, Ex. A,

16   D.  The Court should restrain defendants from further damaging Plaintiff's reputation and good will

17   with its other tenants.

18        **C.     A Balancing of the Equities Strongly Weighs in Plaintiff's Favor**

19        Without entry of a temporary restraining order and an order to show cause, Plaintiff will be

20   left with an inadequate and incomplete remedy.  A damage award, entered months if not years from

21   now, will not restore to Plaintiff what defendants have taken, *i.e.*, the right to determine when specific

22   construction activities in Paragraph 8.C. can be performed by Defendant WeWork.  Without

23   provisional relief, defendants will be emboldened to continue performing barred construction

24   activities during normal business hours.  Not only will this deprive Plaintiff of its rights under the

25   Lease, it will continue to harm the other tenants in the Building.  Plaintiff has been forced to expend

26   an extraordinary amount of resources and staff time in its attempts to police defendant WeWork's

27   construction activities in the Building.  Liu Decl., ¶ 20.  If defendants are not restrained, Plaintiff will

28

1   continue to suffer that increased burden on its business operations, despite the parties' agreement in

2   the Lease that it was Plaintiff's right to restrict the time and dates when certain construction activities

3   could be performed in the Premises.

4       There is no equity in condoning Defendant WeWork's violations of the Lease.  Rather, the

5   equities demand that defendants be ordered to comply with their lease obligations, especially where

6   the only "harm" defendants could possibly claim here is the customary inconvenience associated with

7   performing the construction activities identified in Paragraph 8.C. outside of normal business hours

8   as specifically provided in the Lease.  *Wind*, 186 Cal.App.2d at 284-286 (injunctive relief appropriate

9   where equities favor applicant, other remedies inadequate and harm is irreparable).

10   **IV.   CONCLUSION**

11       For the foregoing reasons, Plaintiff requests that the court issue a temporary restraining order,

12   and an order to show cause why a preliminary injunction should not be granted during the pendency

13   of this action, restraining defendants 180 Sansome Street Tenant, LLC and WeWork Companies,

14   Inc., and their employees, agents and servants from further violations of the parties' lease and from

15   performing construction activities during normal business hours that are barred by the lease, to wit,

16   shooting of studs for mechanical fastenings; installations of any vertical support; testing of fire

17   alarms (except in the event of an emergency), core drilling; penetration or floors or ceilings; and any

18   work that can be heard outside of the leased premises which Plaintiff reasonably believes will

19   interfere with the quiet enjoyment of other tenants or as to which Plaintiff receives one or more

20   reasonable complaints from other tenants in the Building.

21   Dated: September 24, 2019          LOGAN MOONEY LLP

22

23                               By:

24                                  William A. Logan, Jr.

25                               Attorneys for Plaintiff
                            300 Prospect Properties, Inc.

26

27

28

1   WILLIAM A. LOGAN, JR. (BAR NO. 115042)
    LAURA M. MOONEY (BAR NO. 203692)
2   **LOGAN MOONEY LLP**
    100 Pine St., Suite 1250
3   San Francisco, CA 94111

4   Tel: (415) 738-0758
    Fax: (415) 376-0956
5   E-mail: wlogan@loganmooneyllp.com

6   Attorneys for Plaintiff
    300 Prospect Properties, Inc.,
7   a California Corporation

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**09/25/2019**
**Clerk of the Court**
BY: VANESSA WU
Deputy Clerk

8                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                     **COUNTY OF SAN FRANCISCO**

10                       **UNLIMITED JURISDICTION**

11

12   300 PROSPECT PROPERTIES, INC., a           Case No: CGC-19-579504
     California Corporation;
13                                              **DECLARATION OF WILLIAM A.**
                    Plaintiff,                   **LOGAN, JR. IN SUPPORT OF**
14                                              **PLAINTIFF'S EX PARTE**
                                                **APPLICATION FOR**
15         v.                                   **TEMPORARY RESTRAINING**
                                                **ORDER AND ORDER TO SHOW**
16   180 SANSOME STREET TENANT LLC, a New       **CAUSE RE PRELIMINARY**
     York limited liability company; WEWORK     **INJUNCTION**
17   COMPANIES, INC., a Delaware corporation, and
     DOES 1-50, inclusive,                      **Date:** September 26, 2019
18                                              **Time:** 11:00 a.m.
                    Defendants.                 **Location:** Dept. 302
19                                              **Judge:** The Honorable Ethan Schulman

20                                              **Date Action Filed:** September 24, 2019

21

22

23         I, William A. Logan, Jr., declare:

24         1.      I am an active member in good standing of the State Bar of California and a partner of

25   Logan Mooney LLP, counsel of record for Plaintiff in the above-captioned matter. As shown in

26   context below, I have personal knowledge of the facts stated in this declaration.

27

28

2.      On August 22, 2019, I wrote a letter to Brad S. Thomas, in response to his letter to Plaintiff dated August 2, 2019, regarding Defendant WeWork's performance of construction work in violation of the lease entered into between Plaintiff and defendants.  A true and correct copy of my letter dated August 22, 2019, is attached hereto as Exhibit A.  As of the September 25, 2019, date of execution of this declaration, neither Mr. Thomas nor anyone else on behalf of WeWork or 180 Sansome Street Tenant LLC has responded to my letter.

3.      In numerous stories reported in the financial press, it was disclosed in early September 2019, that The We Company/WeWork had filed with the Securities and Exchange Commission to make an initial public offering of its stock, allowing it to be publicly traded.  A true and correct copy of the store in CNBC.com is attached hereto as Exhibit B.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 24th day of September, 2019, at Orinda, California.

_____
William A. Logan, Jr

LOGAN DECL.

EX. A

# LOGAN MOONEY LLP

100 PINE STREET
SUITE 1250
SAN FRANCISCO, CA 94111
Tel: 415/738.0758   Fax: 415/376.0956

WILLIAM A. LOGAN, JR.
wlogan@loganmooneyllp.com

August 22, 2019

**VIA FEDERAL EXPRESS**

Brad S. Thomas
WeWork
Salesforce Tower
415 Mission Street, Floor 37
San Francisco, CA  94105

Re:   180 Sansome Street – WeWork Construction Noise

Dear Mr. Thomas:

We have been retained by 300 Prospect Properties, Inc. ("Prospect Properties") in connection with WeWork's construction of tenant improvements at 180 Sansome Street and WeWork's failure to abide by the construction noise and other requirements set forth in its lease with Prospect Properties dated November 29, 2018 ("the Lease").  We write specifically in response to your letter dated August 2, 2019.

Your position that WeWork has "fully complied with its obligations under its Lease in relation to its construction of tenant improvements and, specifically, with regard to its noise generating activities" is flatly contradicted by the numerous complaints Prospect Properties has received from Climate Policy Initiative ("CPI"), the tenant located on the 10th Floor of 180 Sansome Street, regarding WeWork's construction work in the building.  Contrary to the assertion in your letter, the Lease does not grant WeWork the right to perform, during business hours, construction work that "is typical and customary in commercial tenant improvement

**LOGAN MOONEY** LLP

Brad S. Thomas
August 22, 2019
Page 2

projects performed in multi-tenanted buildings."  Rather, the Lease specifically proscribes the type of construction activity that can take place during normal business hours (8 am to 6 pm, Monday through Friday).  During those hours, WeWork cannot do the following: "(i) shooting of studs for mechanical fastenings; ... (iv) core drilling; (v) penetration of floors or ceilings; and (vi) any work that can be heard outside of the Premises which *Landlord reasonably believes* will interfere with the quiet enjoyment of other tenants *or* as to which Landlord receives [sic] or more reasonable complaints from other tenants in the Building."  Lease, ¶ 8.C (emphasis added).

CPI has reported to Prospect Properties numerous instances of excessive noise interfering with CPI's ability to perform work in their leased space during normal business hours, which complaints Prospect Properties immediately reported to WeWork.  CPI's noise complaints include the following specific construction activities barred by paragraph 8.C of the Lease, which complaints were made on different dates regarding WeWork's construction activities during normal business hours: "drilling through cement or grinding on an adjacent floor", "grinding or drilling above us", "drilling was so loud that our staff had to cancel call with clients", "drilling has now stopped in floors above us, but it would now appear that the trades are moving in heavy equipment which is making as much noise as the drilling was", "[d]rilling has resumed again", "drilling has just started up again", "[t]here are workers in our unit preforming some loud work. We were never given noticed that they would enter our office", "[t]hey are still doing construction in our phone room in our unit. This work is not approved during work hours", "constant noise and drilling all day", "[d]rilling has just started now", "I can confirm drilling is still on right now", "drilling has resumed above us", and "workers broke through the bathroom room floor. Someone could have been severely injured" with attached photograph of ruptured

**LOGAN MOONEY** LLP

Brad S. Thomas
August 22, 2019
Page 3

bathroom tile in CPI's premises.[1]  CPI's numerous noise complaints are documented in writings

made contemporaneous with the events they describe.  Representatives of Prospect Properties

visited the building after receiving CPI's complaints and witnessed the work WeWork

contractors were performing and their generation of excessive construction noise that, in

Prospect Properties' opinion, constituted an interference with CPI's quiet enjoyment of their

leased premises.  Thus, it is beyond any reasonable dispute that WeWork is in breach of

paragraph 8 of the Lease.

     With respect to your cursory assertion that WeWork has "video recordings of its

activities in the space" that it contends shows WeWork's "full compliance with the Lease", those

video recordings are obviously of no probative value unless they document WeWork's

construction activities at the exact time CPI complained of excessive construction noise.  From

what we know of WeWork's video recordings, they were made *after* Prospect Properties notified

WeWork of a specific noise complaint by CPI and show no activities during the relevant time

periods, *i.e.*, work being performed at the time CPI lodged a noise complaint.  If WeWork has

video recordings of its activities in the entire construction space that were made at the same time

CPI complained of loud construction noises, please forward them to us for our review.

     The only defense offered in your letter regarding WeWork's construction activities in

violation of paragraph 8 of the Lease is an attack on CPI and its supposed lack of sophistication,

with you characterizing CPI as having "little experience with, and unrealistic expectations about,

what is reasonable in this context, which have led to their unreasonable complaints."  No facts

are provided to support this conclusion.  More importantly, it ignores the governing legal

standard.  The covenant of quiet enjoyment insulates CPI and the other tenants at 180 Sansome

---

[1] There are numerous additional complaints about loud and excessive noise as well as the
interference with CPI's ability to work in their premises due to WeWork's construction activity,
which additional complaints are not set forth herein.

**LOGAN MOONEY** LLP

Brad S. Thomas
August 22, 2019
Page 4

Street from any act that interferes with their right "to use and enjoy the premises *for the*

*purposes contemplated by the tenancy*." *Andrews v. Mobile Aire Estates* (2005) 125

Cal.App.4th 578, 589 (emphasis added).  CPI is a climate think tank, performing research and

analysis on land use policies around the world (*see*

https://en.wikipedia.org/wiki/Climate_Policy_Initiative).  Prospect Properties is of the opinion

that given the noise and disruption to date generated by WeWork's construction, CPI has a valid

argument that it is being deprived of the right to use and enjoy their leased premises for their

primary function, *i.e.*, research activities.

Your dismissal of CPI's complaints—both their veracity and their reasonableness—

without any factual or legal support demonstrate a troubling pattern.  The pattern includes

WeWork performing whatever construction work it wants, whenever it wants.  It also includes

your claim that WeWork's proposed actions to accommodate CPI "will result in project delays

and additional project costs, for which WeWork reserves its right to seek recovery from the

Landlord under the Lease."  WeWork's delays in connection with the tenant improvements are

of its own making.  For example, WeWork was required to submit its initial plans for the tenant

improvements to Prospect Properties within thirty days of November 29, 2018, the date the

Lease was signed.  WeWork submitted its initial permit sets for the leased premises on February

27, 2019 (after repeated inquiries by Prospect Properties), and submitted its revised plans on

April 16, 2019.  WeWork did not get its permits approved by the San Francisco Department of

Building Inspection until May 23, 2019, nearly six months after delivery of the premises on

January 1, 2019.  It appears to us that WeWork has been severely behind schedule from the very

beginning and is now attempting to make up time by performing prohibited construction work

during normal business hours in contravention of its duties under the Lease.  Moreover, Prospect

Properties is not liable for WeWork's construction delays in any event.  *See* Lease, ¶ 12.

**LOGAN MOONEY** LLP

Brad S. Thomas
August 22, 2019
Page 5

We further note that your representation that WeWork "has rescheduled its current work on Floor 11 from normal business hours to after hours and the weekend in response to your request and to minimize any impact on" CPI has already been disregarded by WeWork. Its construction activities on the 11th floor continued after August 2nd, including drilling, hammering and other loud noises that generated noise complaints by CPI after August 2nd, which have been communicated to WeWork.

Prospect Properties is concerned about potential legal action by CPI if WeWork continues its tenant improvements in a manner inconsistent with its obligations under the Lease. In addition, since your August 2nd letter, there have been additional complaints by other tenants, which have been communicated by Prospect Properties to WeWork. It is in both parties' interest to ensure that litigation is not commenced and that WeWork's interference with Prospect Properties' relationships with its existing tenants comes to an end. Accordingly, Prospect Properties proposes the following: (1) in recognition of the disturbances to CPI's tenancy to date, no construction work will be performed on the 11th floor during normal business hours (Monday through Friday, 8:00 am to 6:00 pm); (2) to the greatest extent possible, WeWork will commence construction work at 5:00 am on weekdays; (3) WeWork will ensure that all work moving forward complies with the Lease; (4) WeWork will prepare a noise mitigation plan to govern construction activities moving forward, which will include how WeWork will reduce the impact of noise and related vibrations through specific strategies like using muffling equipment, and a process for WeWork to quickly and effectively respond to noise or other construction complaints by the tenants at 180 Sansome Street, such as providing direct text message access to the on-site construction manager who will immediately respond to all noise or other construction complaints received from a tenant; and (5) WeWork will ensure that the following construction work will not be performed in the building between the hours 8:30 a.m. to 6:00 p.m. (Monday – Friday): shooting of studs for mechanical fastenings; installations of any vertical support; testing of fire

# LOGAN MOONEY LLP

Brad S. Thomas
August 22, 2019
Page 6

alarms (except in the event of an emergency), core drilling; penetration or floors or ceilings; and any work that can be heard outside of the Premises which Prospect Properties reasonably believes will interfere with the quiet enjoyment of other tenants or as to which Prospect Properties receives one or more reasonable complaints from other tenants in the Building. Please let us know as soon as possible WeWork's position on these remedial steps, and further ideas on how the damage done to date can be mitigated and how future breaches of the Lease can be avoided.

Notwithstanding our efforts to reach a mutually acceptable resolution of the issues addressed in this letter, Prospect Properties necessarily reserves all of its rights and remedies under the Lease.

Very truly yours,

William A. Logan, Jr.

LOGAN DECL.

EX. B

## TOP STORIES

Voters equally uneasy about Trump, Democratic 2020 rivals:...

The stock market rotation that rocked investors this month may...

Suspected drone activity diverts flights coming into Dubai:...

TECH

# WeWork reveals massive $900 million loss in filing to go public

PUBLISHED WED, AUG 14 2019 • 7:16 AM EDT   UPDATED WED, AUG 14 2019 • 12:59 PM EDT

 **Jesse Pound** | **Annie Palmer**
@JESSERPOUND | @ANNIERPALMER

SHARE   f   t   in   ✉   •••

## KEY POINTS

WeWork is widely expected to hold its IPO as soon as next month, joining a flurry of tech companies that have gone public this year.

The company, which recently rebranded to the We Company, announced in April it had confidentially filed for an IPO.

We Company reported a net loss of more than $900 million for the first six months of 2019 on revenues of $1.54 billion.



    

VIDEO 08:50
WeWork is losing billions — will it ever be profitable?

WeWork released its much-anticipated IPO prospectus on Wednesday, revealing a $900 million loss in six months as the workspace rental company lined up to join a flurry of tech companies going public in 2019.

WeWork, which rebranded to the We Company, is widely expected to go public as soon as next month. It was recently valued at $47 billion after SoftBank, the company's biggest backer, invested an additional $2 billion in January.

In the filing, the company reported revenues of $1.54 billion and a net loss of more than $900 million for the first six months of 2019. By comparison, another tech titan that went public this year, Uber, had a loss of $5 billion in the second quarter, largely due to stock based compensation from the IPO.

WeWork also reported that it had 527,000 members as of June 30, an increase of more than 90% from the year before.

It will trade under the ticker WE. J.P. Morgan Chase and Goldman Sachs are the main underwriters for the IPO.

WeWork, which rents out co-working spaces to start-ups, freelancers and enterprises, has to plunge cash into real estate in some of the most expensive markets and makes money back over time as companies and individuals pay their rent, or membership. The company reported long-term lease obligations of $17.9 billion in the filing.

When not discounted for accounting purposes, the future lease payment obligations were $47.2 billion as of June 30. The average length of an initial term of a lease in the U.S. is 15 years, according to the prospectus.

WeWork has 528 locations, up from 485 at the end of the first quarter of 2019, and said it plans to open 169 new locations. The company said 50% of its memberships are based outside the U.S. and that enterprise customers, which made up 40% of its memberships, are its fastest growing membership type.

"We have grown significantly since our inception," the company said in the filing. "Our membership base has grown by over 100% every year since 2014. It took us more than seven years to achieve $1 billion of run-rate revenue, but only one additional year to reach $2 billion of run-rate revenue and just six months to reach $3 billion of run-rate revenue."

The company also confirmed in the filing that it plans to raise up to $6 billion in debt that it expects to close along with the IPO.

According to the prospectus, WeWork's biggest shareholders are the WE Holdings company and entities of Benchmark, J.P. Morgan and SoftBank. The WE Holdings company is controlled by WeWork CEO Adam Neumann.

For the first six months of 2019, 56% of WeWork's revenue came from the United States with the rest generated internationally, according to the prospectus.

The We Company filed confidentially for an IPO in April. The filing didn't include financial specifics, but in its first-quarter business update in May, the company said revenue more than doubled to $728.3 million, helped by expansion into international markets and growing memberships.



9/22/2019  WeWork releases S-1 filing for IPO, reveals it lost $900 million last...

Case 4:19-cv-06459-KAW   Document 1-1   Filed 10/08/19   Page 150 of 258

in May that investors should view WeWork's losses as "investments," adding that renting out work space is a "proven business model."

The company has been expanding beyond co-working spaces and into new markets. It has launched communal housing complexes under its WeLive business, as well as early education schools called WeGrow.

## TRENDING NOW

 **52% of Americans are considered 'middle class'—here's how much money they earn**

 **10 low-cost franchises you can start with $15,000 or less and reap a six-figure salary**

 **Review: The 2019 Jeep Gladiator pickup is extremely cool, smartly designed and incredibly capable**

 **The 10 hottest remote work opportunities—and the companies hiring for them right now**

 **Bob Iger on why Disney walked away from Twitter: 'The nastiness is extraordinary'**

Sponsored Links  by Taboola

## FROM THE WEB

**Changes Seniors Need To Know About Medicare This Year. Research The Best 5 Medicare Supplement Plans**

Yahoo Search



   

1  WILLIAM A. LOGAN, JR. (BAR NO. 115042)
2  LAURA M. MOONEY (BAR NO. 203692)
   **LOGAN MOONEY LLP**
3  100 Pine St., Suite 1250
   San Francisco, CA 94111

4  Tel:  (415) 738-0758
   Fax: (415) 376-0956
5  E-mail: wlogan@loganmooneyllp.com

6  Attorneys for Plaintiff
   300 Prospect Properties, Inc.,
7  a California Corporation

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**09/25/2019**
**Clerk of the Court**
BY: VANESSA WU
Deputy Clerk

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                        **COUNTY OF SAN FRANCISCO**

10                           **UNLIMITED JURISDICTION**

11

12  300 PROSPECT PROPERTIES, INC., a
    California Corporation;
13
                    Plaintiff,
14
         v.
15
    180 SANSOME STREET TENANT LLC, a New
16  York limited liability company; WEWORK
    COMPANIES, INC., a Delaware corporation, and
17  DOES 1-50, inclusive,
18                  Defendants.
19

20

Case No: CGC-19-579504

**DECLARATION OF HELEN LIU
IN SUPPORT OF PLAINTIFF'S EX
PARTE APPLICATION FOR
TEMPORARY RESTRAINING
ORDER AND ORDER TO SHOW
CAUSE RE PRELIMINARY
INJUNCTION**

**Date**:  September 26, 2019
**Time**: 11:00 a.m.
**Location**: Dept. 302
**Judge**: The Honorable Ethan Schulman

**Date Action Filed**: September 24, 2019

21          I, Helen Liu, declare:

22          1.      I am the Operations Manager for Plaintiff 300 Prospect Properties, Inc. ("Plaintiff").

23  As shown in context below, I have personal knowledge of the facts stated in this declaration.

24          2.      Plaintiff is the commercial landlord for the downtown office building at 180 Sansome

25  Street, San Francisco ("the Building").  As Plaintiff's Operations Manager, my job responsibilities

26  include overseeing day to day administrative operations of the Building, including issues with the

27  tenants and any tenant disputes, and monitoring activity in the Building.  In connection with those

28

1

duties, I am responsible for knowing the terms of the leases in the Building as they relate to any tenant issues and/or disputes.

3.      Defendant 180 Sansome Street Tenant LLC ("Defendant WeWork") entered into a lease with Plaintiff dated November 29, 2018, a true and correct copy of which is attached to the Complaint on file in this action as Exhibit A ("the Lease").  Pursuant to the Lease, Defendant WeWork leases Floors 2, 3, 4, 6, 7, 9, 11, 12, 14, 15, 16, 17 and 18 in the Building ("the Premises").

4.      The other tenants currently in the Building include: (1) a subtenant on the 10th Floor, Climate Policy Initiative ("CPI"), a climate think tank; (2) on the 8th Floor, INSEEC, a private French school; and (3) on the ground floor, Rumble, a group fitness gym.

5.      Under its Lease, Defendant WeWork is to perform certain tenant improvements to the Premises.  Compl, Ex. A (Lease, ¶ 8 and Ex. B).  In connection with those tenant improvements, Paragraph 8.C. of the Lease provides as follows (emphasis added):

> "All such [tenant improvement] work [by Defendant WeWork] will be performed in a first class manner causing no interference with the operation of the Building and no unreasonable noise, odors or inconvenience to Landlord or the other tenants of the Building; provided, however, Landlord acknowledges and agrees that ***Tenant may perform all work at all times (i.e. 24 hours a day, 7 days a week) except the following types of work: (i) shooting of studs for mechanical fastenings***; (ii) installations of any vertical support; (iii) testing of fire alarms (except in the event of an emergency) ***(iv) core drilling; (v) penetration or floors or ceilings; and (vi) any work that can be heard outside of the Premises which Landlord reasonably believes will interfere with the quiet enjoyment of other tenants or as to which Landlord receives [sic] or more reasonable complaints from other tenants in the Building.***  If, in connection with any alterations to the Premises (including in connection with any plumbing work), Tenant reasonably needs access to the ceiling of the area on any non-Premises floor immediately beneath any floor of the Premises Landlord shall arrange a time (which may be after Business Hours, including on the weekend) to allow Tenant access to such other tenant's space (subject to any rights of such tenant regarding access by outside parties) to perform the applicable portion of the alterations, provided that Tenant shall pay for after-hours supervision by Landlord's engineer or other Landlord-designated supervisor.  Tenant shall pay the cost of all after-hours and weekend security, engineering and other staff reasonably required by Landlord on account of such work."

6.      The Lease also requires Defendant WeWork to ensure that its architects, contractors and subcontractors shall comply with all rules, regulations and requirements in the Lease.  Compl., Ex. A (Lease, Ex. B, ¶ 3).

7.      As Plaintiff's Operations Manager, I am responsible for monitoring and responding to issues that arise out of Defendant WeWork's construction activities related to its tenant

improvements in the Building.  In particular, I am responsible for responding to Defendant

WeWork's inquiries and issues related to construction activities in the Building as well as other

tenants' inquires and issues related to Defendant WeWork's construction activities in the Building.

8.       Defendant WeWork began construction activity on the tenant improvements at issue in

this action in May, 2019.  To avoid unreasonable disruptions to the other tenants and their business

operations in the Building, I directed Defendant WeWork that the construction work specified in

Paragraph 8.C. of the Lease was not to be performed Monday through Friday, from 8:00 a.m. to 6:00

p.m.  Originally, I gave Defendant WeWork a thirty minute window in the morning (from 8:00 a.m.

to 8:30 a.m.) to wind down their construction activity performed off-hours.  However, after receiving

noise complaints, I directed Defendant WeWork that the construction work specified in paragraph

8.C. of the Lease was not to be performed during normal business hours, *i.e.*, Monday through

Friday, from 8:00 a.m. to 6:00 p.m.

9.       Beginning on May 16, 2019, and continuing thereafter, I received numerous

complaints from CPI, the tenant on the 10th Floor, regarding excessive and disruptive noise from

Defendant WeWork's construction activity that could be heard on the 10th Floor during normal

business hours.  The noise reported by CPI's representatives to me included numerous instances of

"drilling" noises on the 11th Floor by Defendant WeWork's construction crews during normal

business hours and repeated instances of penetration of the floor in CPI's leased space.  CPI's

representatives made these complaints to me by email and I also spoke with CPI representatives

about the complaints.  CPI's complaints regarding excessive noise, including drilling, generated by

Defendant WeWork and its construction activities in the Building continued throughout the Summer

and they have continued through the date of the filing of the Complaint in this action.

10.      Attached hereto as Exhibit A are true and correct copies of emails sent to me by CPI

reporting on Defendant WeWork's construction activities during normal business hours and

complaining of excessive noise, email responses by me to CPI, and emails with Defendant

WeWork's representatives in charge of the tenant improvements regarding CPI's noise complaints.

Given the volume and to assist in the reading of the emails, the emails have been combined into one

document and presented in chronological order.

11.     In addition to my email communications with CPI regarding its noise complaints, I met in person with CPI representatives on several occasions in the Summer of 2019 regarding their noise complaints. Those CPI representatives reported the noises they were hearing from Defendant WeWork's construction activities in the Building during normal business hours, which they described to me as numerous, repeated instances of very loud noises, including loud drilling sounds, of varying durations that interfered with CPI's employees ability to perform work on the 10th Floor. The CPI representatives were insistent with me that the noises were very disruptive, and interfered with, and in some cases barred, CPI's employees' ability to make phone calls, hold meetings in their space, and conduct normal business functions. The CPI representatives expressed extreme frustration in having to endure those loud noises during normal business hours. They also told me that they were preparing to take legal action.

12.     On a number of occasions, in response to a specific noise complaint from CPI, I went to the Building to investigate. I observed Defendant WeWork performing construction activity during normal business hours that is barred by the Lease, including generating construction noise that could be heard on the 10th Floor (CPI's leased space) and that I considered to be disruptive to performing work in the 10th Floor office space where I was standing when I heard the noise, as well as studding and framing near a window on the 11th Floor, with another nearby construction worker consistently dropping metal frames on the floor causing very loud, reverberating sounds.

13.     In addition to my own observations and interactions with the tenants at the Building, I also relied on the observations and reports made by Plaintiff's Building Engineer, Doug Davies, to me regarding construction noise in the Building during normal business hours. Mr. Davies was often in the Building at or near the time CPI made a noise complaint to me, and I would confer with Mr. Davies about CPI's noise complaints. Mr. Davies reported to me several instances that he witnessed where Defendant WeWork's construction crew were generating loud and disruptive noise during normal business hours. Mr. Davies told me that on many occasions, he directed Defendant WeWork's construction crew to cease their activities.

14.     Given my interactions with the Building's tenants and the reports I received regarding construction noise during normal business hours, I concluded that the noises generated by Defendant

WeWork that could be heard outside of the Premises were sufficiently disruptive in degree, duration and frequency so as to constitute a significant interference with the tenant's regular business operations and that they were therefore reasonable.

15.     By letter dated July 26, 2019, I sent a formal notice to Defendant WeWork identifying its construction activities in breach of Paragraph 8.C. of the Lease, and stating Plaintiff's determination that Defendant WeWork was interfering with other tenants' quiet enjoyment of their premises.  A true and correct copy of the letter dated July 26, 2019, to Defendant WeWork is attached hereto as Exhibit B.

16.     I received a response to my July 26, 2019, letter from Defendant WeWork dated August 2, 2019.  In it, Defendant WeWork agreed to "reschedule its current work on Floor 11 from normal business hours to after hours and the weekends in response to your request and to minimize any impact on the 10th floor tenant."  A true and correct copy of the letter I received from Defendant WeWork is attached hereto as Exhibit C.  Despite this representation, I thereafter received additional noise complaints from CPI regarding Defendant WeWork's construction activity on Floor 11, including a noise complaint as soon as August 5, 2019, regarding "the usual drilling/hammering" by defendant WeWork.  *See* Ex. A, p. 27.

17.     Plaintiff's tenant on the 8th Floor, INSEEC, is a French school that was in recess during the 2019 summer months.  In early August, 2019, INSEEC's Director, Ron Morris, contacted me and stated he was upset about the construction noises in the Building due to Defendant WeWork's construction activities and concerned the noise would interfere with INSEEC's classes once they resumed in September, 2019.  He also asked me whether INSEEC would be compensated for the disruption.  I informed Defendant WeWork that INSEEC's classes would resume in early September, 2019, and of the need to avoid disrupting those classes.  However, on the morning of September 9, 2019, I received a noise complaint from INSEEC regarding Defendant WeWork's construction activities during normal business hours, consisting of loud noises and drilling, that could be heard below the 8th Floor and that interfered with INSEEC's ability to conduct an on-going class in their space.  I immediately communicated the noise complaint to Defendant WeWork.  Thereafter, tenant INSEEC complained to me again regarding Defendant WeWork's loud and disruptive construction

1    work on September 10 and September 12, 2019, all of which I immediately communicated to

2    Defendant WeWork.  A true and correct copy of my email exchanges with INSEEC, and with

3    Defendant WeWork regarding INSEEC's noise complaints, is attached hereto as Exhibit D.  Given

4    the volume and to assist in the reading of the emails, the emails have been combined into one

5    document and presented in chronological order.

6          18.    From the beginning of Defendant WeWork's tenancy, it has been behind schedule on

7    performing its tenant improvements.  Pursuant to Exhibit B, paragraph 1, of the Lease, Defendant

8    WeWork was to furnish Plaintiff the plans, drawings, specifications, and finishing details for

9    WeWork's tenant improvements within thirty days of signing the lease, *i.e.*, on December 29, 2018.

10   Defendant WeWork did not provide the required materials on time and did not submit its initial

11   permit sets to Plaintiff until February 27, 2019, despite my repeated written inquiries seeking the

12   materials and noting the delay.  Defendant WeWork did not get the permits for its tenant

13   improvements approved by the City of San Francisco until May 23, 2019, nearly six months after

14   Plaintiff delivered the Premises on January 1, 2019.

15         19.    On August 14, 2019, Defendant WeWork and its subcontractor caused substantial

16   damage to the Building's elevators when WeWork's subcontractor hit a sprinkler head on Floor 4,

17   causing water to pour out into the elevators.  A true and correct copy of a report of the incident made

18   by Brian Schaffer of Schindler Elevator Company, the elevator service company engaged by Plaintiff

19   to service the elevators in the Building, is attached hereto as Exhibit E.  As of the filing date of the

20   Complaint, there is only one operable elevator in the Building, which must service all of the other

21   tenants in the Building and their employees and visitors.  I have discussed the use of that one

22   remaining elevator with Defendant WeWork and we agreed that Defendant WeWork and its

23   construction crew cannot use that elevator during normal business hours without such use being

24   specifically approved by me in advance.  Despite this agreed upon restriction, Defendant WeWork's

25   subcontractors continue to use that elevator during normal business hours, causing disruption in the

26   Building and difficulties for the other tenants to access their Floors.

27         20.    As Plaintiff's Operations Manager, I have, on many other occasions, worked with

28   tenants on tenant improvement projects, including coordinating with the tenant's construction teams

6

1    as well as overseeing and managing the tenant's construction activities as needed on behalf of the

2    landlord.  Defendant WeWork's construction activity in the Building has generated a level of tenant

3    complaints that I have not experienced on any other tenant improvement project in which I have

4    participated.  The tenants' complaints and issues generated by Defendant WeWork's construction

5    activities have regularly required me to devote a large part of my day to managing the situation in the

6    Building, and diverted my workload to be largely consumed with issues related to Defendant

7    WeWork's construction activities, including the repeated noise complaints as well as the damage

8    WeWork is causing to the Building (*i.e.*, the broken elevators) and to Plaintiff's relationships with the

9    Building's tenants.  I have also been required to redirect Plaintiff's staff resources to address issues at

10   the Building, consuming time and labor that would otherwise be devoted to Plaintiff's regular work

11   load.

12          I declare under penalty of perjury under the laws of the State of California that the foregoing

13   is true and correct.

14          Executed this 24 day of September, 2019, at San Francisco, California.

16          _____

17                    Helen Liu

EXHIBIT A

**From:** David Pitson [mailto:David.Pitson@cpisf.org]
**Sent:** Thursday, May 16, 2019 11:32 AM
**To:** Helen Ying Liu
**Cc:** Woare, Elisabeth; Keren Gross; Cate McDonough; Catherine Morrison
**Subject:** Construction noise

Dear Helen.

There has been quite a bit of construction activity in the floors nearby to us today, and it is quite disturbing to our staff, who as you may now, are largely engaged in research activities, and do require quiet enjoyment of our space in order to be productive.

Could you please advise us as to what construction plans you have, for what length of time, and what the plans are to mitigate the disturbance to tenants?

Thanks

David Pitson
Director of Finance
Climate Policy Initiative
180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Sent:** Thursday, May 16, 2019 11:38 AM
**To:** David Pitson <David.Pitson@cpisf.org>
**Cc:** Woare, Elisabeth <elisabethwoare@dwt.com>; Keren Gross <Keren.Gross@cpiclimatefinance.org>; Cate McDonough <cate@skyroam.co>; Catherine Morrison <catherine.morrison@navigant.com>
**Subject:** RE: Construction noise

Hi David,

The new Tenant is doing Tenant Improvement on the floors. Are the construction activity noisy? They were told to end all noisy work before 8:30am

What specific kind of disruptions are they causing? So I can address specific issues to their superintendent.

Regards,
**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

1

**From:** David Pitson
**To:** Helen Ying Liu
**Cc:** Woare, Elisabeth; Keren Gross; Cate McDonough; Catherine Morrison
**Subject:** RE: Construction noise
**Date:** Thursday, May 16, 2019 11:42:19 AM

Thanks Helen.
Just recently, it sounds like they were drilling through cement or grinding on an adjacent floor.
Dave

On May 16, 2019, at 11:49 AM, Helen Ying Liu hliu@brothersintl.com wrote:

Hi Jamie and team, We have a tenant at the building expressed concerns over the construction noise –it sounds like drilling through cement and grinding on adjacent floor. Please note all noisy work should stop by 8:30am.

Please address this so it won't disturb the other tenants during their work day.

Regards,

Helen Liu
*Operations Manager*

300 Prospect Properties, Inc.
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986- 8880 | f: 415- 986-8846

On May 16, 2019, at 12:12 PM, Jamie Kiley <james.kiley@wework.com> wrote:

Helen,

Yes Doug and I discussed this. The current scope of work going on is just safe off which is not typically a noisy activity.

We are looking for some more information in regards to the type of noise and when it occurred so I can help trace back the cause.

We have shared the noise restrictions with each subcontractor at our kick off meetings and we will continue to stay on top of it. Sorry for the inconvenience here.
--
**WeWork | Jamie Kiley**
Construction Superintendent, US West
M: 781.820.8211
wework.com
**Wework Construction**
California License #1041785

On May 16, 2019, at 1:23 PM, Helen Ying Liu <hliu@brothersintl.com> wrote:

Hi Jamie,

Thank you for your prompt response.

Regards
Helen

Sent from my iPhone

On Thu, Jun 6, 2019 at 7:33 PM Helen Ying Liu <hliu@brothersintl.com> wrote:

Hi Jamie,

The tenant just informed me that there is construction noise around 5pm daily and is disruptive for them.

Can you please have your people start noisy scopes after 6:30pm.

Thank you so much
Helen

On Jun 6, 2019, at 7:42 PM, Jamie Kiley james.kiley@wework.com wrote:

Helen,

Apologies for this we have been starting at 5PM since the beginning of demo and this is the first we have heard of it. Does the tenant work until 6:30? I can ask the crew to keep the noise to a minimum to 6PM but with them starting at 5PM an hour and a half of lost production could be a challenge.

Let us know what you think we are happy to discuss further. We are starting our floor polishing crew at 6PM since that is the most onerous trade as far as noise goes.

On Jun 7, 2019, at 9:26 AM, Helen Ying Liu <hliu@brothersintl.com> wrote:

Hi Jamie,

The tenant starts leaving work around 6:30pm. They said it would be great if noisy work start around 6:30pm instead of 5pm
Thank you
Helen
Sent from my iPhone

**From:** Helen Liu <hliu@brothersintl.com>
**Date:** Friday, June 7, 2019 at 10:00 AM
**To:** Jamie Kiley <james.kiley@wework.com>
**Cc:** "Timothy.Davidson@wework.com" <Timothy.Davidson@wework.com>,
Aparna Joneja <aparna.joneja@wework.com>, Mark Kim
<mark.kim4@wework.com>, Douglas Davies <DDavies@brothersintl.com>
**Subject:** Re: Construction Noise 180 Sansome

Hi Jamie,

3

I'm thinking maybe if 6:30pm is too late of a start for you guys, can you guys start doing noisy scope at 6pm on other floors first. Wait till after 6:30pm to do floor 11th and floor 9th.

Thanks
Helen
Sent from my iPhone

**From:** David Pitson <David.Pitson@cpisf.org>
**Date:** Friday, June 7, 2019 at 3:22 PM
**To:** Helen Liu <hliu@brothersintl.com>
**Cc:** Keren Gross <Keren.Gross@cpiclimatefinance.org>, Cate McDonough <cate@skyroam.co>, "elisabethwoare@dwt.com" <elisabethwoare@dwt.com>, "catherine.morrison@navigant.com" <catherine.morrison@navigant.com>
**Subject:** Construction noise

Dear Helen.

Thanks for trying to help with the construction noise problem, but we are still having significant issues during normal work hours. That was true both today and yesterday.

As you know, we are involved with detailed research on climate finance issues and projects, and our employees require a work place with just normal noise levels. I understand that this construction progress may last for many months to come, so we need to address the issue soon.

I hope that you can meet directly with the Construction management company to work out a satisfactory solution, and to provide us with quiet enjoyment of the work place.

Let me know your plans.

Regards,

David Pitson
Director of Finance
Climate Policy Initiative
180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240
On Jun 7, 2019, at 3:37 PM, Helen Ying Liu <hliu@brothersintl.com> wrote:

Hi Jamie,

I got another email from the SubTenant minutes ago, reporting construction noise issues today. We really need to address this ASAP, as construction is just getting started.

Please put this item on our meeting agenda next Wednesday. In the mean time, I'll discuss with my team on some ideas.

4

Thank you,
**Helen Liu**
*Operations Manager*
**300 Prospect Properties**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Jamie Kiley <james.kiley@wework.com>
**Date:** Friday, June 7, 2019 at 3:47 PM
**To:** Helen Liu <hliu@brothersintl.com>
**Cc:** "Timothy.Davidson@wework.com" <Timothy.Davidson@wework.com>, Aparna Joneja
<aparna.joneja@wework.com>, Mark Kim <mark.kim4@wework.com>, Douglas Davies
<DDavies@brothersintl.com>
**Subject:** Re: Construction Noise 180 Sansome

Helen,

Did they report when ? I haven't had anyone working in the building since 2:30.

We can discuss Wednesday our direction to our team has been no noisy work with 3 floors of the tenant and I
have been periodically staying on 11, above them, to make sure I do not hear our construction noise.

If they can pinpoint a time or sound we can investigate further.

Thanks,
--
**WeWork | Jamie Kiley**
Construction Superintendent, US West
M: 781.820.8211
wework.com
**Wework Construction**
California License #1041785
**Create Your Life's Work**
Get rewarded for good ideas and good people!
Apply for funding at **creatorawards.wework.com** or
help grow the community at **refer.wework.com**.

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Sent:** Friday, June 7, 2019 3:54 PM
**To:** David Pitson <David.Pitson@cpisf.org>
**Cc:** Keren Gross <Keren.Gross@cpiclimatefinance.org>; Cate McDonough <cate@skyroam.co>;
Woare, Elisabeth <elisabethwoare@dwt.com>; Catherine Morrison
<catherine.morrison@navigant.com>
**Subject:** Re: Construction noise

Hello,

5

What time frame do you hear the construction noises? They haven't had any working since 2:30pm

If you can pinpoint the timeframe, they can investigate further on the issue.

Thank you,
**Helen Liu**
*Operations Manager*
**300 Prospect Properties**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846


**From:** David Pitson
**To:** Helen Ying Liu
**Cc:** Keren Gross; Cate McDonough; Woare, Elisabeth; Catherine Morrison
**Subject:** RE: Construction noise
**Date:** Friday, June 07, 2019 3:55:37 PM

Thanks.
Thursday was noon and 5 p.m.
Today was noon.

**From:** David Pitson <David.Pitson@cpisf.org>
**Date:** Friday, June 7, 2019 at 5:20 PM
**To:** Helen Liu <hliu@brothersintl.com>
**Cc:** Keren Gross <Keren.Gross@cpiclimatefinance.org>, "elisabethwoare@dwt.com" <elisabethwoare@dwt.com>
**Subject:** Work schedule

Hi Helen.

Work has just started again at 5.15 on floors above.

Is that the agreement you have with the construction crew?

We have about 6 employees in office trying to work right now.

Dave

David Pitson
Director of Finance
Climate Policy Initiative
180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240


On Fri, Jun 7, 2019 at 5:34 PM Helen Ying Liu <hliu@brothersintl.com> wrote:

6

Hi Jamie, Tim, Aparna, and Mark

Noise was heard noon and 5pm yesterday
Today was noon.

I just got yet another email from this tenant saying they can hear construction noise on the floor above at 5:15pm. Please tell your crew DON"T do noisy construction before 6:30pm on 11th floor. Who is the on site supervising right now? Please forward their number.

Thank you,
**Helen Liu**
*Operations Manager*
**300 Prospect Properties**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Jamie Kiley <james.kiley@wework.com>
**Date:** Friday, June 7, 2019 at 5:37 PM
**To:** Helen Liu <hliu@brothersintl.com>
**Cc:** "Timothy.Davidson@wework.com" <Timothy.Davidson@wework.com>, Aparna Joneja <aparna.joneja@wework.com>, Mark Kim <mark.kim4@wework.com>, Douglas Davies <DDavies@brothersintl.com>
**Subject:** Re: Construction Noise 180 Sansome

Helen,
I have been on the 11th floor since 5PM today the work they are performing is picking up drywall and cleaning up debris noisy demolition work. As far as the noise at noon we will talk to our trades on Monday first thing.

I think Wednesday will be a good forum to discuss the work that is going to take place on the 11th floor, after tonight demolition will be complete but we need to discuss the actual build out.

I am happy to take a video of the work going on at the moment or walk with a representative from your team now.

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Sent:** Friday, June 7, 2019 5:38 PM
**To:** David Pitson <David.Pitson@cpisf.org>
**Cc:** Keren Gross <Keren.Gross@cpiclimatefinance.org>; Woare, Elisabeth <elisabethwoare@dwt.com>
**Subject:** Re: Work schedule

David,

I don't have any agreement with them to start noisy scope at 5pm. I already told them not to start noisy work till 6:30pm, especially on the 11th floor.

7

**Helen Liu**
*Operations Manager*
**300 Prospect Properties**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

On Fri, Jun 7, 2019 at 5:44 PM Helen Ying Liu <hliu@brothersintl.com> wrote:

Hi Jamie,

Let's discuss further next week. For now, please stop all work on the 11th floor until after 6:30pm. Please tell your crew now.

Thank you,
**Helen Liu**
*Operations Manager*
**300 Prospect Properties**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

On Fri, Jun 7, 2019 at 5:50 PM Jamie Kiley <james.kiley@wework.com> wrote:

Helen - please let us know what time Monday you are available to meet. Per building rules 6PM is end of business hours so I would like to discuss that as well.

**From:** Jamie Kiley
**To:** Helen Ying Liu
**Cc:** Aparna Joneja; Douglas Davies; Mark Kim (mark.kim4@wework.com); Timothy.Davidson@wework.com
**Subject:** Re: Construction Noise 180 Sansome
**Date:** Friday, June 07, 2019 5:53:59 PM
**Attachments:** IMG_6453.MOV

Attached is a video of the work we were performing when you received a complaint.

**From:** David Pitson [mailto:David.Pitson@cpisf.org]
**Sent:** Thursday, June 20, 2019 10:31 AM
**To:** Helen Ying Liu; Qianwen Chen
**Cc:** Cate McDonough
**Subject:** Construction Noise

Hi Helen.

Construction crews are creating quite a bit of noise right now. Sounds like they are grinding or drilling above us.

David Pitson
Director of Finance

8

Climate Policy Initiative
180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240

On Thu, Jun 20, 2019 at 10:37 AM Helen Ying Liu <hliu@brothersintl.com> wrote:

Hi Jamie,

I just got email from 10th floor Tenant. See below:

"Construction crews are creating quite a bit of noise right now. Sounds like they are grinding or drilling above us."

Can you please have your crew stop the drilling/grinding.

Thank you,
**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Jamie Kiley
**To:** Helen Ying Liu
**Cc:** Aparna Joneja; Douglas Davies; Mark Kim (mark.kim4@wework.com); Timothy.Davidson@wework.com
**Subject:** Re: Construction Noise 180 Sansome
**Date:** Thursday, June 20, 2019 11:16:06 AM

Helen - As discussed we are on it. Looks like the sprinkler installer drilled a bit past 8:30 and we will make sure it does not happen again.

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Sent:** Thursday, June 20, 2019 11:25 AM
**To:** David Pitson <David.Pitson@cpisf.org>; Qianwen Chen <QChen@brothersintl.com>
**Cc:** Cate McDonough <cate@skyroam.co>
**Subject:** RE: Construction Noise

Hi David,

Thank you for notifying me.

Please see below response from their superintendent:

"Helen - As discussed we are on it. Looks like the sprinkler installer drilled a bit past 8:30 and we will make sure it does not happen again."

9

Regards,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** David Pitson
**To:** Helen Ying Liu; Qianwen Chen
**Cc:** Cate McDonough
**Subject:** RE: Construction Noise
**Date:** Thursday, June 20, 2019 11:38:52 AM

Thanks – but the drilling was from around 10.30 on, but has stopped now.

**From:** David Pitson
**To:** Helen Ying Liu
**Subject:** construction noise
**Date:** Friday, June 21, 2019 8:48:55 AM

Dear Helen.

Steady construction noise once again from floor above us at 8.47 a.m.

Please advise what you can do about this.

thanks

David Pitson
Director of Finance
Climate Policy Initiative
180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240

**From:** Keren Gross
**To:** Helen Ying Liu; David Pitson
**Cc:** Woare, Elisabeth; Cate McDonough
**Subject:** RE: Work schedule
**Date:** Monday, July 08, 2019 1:05:41 PM

Hi Helen,

We are still experiencing issues with the construction noise. This morning around 8 am the drilling was so loud that our staff had to cancel call with clients. There is also some hammering and noise from the floors above us which started around 12:30 pm.

This is extremely frustrating to staff and impacting our normal business operations.

Please let me know what can be done on your end since the current agreement is not working.

Best,
Keren

**From:** David Pitson
**To:** Helen Ying Liu
**Cc:** Barbara Buchner; Woare, Elisabeth
**Subject:** Continued Noise
**Date:** Wednesday, July 17, 2019 11:04:19 AM
Dear Helen.

The drilling has now stopped in floors above us, but it would now appear that the trades are moving in heavy equipment which is making as much noise as the drilling was.

Did you have anyone go over to discuss with the trades today?

thanks

David Pitson
Director of Finance
Climate Policy Initiative
180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240

**From:** David Pitson
**To:** Helen Ying Liu
**Cc:** Woare, Elisabeth; catherine.morrison@navigant.com; Keren Gross; Cate McDonough
**Subject:** Construction Noise
**Date:** Friday, July 19, 2019 8:34:26 AM

Dear Helen.

In spite of your assurances yesterday about dealing with the construction noise issues, the drilling and other construction noises continue at this hour, making it impossible for our staff, or the staff of our sub-sub tenant, to accomplish their work assignments in our office.

David Pitson
Director of Finance
Climate Policy Initiative

11

180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240

On Jul 25, 2019, at 10:11 AM, Jamie Kiley <james.kiley@wework.com> wrote:

Helen,

Allied will need to access to the 10th floor telecom room to continue the installation of the refrigerant lines for the rooftop units. The work is planned for Monday and Tuesday. This work will be soldering of pipes and connections of fittings.

Can you request access from the tenant. We can start at 7am when Doug provides access.

Thanks,
--
**WeWork | Jamie Kiley**
**WeWork Construction**
**CA License #1041785**
Construction Superintendent
M: 781-820-8211
wework.com
Create Your Life's Work
Get rewarded for good ideas and good people!
Apply for funding at **creatorawards.wework.com** or
help grow the community at **refer.wework.com**.

On Thu, Jul 25, 2019 at 10:16 AM Helen Ying Liu <hliu@brothersintl.com> wrote:

Jamie,
How long will the work take on 10th floor?

Helen

Sent from my iPhone

**From:** Jamie Kiley [mailto:james.kiley@wework.com]
**Sent:** Thursday, July 25, 2019 12:28 PM
**To:** Helen Ying Liu
**Cc:** Douglas Davies; Aparna Joneja; Mark Kim; Timothy Davidson
**Subject:** Re: 180 Sansome - 10th Floor Access

I am hoping to complete it in a few hours each day to minimize
tenant disruption. Would they be ok with 7am-11am each day?

**From:** David Pitson
**To:** Helen Ying Liu

12

**Cc:** Woare, Elisabeth; Keren Gross; Cate McDonough
**Subject:** Drilling
**Date:** Thursday, July 25, 2019 1:36:10 PM
Helen.

Drilling has resumed again just now.

Dave

David Pitson
Director of Finance
Climate Policy Initiative
180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240

**From:** Helen Ying Liu
**To:** Jamie Kiley (james.kiley@wework.com); Timothy.Davidson@wework.com; "Aparna Joneja"; Ben Wright
(ben.wright2@wework.com)
**Subject:** Drilling Noise Complaint at 1:36pm
**Date:** Thursday, July 25, 2019 3:00:00 PM

Hi All,

We Received another drilling noise complaint at 1:36pm this afternoon.

Please don't perform any drilling scope during regular office hours.

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Jamie Kiley [mailto:james.kiley@wework.com]
**Sent:** Thursday, July 25, 2019 3:21 PM
**To:** Helen Ying Liu
**Cc:** Timothy.Davidson@wework.com; Aparna Joneja; Ben Wright (ben.wright2@wework.com);
brad.thomas3@wework.com
**Subject:** Re: Drilling Noise Complaint at 1:36pm

Helen,

Doug called me when he received the complaint and I went down to see. Please see attached video taken at
1:40pm.

13

Again we are working with you to be fair and reasonable but as you can see nothing we are doing is excessively noisy or falls within the industry norms of "noisy".

We continue to ask our trade partners to be cognizant of the tenants and they are but I foresee two more weeks of active construction and additional complaints. I think it is worthwhile for you to engage the tenant below and inform them of customary noise requirements in a building undergoing a TI project and to provide them this timeline.

Lastly, in an effort to lessen the construction burden we have re-designed our plumbing on the 11th floor to avoid having to do overhead work in the 10th floor space to ease the burden of the tenant.

**From:** David Pitson [mailto:David.Pitson@cpisf.org]
**Sent:** Friday, July 26, 2019 12:33 PM
**To:** Helen Ying Liu
**Cc:** Woare, Elisabeth; catherine.morrison@navigant.com
**Subject:** Drilling

Helen.
The drilling has just started up again.

Could you have Doug evict the culprits as you did last week?

David Pitson
Director of Finance
Climate Policy Initiative
180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Sent:** Friday, July 26, 2019 12:52 PM
**To:** David Pitson <David.Pitson@cpisf.org>
**Cc:** Woare, Elisabeth <elisabethwoare@dwt.com>; catherine.morrison@navigant.com
**Subject:** RE: Drilling

Hi David,

Just asked Doug to ask them to leave. I'll inform security to check 11th floor to make sure no one is working there.

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104

14

p: 415-986-8880 | f: 415-986-8846

**From:** David Pitson
**To:** Helen Ying Liu
**Cc:** Woare, Elisabeth; catherine.morrison@navigant.com
**Subject:** RE: Drilling
**Date:** Friday, July 26, 2019 1:25:52 PM

Thank you.

**From:** Helen Ying Liu
**To:** "Jamie Kiley"
**Cc:** Timothy.Davidson@wework.com; Aparna Joneja; Ben Wright (ben.wright2@wework.com);
brad.thomas3@wework.com
**Subject:** RE: Drilling Noise Complaint at 1:36pm
**Date:** Friday, July 26, 2019 1:37:00 PM

Hi Jamie,

Reporting to your team that I received another complaint this afternoon.

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846
**From:** Keren Gross [mailto:Keren.Gross@cpiclimatefinance.org]
**Sent:** Monday, July 29, 2019 8:56 AM
**To:** Helen Ying Liu
**Cc:** Woare, Elisabeth; David Pitson
**Subject:** Construction in our unit
**Importance:** High

Hi Helen,

There are workers in our unit preforming some loud work. We were never given noticed that they would enter our office.

This is deeply concerning. Can they be removed immediately.

Additionally, there is loud construction noise on the above floors.

Best,

**Keren Gross** | Senior Operations Associate

Climate Policy Initiative
180 Sansome Street Suite 1000 | San Francisco, CA 94104
T: +1.628.201.9226 | Skype: keren.gross@cpiclimatefinance.org
www.climatepolicyinitiative.org | @climatepolicy

**From:** Helen Ying Liu
**Sent:** Monday, July 29, 2019 9:09 AM
**To:** 'Keren Gross'
**Cc:** Woare, Elisabeth; David Pitson
**Subject:** RE: Construction in our unit

Hi Keren,

They're not supposed to work past 8:30am. They'll have to figure out another way to work at another time.

I'll have Doug remove them immediately.

Thank you.
**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Helen Ying Liu
**Sent:** Monday, July 29, 2019 9:09 AM
**To:** 'Jamie Kiley'
**Cc:** Douglas Davies; Aparna Joneja; Mark Kim; Timothy Davidson
**Subject:** RE: 180 Sansome - 10th Floor Access

Hi Jamie,

You guys cannot work on 10th past 8am

Tenant is already complaining

Regards,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Sent:** Monday, July 29, 2019 9:23 AM

16

**To:** Keren Gross <Keren.Gross@cpiclimatefinance.org>
**Cc:** Woare, Elisabeth <elisabethwoare@dwt.com>; David Pitson
<David.Pitson@cpisf.org>
**Subject:** RE: Construction in our unit

Hi Keren,

Also, were they doing drilling again above you? or banging noises? Have they stopped since Doug got there? I need to record the type of disruptions in our file.

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Keren Gross [mailto:Keren.Gross@cpiclimatefinance.org]
**Sent:** Monday, July 29, 2019 9:56 AM
**To:** Helen Ying Liu
**Cc:** Woare, Elisabeth; David Pitson
**Subject:** RE: Construction in our unit

Hi Helen,

The workers broke through the bathroom room floor. Someone could have been severely injured.

I'm not sure if its safe to be in our unit.

Keren

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Sent:** Monday, July 29, 2019 10:13:12 AM
**To:** Keren Gross <Keren.Gross@cpiclimatefinance.org>
**Cc:** Woare, Elisabeth <elisabethwoare@dwt.com>; David Pitson
<David.Pitson@cpisf.org>
**Subject:** RE: Construction in our unit

Hi Keren,

I need to have Doug check this. I am not aware of their scope involving 10th floor bathroom floor.

Let me know find out more information and I'll update you.

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Keren Gross
**To:** Helen Ying Liu
**Cc:** Woare, Elisabeth; David Pitson
**Subject:** Re: Construction in our unit
**Date:** Monday, July 29, 2019 10:42:12 AM
**Attachments:** Image-14.png

Hi Helen,

Doug came by and gave us an update.

I wanted to attach a photo to document the incident.

Noise is also still terrible.

Keren



**From:** David Pitson [mailto:David.Pitson@cpisf.org]
**Sent:** Monday, July 29, 2019 10:49 AM
**To:** Keren Gross
**Cc:** Helen Ying Liu; Woare, Elisabeth
**Subject:** Re: Construction in our unit

Helen. Did Doug ask the workers to leave?

Sent from my iPhone

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Sent:** Monday, July 29, 2019 10:59 AM
**To:** David Pitson <David.Pitson@cpisf.org>; Keren Gross <Keren.Gross@cpiclimatefinance.org>
**Cc:** Woare, Elisabeth <elisabethwoare@dwt.com>; catherine.morrison@navigant.com

**Subject:** RE: Construction in our unit

Hi Keren,

Thank you for the picture. Doug said Wework's plumber drilled through floor tile from the 9th floor.

Hi David,

The workers need to access 10th floor to fix the tile flooring in the restroom. But I have instructed Doug to stop work on the 11th floor, if any. Doug is going back over there to check.

Regards,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Keren Gross [mailto:Keren.Gross@cpiclimatefinance.org]
**Sent:** Monday, July 29, 2019 11:13 AM
**To:** Helen Ying Liu; David Pitson
**Cc:** Woare, Elisabeth; catherine.morrison@navigant.com
**Subject:** RE: Construction in our unit
**Importance:** High

Hi Helen,

They are still doing construction in our phone room in our unit.

This work is not approved during work hours. Please have the removed ASAP and that this is communicated to the team.

Best,
Keren

On Jul 29, 2019, at 11:17 AM, Helen Ying Liu <hliu@brothersintl.com> wrote:

Hi Jamie and team,

You guys need to do 10th floor scope after office hours. The Tenant is really upset now, especially since your sub drilled through their restroom floor from the 9th floor ceiling to the 10th floor.

Please pause your work on the 10th floor immediately.

Thank you,
**Helen Liu**

19

*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Sent:** Monday, July 29, 2019 11:23 AM
**To:** Keren Gross <Keren.Gross@cpiclimatefinance.org>; David Pitson <David.Pitson@cpisf.org>
**Cc:** Woare, Elisabeth <elisabethwoare@dwt.com>; catherine.morrison@navigant.com
**Subject:** RE: Construction in our unit

Hi Keren,

Doug said they already stopped?

He's there now. Let me know if you still hear noise from the 11th floor.

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Jamie Kiley [mailto:james.kiley@wework.com]
**Sent:** Monday, July 29, 2019 12:11 PM
**To:** Helen Ying Liu
**Cc:** Douglas Davies; Aparna Joneja; Mark Kim; Timothy Davidson
**Subject:** Re: 180 Sansome - 10th Floor Access

Helen,

The work on 10 is on hold and will be moved off hours.
--
**WeWork | Jamie Kiley**
Construction Superintendent, US West
M: 781.820.8211
wework.com
**Wework Construction**
California License #1041785
**Create Your Life's Work**
Get rewarded for good ideas and good people!
Apply for funding at **creatorawards.wework.com** or
help grow the community at **refer.wework.com**.

**From:** Keren Gross
**To:** Helen Ying Liu; David Pitson
**Cc:** Woare, Elisabeth; catherine.morrison@navigant.com
**Subject:** RE: Construction in our unit
**Date:** Monday, July 29, 2019 12:36:55 PM

Hi Helen,

Yes, Doug has stopped by and the workers on our floor have left.

But, there is still noise coming from the 11th floor.

Best,
Keren

On Jul 29, 2019, at 1:04 PM, Helen Ying Liu <hliu@brothersintl.com> wrote:

Hi Jamie,

Can you please ask the crew on 11th floor to clear out for today, Tenant is complaining

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Jamie Kiley [mailto:james.kiley@wework.com]
**Sent:** Monday, July 29, 2019 1:23 PM
**To:** Helen Ying Liu
**Cc:** Douglas Davies; Aparna Joneja; Mark Kim; Timothy Davidson
**Subject:** Re: 180 Sansome - 10th Floor Access

Helen,

Is this a formal direction to stop work? I will need to send along to our council if it is.

Thanks,
--
**WeWork | Jamie Kiley**
Construction Superintendent, US West
M: 781.820.8211
wework.com
**Wework Construction**
California License #1041785

21

**Create Your Life's Work**
Get rewarded for good ideas and good people!
Apply for funding at **creatorawards.wework.com** or
help grow the community at **refer.wework.com**.

**From:** Helen Ying Liu
**To:** "Jamie Kiley"
**Cc:** Douglas Davies; Aparna Joneja; Mark Kim; Timothy Davidson
**Subject:** RE: 180 Sansome - 10th Floor Access
**Date:** Monday, July 29, 2019 1:35:00 PM

Hi Jamie,

This is a direction to stop on 11th floor for today, because tenant has been complaining of construction noise being heard in their office from above them since this morning. I've got 7 emails from them since 8:56am regarding noise/construction issues.

Regards,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Keren Gross
**To:** Helen Ying Liu
**Cc:** Woare, Elisabeth; David Pitson
**Subject:** Terrible noise and drilling today
**Date:** Tuesday, July 30, 2019 1:44:24 PM

Hi Helen,

There's been constant noise and drilling all day.

We were told last week that most of the noisy work was completed but it appears that is not the case.

Is there any near insight or is this how its going to be until all of the construction complete.

Keren Gross | Senior Operations Associate
Climate Policy Initiative
180 Sansome Street Suite 1000 | San Francisco, CA 94104
T: +1.628.201.9226 | Skype: keren.gross@cpiclimatefinance.org
www.climatepolicyinitiative.org | @climatepolicy

**From:** David Pitson [mailto:David.Pitson@cpisf.org]
**Sent:** Wednesday, July 31, 2019 10:45 AM

**To:** Helen Ying Liu
**Cc:** Woare, Elisabeth; Catherine Morrison; Keren Gross
**Subject:** 11th floor

Dear Helen.

There is a lot of disruptive noise coming from the 11 floor again today.

Would you have Doug ask them to leave?

Thanks

David Pitson
Director of Finance
Climate Policy Initiative
180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Sent:** Wednesday, <mark>July 31, 2019 10:49 AM</mark>
**To:** David Pitson <David.Pitson@cpisf.org>
**Cc:** Woare, Elisabeth <elisabethwoare@dwt.com>; Catherine Morrison
<catherine.morrison@navigant.com>; Keren Gross <Keren.Gross@cpiclimatefinance.org>
**Subject:** RE: 11th floor

Hi David,

Is it drilling again?

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** David Pitson [mailto:David.Pitson@cpisf.org]
**Sent:** Wednesday, <mark>July 31, 2019 10:53 AM</mark>
**To:** Helen Ying Liu
**Cc:** Woare, Elisabeth; Catherine Morrison; Keren Gross
**Subject:** RE: 11th floor

Helen.

23

Drilling has just started now.

Dave

**From:** Helen Ying Liu
**To:** "David Pitson"
**Cc:** Woare, Elisabeth; Catherine Morrison; Keren Gross
**Subject:** RE: 11th floor
**Date:** Wednesday, July 31, 2019 10:55:00 AM

Understood. Thank you. Doug is heading over

Helen

**From:** Helen Ying Liu
**Sent:** Friday, August 02, 2019 1:38 PM
**To:** Jamie Kiley (james.kiley@wework.com);
Aparna Joneja; Timothy.Davidson@wework.com;
Mark Kim (mark.kim4@wework.com); Ben Wright
(ben.wright2@wework.com)
**Subject:** Noise today

Hi Jamie and team,

10th floor tenant is in the middle of a presentation, and there is hammering and drilling below them.

Please address ASAP so it won't disturb Tenant's business.

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** David Pitson
**Sent:** Friday, August 2, 2019 1:39 PM
**To:** Helen Ying Liu <hliu@brothersintl.com>
**Subject:** I can confirm drilling is still on right now

David Pitson
Director of Finance
Climate Policy Initiative
180 Sansome Street
Suite 1000

San Francisco. CA 94104
Direct: 628.201.9240

**From:** David Pitson [mailto:David.Pitson@cpisf.org]
**Sent:** Friday, August 02, 2019 1:40 PM
**To:** Helen Ying Liu
**Subject:** RE: I can confirm drilling is still on right now

And lots of hammering

My noise is from the 11th floor
On Aug 2, 2019, at 1:42 PM, Helen Ying Liu <hliu@brothersintl.com> wrote:

Hi Team,

I just received 4 emails in a row from 10th floor.
Drilling on the 11th floor as well.

Please stop all noisy work on 9th and 11th floor now. They're doing business presentation on the 10th.

Thanks,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Sent:** Friday, August 2, 2019 1:47 PM
**To:** David Pitson <David.Pitson@cpisf.org>
**Subject:** RE: I can confirm drilling is still on right now

Oh man, it's unbelievable, I'm sorry. I called and emailed them to stop immediately.

I dispatched my engineers to the 9th and 11th floor to make sure they stop.

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** David Pitson [mailto:David.Pitson@cpisf.org]
**Sent:** Friday, August 02, 2019 1:50 PM
**To:** Helen Ying Liu

25

**Subject:** RE: I can confirm drilling is still on right now

Thanks for support, but it keeps happening so we have to do something else.

One idea for you comes from our conversations with the workers.

They have mentioned that they were able to start work at 5 a.m. initially.

They now advise that they cannot start until 7.00 a.m.

If you could allow them to start earlier, they would get that much more done before the 8.30 cut off time we have observed.

Dave

**From:** Jamie Kiley [mailto:james.kiley@wework.com]
**Sent:** Friday, <mark>August 02, 2019 1:58 PM</mark>
**To:** Helen Ying Liu
**Cc:** Aparna Joneja; Timothy.Davidson@wework.com; Mark Kim (mark.kim4@wework.com); Ben Wright (ben.wright2@wework.com)
**Subject:** Re: Noise today
Helen,

I went to the floors when you called we were not performing noisy work but we did stop the crews early to just clean up for the last 30 minutes of the day.

Thanks,
--
**WeWork | Jamie Kiley**
Construction Superintendent, US West
M: 781.820.8211
wework.com
**Wework Construction**
California License #1041785
**Create Your Life's Work**
Get rewarded for good ideas and good people!
Apply for funding
at **creatorawards.wework.com** or
help grow the community at **refer.wework.com**.

**From:** Helen Ying Liu
**To:** "David Pitson"
**Subject:** RE: I can confirm drilling is still on right now
**Date:** Friday, <mark>August 02, 2019 2:13:00 PM</mark>

Hi David

We never said to start 7am on weekdays. Our security is here 4:30am-5:00am on weekdays (because Rumble opens that time). We only said start 7am on weekends because security is here at 7am on weekends. We actually encourage them to start doing noisy work early on the weekdays or do it on the weekend.

Weekdays cut off time is 8:30am and weekend there's no cut off time.

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

On Aug 2, 2019, at 4:53 PM, Helen Ying Liu hliu@brothersintl.com wrote:

Hi Jamie,

Ricardo went back before 3pm to ask your guys to stop.
Tenant informed construction noise have ceased after that.

Regards,
**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Helen Ying Liu
**Sent:** Monday, August 05, 2019 2:48 PM
**To:** Jamie Kiley
**Cc:** Aparna Joneja; Timothy.Davidson@wework.com; Mark Kim (mark.kim4@wework.com); Ben Wright (ben.wright2@wework.com)
**Subject:** Re: Noise today

Hi Jamie and Team,

10th floor tenant emailed me at 10:37am to report disruptive construction noise, I asked them for what specific noises they're hearing, they said the usual drilling/hammering. Please make sure to mitigate disruptive construction noises during business hours so it won't disrupt tenant's business.

Thank you,
Helen Liu
Operations Manager
300 Prospect Properties, Inc

On Aug 8, 2019, at 10:35 AM, David Pitson <David.Pitson@cpisf.org> wrote:

Could you please evict the culprits?

Thanks

David Pitson
Director of Finance
Climate Policy Initiative
180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Sent:** Thursday, August 8, 2019 11:44 AM
**To:** David Pitson <David.Pitson@cpisf.org>
**Cc:** Keren Gross <Keren.Gross@cpiclimatefinance.org>; Farren, Rhys
<rhysfarren@dwt.com>; Catherine Morrison <catherine.morrison@navigant.com>
**Subject:** Re: drilling has resumed above us

Hi David and Keren,

James said one of you guys went to 11th floor? Next time please don't go by yourself, it's not safe on
construction site.

Do you have a recording of previous noise issues?

Thank you so much
Helen

Sent from my iPhone

**From:** David Pitson [mailto:David.Pitson@cpisf.org]
**Sent:** Thursday, August 08, 2019 11:47 AM
**To:** Helen Ying Liu
**Cc:** Keren Gross; Farren, Rhys; Catherine Morrison
**Subject:** RE: drilling has resumed above us

Dear Helen.

We do not have a recording of noises but would be happy to do that if you could supply us with the appropriate
equipment. I would hope that you could have done that as Property Manager who has been dealing with this
issue for many weeks?

As you have noted yourself on your visits, the noise is not appropriate.

Dave

28

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Sent:** Thursday, August 8, 2019 11:49:23 AM
**To:** David Pitson <David.Pitson@cpisf.org>
**Cc:** Keren Gross <Keren.Gross@cpiclimatefinance.org>; Farren, Rhys
<rhysfarren@dwt.com>; Catherine Morrison <catherine.morrison@navigant.com>
**Subject:** RE: drilling has resumed above us

Hi David,

I have a recording. We'll discuss this tomorrow as well.

Regards,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

On Aug 8, 2019, at 11:50 AM, Helen Ying Liu <hliu@brothersintl.com> wrote:

Hi Wework Team,

Reporting that 10th floor reported drilling again above them. Please take necessary steps to mitigate the noise today.

Thank you!

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

On Aug 8, 2019, at 12:49 PM, Keren Gross <Keren.Gross@cpiclimatefinance.org> wrote:

Hi Helen,

Drilling is still going on. As I mentioned a few times, we have high level executive meetings this week. The noise is really disruptive.

Keren
**From:** Helen Ying Liu
**To:** Keren Gross
**Cc:** David Pitson; Farren, Rhys; Catherine Morrison
**Subject:** Re: drilling has resumed above us

29

**Date:** Thursday, August 08, 2019 2:01:59 PM

Doug is going over there now.

Sent from my iPhone

On Aug 8, 2019, at 2:03 PM, Helen Ying Liu <hliu@brothersintl.com> wrote:

Team,

It's happening again. Please I'm urging you guys to mitigate the noise. Tenant is having executive meetings this week.

Helen

Sent from my iPhone

**From:** Jamie Kiley
**To:** Helen Ying Liu
**Cc:** Aparna Joneja; Timothy.Davidson@wework.com; Mark Kim (mark.kim4@wework.com); Ben Wright (ben.wright2@wework.com)
**Subject:** Re: Noise today
**Date:** Thursday, August 08, 2019 2:13:32 PM

Helen,

They are saying they hear noise now ? There is no one on the floors the electricians already cleaned up.
We walked the floor earlier when you asked us and nothing out of the ordinary was going on then either we have significantly curtailed work on these floors as drywall hanging is complete.

Thanks,
--
**WeWork | Jamie Kiley**
Construction Superintendent, US West
M: 781.820.8211
wework.com
**Wework Construction**
California License #1041785
**Create Your Life's Work**
Get rewarded for good ideas and good people!
Apply for funding at **creatorawards.wework.com** or
help grow the community at **refer.wework.com**.

**From:** David Pitson
**To:** Helen Ying Liu
**Cc:** Barbara Buchner; Keren Gross; Cate McDonough; Farren, Rhys
**Subject:** Noise Level
**Date:** Tuesday, August 13, 2019 9:22:22 AM

Dear Helen.

The drilling and hammering has started up again this morning.

Fortunately it does not appear to be directly above us, so the noise is not as punishing as in the past, but it is still quite disruptive as it reverberates through the building.

Could you confirm that the contractor is restricted from drilling and hammering during business hours, and if so, send someone over to evict the construction team?

Thanks
Dave
David Pitson
Director of Finance
Climate Policy Initiative
180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240

On Aug 22, 2019, at 12:24 PM, David Pitson <David.Pitson@cpisf.org> wrote:

Right above our heads.

Hard to think.

Can you sent someone over again?

thanks

David Pitson
Director of Finance
Climate Policy Initiative
180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Sent:** Thursday, August 22, 2019 12:52 PM
**To:** David Pitson <David.Pitson@cpisf.org>
**Cc:** Keren Gross <Keren.Gross@cpiclimatefinance.org>; Farren, Rhys <rhysfarren@dwt.com>; Catherine Morrison <catherine.morrison@navigant.com>
**Subject:** Re: Hammering of pipes

Can I send the sound consultant to record now? He will come with recording equipment.

Thank you
Helen

Sent from my iPhone

**From:** David Pitson <David.Pitson@cpisf.org>
**Sent:** Thursday, August 22, 2019 1:10 PM

**To:** Helen Ying Liu <hliu@brothersintl.com>
**Cc:** Keren Gross <Keren.Gross@cpiclimatefinance.org>; Farren, Rhys <rhysfarren@dwt.com>; Catherine Morrison <catherine.morrison@navigant.com>
**Subject:** RE: Hammering of pipes

Helen.

The equipment needs to be here all the time so that it can capture the short, but intense noise that often happens.  It makes no sense to try and organize the consultant after the fact.

As long as you agree that the report will be available to both of us, and that it will not be used against us in any future legal action, let's get the equipment installed on a permanent basis.

thanks

**From:** David Pitson
**To:** Helen Ying Liu
**Cc:** Farren, Rhys; Keren Gross; Catherine Morrison
**Subject:** Drilling
**Date:** Friday, August 23, 2019 11:26:03 AM

Helen.

Drilling has commenced once again above us.

Would be helpful if Doug came over to ask them to leave.

Dave
David Pitson
Director of Finance
Climate Policy Initiative
180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240
On Fri, Aug 23, 2019 at 11:29 AM Helen Ying Liu hliu@brothersintl.com wrote:

Hi Tim,

10th floor reported drilling noise above them. Please mitigate.

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

On Aug 23, 2019, at 12:05 PM, Timothy Davidson <timothy.davidson@wework.com> wrote:

Hi Helen,

I am investigating now and we will mitigate this for the remainder of the day.

Thanks

**From:** Helen Ying Liu
**To:** Timothy Davidson
**Cc:** Aparna Joneja; Mark Kim (mark.kim4@wework.com); Ben Wright (ben.wright2@wework.com)
**Subject:** Re: Drilling Noise Complaint -180 Sansome
**Date:** Friday, August 23, 2019 12:08:23 PM

Thanks

Sent from my iPhone

**From:** David Pitson
**To:** Helen Ying Liu
**Cc:** Farren, Rhys
**Subject:** Drilling again
**Date:** Tuesday, September 3, 2019 10:57:30 AM

Dear Helen.

Drilling above us has started up again.

Can Doug speak to them?

Dave
David Pitson
Director of Finance
Climate Policy Initiative
180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240

On Tue, Sep 3, 2019 at 1:41 PM Helen Ying Liu <hliu@brothersintl.com> wrote:

Hi Tim,

Got noise complaint today around 11am. Drilling noise above 10th floor. Please no drilling scope during office hours.

Thank you
Helen

Sent from my iPhone

**From:** Timothy Davidson
**To:** Helen Ying Liu
**Cc:** Mark Kim; Aparna Joneja; Ben Wright; geoffrey.bockwillmes@wework.com
**Subject:** Re: Noise complaint today
**Date:** Tuesday, September 3, 2019 2:06:25 PM

Hi Helen,

We went and checked this out. By the time we received the complaint, the floor was cleared out. Danny also informed me that he did not see any trades on the 11th floor when he was there at 11am but we will keep an eye on it when activities start up again.

Thanks

**From:** David Pitson
**To:** Helen Ying Liu
**Cc:** Barbara Buchner; Farren, Rhys
**Subject:** Drilling
**Date:** Friday, September 6, 2019 10:30:59 AM

Dear Helen.

Just 5 minutes ago the drilling above us commenced and caused us to terminate our executive team meeting because of the sound.

David Pitson
Director of Finance
Climate Policy Initiative
180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240

**From:** Helen Ying Liu
**To:** Timothy.Davidson@wework.com
**Cc:** "Aparna Joneja"; Ben Wright (ben.wright2@wework.com); Mark Kim (mark.kim4@wework.com);
geoffrey.bockwillmes@wework.com
**Subject:** Noise Complaint Today 9-6-19
**Date:** Friday, September 6, 2019 10:37:00 AM

Hi Tim,

10th floor tenant reported drilling noise above them 5 minutes ago, they ended their executive team meeting due to the disruption.

I urge everyone to not perform noisy construction work during business hours.

34

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

On ==Sep 11, 2019, at 8:57 AM==, Keren Gross <Keren.Gross@cpiclimatefinance.org> wrote:

Hi Helen,

Lots of drilling and hammering above us this morning.

Can we send someone to put a stop to the noise.

Best,

**Keren Gross** | Senior Operations Associate
Climate Policy Initiative
180 Sansome Street Suite 1000 | San Francisco, CA 94104
T: +1.628.201.9226 | Skype: keren.gross@cpiclimatefinance.org
www.climatepolicyinitiative.org | @climatepolicy

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Sent:** Wednesday, ==September 11, 2019 9:04 AM==
**To:** Keren Gross <Keren.Gross@cpiclimatefinance.org>
**Cc:** Qianwen Chen <QChen@brothersintl.com>; David Pitson <David.Pitson@cpisf.org>; Farren, Rhys <rhysfarren@dwt.com>
**Subject:** Re: Drilling/Hammering

Hi Keren,

I'm heading over myself. Every time I tell them to stop performing noisy construction work during business hours, they say they're not doing anything noisy.

Thanks

Helen
Sent from my iPhone

**From:** Helen Ying Liu
**To:** Keren Gross
**Cc:** Qianwen Chen; David Pitson; Farren, Rhys
**Subject:** RE: Drilling/Hammering
**Date:** Wednesday, ==September 11, 2019 10:42:00 AM==
Hi Keren,

35

Has the noisy construction sounds stopped since my last email?

Thanks,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Helen Ying Liu [mailto:hliu@brothersintl.com]
**Sent:** Wednesday, <mark>September 11, 2019 10:54 AM</mark>
**To:** Timothy.Davidson@wework.com; Ben Wright (ben.wright2@wework.com) <ben.wright2@wework.com>; Mark Kim (mark.kim4@wework.com) <mark.kim4@wework.com>; Aparna Joneja <aparna.joneja@wework.com>
**Cc:** Thomas Tin <ttin@brothersintl.com>; William Logan <wlogan@loganmooneyllp.com>; Laura Mooney <lmooney@loganmooneyllp.com>
**Subject:** Noise Complaint Today 9-11-19 and Elevator A Use

Hi Tim and Wework Team,

We received a noise complaint today at 8:57am from 10th floor described as "Lots of drilling and hammering above us this morning."

While on site this morning, there was several instances of subcontractors using Elevator A. Some of them came out from the elevator to the lobby, I don't which floor they came from. Another group of subcontractors was calling Elevator A from the 3rd floor and used it to go down to lobby. Please reiterate to them again that subcontractors are not allowed to use Elevator A during business hours, and without prior written approval.

Thank you,
**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f:  415-986-8846

**From:** Ben Wright [mailto:ben.wright2@wework.com]
**Sent:** Wednesday, <mark>September 11, 2019 11:27 AM</mark>
**To:** Helen Ying Liu <hliu@brothersintl.com>
**Cc:** Timothy.Davidson@wework.com; Mark Kim (mark.kim4@wework.com) <mark.kim4@wework.com>; Aparna Joneja <aparna.joneja@wework.com>; Thomas Tin <ttin@brothersintl.com>; William Logan <wlogan@loganmooneyllp.com>; Laura Mooney <lmooney@loganmooneyllp.com>
**Subject:** Re: Noise Complaint Today 9-11-19 and Elevator A Use

Helen,

Thank you for the notice. We have confirmed that no activities specified in the rules and regulations were occurring at the time of the complaint.

From a report from our subcontractor, we understand that you entered the WeWork space during active construction, without PPE or other safety equipment, to provide direction to the contractor. In accordance with the lease related to entry of the Premises and with our concern for your personal safety please utilize WeWork's Site Supervision as a conduit for providing direction to subcontractors. Your team's safety is our highest priority.

Thank you for bringing your understanding of the elevator issue to our attention. We have swiftly notified all contractors that any construction personnel observed using the elevator after 8 am will be promptly escorted off of the project site.

36

**WeWork | Ben Wright, PE, PMP**
**WeWork Construction**
**CA License #1041785**
Sr. Construction Project Lead
M: 415-857-5435
wework.com

**Create Your Life's Work**

Get rewarded for good ideas and good people!
Apply for funding at **creatorawards.wework.com** or
help grow the community at **refer.wework.com**.

**From:** David Pitson <David.Pitson@cpisf.org>
**Sent:** Wednesday, September 11, 2019 12:33 PM
**To:** Helen Ying Liu <hliu@brothersintl.com>
**Cc:** Keren Gross <Keren.Gross@cpiclimatefinance.org>; Farren, Rhys <rhysfarren@DWT.com>
**Subject:** Drilling and grinding above us
Has started again.
Coming over for a "chat" is not working.
David Pitson
Director of Finance
Climate Policy Initiative
180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240

**From:** Helen Ying Liu [mailto:hliu@brothersintl.com]
**Sent:** Wednesday, September 11, 2019 1:53 PM
**To:** Ben Wright <ben.wright2@wework.com>
**Cc:** Timothy.Davidson@wework.com; Mark Kim (mark.kim4@wework.com) <mark.kim4@wework.com>; Aparna
Joneja <aparna.joneja@wework.com>; Thomas Tin <ttin@brothersintl.com>; William Logan
<wlogan@loganmooneyllp.com>; Laura Mooney <lmooney@loganmooneyllp.com>
**Subject:** RE: Noise Complaint Today 9-11-19 and Elevator A Use

Hi Ben,

Thank you for your prompt attention in this matter.

Received another drilling and grinding noise complaint from 10th floor, reporting noise from above them around
12:33 PM. Geoff has been informed.

Regarding the elevator A use for Wework Construction, I have confirmed with management that Wework
Construction should not use Elevator A due to it being the only elevator remaining in operation at this time, and
should be reserved for Tenant's use during business hours. Wework Construction is the not the Tenant.

Regards,
**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f:  415-986-8846

**From:** Helen Ying Liu
**To:** "David Pitson"
**Cc:** Keren Gross; Farren, Rhys
**Subject:** RE: Drilling and grinding above us
**Date:** Wednesday, September 11, 2019 2:35:00 PM

Hi David,

Honestly, I have no words. I notified Danny and he went up to ask their superintendent to stop immediately.

Regards,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Keren Gross
**To:** Helen Ying Liu
**Cc:** David Pitson; Melody Salerno; Farren, Rhys
**Subject:** Construction damage in our unit
**Date:** Friday, September 13, 2019 11:40:18 AM

Hi Helen,

It looks like the construction team broke through our floor again. This time in the carpet area. Photos are attached.

 

Best,

Keren

38

On Fri, Sep 13, 2019 at 11:47 AM Helen Ying Liu <hliu@brothersintl.com> wrote:

Ben,

As I was notifying the 10th floor tenant about Wework's use of the elevator A next week, tenant emailed me reporting your subs broke into their floor again! This time in the middle of their suite. See below pictures.

Doug and Danny is going there right now.

Landlord is not responsible for any costs incurred related to disruptions related to changes in access to an elevator, so please don't try to put this on the Landlord.

 

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

On Sep 13, 2019, at 11:51 AM, Helen Ying Liu <hliu@brothersintl.com> wrote:

Hi Keren,

Thank you for the pics. Danny and Doug has been dispatch to investigate

Thanks
Helen

Sent from my iPhone

39

On Sep 13, 2019, at 12:16 PM, David Pitson <David.Pitson@cpisf.org> wrote:
!!!
Sent from my iPhone

On Fri, Sep 13, 2019 at 12:27 PM Ben Wright <ben.wright2@wework.com> wrote:

Helen,
Thank you for the notice. We met Doug on the 9th floor and reviewed the potential causes of the damage. There was no overhead work going on at the time you reported this to us. It appears to be related to ceiling anchors set by electricians several weeks ago. The debris has been cleaned up immediately and we will have re-grouted next week.

It is important to reiterate the no work penetrating floors occurs during business hours. WeWork Construction has also implemented depth guards on all deck penetrating devices. Thus it is important to know that the tenant was exposed to harm.

Thank you again for letting me know.

Ben

**WeWork | Ben Wright, PE, PMP**
**WeWork Construction**
**CA License #1041785**
Sr. Construction Project Lead
M: 415-857-5435
wework.com
Create Your Life's Work
Get rewarded for good ideas and good people!
Apply for funding at **creatorawards.wework.com** or
help grow the community at **refer.wework.com**.

**From:** Ben Wright
**To:** Helen Ying Liu
**Cc:** Geoffrey Bock-Willmes; Aparna Joneja; Mark Kim; Douglas Davies; Timothy Davidson
**Subject:** Re: 180 Sansome - Elevator use
**Date:** Friday, September 13, 2019 1:08:06 PM
**Attachments:** image003.png
image007.png
image008.png
image009.png

Helen - correction -

* Thus it is important to know that the tenant was **NOT** exposed to harm.*

**WeWork | Ben Wright, PE, PMP**
**WeWork Construction**
**CA License #1041785**
Sr. Construction Project Lead

M: 415-857-5435
wework.com
Create Your Life's Work
Get rewarded for good ideas and good people!
Apply for funding at **creatorawards.wework.com** or
help grow the community at **refer.wework.com**.

**From:** Helen Ying Liu
**To:** Keren Gross
**Cc:** David Pitson
**Subject:** Re: Construction damage in our unit
**Date:** Friday, September 13, 2019 2:05:29 PM

Hi Keren,

How did you discover the damage? Was it drilled today?

I'm gathering full reports.

Thank you so much
Helen

Sent from my iPhone

**From:** Helen Ying Liu [mailto:hliu@brothersintl.com]
**Sent:** Monday, September 16, 2019 9:49 AM
**To:** Ben Wright (ben.wright2@wework.com) <ben.wright2@wework.com>; Aparna Joneja <aparna.joneja@wework.com>; Mark Kim (mark.kim4@wework.com) <mark.kim4@wework.com>; Timothy.Davidson@wework.com
**Cc:** Thomas Tin <ttin@brothersintl.com>; William Logan <wlogan@loganmooneyllp.com>; Laura Mooney <lmooney@loganmooneyllp.com>
**Subject:** Noise Complaint Today 9-16-19

Hi Wework Construction team,

10th floor reported drilling noise past 8:30am today. I believe Doug and Danny already spoke to you guys promptly after receiving the report. 10th floor have a Board of Directors meeting today, please reiterate to all your subs again no noisy construction work during business hours.

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f:  415-986-8846

**From:** Mark Kim [mailto:mark.kim4@wework.com]
**Sent:** Monday, September 16, 2019 10:15 AM
**To:** Helen Ying Liu <hliu@brothersintl.com>
**Cc:** Ben Wright (ben.wright2@wework.com) <ben.wright2@wework.com>; Aparna Joneja <aparna.joneja@wework.com>; Timothy.Davidson@wework.com; Thomas Tin <ttin@brothersintl.com>;

41

William Logan <wlogan@loganmooneyllp.com>; Laura Mooney <lmooney@loganmooneyllp.com>
**Subject:** Re: Noise Complaint Today 9-16-19

Helen,

Are you directing us to stop work for the rest of the day or for a specific period of time?  Is this a meeting that occurs weekly?  If we had a schedule with times of important meetings by your tenants, we can share this with our subcontractors to have them work in other areas during those times.  Is this something you can provide?

**WeWork | Mark Kim**
**WeWork Construction**
**CA License #1041785**
Senior Project Manager
C: 415.793.9048
wework.com

**Create Your Life's Work**

Get rewarded for good ideas and good people!
Apply for funding at **creatorawards.wework.com** or
help grow the community at **refer.wework.com**.

On Sep 16, 2019, at 10:23 AM, David Pitson <David.Pitson@cpisf.org> wrote:

Helen.

Drilling is nonstop right now.

Board meeting about to start.

What are you doing??

Dave

David Pitson
Director of Finance
Climate Policy Initiative
180 Sansome Street
Suite 1000
San Francisco. CA 94104
Direct: 628.201.9240

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Sent:** Monday, September 16, 2019 11:46 AM
**To:** David Pitson <David.Pitson@cpisf.org>
**Cc:** Farren, Rhys <rhysfarren@dwt.com>; Keren Gross <Keren.Gross@cpiclimatefinance.org>
**Subject:** Re: Drilling

Hi Dave,

They just won't listen!

Doug and Dan took care of it when they received the report from Keren. I'm working with Bill and Laura on this

Thanks
Helen

Sent from my iPhone

**From:** David Pitson <David.Pitson@cpisf.org>
**Sent:** Monday, September 16, 2019 11:48 AM
**To:** Helen Ying Liu <hliu@brothersintl.com>
**Cc:** Farren, Rhys <rhysfarren@dwt.com>; Keren Gross <Keren.Gross@cpiclimatefinance.org>
**Subject:** RE: Drilling

Helen.
YOU OWN THE BUILDING!!!!!

Kick them out if they will not listen.

**From:** Keren Gross [mailto:Keren.Gross@cpiclimatefinance.org]
**Sent:** Monday, September 16, 2019 1:11 PM
**To:** David Pitson <David.Pitson@cpisf.org>; Helen Ying Liu <hliu@brothersintl.com>
**Cc:** Farren, Rhys <rhysfarren@dwt.com>
**Subject:** RE: Drilling

Hi Helen,

Drilling has started up again.

Keren

**From:** Keren Gross <Keren.Gross@cpiclimatefinance.org>
**Sent:** Tuesday, September 17, 2019 10:27 AM
**To:** Helen Ying Liu <hliu@brothersintl.com>
**Cc:** David Pitson <David.Pitson@cpisf.org>; Farren, Rhys <rhysfarren@dwt.com>
**Subject:** Drilling + Hammering Above us

Hi Helen,

There's been lots of drilling and hammering this morning.

Best,
**Keren Gross** | Senior Operations Associate

Climate Policy Initiative

180 Sansome Street Suite 1000 | San Francisco, CA 94104

T: +1.628.201.9226 | Skype: keren.gross@cpiclimatefinance.org

www.climatepolicyinitiative.org | @climatepolicy

**From:** Keren Gross <Keren.Gross@cpiclimatefinance.org>
**Sent:** Monday, September 23, 2019 8:47 AM
**To:** Helen Ying Liu <hliu@brothersintl.com>
**Cc:** David Pitson <David.Pitson@cpisf.org>; Farren, Rhys <rhysfarren@dwt.com>
**Subject:** construction noise
Hi Helen,
Lots of drilling and sawing noise this morning.
Can you have someone sent up to the construction team.
Best,
**Keren Gross** | Senior Operations Associate

Climate Policy Initiative
180 Sansome Street Suite 1000 | San Francisco, CA 94104
T: +1.628.201.9226 | Skype: keren.gross@cpiclimatefinance.org
www.climatepolicyinitiative.org | @climatepolicy

**From:** Helen Ying Liu
**To:** "Keren Gross"
**Cc:** David Pitson; Farren, Rhys
**Subject:** RE: construction noise
**Date:** Monday, September 23, 2019 9:41:00 AM

Hi Keren,

I have dispatched Danny to go see them.

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Helen Ying Liu
**To:** Ben Wright (ben.wright2@wework.com); Timothy.Davidson@wework.com; "Aparna Joneja"; Mark Kim
(mark.kim4@wework.com); "Geoffrey Bock-Willmes"
**Cc:** Thomas Tin; William Logan; Laura Mooney (lmooney@loganmooneyllp.com)
**Subject:** Construction Noise Complaint today 9-23-19
**Date:** Monday, September 23, 2019 9:43:00 AM

Hi Ben and Wework Construction Team,

10th floor reported lots of drilling and sawing noises this morning. Please remind your subs NO noisy
construction work during business hours.

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

44

EXHIBIT B

## 300 PROSPECT PROPERTIES, INC.
### 100 BUSH STREET, SUITE 218
### SAN FRANCISCO, CALIFORNIA 94104

TEL: (415) 986-8880    FAX: (415) 986-8846

July 26, 2019

180 Sansome Street Tenant LLC          180 Sansome Street Tenant LLC
c/o WeWork Companies Inc.               c/o WeWork Companies Inc.
115 West 18th Street, 2nd Floor         115 West 18th Street, 2nd Floor
New York, NY 10011                      New York, NY 10011
Attn: Lease Administration              Attn: Legal Department

With Copy to:
Corporation Service Company DBA CSC-Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95833-3505

### RE: Construction Noise

Dear Tenant:

Reference is made to that 180 Sansome Street Office Lease dated November 29, 2018 (the "Lease") between 300 Prospect Properties, Inc. ("Landlord"), and 180 Sansome Street Tenant LLC ("Tenant"), pursuant to which Tenant leases certain premises from Landlord (the "Premises") in the building located at 180 Sansome Street, San Francisco, California (the "Building"). Capitalized terms used but not defined in this letter have the meanings given to such terms in the Lease.

Section 8C of the Lease provides that, in making alterations to the Premises, Landlord may restrict the times in which Tenant conducts the following work: "(i) shooting of studs for mechanical fastenings;...(iv) core drilling; (v) penetration of floors or ceilings; and (vi) any work that can be heard outside of the Premises which Landlord reasonably believes will interfere with the quiet enjoyment of other tenants or as to which Landlord receives [sic] or more reasonable complaints from other tenants in the Building".

Tenant is currently constructing its initial alterations in the Premises pursuant to the Lease and the Work Letter Agreement attached as Exhibit B to the Lease. As a result of construction noise caused by Tenant or its contractors in the Premises, Landlord has received numerous complaints from its tenth floor tenant in the Building over a period from May 16, 2019 through the present. The complaints have indicated Tenant or its contractors are engaged in activities including drilling, grinding, moving heavy equipment, and loud banging during the Building's Business Hours (defined in the Lease as 8 a.m. to 6 p.m. Monday through Friday, except specified holidays).

Because the activities of Tenant or its contractors have involved drilling and other work which has been heard outside of the Premises and which Landlord reasonably believes is interfering with other tenants' quiet enjoyment of their premises, and Landlord has in fact received numerous complaints, Landlord has instructed Tenant to conduct those activities outside of the Building's Business Hours. Tenant and its contractors have failed on numerous occasions to comply with these instructions, constituting a pattern of disregard for the requirements of the Lease. On multiple occasions, Tenant's construction superintendent has argued that the noise at

issue is within "commercially reasonable standards". Landlord disputes this assertion given the nature of the noise its tenant has complained about, as witnessed by Landlord's representatives, but that argument is not relevant because the relevant provision of the Lease, cited above, does not turn on whether the applicable construction noise is within commercially reasonable standards. Instead, it turns on whether Tenant or its contractors are generating noise that can be heard outside of the Premises which Landlord reasonably believes will interfere with the quiet enjoyment of other tenants, or as to which Landlord receives reasonable complaints from other tenants in the Building.

Tenant or its contractor is generating noise which can be heard outside the Premises, and Landlord reasonably believes it is interfering with other tenants' quiet enjoyment of their premises, and has exercised its right to cause Tenant to conduct those activities after Business Hours. Tenant has repeatedly failed to conduct those activities after hours in accordance with Landlord's instructions. Therefore, Tenant is in default under the Lease. Landlord's tenth floor tenant has threatened to bring legal action against Landlord as a result of Tenant's construction noise. In the event such legal action occurs, Landlord may seek defense and indemnity from Tenant under Section 12A of the Lease, which requires Tenant to indemnify, defend, and hold Landlord harmless from and against any and all claims, demands, liabilities, damages, and other matters caused by Tenant's and its employees' and contractors' violation of the Lease. In addition, Landlord reserves all other rights and remedies under the Lease or at law or in equity with respect to Tenant's breach of the Lease.

Regards,
*300 Prospect Properties, Inc.*

Helen Liu
*Operations Manager*

c. Thomas Tin
   Brad Van Blois
   Arash Gohari
   Chris Grimaldi
   Brad S. Thomas

2

EXHIBIT C

# **we**work®

August 2, 2019

Helen Liu                                                                                   Via email only
300 PROSPECT PROPERTIES, INC.
100 Bush Street, Suite 218
San Francisco, CA 94104

      Re:    **180 Sansome Street, San Francisco, CA**
              **WeWork – Construction Noise**

Dear Ms. Liu,

      Thank you for your July 26, 2019 letter.

      WeWork has fully complied with its obligations under its Lease in relation to its construction of tenant improvements and, specifically, with regard to its noise generating activities.  WeWork has and will provide, if needed, video recordings of its activities in its space as evidence of (i) its full compliance with the Lease and (ii) confirmation that WeWork is performing, during business hours, only that work, the scope of which is typical and customary in commercial tenant improvement projects performed in multi-tenanted buildings.  Notwithstanding your declaration to the contrary, WeWork is not in default under the Lease.

      Section 8(c) of the Lease imposes a reasonableness standard to this situation.  The tenant complaints and the expectation that reasonable construction related sounds would not be heard on adjacent floors is unreasonable in any commercial tenant improvement project.  In this case, it appears the adjacent floor tenants have little experience with, and unrealistic expectations about, what is reasonable in this context, which have led to their unreasonable complaints.

      Notwithstanding the foregoing, WeWork has rescheduled its current work on Floor 11 from normal business hours to after hours and the weekend in response to your request and to minimize any impact on the 10th floor tenant.  This rescheduling effort will result in project delays and additional project costs, for which WeWork reserves its right to seek recovery from the Landlord under the Lease.

      WeWork requests that the Landlord notify the adjacent floor tenant of WeWork's accommodation and inform the adjacent floor tenant of what is reasonable noise during a tenant improvement project in a multi-tenanted building.

      Please feel free to contact me if you have any questions that the onsite team cannot answer.

      Respectfully,

      *Brad S. Thomas*

      Brad S. Thomas
      Transaction Manager and Special Counsel

BST/tm
Cc: Eric Lunsford, Esq.
    Arash Gohari
    Chris Grimaldi
    Aparna Joneja
    Matt Brandt, Esq.

EXHIBIT D

**From:** Jamie Kiley
**To:** Helen Ying Liu
**Cc:** Mark Kim; Aparna Joneja; Timothy Davidson
**Subject:** 8th Floor Tenant
**Date:** Tuesday, August 06, 2019 5:38:06 PM

Helen,

I just wanted to follow up on our call earlier. We were unaware the 8th floor tenant had returned all we had been told was that they were returning in early August. I asked Bruce this morning if he knew when they were returning as well since we had a minor delay with the SF
Plumbing inspector.

As far the work, the ceiling is patched and just needs to be finished and painted, work which we can easily do in the mornings before the tenant comes in. Tomorrow we will start the sanding and remove the protection so it is a functional restroom and then we will just continue the work in the early mornings from 5-8AM. It should all be wrapped up by the end of the week.

If you have further questions let us know. I think this one snuck up on all of us.

Thanks,
--
**WeWork | Jamie Kiley**
**WeWork Construction**
**CA License #1041785**
Construction Superintendent
M: 781-820-8211
wework.com
Create Your Life's Work
Get rewarded for good ideas and good people!
Apply for funding at **creatorawards.wework.com** or
help grow the community at **refer.wework.com**.

**From:** Helen Ying Liu
**To:** Timothy.Davidson@wework.com; Aparna Joneja; Ben Wright (ben.wright2@wework.com); Mark Kim
(mark.kim4@wework.com)
**Cc:** Geoffrey Bock-Willmes; Thomas Tin
**Subject:** Noise Complaint Today -180 Sansome 8th floor
**Date:** Monday, September 9, 2019 11:02:00 AM

Hi Tim and Wework Team,
Please stop noisy construction work during business hours. School has started on the 8th floor, and they can hear loud construction noise from below them.

The Tenant brought it to our team's attention today during the middle of their class, and the Engineers promptly called Geoff to have this stopped.

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Date:** Tuesday, September 10, 2019 at 8:43 AM
**To:** MORRIS Ronald <rmorris@inseec.com>
**Subject:** Construction Noise Reported 9-10-19

Hi Ron,

Doug just called me to let me know that you reported construction noise (drilling noise) right now.

Please confirm correct.

I am contacting wework to have them stop. I told them yesterday that noisy construction work CANNOT be performed during business hour, but I guess it was ignored.

Thank you,
**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** MORRIS Ronald
**To:** Helen Ying Liu
**Subject:** Re: Construction Noise Reported 9-10-19
**Date:** Tuesday, September 10, 2019 8:48:41 AM

Hi Helen,

That is correct.

Repeated cases of noise after 8:30 am. I needed to contact Doug several times yesterday before they finally stopped.

I have to say that we have been accommodating this summer, but also clear that as of Sept we need acceptable conditions to conduct our business. The elevator is another serious issue affecting our business.

Thank you,

Ron
Ron Morris
Director
INSEEC San Francisco
180 Sansome Street, Suite 800
San Francisco, CA 94104
+1 925 596-5523

On Tue, Sep 10, 2019 at 8:57 AM Helen Ying Liu <hliu@brothersintl.com> wrote:

Hi Wework,

Another construction noise complaint was reported to us just now, drilling noise that can be heard on the 8th floor.

Again, PLEASE stop performing disruptive/noisy construction work during business hour.

School has started on the 8th floor, and it's very disruptive for the student. Tenant already express concerns over how it affects their business.

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Date:** Tuesday, September 10, 2019 at 9:03 AM
**To:** MORRIS Ronald <rmorris@inseec.com>
**Subject:** RE: Construction Noise Reported 9-10-19

Hi Ron,

Thanks.

Yes you have been very accommodating. We have informed wework on multiple occasions (prior to September), verbal and written, that NO noisy construction work can be performed during business hours. I understand your frustration, we are working with our attorneys at this time to get wework to stop.

Insurance is processing our claim for the elevators. I am in contact with them daily to try to get the repair expedited.

My sincere apologies for all the troubles the tenant construction work has caused you.

3

Regards,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Timothy Davidson <timothy.davidson@wework.com>
**Sent:** Tuesday, September 10, 2019 10:22 AM
**To:** Helen Ying Liu <hliu@brothersintl.com>
**Cc:** Ben Wright (ben.wright2@wework.com) <ben.wright2@wework.com>; Mark Kim
(mark.kim4@wework.com) <mark.kim4@wework.com>; Aparna Joneja
<aparna.joneja@wework.com>; Geoffrey Bock-Willmes <geoffrey.bockwillmes@wework.com>;
Thomas Tin <ttin@brothersintl.com>; Elton Kwok (ekwok@wework.com) <ekwok@wework.com>;
William Logan <wlogan@loganmooneyllp.com>; Laura Mooney (lmooney@loganmooneyllp.com)
<lmooney@loganmooneyllp.com>
**Subject:** Re: Noise Complaint Today 9/10/19 180 Sansome 8th floor

Hi Helen,

Thanks for your email.

Geoff investigated each of the neighboring floors to the 8th floor tenant immediately after your email
was received. He did not detect any construction activity creating unreasonable noise, as determined by
the lease, on those floors. Did the tenant provide any other information about the type of noise and
where it was coming from?

As previously requested, can you provide the 8th floor class schedule so that we can closely monitor the
floors during those times?

Let me know,

Thanks

**From:** Helen Ying Liu
**To:** "Timothy Davidson"
**Cc:** Ben Wright (ben.wright2@wework.com); Mark Kim (mark.kim4@wework.com); Aparna Joneja;
Geoffrey Bock-
Willmes; Thomas Tin; Elton Kwok (ekwok@wework.com); William Logan; Laura Mooney
(lmooney@loganmooneyllp.com)
**Subject:** RE: Noise Complaint Today 9/10/19 180 Sansome 8th floor
**Date:** Tuesday, September 10, 2019 11:05:00 AM

Hi Tim,

It was drilling noise he heard. We continue to receive complaints of noisy construction work from tenants from two different floors almost daily, despite your team checking at the time of my emails.

Tenant said they have classes 8am-6pm, they may have events on some days that will last till 9pm. Tenant will notify management in advance of the dates they will have event, I will inform you of those dates once I have it.

Regards,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Timothy Davidson [mailto:timothy.davidson@wework.com]
**Sent:** Tuesday, September 10, 2019 12:10 PM
**To:** Helen Ying Liu <hliu@brothersintl.com>
**Cc:** Ben Wright (ben.wright2@wework.com) <ben.wright2@wework.com>; Mark Kim (mark.kim4@wework.com) <mark.kim4@wework.com>; Aparna Joneja <aparna.joneja@wework.com>; Geoffrey Bock-Willmes <geoffrey.bockwillmes@wework.com>; Thomas Tin <ttin@brothersintl.com>; Elton Kwok (ekwok@wework.com) <ekwok@wework.com>; William Logan <wlogan@loganmooneyllp.com>; Laura Mooney <lmooney@loganmooneyllp.com>
**Subject:** Re: Noise Complaint Today 9/10/19 180 Sansome 8th floor

Hi Helen,

We have given strict instructions to our subs about the activities they can and cannot perform during regular hours and we will continue to monitor this closely and regularly.

Thanks for the information on the classes. We do not have any construction activity scheduled after 2.30pm in the near term and will let you know if that changes.

**From:** MORRIS Ronald <rmorris@inseec.com>
**Sent:** Thursday, September 12, 2019 10:25 AM
**To:** Helen Ying Liu <hliu@brothersintl.com>
**Subject:** Re: Construction Noise Reported 9-10-19

Hi Helen,

We are being disrupted by noise… as I write -- and this is after having reported it twice this morning to Doug.

Ron Morris
Director
INSEEC San Francisco
180 Sansome Street, Suite 800
San Francisco, CA 94104
+1 925 596-5523

5

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Date:** Thursday, September 12, 2019 at 10:43 AM
**To:** MORRIS Ronald <rmorris@inseec.com>
**Subject:** RE: Construction Noise Reported 9-10-19

Hi Ron,

Thank you for the email. What kind of construction noise have you been hearing?

I just instructed their on-site PM and Superintendent to walk the floors regularly to monitor and stop any noisy construction work.

My apologies for the interruption.

Regards,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846


**From:** MORRIS Ronald <rmorris@inseec.com>
**Sent:** Thursday, September 12, 2019 10:55 AM
**To:** Helen Ying Liu hliu@brothersintl.com
**Cc:** VILA-IRISSOU Marianne <mvila-irissou@inseec.com>
**Subject:** Re: Construction Noise Reported 9-10-19

Hi Helen,

The disruptive kind of noise. As stated, my business is being impacted. I just spoke with Doug again 30 seconds ago because they are still at it.

Whether it be a percussion drill, saw, hammer or whatever, it makes no difference to us. Decibels is all that matters and there are a million ways to make noise.

I'm cc'ing my colleague so that she can update you directly should I be out of the office.

Ron Morris
Director
INSEEC San Francisco
180 Sansome Street, Suite 800
San Francisco, CA 94104
+1 925 596-5523

**From:** Helen Ying Liu <hliu@brothersintl.com>
**Date:** <mark>September 12, 2019 at 10:57:33 AM</mark> PDT
**To:** "Ben Wright (ben.wright2@wework.com)" <ben.wright2@wework.com>,
"Timothy.Davidson@wework.com" <Timothy.Davidson@wework.com>, "Mark Kim
(mark.kim4@wework.com)" <mark.kim4@wework.com>, Aparna Joneja <aparna.joneja@wework.com>
**Cc:** Thomas Tin <ttin@brothersintl.com>, William Logan <wlogan@loganmooneyllp.com>, Laura
Mooney <lmooney@loganmooneyllp.com>
**Subject: Construction Noise Complaint Today 9-12-19**

Good Morning Wework Construction Team,

Received drilling construction noise complaint this morning 3 times from 8th floor Tenant starting around
9:30am today

I just got another call as I'm writing this email. Tenant is really upset now, he's got students from other
countries visiting and it's disrupting them.

**Please STOP all noisy work IMMEDIATELY. I am urging all of you to walk the floors immediately and
stop your subcontractors right now.** Our Engineer have the right to enter the space to put a stop to this.

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f:  415-986-8846
**From:** Helen Ying Liu
**Sent:** Thursday, <mark>September 12, 2019 11:01 AM</mark>
**To:** 'MORRIS Ronald' <rmorris@inseec.com>
**Cc:** VILA-IRISSOU Marianne <mvila-irissou@inseec.com>
**Subject:** RE: Construction Noise Reported 9-10-19

Hi Ron,

Understood. Our Team meeting with start in about 30 minutes, we will prioritize this issue for
discussion/resolution with Thomas.

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** Ben Wright [mailto:ben.wright2@wework.com]
**Sent:** Thursday, <mark>September 12, 2019 11:13 AM</mark>
**To:** Helen Ying Liu <hliu@brothersintl.com>
**Cc:** Timothy.Davidson@wework.com; Mark Kim (mark.kim4@wework.com)
<mark.kim4@wework.com>; Aparna Joneja <aparna.joneja@wework.com>; Thomas Tin
<ttin@brothersintl.com>; William Logan <wlogan@loganmooneyllp.com>; Laura Mooney

<lmooney@loganmooneyllp.com>; Geoffrey Bock-Willmes <geoffrey.bockwillmes@wework.com>
**Subject:** Re: Construction Noise Complaint Today 9-12-19

Helen,

Thank you for the notice.  We have confirmed that no activities specified in the rules and
regulations were occurring at the time of the complaint.  Further we have halted all work on
Floor 9.

Ben Wright

---

**WeWork | Ben Wright, PE, PMP**
**WeWork Construction**
**CA License #1041785**
Sr. Construction Project Lead
M: 415-857-5435
wework.com

**Create Your Life's Work**

Get rewarded for good ideas and good people!
Apply for funding at **creatorawards.wework.com** or
help grow the community at **refer.wework.com**.

**From:** Ben Wright [mailto:ben.wright2@wework.com]
**Sent:** Thursday, September 12, 2019 11:13 AM
**To:** Helen Ying Liu <hliu@brothersintl.com>
**Cc:** Timothy.Davidson@wework.com; Mark Kim (mark.kim4@wework.com)
<mark.kim4@wework.com>; Aparna Joneja <aparna.joneja@wework.com>; Thomas Tin
<ttin@brothersintl.com>; William Logan <wlogan@loganmooneyllp.com>; Laura Mooney
<lmooney@loganmooneyllp.com>; Geoffrey Bock-Willmes <geoffrey.bockwillmes@wework.com>
**Subject:** Re: Construction Noise Complaint Today 9-12-19

Helen,

Thank you for the notice.  We have confirmed that no activities specified in the rules and regulations
were occurring at the time of the complaint.  Further we have halted all work on Floor 9.

Ben Wright

---

**WeWork | Ben Wright, PE, PMP**
**WeWork Construction**
**CA License #1041785**
Sr. Construction Project Lead
M: 415-857-5435
wework.com

**Create Your Life's Work**

Get rewarded for good ideas and good people!
Apply for funding at **creatorawards.wework.com** or
help grow the community at **refer.wework.com**.

**From:** Helen Ying Liu
**To:** "MORRIS Ronald"
**Cc:** "VILA-IRISSOU Marianne"
**Subject:** RE: Construction Noise Reported 9-10-19
**Date:** Thursday, September 12, 2019 11:17:00 AM
**Attachments:** image001.png
image002.png
image003.png

Hi Ron and Marianne,

Update: Our engineer had the sprinkler subcontractor on the 9th floor leave the building today, due to construction noise.

Thank you,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846


**From:** Helen Ying Liu <hliu@brothersintl.com>
**Date:** Wednesday, September 18, 2019 at 10:43 AM
**To:** MORRIS Ronald <rmorris@inseec.com>
**Subject:** Construction Noise 9-18-19

Hi Ron,

Danny called me saying you heard construction noises earlier. I believe Danny already spoke to Wework after you contacted him. We have a sound specialist on site this morning. Danny will accompany him to record construction noises.

Regards,

**Helen Liu**
*Operations Manager*
**300 Prospect Properties, Inc.**
100 Bush Street, Suite 218
San Francisco, CA 94104
p: 415-986-8880 | f: 415-986-8846

**From:** MORRIS Ronald
**To:** Helen Ying Liu
**Cc:** VILA-IRISSOU Marianne
**Subject:** Re: Construction Noise 9-18-19
**Date:** Wednesday, September 18, 2019 11:54:46 AM
**Attachments:** image001.png

Hi Helen,

As I write this there are some noises, possibly dragging or cutting something nearby.

Thank you for your help.

Ron
Ron Morris
Director
INSEEC San Francisco
180 Sansome Street, Suite 800
San Francisco, CA 94104
+1 925 596-5523

EXHIBIT E

**Schindler Elevator Corporation**
555 McCormick Street
San Leandro, CA  94577-1107
Phone: 510-382-2229
Fax:     510-382-2250

August 27, 2019

 Helen Ying Liu
180 Sansome
180 Sansome
San Francisco, CA   94107

Attn:     Helen Ying Liu
Re:       180 Sansome St - Water Damage - Elevators A, B, and C.

Dear Helen:

On August 15, a contractor named Jamie, contacted the Schindler service technician to request assistance with the elevators.  Immediately after the Schindler technician arrived on site, he began to troubleshoot the shut down elevators.  Shortly thereafter, Schindler service technician was approached by the building engineer, Doug, and stated there was significant water damage.

Schindler gathered the following information:

Water was coming into the elevator hoistway via the 4th floor.
It was a reported broken sprinkler head that was struck during construction work on said floor
Elevators C, and B and A were all exposed to water.
Elevators C and B remain out of service due to electrical failure
Car tops, car stations, electrical boards, door operators, hoist ropes, compensation ropes, governor ropes are some of the major components exposed to water.

On August 22nd, Schindler Field Engineer was sent to the building to gather additional information regarding component identification and minor field survey.

Attached with this letter is a file with various pictures that were taken by the Schindler technician that shows exposure of water to various major components of the elevator.

Brian Schafer
Phone (415) 235-9361
Brian.Schafer@Schindler.com

Schindler Elevator Corporation | Service
555 McCormick Street | San Leandro, CA 94577, USA
www.us.schindler.com

1  WILLIAM A. LOGAN, JR. (BAR NO. 115042)
   LAURA M. MOONEY (BAR NO. 203692)
2  **LOGAN MOONEY LLP**
   100 Pine St., Suite 1250
3  San Francisco, CA 94111

4  Tel:  (415) 738-0758
   Fax: (415) 376-0956
5  E-mail: wlogan@loganmooneyllp.com

6  Attorneys for Plaintiff
   300 Prospect Properties, Inc.,
7  a California Corporation

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**09/25/2019**
**Clerk of the Court**
BY: VANESSA WU
Deputy Clerk

8         **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                    **COUNTY OF SAN FRANCISCO**

10                     **UNLIMITED JURISDICTION**

11

12  300 PROSPECT PROPERTIES, INC., a
    California Corporation;

13
                                            Case No: CGC-19-579504
14                Plaintiff,
                                            **DECLARATION OF DIEGO**
15       v.                                 **HERNANDEZ IN SUPPORT OF**
                                            **PLAINTIFF'S EX PARTE**
16  180 SANSOME STREET TENANT LLC, a New    **APPLICATION FOR**
    York limited liability company; WEWORK  **TEMPORARY RESTRAINING**
17  COMPANIES, INC., a Delaware corporation, and **ORDER AND ORDER TO SHOW**
    DOES 1-50, inclusive,                   **CAUSE RE PRELIMINARY**
                                            **INJUNCTION**
18
                Defendants.                 **Date**:  September 26, 2019
19                                          **Time**:  11:00 a.m.
                                            **Location**: Dept. 302
20                                          **Judge**: The Honorable Ethan Schulman

21                                          **Date Action Filed**: September 24, 2019

22        I, Diego Hernandez, declare:

23        1.      I am an Associate with Charles M. Salter Associates, Inc. ("Salter Associates"), a

24  consulting firm located in San Francisco, California, that provides acoustical and other services for

25  architects, engineers, facility owners and managers, specifiers, contractors, and other professionals

26  with a need for information on acoustics.  I have a Bachelor of Science degree in Mechanical

27  Engineering from California State University, Sacramento.  I have worked for Salter Associates since

28

2013 and my project experience includes room acoustics and mechanical noise analysis for both commercial and residential buildings, and environmental noise studies.

2.   Salter Associates has been retained to measure, record and document noise levels in the commercial building located at 180 Sansome Street, San Francisco ("the Building"), and I am part of the team providing those services to Plaintiff.  As shown in context below, I have personal knowledge of the facts stated in this declaration.

3.   On Tuesday, September 17, 2019, at 8:00 a.m., I went to the Building and reported to the landlord's on-site Chief Engineer for the Building, Danny Halmagean.  At approximately 10:30 a.m., Danny Halmagean told me there was a complaint from the tenant on the 10th Floor about construction noise that could be heard on the 10th Floor.  I went to the 10th Floor to conduct noise measurements in the 10th Floor tenant's space.

4.   The 10th Floor tenant space consists of a small reception lobby off the elevator bank, which opens to a larger rectangle-shaped space.  That space contains an enclosed conference room as well as several enclosed offices around the perimeter of the space, with an open center space that contains office cubicles and work area.  I saw people working in the enclosed office spaces as well in the open work area, which work entailed typing and observing data on individual computer work stations, looking at documents, two or three people conversing with each other for a limited duration, and meetings occurring in the conference room.

5.   To conduct the noise measurements, I used a noise monitor that records numerical data of the decibel level of sound in the space during the time of the measurement.  I also used the noise monitor to make a listenable recording of the sound whenever the measured level exceeded 40 db.  "db" stands for "decibel", which is a unit that describes the magnitude of a sound with respect to a reference sound level near the threshold of hearing.  All sound levels referred to in this Declaration are A-Weighted, sometimes written as dBA.  A-weighting is a standard weighting that accounts for the sensitivity of human hearing.  People perceive a 10 dB increase in sound level to be twice as loud.  The recordings I made of sounds that measured level above 40 db were used by me in preparing this Declaration to identify the sources of noise during a specific noise incident.

6.      The ambient or background noise level that I measured in the enclosed office spaces located on the 10th Floor was below 40 dB.  Typical background noise levels in enclosed offices and meeting spaces are between 30 dB and 40 dB.  Open-plan areas can often have a background noise level of 45 dB.  Single-event exterior noise sources such as sirens, loud vehicles, or car horns can occasionally exceed these levels.

7.      I set my single noise monitor to measure the sound in one of the enclosed office spaces located in the north section on the 10th Floor.  I measured and recorded noise continuously in that space from 10:45 a.m. to 12:58 p.m., when the continuous nature of the noises being generated from outside the 10th Floor space ceased being heard inside of the 10th Floor tenant's space.

8.      In addition to using my noise monitor, I also heard the noises being generated from above the 10th Floor which consisted of thumping, banging and drilling sounds typical of construction activity.  The noises generated were repetitive and could be perceived as annoying.  The recordings I made of noises exceeding 40dB confirm that these types of sounds took place during the time I measured noise in the 10th Floor space and that the noise levels during those recorded events were up to 65 dB, almost 30 dB above the background noise levels of the space.  These levels were clearly audible and likely objectionable to most people, as they would interfere with activities such as speech communication.  For reference, face-to-face, or conversational, voice levels are often 60 dB. Ideally, the background noise would remain at least 10 dB below voice levels to avoid speech interference.  Thus, the noise being generated from above the 10th Floor space that was above approximately 50 dB would be expected to interfere with speech.  In a large area such as a conference room, where the speaker-to-listener distance is greater, speech interference would occur at even lower levels.

9.      Using the data I collected on September 17, 2019, in the 10th Floor space, I prepared the Chart below that illustrates measured noise levels in the space from 10:45 a.m. to 12:58 p.m.:



10.     I also prepared the Table below that summarizes some of the loudest measured events during the time I measured and recorded noise on the 10th Floor.  I identified the "Interior Source" and "Exterior Source" of the sound by listening to the recordings I made contemporaneous with measuring the noise level.  The sound events have been sorted by noise level, from approximately 50 to 66 db:

HERNANDEZ DECLARATION IN SUPP. OF EX PARTE APPLICATION.

**Table 1: Exceedances Above 50 dBA in Level 10**

| Time (am) | Noise Level | Interior Source |
|-----------|-------------|-----------------|
| 11:52 | 62 | loud thumps |
| 12:12 | 62 | loud thumps |
| 11:48 | 60 | loud thump |
| 11:59 | 60 | loud thumps |
| 12:16 | 60 | loud thumps |
| 12:55 | 60 | loud thumps |
| 12:33 | 57 | loud thumps |
| 11:46 | 56 | loud thump |
| 12:24 | 53 | loud thumps |
| 12:49 | 53 | loud thumps |
| 10:49 | 52 | loud thump |
| 10:52 | 52 | loud thump |
| 10:55 | 52 | hammering |
| 11:30 | 52 | Hammering |
| 11:57 | 52 | loud thump |
| 12:13 | 52 | loud thumps |
| 10:46 | 51 | loud thump |
| 10:59 | 51 | drilling |
| 12:09 | 51 | loud thumps |
| 12:20 | 51 | loud thumps |
| 12:30 | 51 | loud thumps |
| 12:54 | 51 | loud thumps |
| 11:58 | 50 | loud thumps |
| 12:11 | 50 | loud thumps |
| 12:44 | 50 | drilling |

5

1

2      11.     During the time I measured and recorded noise in the 10th Floor space, I heard

3  drilling, machine cutting and/or sawing and other noises that were sufficiently loud and long in

4  duration that they would interfere with my and most people's ability to concentrate and perform

5  ordinary office work in the space, such as writing a report or engaging in a conference call.

6      I declare under penalty of perjury under the laws of the State of California that the foregoing

7  is true and correct.

8      Executed this 23 day of September, 2019, at San Francisco, California.

9

10                                              _____

11                                                     Diego Hernandez

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   WILLIAM A. LOGAN, JR. (BAR NO. 115042)
2   LAURA M. MOONEY (BAR NO. 203692)
    **LOGAN MOONEY LLP**
3   100 Pine St., Suite 1250
    San Francisco, CA 94111
4
    Tel:  (415) 738-0758
5   Fax: (415) 376-0956
    E-mail: wlogan@loganmooneyllp.com
6
    Attorneys for Plaintiff
7   300 Prospect Properties, Inc.,
    a California Corporation

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**09/25/2019**
**Clerk of the Court**
BY: VANESSA WU
Deputy Clerk

8               **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                        **COUNTY OF SAN FRANCISCO**

10                          **UNLIMITED JURISDICTION**

11

12  300 PROSPECT PROPERTIES, INC., a
    California Corporation;
13
                   Plaintiff,
14
         v.
15
    180 SANSOME STREET TENANT LLC, a New
16  York limited liability company; WEWORK
    COMPANIES, INC., a Delaware corporation, and
17  DOES 1-50, inclusive,
18                 Defendants.
19
20
21
22

Case No: CGC-19-579504

**DECLARATION OF DOUG
DAVIES IN SUPPORT OF
PLAINTIFF'S EX PARTE
APPLICATION FOR
TEMPORARY RESTRAINING
ORDER AND ORDER TO SHOW
CAUSE RE PRELIMINARY
INJUNCTION**

**Date**:   September 26, 2019
**Time**:  11:00 a.m.
**Location**: Dept 302
**Judge:** The Honorable Ethan Schulman

**Date Action Filed**: September 24, 2019

23        I, Doug Davies, declare:

24        1.       I am currently employed by Township Engineering ("Township"), a company that

25  provides building engineering services to the owner of the property located at 180 Sansome Street,

26  San Francisco, California ("the Building").  Prior to late August 2019, and dating back before the

27  Building tenant WeWork started its tenant improvement work, I was the full time building engineer

28

---

1

1 onsite at the Building.  Beginning in late August 2019, Township hired a replacement onsite building

2 engineer, and since that time I have been training that individual and splitting my work hours

3 between the Building and other buildings for which Township is responsible.  As shown in context

4 below, I have personal knowledge of the facts stated in this declaration.

5      2.     I have been directly involved in the WeWork construction project at the Building since

6 the planning stages, including regular attendance at planning meetings and at weekly (Wednesday)

7 construction meetings.  I have also been the individual onsite at the Building to assist building

8 management in responding to the countless complaints from other tenants in the Building about

9 excessive construction noise.  Those complaints have been frequent (sometimes multiple times a day)

10 and continuous since WeWork started its construction work.  During the initial stages of the project,

11 and continuing through about early July, 2019, WeWork would often respond to a complaint with

12 appropriate steps to abate or minimize the excessive noise generated by their work crews.  However,

13 beginning in mid to late July, and continuing through the present, WeWork's response to noise

14 complaints has been increasingly hostile and uncooperative to the point that their personnel either

15 deny the existence of the excessive noise under circumstances in which it is obvious, and/or simply

16 refuse to follow our direction that the noise be abated.  Indeed, I recall at least one instance in which

17 a worker for one of the construction trades told that the WeWork construction foreperson that he did

18 not care about the noise.

19      3.     On a number of occasions in response to a noise complaint, I would respond by

20 visiting the floor or floors in question from which the noise was emanating.  On those occasions, I

21 would typically observe workers during normal business hours engaging in construction activities

22 that would create excessive construction noise that could easily be heard on surrounding floors of the

23 Building, including drilling metal studs into walls and into the concrete floors, using a high pitched

24 machine to thread metal pipes, cutting of metal (including heavy metal pipes) with a chop saw, which

25 makes a loud shrill noise and which noise was exacerbated by allowing the heavy cut piece of metal

26 pipe to slam onto the concrete floor.

27      4.     Also on a number of occasions in response to a noise complaint, I would visit the

28 office space of the complaining tenant so that I could personally experience the noise to which the

DAVIES DECLARATION IN SUPP. OF EX PARTE APPLICATION.

1   tenant's employees were being subjected. On those occasions, I found that the construction noise to

2   be at a level and frequency that would make ordinary office work difficult if not impossible.

3       5.      During some of the weekly construction meetings that I attended, I and others

4   proposed that WeWork limit its noisy construction activities to nights or at least very early morning

5   hours. WeWork representatives consistently declined to do so, often citing budgetary reasons. In my

6   40 years of experience working as a building engineer in downtown San Francisco office buildings,

7   noisy construction activities in tenant improvement build-outs are often done at night or in the very

8   early morning hours so avoid the very problems that have arisen at 180 Sansome.

9       I declare under penalty of perjury under the laws of the State of California that the foregoing

10  is true and correct.

11      Executed this 23rd day of September, 2019, at Pleasant Hill, California.

12

13  _____

                                    Doug Davies

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DAVIES DECLARATION IN SUPP. OF EX PARTE APPLICATION.

1
WILLIAM A. LOGAN, JR. (BAR NO. 115042)
LAURA M. MOONEY (BAR NO. 203692)

2
**LOGAN MOONEY LLP**
100 Pine St., Suite 1250

3
San Francisco, CA 94111

4
Tel: (415) 738-0758
Fax: (415) 376-0956

5
E-mail: wlogan@loganmooneyllp.com

6
Attorneys for Plaintiff
300 Prospect Properties, Inc.,

7
a California Corporation

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**09/25/2019**
**Clerk of the Court**
BY: ERNALYN BURA
Deputy Clerk

8
**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9
**COUNTY OF SAN FRANCISCO**

10
**UNLIMITED JURISDICTION**

11

12
300 PROSPECT PROPERTIES, INC., a
California Corporation;

13
                Plaintiff,

14
        v.

15

16
180 SANSOME STREET TENANT LLC, a New
York limited liability company; WEWORK

17
COMPANIES, INC., a Delaware corporation, and
DOES 1-50, inclusive,

18
                Defendants.

19

20

Case No: CGC-19-579504

**AMENDED[1] EX PARTE
APPLICATION FOR
TEMPORARY RESTRAINING
ORDER AND ORDER TO SHOW
CAUSE RE PRELIMINARY
INJUNCTION**

**Date:** September 26, 2019
**Time:** 11:00 a.m.
**Location:** Dept. 302
**Judge:** The Honorable Ethan Schulman

**Date Action Filed:** September 24, 2019

21

22
        Plaintiff 300 Prospect Properties, Inc. ("Plaintiff") applies, *ex parte*, for a temporary

23
restraining order restraining defendants 180 Sansome Street Tenant, LLC and WeWork Companies,

24
Inc., and their employees, agents and servants from further violations of the parties' lease in

25
performing construction activities during normal business hours that are barred by the lease, to wit,

26
shooting of studs for mechanical fastenings; installations of any vertical support; testing of fire

27

28
[1] The amendment to the application is limited to identifying Defendants' outside counsel who contacted Plaintiff's
counsel after Plaintiff had already filed its *ex parte* application.

1  alarms (except in the event of an emergency), core drilling; penetration of floors or ceilings; and any

2  work that can be heard outside of the leased premises which Plaintiff landlord reasonably believes

3  will interfere with the quiet enjoyment of other tenants or as to which Plaintiff receives one or more

4  reasonable complaints from other tenants in the Building.  Plaintiff also applies for an order to show

5  cause why a preliminary injunction should not be granted enjoining defendants and their agents,

6  servants, and employees, from committing the above described acts during the pendency of this

7  action.  This application is made on the grounds set forth in Code of Civil Procedure §§ 526(a)(1)-(6)

8  and on the further ground that great or irreparable injury will result to Plaintiff before the matter can

9  be heard on notice.  Plaintiff filed this action on September 24, 2019, and has not previously applied

10 to any judicial officer for any of the relief sought herein.

11      Plaintiff's counsel gave notice of the ex parte application to defendants on September 24,

12 2019, at 6:40 p.m., in compliance with Rules 3.1230 and 3.1204 of the California Rules of Court.

13 Logan Decl. Re Notice, ¶¶ 2-4, Ex. A.  Plaintiff's counsel has not been advised of any outside

14 counsel for Defendants.  However, the lease at issue provides that Plaintiff is to deliver notices to the

15 WeWork Legal Department at 115 West 18th Street, 2nd Floor, New York, New York.  Accordingly,

16 notice of the instant ex parte application was given via e-mail to the following individuals who are

17 reported as both in-house counsel for WeWork and representatives for the defendants:

| Jared DeMatteis, Esq. | Pamela Swindler, Esq. |
|---|---|
| General Counsel | Head of Real Estate Transactions |
| WeWork | and Special Counsel |
| 115 W 18th Street | WeWork |
| New York, New York  10011-4113 | 115 W 18th Street |
| jared@wework.com | New York, New York  10011-4113 |
| (646) 893-3020 | pam.swidler@wework.com, |
| | pamela.swidler@wework.com |
| | (203) 536-1815 |
| Peter A. Greenspan, Esq. | Brad S. Thomas, Esq. |
| Assistant Secretary | Transaction Manager and Special |
| 180 Sansome Street Tenant LLC | Counsel |
| 115 W 18th Street | WeWork |
| New York, New York  10011-4113 | 415 Mission Street |
| pgreenspan@wework.com | San Francisco, CA  94105 |
| (212) 202-3406 | brad.thomas3@wework.com |
| | (877) 796-2434 |

1

2

3

4

5

6

| | |
|---|---|
| Jennifer C. Berrent, Esq.<br>Chief Operating Officer, Chief Legal<br>Officer and Secretary<br>WeWork<br>115 W 18th Street<br>New York, New York  10011-4113<br>Jennifer.berrent@wework.com<br>jberrent@wework.com | |

7   See Logan Decl. Re Notice, ¶ 3.  After providing said notice, Plaintiff's counsel was advised that

8   David A. Perez, Esq. and Aaron J. Ver, Esq., Perkins Coie, will be representing WeWork.  Mr.

9   Perez's office is located at 1201 3rd Avenue, Seattle, WA 98101.  Mr. Perkin's phone number is 206-

10  359-6767 and his e-mail address is dperez@perkinscoie.com.  Mr. Ver's office is located at 505

11  Howard Street, Suite 1000, San Francisco, CA 94105.  Mr. Ver's phone number is 415-344-7110,

12  and his e-mail address is aver@perkinscoie.com.  See Logan Decl., ¶ 6.

13      This Application will be based upon the instant application, the complaint filed in this action,

14  the accompanying memorandum of points and authorities submitted herewith, the declarations of

15  Helen Liu, Doug Davies, Diego Hernandez and William A. Logan, Jr., submitted herewith, and such

16  other and further matters as the court may deem appropriate.

17  Dated: September 25, 2019                    LOGAN MOONEY LLP

18

19                                              By: _____

20                                                      William A. Logan, Jr.

21                                              Attorneys for Plaintiff
                                                300 Prospect Properties, Inc.

22

23

24

25

26

27

28

1    WILLIAM A. LOGAN, JR. (BAR NO. 115042)
     LAURA M. MOONEY (BAR NO. 203692)
2    **LOGAN MOONEY LLP**
     100 Pine St., Suite 1250
3    San Francisco, CA 94111

4    Tel: (415) 738-0758
     Fax: (415) 376-0956
5    E-mail: wlogan@loganmooneyllp.com

6    Attorneys for Plaintiff
     300 Prospect Properties, Inc.,
7    a California Corporation

ELECTRONICALLY

**F I L E D**

*Superior Court of California,*
*County of San Francisco*

**09/25/2019**
**Clerk of the Court**
**BY: ERNALYN BURA**
**Deputy Clerk**

8                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                            **COUNTY OF SAN FRANCISCO**

10                              **UNLIMITED JURISDICTION**

11

12   300 PROSPECT PROPERTIES, INC., a          Case No: CGC-19-579504
     California Corporation;
13                                              **DECLARATION OF WILLIAM A.**
                    Plaintiff,                   **LOGAN, JR. RE NOTICE OF *EX***
14                                              ***PARTE* APPLICATION**

15          v.                                  **[CRC Rule 3.1204]**

16   180 SANSOME STREET TENANT LLC, a New       **Date**: September 26, 2019
     York limited liability company; WEWORK     **Time**: 11:00 a.m.
17   COMPANIES, INC., a Delaware corporation, and  **Location**: Dept. 302
     DOES 1-50, inclusive,                      **Judge**: The Honorable Ethan Schulman
18
                    Defendants.                  **Date Action Filed**: September 24, 2019
19

20

21

22          I, William A. Logan, Jr., declare:

23          1.      I am an active member in good standing of the State Bar of California and a partner of

24   Logan Mooney LLP, counsel of record for Plaintiff in the above-captioned matter.  As shown in

25   context below, I have personal knowledge of the facts stated in this declaration.

26          2.      On September 24, 2019, at 6:43 p.m., I sent an e-mail to counsel and authorized

27   representatives of defendants – namely Jared DeMatteis, Esq., Pamela Swindler, Esq., Peter

28

                                                 1

1   Greenspan, Brad S. Thomas and Jennifer C. Berrent, Esq. – in which I informed them that the above

2   application for a temporary restraining order and order to show cause would be made on September

3   26, 2019, at 11:00 a.m., in Department 302 of the above captioned Court located at 400 McAllister

4   Street, San Francisco, California 94102.  A true copy of my e-mail with the electronic delivery

5   confirmation to each of the above individuals is attached hereto as Exhibit A.

6       3.      I briefly explain below the capacity of each of the above individuals to whom such

7   notice was provided on behalf of Defendants.

8           a.   Jared DeMatteis, Esq.: According to his Linkedin profile, Mr. DeMatteis is the

9                General Counsel of WeWork, and he is reported by the New York Courts as an

10               active member of the New York bar;

11          b.   Pamela Swindler, Esq.: According to her Linkedin profile, Ms. Swindler is the

12               Head of Real Estate Transactions and Special Counsel at WeWork, she is

13               reported by the New York courts as an active member of the New York bar

14               and she executed the Form LLC-5 on behalf of the defendant tenant that was

15               filed with the California Secretary of State;

16          c.   Peter Greenspan, Esq.: Mr. Greenspan executed the lease on behalf of the

17               defendant tenant in his capacity as Assistant Secretary, and as recently as

18               September 24, 2019, he communicated with the Plaintiff landlord that he had

19               been instructed to send legal letters to the Plaintiff landlord;

20          d.   Brad S. Thomas, Esq.: According to the online records for the California State

21               Bar, Mr. Thomas is an active member of the California State Bar, and he

22               communicated with the Plaintiff landlord in August 2019 regarding the

23               excessive construction noise complaints at issue in this action (See Ex. C

24               attached to accompanying Declaration of Helen Liu in Supp. of Ex Parte

25               App.);

26          e.   Jennifer Berrent, Esq.: Ms. Berrent is identified in public filings and other

27               publicly available sources as the Chief Operating Officer, Chief Legal Officer

28

1    and Secretary for defendant WeWork Companies, Inc., as well as for the

2    entities WeWork Companies LLC and The We Company.

3        4.    Under Sections 39 and 1.K. of the Lease at issue in this action, notices to the tenant

4    are to be delivered to the WeWork Legal Department at 115 West 18th Street, 2nd Floor, New York,

5    New York.  With the exception of Mr. Thomas who is in a WeWork San Francisco office, each of the

6    above individuals is registered with the State Bar of New York as having an office at the WeWork

7    offices at the 115 West 18th Street.

8        5.    In addition to the above notice, we also had a copies of my September 24, 2019, e-

9    mail attached hereto as Exhibit A personally served on the agent for service for each of the

10   Defendants.  The service was completed today, September 25, 2019, before 9:30 a.m.

11       6.    On September 25, 2019, at 9:17 a.m., David A. Perez, Esq., advised me by e-mail that

12   Perkins Coie would be representing the Defendants in connection with the instant *ex parte*

13   application and he advised me that he did not believe that the case was not appropriate for equitable

14   relief.  Mr. Perez's office is located at 1201 3rd Avenue, Seattle, WA 98101.  Mr. Perkin's phone

15   number is 206-359-6767 and his e-mail address is dperez@perkinscoie.com.  Mr. Perez included on

16   his e-mail another Perkins Coie lawyer in its San Francisco office, Aaron J. Ver, Esq.  Mr. Ver's

17   office is located at 505 Howard Street, Suite 1000, San Francisco, CA 94105.  Mr. Ver's phone

18   number is 415-344-7110, and his e-mail address is aver@perkinscoie.com.

19       I declare under penalty of perjury under the laws of the State of California that the foregoing

20   is true and correct.

21       Executed this 25th day of September, 2019, at Orinda, California.

22

23

24                             William A. Logan, Jr

25

26

27

28

LOGAN DECL.

EX. A

## William Logan

| | |
|---|---|
| **From:** | William Logan |
| **Sent:** | Tuesday, September 24, 2019 6:43 PM |
| **To:** | 'jared@wework.com'; 'pam.swidler@wework.com'; 'pamela.swidler@wework.com'; 'pswidler@wework.com'; 'brad.thomas3@wework.com'; 'pgreenspan@wework.com' |
| **Cc:** | 'Jennifer.berrent@wework.com'; 'jen.berrent@wework.com'; 'jberrent@wework.com' |
| **Subject:** | 300 Prospect Properties, Inc. v. 180 Sansome Tenant LLC, WeWork Companies, Inc., et al. |
| **Attachments:** | 23996.pdf |

Dear Ms. Swidler and Messrs. DeMatteis, Greenspan and Thomas,

We represent 300 Prospect Properties, Inc., the owner and landlord at 180 Sansome Street, San Francisco, California (hereinafter, "Landlord").  As you know, 180 Sansome Tenant LLC is a tenant/lessee at the 180 Sansome Street property, and WeWork Companies, Inc. is guarantor of all obligations under the lease (collectively, "WeWork").  Today we filed the attached Complaint in the Superior Court of California, County of San Francisco, against WeWork (hereinafter, the "Action").

Please be advised that we hereby give the WeWork defendants formal notice that we will be appearing this Thursday, September 26, 2019, at 11:00 a.m., in Department 302 of the Superior Court of the State of California, County of San Francisco, California, located at 400 McAllister Street, San Francisco, and applying, *ex parte*, for the following orders:

1. An order directing defendants to appear and show cause at a date and time to be determined by the Court why they and all persons acting on their behalf or otherwise subject to their control should not be enjoined and restrained during the pendency of the Action from engaging in, committing, or performing, directly or indirectly, any and all of the following acts: Performing construction activities during normal business hours, *i.e.*, Monday through Friday, 8:00 a.m. to 6:00 p.m., excluding holidays, that are barred by the lease entered into between Plaintiff Landlord and defendants dated November 29, 2018, a copy of which is attached as Exhibit A to the Complaint in the Action, to wit, shooting of studs for mechanical fastenings; installations of any vertical support; testing of fire alarms (except in the event of an emergency), core drilling; penetration or floors or ceilings; and any work that can be heard outside of the leased premises which Plaintiff Landlord reasonably believes will interfere with the quiet enjoyment of other tenants or as to which Plaintiff Landlord receives one or more reasonable complaints from other tenants in the Building; and

2. An order that pending the hearing and determination of the above described order to show cause, the WeWork defendants and all persons acting on their behalf or otherwise subject to their control be enjoined and restrained during the pendency of the Action from engaging in, committing, or performing, directly or indirectly, any and all of the following acts: Performing construction activities during normal business hours, *i.e.*, Monday through Friday, 8:00 a.m. to 6:00 p.m., excluding holidays, that are barred by the lease entered into between Plaintiff Landlord and defendants dated November 29, 2018, a copy of which is attached as Exhibit A to the Complaint in the Action, to wit, shooting of studs for mechanical fastenings; installations of any vertical support; testing of fire alarms (except in the event of an emergency), core drilling; penetration or floors or ceilings; and any work that can be heard outside of the leased premises which Plaintiff reasonably believes will interfere with the quiet enjoyment of other tenants or as to which Plaintiff receives one or more reasonable complaints from other tenants in the Building.

We expect to have our papers supporting the application filed tomorrow morning and will e-mail them to you as soon as they are ready.  In the meantime, we are required by Rule 3.1204 of the California Rules of Court to attempt to determine whether either or both of the defendants will be appearing to oppose the application, and we ask that you please so advise us at your earliest convenience.

Thank you for your prompt attention to this.

William A. Logan, Jr.
Logan Mooney LLP

**William Logan**

| | |
|---|---|
| **From:** | Mail Delivery System <MAILER-DAEMON@dispatch1-us1.ppe-hosted.com> |
| **To:** | Jennifer.berrent@wework.com; brad.thomas3@wework.com; jared@wework.com; jberrent@wework.com; pam.swidler@wework.com; pamela.swidler@wework.com; pgreenspan@wework.com |
| **Sent:** | Tuesday, September 24, 2019 6:44 PM |
| **Subject:** | Relayed: 300 Prospect Properties, Inc. v. 180 Sansome Tenant LLC, WeWork Companies, Inc., et al. |

**Delivery to these recipients or distribution lists is complete, but delivery notification was not sent by the destination:**

Jennifer.berrent@wework.com

brad.thomas3@wework.com

jared@wework.com

jberrent@wework.com

pam.swidler@wework.com

pamela.swidler@wework.com

pgreenspan@wework.com

Subject: 300 Prospect Properties, Inc. v. 180 Sansome Tenant LLC, WeWork Companies, Inc., et al.

1

1  WILLIAM A. LOGAN, JR. (BAR NO. 115042)
   LAURA M. MOONEY (BAR NO. 203692)
2  **LOGAN MOONEY LLP**
   100 Pine St., Suite 1250
3  San Francisco, CA 94111

4  Tel:  (415) 738-0758
   Fax: (415) 376-0956
5  E-mail: wlogan@loganmooneyllp.com

6  Attorneys for Plaintiff
   300 Prospect Properties, Inc.,
7  a California Corporation

ELECTRONICALLY

**F I L E D**

*Superior Court of California,*
*County of San Francisco*

**09/25/2019**
**Clerk of the Court**
**BY: ERNALYN BURA**
**Deputy Clerk**

8          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                 **COUNTY OF SAN FRANCISCO**

10                   **UNLIMITED JURISDICTION**

11

12  300 PROSPECT PROPERTIES, INC., a
    California Corporation;
13
                      Plaintiff,
14
           v.
15
    180 SANSOME STREET TENANT LLC, a New
16  York limited liability company; WEWORK
    COMPANIES, INC., a Delaware corporation, and
17  DOES 1-50, inclusive,

18                    Defendants.

19

20

21

Case No: CGC-19-579504

**PROOF OF SERVICE**

**Date**:  September 26, 2019
**Time**:  11:00 a.m.
**Location**: Dept. 302
**Judge**: The Honorable Ethan Schulman

**Date Action Filed**: September 24, 2019

22      I, William A. Logan, Jr., declare:

23      I am an active member of the State Bar of California and a Partner of Logan Mooney LLP,

24  attorneys of record for Plaintiffs in the above captioned action. My business address is 100 Pine St.,

25  Suite 1250, San Francisco, CA 94111.  I make this declaration based on my personal knowledge of

26  the facts stated within.

27      On September 25, 2019, I caused the following documents to be served:

28

(1)     **EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION;**

(2)     **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION;**

(3)     **DECLARATION OF WILLIAM A. LOGAN, JR. IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION;**

(4)     **DECLARATION OF HELEN LIU IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION;**

(5)     **DECLARATION OF DOUG DAVIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION;**

(6)     **DECLARATION OF DIEGO HERNANDEZ IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; and**

(7)     **[PROPOSED] ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

**By Electronic Service:** I caused the documents to be sent to the persons at the e-mail addresses on the service list below on the date stated herein. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful. The electronic notification address of the person making the service is wlogan@loganmooneyllp.com.

<u>Service List</u>

David A. Perez, Esq.                 *Attorneys for Defendants*
PERKINS COIE
dperez@perkinscoie.com

Aaron J. Ver, Esq.                  *Attorneys for Defendants*
PERKINS COIE
aver@perkinscoie.com

1        I declare under penalty of perjury under the laws of the State of California that the foregoing

2 is true and correct.

3        Executed on September 25, 2019 at Orinda, California.

4

5

                             William A. Logan, Jr.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  WILLIAM A. LOGAN, JR. (BAR NO. 115042)
   LAURA M. MOONEY (BAR NO. 203692)
2  **LOGAN MOONEY LLP**
   100 Pine St., Suite 1250
3  San Francisco, CA 94111

4  Tel:  (415) 738-0758
   Fax: (415) 376-0956
5  E-mail: wlogan@loganmooneyllp.com

6  Attorneys for Plaintiff
   300 Prospect Properties, Inc.,
7  a California Corporation

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**09/26/2019**
**Clerk of the Court**
BY: ERNALYN BURA
Deputy Clerk

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                     **COUNTY OF SAN FRANCISCO**

10                      **UNLIMITED JURISDICTION**

11

12  300 PROSPECT PROPERTIES, INC., a       Case No: CGC-19-579504
    California Corporation;
13                                         **STIPULATION FOR**
                    Plaintiff,             **APPEARANCE BY DEFENDANTS**
14                                         **AND ENTRY OF TEMPORARY**
         v.                                **RESTRAINING ORDER**
15
    180 SANSOME STREET TENANT LLC, a New   **Date**:  September 26, 2019
16  York limited liability company; WEWORK **Time**:  11:00 a.m.
    COMPANIES, INC., a Delaware corporation, and **Location**: Dept. 302
17  DOES 1-50, inclusive,                  **Judge**: The Honorable Ethan Schulman
18                  Defendants.            **Date Action Filed**: September 24, 2019
19

20

21        Whereas, on September 24, 2019, Plaintiff 300 Prospect Properties, Inc. ("Plaintiff") filed its

22  complaint in this action against defendants 180 Sansome Street Tenant, LLC and WeWork

23  Companies, Inc. (collectively, "Defendants");

24        Whereas, Plaintiff filed its *ex parte* application for a temporary restraining order on

25  September 25, 2019, and duly noticed it for presentation to the Court on September 26, 2019,

26        Whereas, Plaintiff and Defendants have reached an interim agreement with respect to said *ex*

27  *parte* application;

28

                                        1

1    Now, Therefore, Plaintiffs and Defendants stipulate as follows:

2       1.    Defendants hereby formally appear in the action; and

3       2.    Defendants agree that the Court may and should enter as its order the [Proposed]

4    Stipulated Temporary Restraining Order attached hereto as Exhibit A.

5    Dated: September 26, 2019                    LOGAN MOONEY LLP

6

7                                                By: _____

8                                                     William A. Logan, Jr.

9                                                Attorneys for Plaintiff
                                                 Plaintiff 300 Prospect Properties, Inc.

10

11   Dated: September 26 2019                     PERKINS COIE LLP

12

13                                               By: _____

14                                                    Aaron J. Ver

15                                               Attorneys for Defendants
                                                 180 Sansome Street Tenant, LLC and
16                                               WeWork Companies, Inc.

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1   WILLIAM A. LOGAN, JR. (BAR NO. 115042)
    LAURA M. MOONEY (BAR NO. 203692)
2   **LOGAN MOONEY LLP**
    100 Pine St., Suite 1250
3   San Francisco, CA 94111

4   Tel:  (415) 738-0758
    Fax: (415) 376-0956
5   E-mail: wlogan@loganmooneyllp.com

6   Attorneys for Plaintiff
    300 Prospect Properties, Inc.,
7   a California Corporation

8           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                   **COUNTY OF SAN FRANCISCO**

10                      **UNLIMITED JURISDICTION**

11

12   300 PROSPECT PROPERTIES, INC., a          Case No: CGC-19-579504
     California Corporation;
13                                             **[PROPOSED] STIPULATED**
                      Plaintiff,               **TEMPORARY RESTRAINING**
14                                             **ORDER**
             v.
15                                             **Date**:  September 26, 2019
     180 SANSOME STREET TENANT LLC, a New      **Time**:  11:00 a.m.
16   York limited liability company; WEWORK    **Location**: Dept. 302
     COMPANIES, INC., a Delaware corporation, and  **Judge**: The Honorable Ethan Schulman
17   DOES 1-50, inclusive,
                                               **Date Action Filed**: September 24, 2019
18                    Defendants.

19

20

21          Plaintiff 300 Prospect Properties, Inc. ("Plaintiff) and Defendants 180 Sansome Street Tenant

22   LLC and WeWork Companies, Inc. (collectively, "WeWork"), hereby stipulate to a temporary

23   restraining order as follows.

24          IT IS HEREBY ORDERED that Defendants and their agents, servants, employees, and

25   representatives, and all persons acting in concert or participating with them, are enjoined and

26   restrained from engaging in, committing, or performing, directly or indirectly, any and all of the

27   following acts: Performing the following construction activities between 8:00 a.m. to 6:00 p.m.

28

---

1

Monday to Friday, excluding holidays: shooting of studs for mechanical fastenings; installations of any vertical support; testing of fire alarms (except in the event of an emergency), core drilling; penetration or floors or ceilings; and any work that can be heard outside of the leased premises which Plaintiff reasonably believes will interfere with the quiet enjoyment of other tenants or as to which Plaintiff receives one or more reasonable complaints from other tenants in the Building.

IT IS FURTHER ORDERED that this Order shall dissolve effective October 7, 2019, at 6:00 p.m., after which Plaintiff may re-notice its pending application and/or file a new application for interim equitable relief and Defendants may oppose any such application.

Dated: _____          _____
                                        Judge of the Superior Court

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I, KC Davis, declare:

I am a citizen of the United States and employed in San Francisco County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 505 Howard Street, Suite 1000, San Francisco, California  94105-3204.  On September 26, 2019, I served a copy of the within document(s):

**STIPULATION FOR APPEARANCE BY DEFENDANTS**
**AND ENTRY OF TEMPORARY RESTRAINING ORDER**

☐     by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, the United States mail at San Francisco, California addressed as set forth below.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒     by transmitting via my electronic service address (KCDAVIS@perkinscoie.com) the document(s) listed above to the person(s) at the following e-mail addresses: **wlogan@loganmooneyllp.com; lmooney@loganmooneyllp.com.**

**Attorneys for Plaintiff, 300 Prospect Properties, Inc.**
William A. Logan, Jr.
Laura M. Mooney
Logan Mooney LLP
100 Pine Street, Suite 1250
San Francisco, CA  94111

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on September 26, 2019, at San Francisco, California.

_____
KC Davis

PROOF OF SERVICE

1   David A. Perez, (*Pro hac vice anticipated*)
    DPerez@perkinscoie.com
2   PERKINS COIE LLP
3   1201 Third Avenue, Suite 4900
    Seattle, WA  98101-3099
4   Telephone:  206.359.8000
    Facsimile:  206.359.9000
5
6   Aaron J. Ver, CA Bar No. 295409
    AVer@perkinscoie.com
7   PERKINS COIE LLP
    505 Howard Street, Suite 1000
8   San Francisco, CA  94105-3204
    Telephone:  415.344.7000
9   Facsimile:  415.344.7050

10  Attorneys for Defendants
11  180 SANSOME STREET TENANT LLC
    and WEWORK COMPANIES INC.

12

13              SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                      COUNTY OF SAN FRANCISCO

15

16  300 PROSPECT PROPERTIES, INC., a      Case No. CGC-19-579504
    California corporation,
17                                        **NOTICE OF APPEARANCE**
18                 Plaintiff,
                                          Action Filed:   September 24, 2019
19         v.                             Trial Date:     Not set yet

20  180 SANSOME STREET TENANT LLC,
    a New York limited liability company;
21  WEWORK COMPANIES, INC., a
    Delaware corporation, and DOES 1-50,
22  inclusive,

23                 Defendants.

24

25

26

27

28

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**09/26/2019**
**Clerk of the Court**
BY: ERNALYN BURA
Deputy Clerk

1    TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD HEREIN:

2    PLEASE TAKE NOTICE THAT the law firm of Perkins Coie LLP now appears as

3  counsel in the above-entitled action on behalf of Defendants, 180 SANSOME STREET TENANT

4  LLC and WEWORK COMPANIES INC. as follows:

5    David A. Perez, (*Pro hac vice anticipated*)
     DPerez@perkinscoie.com
6    **PERKINS COIE LLP**
7    1201 Third Avenue, Suite 4900
     Seattle, WA 98101-3099
8    Telephone: 206.359.8000
     Facsimile: 206.359.9000
9
10   Aaron J. Ver (SBN 295409)
     AVer@perkinscoie.com
11   **PERKINS COIE LLP**
     505 Howard Street, Suite 1000
12   San Francisco, CA 94105-3204
     Telephone: 415.344.7000
13   Facsimile: 415.344.7050

14

15    This Notice of Appearance is for purposes of identification of counsel and preparation of a

16  service list only and is without prejudice to any challenge by Defendants to the jurisdiction of the

17  Court, substantive or procedural challenges to the Complaint, or affirmative defenses raised by

18  Defendants in any responsive pleading(s).

19

20

21  DATED:  September 26, 2019          **PERKINS COIE LLP**

22                                       By: _____
                                             Aaron J. Ver
23
                                         Attorneys for Defendants
24                                       180 SANSOME STREET TENANT LLC
                                         WEWORK COMPANIES, INC.
25

26

27

28

## <u>PROOF OF SERVICE</u>

I, Aaron J. Ver, declare:

I am a citizen of the United States and employed in San Francisco County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 505 Howard Street, Suite 1000, San Francisco, California 94105-3204.  On September 26, 2019, I served a copy of the within document:

### NOTICE OF APPEARANCE

☒    by transmitting via my electronic service address (AVer@perkinscoie.com) the document listed above to the persons at the following e-mail addresses: wlogan@loganmooneyllp.com; lmooney@loganmooneyllp.com.

**<u>Attorneys for Plaintiff, 300 Prospect Properties, Inc.</u>**
William A. Logan, Jr.
Laura M. Mooney
Logan Mooney LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on September 26, 2019, at San Francisco, California.

Aaron J. Ver

F I L E D

San Francisco County Superior Court

SEP 2 7 2019

CLERK OF THE COURT

BY: _____
              Deputy Clerk

1   WILLIAM A. LOGAN, JR. (BAR NO. 115042)
    LAURA M. MOONEY (BAR NO. 203692)
2   **LOGAN MOONEY LLP**
    100 Pine St., Suite 1250
3   San Francisco, CA 94111

4   Tel: (415) 738-0758
    Fax: (415) 376-0956
5   E-mail: wlogan@loganmooneyllp.com

6   Attorneys for Plaintiff
    300 Prospect Properties, Inc.,
7   a California Corporation

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                      **COUNTY OF SAN FRANCISCO**

10                        **UNLIMITED JURISDICTION**

11

12   300 PROSPECT PROPERTIES, INC., a          Case No: CGC-19-579504
     California Corporation;
13                                             **[PROPOSED] STIPULATED**
                      Plaintiff,               **TEMPORARY RESTRAINING**
14                                             **ORDER**
           v.
15                                             **Date:** September 26, 2019
     180 SANSOME STREET TENANT LLC, a New      **Time:** 11:00 a.m.
16   York limited liability company; WEWORK    **Location:** Dept. 302
     COMPANIES, INC., a Delaware corporation, and   **Judge:** The Honorable Ethan Schulman
17   DOES 1-50, inclusive,
                                               **Date Action Filed:** September 24, 2019
18                    Defendants.

19

20

21        Plaintiff 300 Prospect Properties, Inc. ("Plaintiff) and Defendants 180 Sansome Street Tenant

22   LLC and WeWork Companies, Inc. (collectively, "WeWork"), hereby stipulate to a temporary

23   restraining order as follows.

24        IT IS HEREBY ORDERED that Defendants and their agents, servants, employees, and

25   representatives, and all persons acting in concert or participating with them, are enjoined and

26   restrained from engaging in, committing, or performing, directly or indirectly, any and all of the

27   following acts: Performing the following construction activities between 8:00 a.m. to 6:00 p.m.

28

1

1  Monday to Friday, excluding holidays: shooting of studs for mechanical fastenings; installations of

2  any vertical support; testing of fire alarms (except in the event of an emergency), core drilling;

3  penetration or floors or ceilings; and any work that can be heard outside of the leased premises which

4  Plaintiff reasonably believes will interfere with the quiet enjoyment of other tenants or as to which

5  Plaintiff receives one or more reasonable complaints from other tenants in the Building.

6      IT IS FURTHER ORDERED that this Order shall dissolve effective October 7, 2019, at 6:00

7  p.m., after which Plaintiff may re-notice its pending application and/or file a new application for

8  interim equitable relief and Defendants may oppose any such application.

10

11  Dated: *Sept. 26, 2019*

Judge of the Superior Court

**ETHAN P. SCHULMAN**

CIV-130

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>⌐ WILLIAM A. LOGAN, JR. (BAR NO. 115042)<br>LOGAN MOONEY LLP<br>100 Pine Street, Suite 1250<br>San Francisco, CA 94111<br>TELEPHONE NO.(415) 738-0758    FAX NO. *(Optional)*: (415) 376-0956<br>E-MAIL ADDRESS *(Optional)*: wlogan@loganmooneyllp.com<br>ATTORNEY FOR *(Name)*: Plaintiff 300 Prospect Properties, Inc. | FOR COURT USE ONLY<br><br>**ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br><br>**09/30/2019**<br>**Clerk of the Court**<br>BY: YOLANDA TABO-RAMIREZ<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco 94102
BRANCH NAME: Civic Center Courthouse

PLAINTIFF/PETITIONER: 300 Prospect Properties, Inc.

DEFENDANT/RESPONDENT: 180 Sansome Street Tenant LLC, et al.

| | |
|---|---|
| **NOTICE OF ENTRY OF JUDGMENT<br>OR ORDER**<br><br>*(Check one):*  ☒ **UNLIMITED CASE**  ☐ **LIMITED CASE**<br>(Amount demanded  (Amount demanded was<br>exceeded $25,000)  $25,000 or less) | CASE NUMBER:<br><br>CGC-19-579504 |

**TO ALL PARTIES :**

1. A judgment, decree, or order was entered in this action on *(date)*: September 26, 2019

2. A copy of the judgment, decree, or order is attached to this notice.

Date: September 30, 2019

William A. Logan, Jr.
_____
(TYPE OR PRINT NAME OF  ☒ ATTORNEY  ☐ PARTY WITHOUT ATTORNEY)

► _____
(SIGNATURE)

Page 1 of 2

Form Approved for Optional Use<br>Judicial Council of California<br>CIV-130 [New January 1, 2010]

**NOTICE OF ENTRY OF JUDGMENT OR ORDER**

CEB
www.ceb.com

www.courtinfo.ca.gov

CIV-130

| | |
|---|---|
| PLAINTIFF/PETITIONER: 300 Prospect Properties, Inc. | CASE NUMBER: |
| DEFENDANT/RESPONDENT: 180 Sansome Street Tenant LLC, et al. | CGC-19-579504 |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF ENTRY OF JUDGMENT OR ORDER

*(NOTE: You cannot serve the Notice of Entry of Judgment or Order if you are a party in the action. The person who served the notice must complete this proof of service.)*

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

   100 Pine Street, Suite 1250, San Francisco, CA 94111

2. I served a copy of the *Notice of Entry of Judgment or Order* by enclosing it in a sealed envelope with postage fully prepaid and *(check one):*

   a. ☒ deposited the sealed envelope with the United States Postal Service.

   b. ☐ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Entry of Judgment or Order* was mailed:

   a. on *(date):* 9/30/19

   b. from *(city and state):* Orinda, CA

4. The envelope was addressed and mailed as follows:

   a. Name of person served: Aaron J. Ver, Esq.
      Perkins Coie LLP
      Street address: 505 Howard St., Ste. 1000
      City: San Francisco
      State and zip code: CA 94105

   c. Name of person served:

      Street address:
      City:
      State and zip code:

   b. Name of person served:

      Street address:
      City:
      State and zip code:

   d. Name of person served:

      Street address:
      City:
      State and zip code:

   ☐ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

5. Number of pages attached   2  .

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 9/30/19

| | |
|---|---|
| Holly M. Day | ▶ |
| (TYPE OR PRINT NAME OF DECLARANT) | (SIGNATURE OF DECLARANT) |

Page 2 of 2

1   WILLIAM A. LOGAN, JR. (BAR NO. 115042)
    LAURA M. MOONEY (BAR NO. 203692)
2   **LOGAN MOONEY LLP**
    100 Pine St., Suite 1250
3   San Francisco, CA 94111

4   Tel: (415) 738-0758
    Fax: (415) 376-0956
5   E-mail: wlogan@loganmooneyllp.com

6   Attorneys for Plaintiff
    300 Prospect Properties, Inc.,
7   a California Corporation

8                   **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                           **COUNTY OF SAN FRANCISCO**

10                             **UNLIMITED JURISDICTION**

11

12   300 PROSPECT PROPERTIES, INC., a          Case No: CGC-19-579504
     California Corporation;
13                                             **[PROPOSED] STIPULATED
                                               TEMPORARY RESTRAINING
14                Plaintiff,                    ORDER**

15        v.                                   **Date:** September 26, 2019
                                               **Time:** 11:00 a.m.
16   180 SANSOME STREET TENANT LLC, a New      **Location:** Dept. 302
     York limited liability company; WEWORK    **Judge:** The Honorable Ethan Schulman
17   COMPANIES, INC., a Delaware corporation, and
     DOES 1-50, inclusive,                     **Date Action Filed:** September 24, 2019
18
                  Defendants.
19

20

21        Plaintiff 300 Prospect Properties, Inc. ("Plaintiff) and Defendants 180 Sansome Street Tenant

22   LLC and WeWork Companies, Inc. (collectively, "WeWork"), hereby stipulate to a temporary

23   restraining order as follows.

24        IT IS HEREBY ORDERED that Defendants and their agents, servants, employees, and

25   representatives, and all persons acting in concert or participating with them, are enjoined and

26   restrained from engaging in, committing, or performing, directly or indirectly, any and all of the

27   following acts: Performing the following construction activities between 8:00 a.m. to 6:00 p.m.

28

                                              1

1    Monday to Friday, excluding holidays: shooting of studs for mechanical fastenings; installations of

2    any vertical support; testing of fire alarms (except in the event of an emergency), core drilling;

3    penetration or floors or ceilings; and any work that can be heard outside of the leased premises which

4    Plaintiff reasonably believes will interfere with the quiet enjoyment of other tenants or as to which

5    Plaintiff receives one or more reasonable complaints from other tenants in the Building.

6          IT IS FURTHER ORDERED that this Order shall dissolve effective October 7, 2019, at 6:00

7    p.m., after which Plaintiff may re-notice its pending application and/or file a new application for

8    interim equitable relief and Defendants may oppose any such application.

9

10

11   Dated: _Sept. 26, 2019_     _____

12                                Judge of the Superior Court

13                                **ETHAN P. SCHULMAN**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    2
                    [PROPOSED] STIPULATED TEMPORARY RESTRAINING ORDER

*Proof of Service*
300 Prospect Properties, Inc. v. 180 Sansome Street Tenant, LLC, et al.
San Francisco County Superior Court Case No. CGC-19-579504

1    I, Holly Day, declare:

2    I am resident of the State of California, over the age of eighteen years, and not a party to this

3    action. I am an employee of Logan Mooney LLP, and my business address is 100 Pine St, Suite 1250,

4    San Francisco, CA 94111.  I make this declaration based on my personal knowledge of the facts

5    stated within.

6    On September 30, 2019, I caused the following document to be served:

7    **(1) NOTICE OF ENTRY OF JUDGMENT OR ORDER**

8    **By Electronic Service:**  I caused the documents to be sent the person at the e-mail address on

9    the service list below on the date stated herein.  I did not receive, within a reasonable time after the

10   transmission, any electronic message or other indication that the transmission was unsuccessful.  The

11   electronic notification address of the person making the service is hday@loganmooneyllp.com.

12   Service List

13   Aaron J. Ver, Esq.                          *Attorneys for Defendants*
     David A. Perez, Esq.
14   PERKINS COIE LLP
15   aver@perkinscoie.com
     dperez@perkinscoie.com
16

17   I declare under penalty of perjury under the laws of the State of California that the foregoing

18   is true and correct.  Executed on September 30, 2019 at Orinda, California.

19

20   _____
                    Holly Day
21

22

23

24

25

26

27

28